No. _____

# United States Court of Appeals
# for the Federal Circuit

_____

## IN RE SWORDS TO PLOWSHARES AND THE NATIONAL VETERANS LEGAL SERVICES PROGRAM, PETITIONERS

_____

## PETITION FOR A WRIT OF MANDAMUS
## TO THE DEPARTMENT OF VETERANS AFFAIRS

_____

Daniel L. Nagin
Dana Montalto
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Alexander L. Stout
ZWILLGEN PLLC
1900 M Street NW
Suite 250
Washington, DC 20036

April 16, 2024

Matthew T. Murchison
Jordan R. Goldberg
Gabriela Chartier
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Petitioners
Swords to Plowshares and
the National Veterans Legal
Services Program*

# CERTIFICATE OF INTEREST

**Case Number**            <u>2024-</u>

**Short Case Caption**     <u>*In re Swords to Plowshares*</u>

**Filing Party/Entity**    <u>Swords to Plowshares; The National
                           Veterans Legal Services Program</u>

I certify the following information is accurate and complete to the best
of my knowledge.

Date: April 16, 2024       Signature: <u>/s/ Matthew T. Murchison</u>

                      Name:    <u>Matthew T. Murchison</u>

1. **Represented Entities.** Provide the full names of all entities
   represented by undersigned counsel in this case.

   Swords to Plowshares

   The National Veterans Legal Services Program

2. **Real Party in Interest.** Provide the full names of all real parties
   in interest for the entities. Do not list the real parties if they are
   the same as the entities.

   None.

3. **Parent Corporations and Stockholders.** Provide the full
   names of all parent corporations for the entities and all publicly
   held companies that own 10% of more stock in the entities.

   The entities are both non-profit 501(c)(3) organizations not owned
   by any parent corporation, stockholder, or other entity.

4. **Legal Representatives.** List all law firms, partners, and
   associates that (a) appeared for the entities in the originating court
   or agency or (b) are expected to appear in this court for the entities.

Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

**Latham & Watkins LLP**: Matthew T. Murchison, Jordan R. Goldberg, Gabriela Chartier

**Legal Services Center of Harvard Law School, Veterans Legal Clinic**: Dana Montalto, Daniel Nagin

**ZwillGen PLLC**: Alexander L. Stout

5. **Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  *See also* Fed. Cir. R. 47.5(b).

   Pursuant to Fed. Cir. R. 47.5(b), this case is related to a prior case before this Court, as to which petitioners will file a Notice of Related Case Information.  The case title for that case is *In re Swords to Plowshares*, and the case number is 2024-104.

6. **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

   None/Not Applicable.

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

JURISDICTION ................................................................. 5

RELIEF SOUGHT ............................................................. 6

ISSUE PRESENTED .......................................................... 7

FACTUAL BACKGROUND ................................................. 7

    A.    The 2015 Rulemaking Petition .................................. 7

    B.    VA's 2016 Grant of the Rulemaking Petition ...................... 16

    C.    Years and Years of Continued Delay by VA ......................... 17

    D.    The First Mandamus Petition ................................... 20

    E.    Developments Since the Court's First Ruling ...................... 22

ARGUMENT .................................................................. 22

I.    VA VIOLATED ITS CLEAR AND UNDISPUTABLE LEGAL DUTY TO CONCLUDE THE RULEMAKING PROCEEDING. ........................................................ 23

II.    PETITIONERS HAVE NO OTHER MEANS OF ADEQUATE RELIEF ................................................. 25

III.    VA'S YEARS-LONG DELAY IS EGREGIOUS AND MERITS MANDAMUS. ....................................................... 27

    A.    The First, Third, Fourth, and Fifth *TRAC* Factors Strongly Support Mandamus. ................................... 28

    B.    The Remaining *TRAC* Factors Are Neutral, And None Undercuts Mandamus. ......................................... 36

CONCLUSION ............................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied Chem. Corp. v. Daiflon, Inc.*,
449 U.S. 33 (1980) .................................................................. 23

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ................................................................ 22

*Earth Island Inst. v. Regan*,
553 F. Supp. 3d 737 (N.D. Cal. 2021) ............................... 24, 31

*Env't Def. Fund, Inc. v. Ruckelshaus*,
439 F.2d 584 (D.C. Cir. 1971) ........................................... 6

*FCC v. Dean Foods Co.*,
384 U.S. 597 (1966) .......................................................... 6

*In re A Cmty. Voice*,
878 F.3d 779 (9th Cir. 2017) ................................... *passim*

*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) .................................. *passim*

*In re Core Commc'ns, Inc.*,
531 F.3d 849 (D.C. Cir. 2008) ......................... 27, 29, 30, 37

*In re Ctr. for Bio. Diversity*,
53 F.4th 665 (D.C. Cir. 2022) ...................... 7, 22, 27, 37

*In re Nat. Res. Def. Council, Inc.*,
956 F.3d 1134 (9th Cir. 2020) ................................. *passim*

*In re Paralyzed Veterans of Am.*,
392 F. App'x 858 (Fed. Cir. 2010) ......................... 5, 6, 23, 27

*In re Pesticide Action Network N. Am.*,
798 F.3d 809 (9th Cir. 2015) .............................................. 30

**iv**

*In re Swords to Plowshares*,
No. 2024-104, 2024 WL 41325 (Fed. Cir. Feb. 5, 2024) ....................... 1

*Martin v. O'Rourke*,
891 F.3d 1338 (Fed. Cir. 2018) .................................................... *passim*

*Midwest Gas Users Ass'n v. FERC*,
833 F.2d 341 (D.C. Cir. 1987) ............................................................. 29

*Mote v. Wilkie*,
976 F.3d 1337 (Fed. Cir. 2020) .................................................. 22, 27

*Public Citizen Health Rsch. Grp. v. Brock*,
823 F.2d 626 (D.C. Cir. 1987) ............................................................. 31

*Telecomms. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ..................................................... *passim*

## STATUTES

5 U.S.C.
§ 555(b) ................................................................................. *passim*
§ 706(1) ........................................................................... 4, 5, 23

38 U.S.C.
§ 101(2) ...................................................................................... 8
§ 502 ............................................................................................ 5
§ 5303 .......................................................................................... 8
§ 5303(a) ............................................................................... 9, 15

## REGULATIONS

38 C.F.R.
§ 3.12 ................................................................................... 16, 17
§ 3.12(a) ...................................................................................... 3
§ 3.12(d) ........................................................................ 3, 11, 14
§ 17.34 ................................................................................. 11, 16
§ 17.34(b) .................................................................................... 3
§ 17.36 ................................................................................. 12, 16

*Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 85 Fed. Reg. 41471 (July 10, 2020) ................................................................. 4, 17, 18, 25

*Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 86 Fed. Reg. 50513 (Sept. 9, 2021) .......... 4, 18

## OTHER AUTHORITIES

Bradford Adams & Dana Montalto, *With Malice Toward None: Revisiting the Historical and Legal Basis for Excluding Veterans from "Veteran" Services*, 122 PENN. ST. L. REV. 69 (2017) ................................................................. 3, 9, 33

H.R. REP. NO. 79-1510 (1946) ................................................................. 3

## STATEMENT OF RELATED CASES

This petition for a writ of mandamus relates to a previously filed petition by the same Petitioners, seeking the same relief, from the same Respondent, related to the same agency rulemaking proceeding. *See In re Swords to Plowshares*, No. 2024-104, 2024 WL 413425 (Fed. Cir. Feb. 5, 2024). No other appeal in or from the same civil action or proceeding in any lower court has previously been before the Federal Circuit or any other appellate court.

## INTRODUCTION

In October 2023, Petitioners sought a writ of mandamus from this Court to address an egregious, nearly **eight-year** delay by the Department of Veterans Affairs ("VA") in resolving "a petition for rulemaking filed in 2015, ostensibly granted in 2016, and yet sitting in limbo now for the better part of a decade." Ex. L (Mandamus Petition) at 1. In response, the Secretary of Veterans Affairs "represent[ed] to this court . . . that 150 days would be sufficient to finalize the rulemaking process." Ex. M (Order) at 2; *see In re Swords to Plowshares*, No. 2024-104, 2024 WL 41325, at *1 (Fed. Cir. Feb. 5, 2024); Ex. N (VA Mandamus Response) at 23-24 ("request[ing] a deadline of 150 days," which VA deemed "reasonable").

This Court took the Secretary at his word. The Court was "certainly troubled" by VA's **eight-year** delay in finalizing a rule governing the benefits available to thousands of veterans. Ex. M (Order) at 2. But given the Secretary's representation that the rulemaking was nearly complete, the Court found it "proper under these circumstances to deny the petition without prejudice to petitioners again seeking mandamus

relief if [VA] should fail to take final action by April 15, 2024, by which time [the Court] fully expect[ed] final action to be completed." *Id.*

April 15 has now come and gone. The Court stated that Petitioners could "again seek[] mandamus relief" if VA failed to meet the Court's—and, just as importantly, Congress's—expectations. *Id.* Petitioners now request that relief.

The underlying rulemaking implicates VA's core mission of providing health care, disability compensation, and other benefits to eligible service members and their families. VA's current regulations wrongfully withhold these critical benefits from tens of thousands of former service members who received less-than-honorable discharges—most commonly, administrative "other than honorable" ("OTH") discharges for minor or moderate infractions often connected to service-related mental health conditions.[1] Congress had intended to confer

---

[1] As background, discharges can be broadly divided into administrative or punitive. Punitive discharges include "bad conduct" discharges and "dishonorable" discharges, and require conviction by a court-martial. Administrative discharges include "honorable," "general (under honorable conditions)," and "other than honorable," or "OTH." Administrative discharges may be voluntary or involuntary, and an administrative character of service is typically assigned by military commanders or handed down by military administrative boards without direct recourse to judicial process. With narrow exceptions, dishonorably

benefits broadly, including on service members with a history of less serious misconduct.[2] Yet VA's unwise regulations undermine Congress's intent to ensure broad access to VA benefits for those who have served our country.

With the hope of correcting this injustice, Petitioners met in May 2015 with VA officials to present their policy and legal arguments for amending the regulations. In a letter dated July 14, 2015, VA interpreted this meeting as a "request that VA make revisions to 38 C.F.R. § 3.12(d), 38 C.F.R. § 3.12(a) and 38 C.F.R. § 17.34(b)." Ex. A (July 14, 2015 Letter). Then, on December 19, 2015, Petitioners submitted a formal petition for rulemaking asking VA to revise and update its regulations (the

---

discharged service members are statutorily barred from receiving VA benefits, and the Petitioners' rulemaking petition does not include any request to change regulations governing eligibility for this category of former service members. The rulemaking petition predominately relates to how VA assesses eligibility for former service members with OTH characterizations who did not commit serious misconduct and for whom mitigating and extenuating circumstances may exist.

[2] *See, e.g.*, Bradford Adams & Dana Montalto, *With Malice Toward None: Revisiting the Historical and Legal Basis for Excluding Veterans from "Veteran" Services*, 122 PENN. ST. L. REV. 69, 132 (2017) ("Congress was generously providing the benefits on as broad a base as possible and intended that all persons not actually given a [D]ishonorable discharge should profit by this generosity." (quoting H.R. REP. NO. 79-1510, at 13-14 (1946)) (alteration in original)).

"Rulemaking Petition"). Ex. B (Rulemaking Petition). VA granted the Rulemaking Petition on May 27, 2016, through a letter stating that "VA will initiate rulemaking proceedings" in response to the Rulemaking Petition. Ex. C (May 27, 2016 Letter). After more than four years of initial delay, VA published a proposed rule in the Federal Register—one that did little to improve the regulations. *See Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 85 Fed. Reg. 41471 (July 10, 2020). Then, after over a year of additional delay, VA issued a "request for information" and held a series of "listening sessions." *Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 86 Fed. Reg. 50513 (proposed Sept. 9, 2021) (announcing listening sessions to be held October 5, 2021, and October 6, 2021, and inviting additional comments due October 12, 2021). Another two-and-a-half years have elapsed since that second round of public input closed.

Now, over **eight years** after Petitioners submitted the Rulemaking Petition, and close to as long after it was granted, VA still has not issued a final rule. This eight-year delay is unreasonable and unlawful. *See* 5 U.S.C. §§ 555(b), 706(1). The Court was already "troubled" by VA's

egregious delays the first time it considered this issue.  Ex. M (Order) at 2.  And nearly six months since Petitioners' first petition, with VA failing to meet even the deadline it proposed that this Court impose, the situation has become all the more troubling.  Petitioners accordingly ask the Court to issue a writ of mandamus compelling VA to take final, judicially reviewable agency action resolving this proceeding.  Too many service members have been denied the benefits they earned and the help they need for far too long.

## JURISDICTION

This Court has exclusive jurisdiction over challenges to VA rulemaking actions.  38 U.S.C. § 502.  Moreover, "[b]ecause the Secretary's alleged unlawful withholding of the final rule interferes with [this Court's] jurisdiction pursuant to 38 U.S.C. § 502, [this Court] ha[s] authority under the All Writs Act, 28 U.S.C. § 1651, to address the Secretary's action in failing to issue the final rule."  *In re Paralyzed Veterans of Am.* ("*Paralyzed Veterans*"), 392 F. App'x 858, 859-60 (Fed. Cir. 2010); *see* 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]"); *id.* § 555(b) (requiring resolution of "a matter presented to" an agency

"within a reasonable time"); *Telecomms. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 76 (D.C. Cir. 1984) ("Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction." (citing *Env't Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 593 (D.C. Cir. 1971); and *FCC v. Dean Foods Co.*, 384 U.S. 597, 603 (1966))). Under well-settled precedent in this Circuit, "[m]andamus is . . . an appropriate procedural vehicle to address claims of unreasonable delay" by an agency. *Martin v. O'Rourke*, 891 F.3d 1338, 1343 (Fed. Cir. 2018).

## RELIEF SOUGHT

Petitioners seek an order granting this Petition and directing VA to take final, judicially reviewable agency action in response to the Rulemaking Petition within 30 days of this Court's decision. *See, e.g.*, *Paralyzed Veterans*, 392 F. App'x at 861 (directing "the Secretary to issue the final regulation within 30 days of the date of filing of this order"). Petitioners also request that the Court retain jurisdiction over this matter for the purpose of ensuring VA's compliance with the order—a request to which VA was "unopposed" the first time around. Ex. N (VA

Mandamus Response) at 25; *see, e.g.*, *In re Ctr. for Bio. Diversity*, 53 F.4th 665, 673 (D.C. Cir. 2022) ("retain[ing] jurisdiction" to ensure EPA's compliance with court order granting mandamus petition).  To be clear, Petitioners are not asking this Court to compel a particular *substantive* outcome with respect to the Rulemaking Petition—but rather request an order directing VA to take *any* final, judicially reviewable action in accordance with VA's procedural obligations under the Administrative Procedure Act ("APA").

## ISSUE PRESENTED

Whether this Court should issue a writ of mandamus directing VA to take final, reviewable agency action in response to the Rulemaking Petition, which VA has a statutory duty to resolve "within a reasonable time," yet which remains unresolved **eight years** after its submission and after it was ostensibly granted.

## FACTUAL BACKGROUND

### A.    The 2015 Rulemaking Petition

Over eight years ago, on December 15, 2015, Petitioners formally asked VA to initiate a rulemaking to correct regulations that cause extreme harm to tens of thousands of this country's most vulnerable former service members.  VA's failure to resolve this Rulemaking Petition

in the intervening years, and the ongoing harms to our Nation's former service members stemming from this unlawful delay, necessitated the submission of this Petition seeking a writ of mandamus requiring VA to take judicially reviewable action.

As explained in the Rulemaking Petition, VA's failure to provide benefits to many service members with less-than-honorable discharges is based on regulations that do not reflect public expectations, harm former service members, and are inconsistent with VA's official and external commitments, stated policy goals, and—most critically—Congress's intent for the statute that the regulations purport to implement. *See* Ex. B (Rulemaking Petition). VA's delay in amending the regulatory bars to benefits has left tens of thousands of former service members without the benefits and services that they need and which they have earned through their service and sacrifice.

Only "veterans" qualify for VA benefits. *See* 38 U.S.C. § 101(2). Congress defines "veterans" as former service members "discharged . . . under conditions other than dishonorable," *id.*, and specifically excludes former service members who engaged in certain serious misconduct that is enumerated at 38 U.S.C. § 5303. Although no statute defines

"dishonorable conditions," the statutory text, statutory framework, and legislative history show that Congress intentionally chose to echo the military's term of art, "Dishonorable discharge," and to invoke the severe misconduct implied by that term.[3]  In so doing, Congress intended the "dishonorable conditions" requirement to exclude from benefits only those whose serious criminal behavior merited a punitive dismissal "by reason of the sentence of a general court-martial," and very few others. *See* 38 U.S.C. § 5303(a).  In other words, with few exceptions, Congress authorized VA to exclude from benefits only former service members who received, or could have received, the formal due process of a general court-martial and were discharged with a dishonorable or bad conduct characterization of service.  VA is bound by law to provide benefits to all former service members who neither received nor deserved a dishonorable discharge.

But VA is failing to fulfill its statutory duty and is instead operating under regulations that wrongfully deny benefits to former service members who did not have a punitive discharge and could not have been

---

[3] *See, e.g.*, Adams & Montalto, *supra* note 2, at 88 ("Congress ultimately found that only severe misconduct—behaviors that did or should have led to a Dishonorable discharge—should be disqualifying.").

9

convicted by a general court-martial, given the minor nature of their misconduct. Specifically, VA regulations exclude a much broader group of former service members whose separations were administrative OTH discharges, most of whom were never afforded judicial due process. *See* Ex. B (Rulemaking Petition). Studies show that some of the most vulnerable groups of service members, including those who experience post-traumatic stress disorder, have incurred traumatic brain injuries, have suffered military sexual trauma, or have experienced discrimination due to race or LGBT status, are among the most likely to receive an administrative OTH discharge, and suffer the additional stigma that such a discharge carries. *See id.* at 2 ("One study showed that Marine Corps combat veterans with PTSD diagnoses were **eleven times** more likely to get misconduct discharges, because their behavior changes made them unable to maintain military discipline."); *id.* at 27 n.111; *id.* at 64-65.

Petitioners are veterans' service organizations that, among other things, work to help former service members gain access to the benefits they have earned. Petitioner Swords to Plowshares, for example, spends nearly $25 million per year to provide supportive housing, health and

social services, employment and training, and client support services to veterans. But both Petitioners also expend substantial sums of money and provide extensive pro bono representation to veterans seeking discharge upgrades, as well as "Character of Discharge" determinations and benefits eligibility rulings before VA and the courts—that is time and money that could be better spent providing direct services to veterans, if only VA regulations did not default to excluding former service members with OTH discharges.

Petitioners sought to remedy this problem by formally petitioning VA to fix its broken regulations. To align VA's regulations with Congress's directive to provide former service members with essential and life-saving services, the Rulemaking Petition asks VA to amend the regulations below as follows:

- 38 C.F.R. § 3.12(a): Reduce the number of service members that are presumptively ineligible by only requiring prior review for those with punitive discharges or discharges in lieu of court-martial.

- 38 C.F.R. § 3.12(d): Adopt standards for "dishonorable conditions" that exclude service members based only on severe misconduct and that consider mitigating circumstances such as behavioral health, hardship service, overall service, and extenuating circumstances.

- 38 C.F.R. § 17.34: Provide tentative eligibility for health care to all who were administratively discharged, who probably have a service-connected injury, or who probably honorably completed an earlier term of service pending eligibility review.

- 38 C.F.R. § 17.36: Ensure that service members seeking health care receive an eligibility review.

Ex. B at 86 (Rulemaking Petition).

The Rulemaking Petition explains the necessity of these changes and how VA's current regulations have created an unacceptable situation for former service members. The regulations are vague, overbroad, and leave far too much discretion in the hands of adjudicators. Further, the Congress that passed the G.I. Bill intended for former service members to enjoy the benefit of the doubt, and more recent Congresses have established numerous presumptions favoring veterans (*e.g.*, presumptions favoring service connection for exposure to burn pits, water contamination at Camp Lejeune, and exposure to Agent Orange). Yet the current VA regulations take the exact opposite approach and force former service members with an OTH separation to overcome a presumption that they are *not* entitled to benefits. The combination of an unfair adverse presumption and vague regulations has had disastrous results for former service members, including:

- VA excludes current-era veterans at a higher rate than for any prior era: three times more than Vietnam-era veterans, and four times more than World War II-era veterans. Almost seven percent of post-2001 service members—including at least 30,000 who deployed to a contingency operation—are considered "non-veterans" under VA's existing regulations.

- VA Regional Offices decide that former service members' less-than-honorable—but not dishonorable—discharges are "dishonorable" for VA purposes (and therefore disqualifying) in 90% of cases they review.  Many years, some Regional Offices denied 100% of the cases they reviewed.

- Board of Veterans' Appeals decisions deny eligibility to 81% of veterans reporting post-traumatic stress disorder; 83% of veterans with hardship deployments, including during Operation Enduring Freedom (Afghanistan), Operation Iraqi Freedom, and Vietnam; and 77% of veterans with combat service.

- Veterans who are awarded their due benefits following a review must wait, on average, over three years for the review to be completed *before* they receive any benefits.

- Former enlisted Marines are ten times more likely to be excluded from VA services than former Airmen, even when they have equivalent performance and discipline histories.

- Over 120,000 post-2001 veterans have not received an eligibility review and are therefore ineligible by default.

- Veterans who are presumptively excluded under VA's current regulations because of a less-than-honorable discharge are twice as likely to die by suicide, twice as likely to be homeless, and three times as likely to be involved in the criminal justice system than other veterans.

- Internal emails acquired though Freedom of Information Act requests confirm that even VA employees recognize that the system for adjudicating eligibility applications is broken.  Upon discovering that there were over 7,805 pending applications, one VA employee commented, "It is crazy that we just sit on these."  Ex. D.  Another employee, reacting to Petitioners' written comments, claimed defensively that veterans in immediate need of services are only forced to wait, on average, about ***800 days*** for an adjudication. Ex. E.

The record before VA indicates that the bar to benefits for "willful and persistent misconduct" in 38 C.F.R. § 3.12(d) is especially harmful. The vague terminology invites VA adjudicators to deny benefits even in cases of very minor misconduct.  Worse, the bar is often treated as disjunctive, with adjudicators regularly blocking access to benefits if they find conduct to have been willful *or* persistent, in effect requiring an "honorable" or "general (under honorable conditions)" separation, thus transforming the regulatory bars into the very standard that Congress expressly rejected.  During VA's on-the-record listening sessions held in October 2021, Maureen Siedor, legal director for Petitioner Swords to Plowshares, shared a story highlighting this problem:

> I have a client who was diagnosed with mouth cancer on active duty.  Part of his cheek had to be removed.  He tested positive one time for marijuana use and received an OTH discharge.
>
> The VA's decision letter cited only that single non-judicial punishment, yet denied his COD under the willful and persistent misconduct bar.

Veterans Benefits Admin., Bars to Benefits Based on Character of Discharge, Public Listening Session Tr. at 70:8-15 (Oct. 6, 2021).

Another commenter, Mikayla Pentecost of the Veterans Legal Assistance Program at Legal Aid of Sonoma County, shared the story of

a client whom she called simply "John" to protect his privacy.  John was

sexually assaulted by two other service members shortly after arriving

at his first duty station.  When he tried to report the assaults, he was

advised "to never mention the incident again."  John sought mental

health counseling for symptoms resulting from this trauma, but

struggled to cope with what had happened.  In one moment of frustration,

he ripped a sheet of paper in half in front of a superior.  Later, while

experiencing suicidal ideation, John left without authorization to seek

emergency support.  When he voluntarily returned shortly thereafter, he

was charged with insubordination and destruction of property for the

paper-tearing incident months earlier, as well as multiple charges

related to the AWOL offense.  He was separated with an OTH discharge.

"Cut off from the VA services and benefits he so desperately needed to

begin to heal from his trauma, John has experienced poverty and

homelessness for the last two decades."  *Id*. at 100-104.  Although he was

charged for only two incidents (the paper-tearing incident and an AWOL

incident that, at two weeks, fell 166 days shy of the statutory 180-day

AWOL bar to benefits Congress established at 38 U.S.C. § 5303(a)), John

was repeatedly denied VA benefits because adjudicators decided that the

15

number of misconduct specifications with which he had been charged for those two incidents amounted to willful and persistent misconduct.

## B.    VA's 2016 Grant of the Rulemaking Petition

In its May 27, 2016 letter, VA agreed to reexamine these regulations and granted the Rulemaking Petition. Ex. C (May 27, 2016 Letter). The letter expressly acknowledged that the Rulemaking Petition raised a number of issues requiring corrective action by VA. For instance, the letter confirmed that VA's Veterans Benefits Administration "agrees that rulemaking is necessary" to amend certain key limitations on benefits in 38 C.F.R. § 3.12, and pledged that VA "will initiate rulemaking proceedings to update and clarify policies in these areas." *Id.* at 1. The letter also stated that VA's Veterans Health Administration "agrees that [38 C.F.R.] § 17.34 could be improved" to expand tentative eligibility for benefits, and similarly committed that "VA will initiate rulemaking proceedings to clarify and expand the regulations governing tentative eligibility." *Id.* VA also "agree[d] to pursue rulemaking to clarify how requests for administrative determinations are made" under 38 C.F.R. § 17.36. *Id.* at 2. Years later, in its notice of proposed rulemaking, VA acknowledged that the need to update its outdated

regulations was particularly glaring, since "paragraph (d) [of 38 C.F.R. § 3.12] has not been updated since 1980." *Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 85 Fed. Reg. 41473.

### C.    Years and Years of Continued Delay by VA

More than seven years after VA's letter granting the Rulemaking Petition, acknowledging that changes to its regulations are "necessary," and committing to pursue reforms, VA ***still*** has not taken any final agency action in this proceeding—whether that be a final rule amending its regulations or any other judicially reviewable action. All the while, the former service members described in the Rulemaking Petition continue to face significant harm under VA's current regulations.

Indeed, it took years for VA even to ***propose*** amendments to its regulations, and it did so only after prodding by Petitioners. In a December 12, 2019 letter, Petitioners reiterated the importance of addressing these issues promptly and requested that VA either publish a proposed rule or indicate that a proposed rule was imminent. Ex. F (Dec. 12, 2019 Letter). In its February 5, 2020 response, VA stated it "fully intends to publish a rule," and would provide Petitioners an update regarding the Rulemaking Petition's status in sixty days. Ex. G (Feb. 5,

2020 Response Letter).  VA finally published a proposed rule on July 10, 2020, albeit one that did little to ameliorate the harm VA's regulations caused to former service members and fell far short of aligning VA regulations with statutory law.  *See Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 85 Fed. Reg. 41471.

Comments responding to the proposed rule confirmed to VA the proposed rule's numerous and substantial shortcomings.  Precisely one year and one day after the comment period closed on the proposed rule, VA announced a request for information and a series of listening sessions to further inform development of a final rule "[d]ue to the various and differing comments received."  *Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 86 Fed. Reg. 50513.  The listening sessions were held on October 5 and 6, 2021, and written comments were due by October 12, 2021.  *Id.*  The listening sessions revealed overwhelming support for removing VA's regulatory bars to benefits and aligning VA policy with the law as Congress had intended.  Nevertheless, two-and-a-half years after this second round of public input, VA has taken no final, reviewable action.  Both comment periods, combined, resulted in fewer than 120 comments for VA to review.

Throughout the process, Petitioners have worked in good faith to help VA with its rulemaking.  Petitioners met with VA personnel in May 2015 to present their Rulemaking Petition, then again on March 12, 2020, to discuss the status of the rulemaking.  On August 21, 2023, Petitioners requested a meeting with VA Secretary McDonough to further discuss the importance of this rulemaking and what might be done to reach final resolution of the Rulemaking Petition.  The Secretary declined the request on September 19, 2023.

Petitioners have also provided extensive written commentary and advice to assist VA's effort, including the original petition, which was accompanied by a presentation and report detailing the urgency of the issue, comments on the regulatory docket submitted on September 8, 2020, and October 12, 2021, and letters to VA sent on December 12, 2019, February 10, 2021, and July 8, 2022.  Exs. B, G-K.  Through these and other efforts, Petitioners have worked to support VA's effort by providing substantive policy analysis, firsthand accounts of the impact that VA's ill-conceived regulations have had on former service members, legal research to support issuance of a final rule, and any other information that VA has indicated could be helpful or that Petitioners have believed

19

could be beneficial.  Unfortunately, VA has continued to drag its feet; over eight years after the formal Rulemaking Petition was filed (and close to as long after it was granted), VA still has not promulgated a final rule.

Meanwhile, VA continues to exclude tens of thousands of former service members with less-than-honorable discharges from the life-saving benefits to which they should be entitled.  These former service members "are substantially more likely to die by suicide, become homeless, or be imprisoned."  Ex. F (Dec. 12, 2019 Letter).  Despite recognizing this suffering, publicly committing to reducing veteran homelessness and suicide, and granting the Rulemaking Petition, VA still has nothing to offer these former service members but indefinite delay.  *Pledging* action is not *taking* action, and final agency action from VA is long overdue.  Far too many who served our country have been denied life-saving benefits while VA spent the better part of a decade dithering; untold numbers have died waiting for VA to act, denied the benefits they earned and even their treasured status as "veterans."

### D.   The First Mandamus Petition

Given VA's egregious delays and the immense human interests at stake, in October 2023 Petitioners filed a petition in this Court seeking a

writ of mandamus directing VA to take final action in response to the Rulemaking Petition within 30 days of the Court's decision. *See* Ex. L (Mandamus Petition) at 5.

On November 8, 2023, the Secretary responded to that petition, in part, by representing that the rulemaking was in its final stages and "that 150 days would be sufficient to finalize the rulemaking process." Ex. M (Order) at 2. The 150th day after VA's filing was (adjusting for the weekend) April 8, 2024; the 150th day after Petitioners' reply brief was due was April 15, 2024.

On February 5, 2024, the Court ruled on the petition. The Court was "certainly troubled by the amount of time it has taken [VA] to conduct these rulemaking proceedings." *Id.* Even so, given the Secretary's representation about the time left in the rulemaking process, the Court found it "proper under these circumstances to deny the petition without prejudice to petitioners again seeking mandamus relief if [VA] should fail to take final action by April 15, 2024"—that is, 150 days after the Court first could have ruled on the original petition—"by which time [the Court] fully expect[ed] final action to be completed." *Id.*

21

### E.    Developments Since the Court's First Ruling

On April 15, 2024, VA informed Petitioners that it would not take final action on the Rulemaking Petition by that date.  It claimed, again, that the rulemaking was in its final stages and that publication of a final rule, after further regulatory review, was expected by the end of the month—but counsel for the VA would not guarantee action by that date. As of this filing, and despite the Court's "expect[ation]" to the contrary, VA has not published the final rule.

## ARGUMENT

Mandamus is appropriate where (1) "the party's right to the writ [is] 'clear and indisputable,'" (2) there are "'no other adequate means' to obtain the desired relief," and (3) the court is "satisfied that the writ is appropriate under the circumstances."  *Mote v. Wilkie*, 976 F.3d 1337, 1342 (Fed. Cir. 2020) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004)); *see In re Ctr. for Bio. Diversity*, 53 F.4th at 670.  The third prong, often described as an inquiry into whether egregious delay constitutes compelling equitable grounds for mandamus, is evaluated in the Federal Circuit based on the six-part "*TRAC*" test.  *Martin*, 891 F.3d at 1344-45, 1348 (citing *TRAC*, 750 F.2d at 79-80).  Each of these elements is satisfied here.

22

## I.    VA VIOLATED ITS CLEAR AND UNDISPUTABLE LEGAL DUTY TO CONCLUDE THE RULEMAKING PROCEEDING.

Petitioners' "right to the relief sought is 'clear and undisputable.'" *Paralyzed Veterans*, 392 F. App'x at 860 (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980)). Under the APA, "each agency shall proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b); *see also id.* § 706(1) (empowering courts to "compel agency action unlawfully withheld or unreasonably delayed"). "This has been interpreted to mean that an agency has a duty to fully respond to matters that are presented to it under its internal processes." *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (citing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)). A "petition [for rulemaking] is such a matter." *Id.* at 785. And to "'conclude [the] matter'" as the APA requires, VA "must enter a final decision subject to judicial review" within that reasonable time. *Id.* (citing 5 U.S.C. § 555(b)); *see also id.* ("The agency does not comply with that duty merely by 'begin[ning] an appropriate proceeding.'" (citation omitted).

This crystal-clear legal duty to take final, reviewable agency action in response to a rulemaking petition within a reasonable time arises even absent any formal acknowledgment of the petition by the agency. For

example, the D.C. Circuit concluded that the Federal Energy Regulatory Commission ("FERC") was required to act on a petition that it had otherwise ignored. *See In re Am. Rivers*, 372 F.3d at 418 ("FERC's insistence that it is not obligated to address a petition filed under one of its own regulations allowing requests for discretionary action . . . is without merit. Under the APA a federal agency is obligated to 'conclude a matter' presented to it 'within a reasonable time'[.]" (citation omitted)).

Similarly, the Northern District of California found a clear duty to act in *Earth Island Institute v. Regan*, where the EPA neither granted nor denied a petition for rulemaking but *did* indicate that it intended to take action along the lines proposed and even issued a proposed rule. 553 F. Supp. 3d 737, 748-49 (N.D. Cal. 2021). The court concluded that, "having chosen to consider and issue the Proposed Rule to amend Subpart J of the NCP, the EPA came under duty to take final action on the Proposed Rule within a reasonable time." *Id*. at 749 (citing 5 U.S.C. § 555(b)). "Once an agency decides to take a particular action, a duty to do so within a reasonable time is created." *Id*. (citation omitted)).

The duty to act within a reasonable timeframe is even more obvious where, as here, the agency has explicitly granted the rulemaking petition

24

and committed to resolving it. *See, e.g.*, *In re A Cmty. Voice*, 878 F.3d at 785 ("EPA granted this petition for a rulemaking, though not promising a specific timeline or to specifically adopt the outcome offered by the Petitioners. Under these circumstances, EPA is under a clear duty to act."). In this case, VA expressly granted Petitioners' Rulemaking Petition in 2016 and pledged to pursue regulatory reforms it conceded were "necessary," Ex. B, and then published a proposed rule (however substantively problematic it may have been) in 2020, *see Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge*, 85 Fed. Reg. 41471. VA thus has a clear legal duty to conclude the rulemaking and take final, reviewable action within a reasonable time— a duty that VA has plainly failed to fulfill.

## II.    PETITIONERS HAVE NO OTHER MEANS OF ADEQUATE RELIEF.

This request for mandamus is Petitioners' only adequate means of obtaining relief. As an initial matter, the problems raised in the Rulemaking Petition stem solely from VA's unwise regulations, and only VA, through the formal administrative rulemaking process, can amend or withdraw those regulations. *See supra* at 7-16; *see also* Ex. B (Rulemaking Petition). The governing statute certainly does not strip

former service members of their VA benefits eligibility based on an administrative OTH discharge; to the contrary, Congress intended VA to serve nearly all such former service members. Final, reviewable agency action addressing the regulatory issues raised in the Rulemaking Petition can come only from VA.

Moreover, Petitioners' repeated efforts to spur VA into action without resorting to mandamus relief have been unsuccessful. As noted above, Petitioners have made several submissions over the years aimed at providing VA with substantive input to conclude this proceeding, and have reached out to VA regarding the status of this proceeding on numerous occasions. *See supra* at 17-20, 22. When Petitioners inquired in August 2023 about scheduling a meeting with the Secretary about resolving this proceeding, VA declined the request. *See supra* at 19. Even after this Court informed VA of its timing "expect[ations]," VA still failed to take final action in line with VA's own proposed timeline. Ex. M (Order) at 2. In the face of VA's egregious delay in resolving the Rulemaking Petition, Petitioners have no choice but to again seek a judicial *order* directing VA to conclude this proceeding through final, reviewable action.

This Court has acknowledged that, where a Petitioner seeks to end the unlawful withholding of final agency action in a rulemaking proceeding, there is no adequate alternative but to seek mandamus. For example, when the petitioners in *Paralyzed Veterans* sought to compel final agency action in a rulemaking proceeding regarding exposure to herbicides in Vietnam, this Court held that the requirement that there be "no alternative means of obtaining the relief desired" was "clearly satisfied." 392 F. App'x at 859-60. Just as in this case, the petitioners there sought to "compel the Secretary to cease what they allege is an unlawful agency action," specifically, unlawfully withholding a final rule. *Id*. at 860. "Mandamus is clearly the only avenue for the petitioners to obtain such relief." *Id*.

## III. VA'S YEARS-LONG DELAY IS EGREGIOUS AND MERITS MANDAMUS.

The final factor in the mandamus inquiry is whether "the writ is appropriate under the circumstances," *Mote*, 976 F.3d at 1342 (citation omitted), an inquiry that examines "whether the agency's delay is so egregious as to warrant mandamus," *In re Ctr. for Bio. Diversity*, 53 F.4th at 670 (quoting *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)). This inquiry, in turn, is "guided by the standard announced in

TRAC." *In re Am. Rivers*, 372 F.3d at 418. The six factors outlined in *TRAC*, 750 F.2d at 79-80, and adopted by this Court in *Martin*, 891 F.3d at 1344-45, are:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find "any impropriety lurking behind agency lassitude" in order to hold that agency action is unreasonably delayed.

*Id.* (quoting *TRAC*, 750 F.2d at 79-80). Four of the *TRAC* factors strongly support judicial intervention, two factors are neutral or inapplicable, and none supports inaction.

### A.    The First, Third, Fourth, and Fifth *TRAC* Factors Strongly Support Mandamus.

The first *TRAC* factor weighs heavily in favor of mandamus, as VA's years-long delay goes far beyond any meaningful "rule of reason." The

length of the agency's delay "is considered to be the most important factor in some circuits." *Martin*, 891 F.3d at 1345 (citing *In re A Cmty. Voice*, 878 F.3d at 786); *see also In re Core Commc'ns, Inc.*, 531 F.3d at 855 ("The first and most important factor is that 'the time agencies take to make decisions must be governed by a "rule of reason."'" (quoting *TRAC*, 750 F.2d at 80)); *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) ("The most important [*TRAC* factor] is the first factor, the rule of reason." (citation omitted)).  Courts considering this factor widely agree that "a reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers*, 372 F.3d at 419 (quoting *Midwest Gas Users Ass'n v. FERC,* 833 F.2d 341, 359 (D.C. Cir. 1987)); *see also, e.g.*, *In re Nat. Res. Def. Council*, 956 F.3d at 1139 (collecting cases).

Here, VA has failed to issue a final rule for the better part of a decade—over **<u>eight years</u>** since Petitioners submitted their formal Rulemaking Petition, and close to as long since VA granted the request for a rulemaking.  Indeed, VA had the chance to propose its own timeline, representing to this Court that "a 150-day deadline would give VA a *reasonable* 30 days to finalize the rule, with an additional 120 days for [Office of Information and Regulatory Affairs] review."  Ex. N (VA

Mandamus Response) at 24 (emphasis added); *see* Ex. M (Order) at 2 (noting that the Secretary had explained "that 150 days would be sufficient to finalize the rulemaking process"). If it is not unreasonable to propose and then miss a deadline that VA itself described as "reasonable," it is hard to imagine what kind of conduct would fail to satisfy the "rule of reason."

In similar circumstances, courts have not hesitated to grant mandamus relief. The Ninth Circuit, for example, granted mandamus relief after initially denying it out of respect for an agency's proposed "concrete timeline." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814 (9th Cir. 2015). "[I]ssuing a writ was unnecessary" the first time around "in light of EPA's 'concrete timeline' for finally resolving the [rulemaking] petition"—but later, after the agency failed to adhere to that timeline and "the delay ha[d] stretched to eight years," this factor "tipped sharply in favor of" granting mandamus relief. *Id.*; *see, e.g.*, *In re Nat. Res. Def. Council*, 956 F.3d at 1140 (granting mandamus after agency "expressly represented . . . to th[e] court" that it would issue a final decision within a certain time frame but failed to do so). The D.C. Circuit has held similarly. *See In re Core Commc'ns*, 531 F.3d at 855-62

30

(citing agency's failure to abide by its own representation about an ongoing rulemaking timeline, and resulting delay of six years, in granting mandamus relief); *cf. Pub. Citizen Health Rsch. Grp. v. Brock*, 823 F.2d 626, 628-29 (D.C. Cir. 1987) (requiring agency to abide by its proposed timeline on threat of contempt sanctions).

Even setting aside VA's failure to meet its own proposed timeline, courts nationwide routinely find comparable or even shorter delays to be "egregious" without any missed deadlines. *See, e.g.*, *In re Am. Rivers*, 372 F.3d at 419 ("FERC's six-year-plus delay is nothing less than egregious."); *id.* at 419 n.12 (collecting cases in the D.C. Circuit finding delays of three, four, and five years to be unreasonable); *In re Nat. Res. Def. Council*, 956 F.3d at 1139 ("On this issue, the more developed law of the District of Columbia Circuit has held that a six-year-plus delay is nothing less than egregious.  Our own case law is no different." (citations omitted)); *see id.* (collecting cases); *In re A Cmty. Voice*, 878 F.3d at 787 (delay "into its eighth year" is egregious); *Earth Island Inst.*, 553 F. Supp. 3d at 741, 752 (delay is egregious and violates 5 U.S.C. § 555(b) where the agency "failed to conclude the rulemaking process . . . more than five (now six) years since it accepted [plaintiff's] supplemental petition for rulemaking, and

more than seven (now eight) years since [plaintiff's] initial petition for rulemaking").

Nor is it any excuse to say that VA published a proposed rule or has otherwise made halting efforts on this issue. Courts that have considered similar delays have "found egregious delay even though the '[agency] appears to have done some work.'" *In re Nat. Res. Def. Council*, 956 F.3d at 1140 (quoting *In re A Cmty. Voice*, 878 F.3d at 783). This is not a particularly complex rulemaking; there have been fewer than 120 comments submitted across two comment periods, and the best answer—ensuring that all of the former service members Congress intended to cover have access to VA benefits—is clear. There is no excuse for VA's ongoing delay.

The third *TRAC* factor likewise militates strongly for judicial intervention, as VA's unreasonable delay in resolving this rulemaking on benefits eligibility directly impacts "human health and welfare." *See Martin*, 891 F.3d at 1346 ("Veterans' disability claims always involve human health and welfare." (citing *TRAC*, 750 F.2d at 80)). And this rulemaking is not just about one disability claim; the VA regulations at issue prevent ***tens of thousands*** of former service members who apply

32

for vital health benefits from obtaining them, jeopardizing the health and welfare of men and women who wore the uniform of our country.[4] These benefits include health care, supportive housing, disability compensation, and much more, for some of our most vulnerable former service members—disproportionately, individuals with significant mental health challenges like PTSD or TBI incurred during their service. These former service members "are twice as likely to die by suicide, twice as likely to be homeless, and three times as likely to be involved in the criminal justice system" than other veterans. Ex. B at 2 (Rulemaking Petition). While VA has delayed, former service members have suffered and died for lack of healthcare, shelter, counseling, and other services that VA is duty bound to provide. Further delay only adds to the ranks of the fallen.

---

[4] The number of former service members with OTH discharges who do not even pursue benefits in light of VA's regulatory bars is far higher. Over 125,000 post-9/11 former service members who received less-than-honorable discharges are denied the status of "veteran," and the benefits that come with that status, by default. *See* Adams & Montalto, *supra* note 2, at 130. "There are real consequences to a denial of 'veteran' status—to the individual servicemember who cannot get healthcare or disability support, to the servicemember's family who must pick up the slack, and to our society which is losing promising young men and women to unemployment, homelessness, and suicide." *Id.* at 139.

The fourth *TRAC* factor, the effect of expediting delayed action on other priorities, also supports mandamus. There is no reason to believe that competing priorities would suffer. As noted above, this is a simple rulemaking that has required VA to review fewer than 120 comments. These comments overwhelmingly supported Petitioner's position on reform. And VA has had eight years to contemplate Petitioners' proposals, has had three years to contemplate its own proposed rule, and has a number of options for agency action available, including Petitioners' proposal, VA's own proposed rule, and the various alternatives and suggested revisions to the proposed rule that have been on file as comments for years.

VA is well aware that the current rules unreasonably deny crucial benefits, including health care and disability compensation, to former service members; after all, VA granted the Rulemaking Petition over seven years ago. Petitioners reminded VA in their December 12, 2019 letter that "the effect of continued inaction may be that more veterans could lose their housing, their freedom, or even their lives while this rule is pending." Ex. F at 2 (Dec. 12, 2019 Letter). Impacted former service members continue to suffer the effects of being denied benefits, ranging

from experiencing substantially higher suicide rates than both veterans generally and the American population at large, to enduring the indignity of not being considered "veterans" by VA despite their service. There is simply no rational justification for further delaying such a simple, yet important rulemaking in favor of competing priorities—especially when the rulemaking supports VA's core mission of serving veterans, could align VA's regulations with statutory law, and has already stagnated for eight years.

The fifth *TRAC* factor—the nature of the interests prejudiced by delay—strongly supports mandamus for many of the same reasons as the third *TRAC* factor. The interests prejudiced by VA's inaction are of the utmost importance: the health and safety of tens of thousands who served this country; ensuring that our former service members receive the benefits and status they've earned, as well as VA's compliance with its statutory duty to provide services and benefits to former service members; and aligning VA's regulations with the governing statutes and Congress's intent. Further delay will only exacerbate the harms to these critical interests.

## B.    The Remaining *TRAC* Factors Are Neutral, And None Undercuts Mandamus.

The second and sixth *TRAC* factors are inapplicable and certainly do not cut against granting mandamus in this case. On the second factor, courts have made clear that where, as here, there is no specific statutory deadline for agency action beyond the APA's requirement that it be concluded "within a reasonable time," 5 U.S.C. § 555(b), courts will apply the APA's requirement and grant mandamus where the agency's delay is unreasonable. *See, e.g.*, *In re Nat. Res. Def. Council*, 956 F.3d at 1140-41 (finding that the absence of a "specific timetable" set out by statute means only that the APA's "reasonable time" standard applies (citing 5 U.S.C. § 555(b))).

Finally, the sixth *TRAC* factor is of no effect, since a "writ may be appropriate under the *TRAC* analysis even where there is no evidence of bad faith." *Martin*, 891 F.3d at 1348 (citing *In re A Cmty. Voice*, 878 F.3d at 787); *see also In re Nat. Res. Def. Council*, 956 F.3d at 1140-41 ("The . . . sixth factor[ ] merit[s] little discussion . . . because there is no dispute that 'the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'" (quoting *TRAC*, 750 F.2d at 79-80)).

\*          \*          \*

In sum, the first (and most important) *TRAC* factor, along with the third, fourth, and fifth all strongly support a finding that VA's delay is egregious and mandamus is appropriate. The second and sixth *TRAC* factors are neutral. No factor weighs against mandamus. Thus, applying the *TRAC* analysis, "the agency's delay is so egregious as to warrant mandamus." *See In re Ctr. for Bio. Diversity*, 53 F.4th at 670 (quoting *In re Core Commc'ns, Inc.*, 531 F.3d at 855).

## CONCLUSION

Because VA has violated its clear legal duty to conclude its rulemaking within a reasonable time, Petitioners have no other adequate means to obtain relief, and VA's delay is so egregious as to merit mandamus, the Court should grant the requested writ of mandamus and compel VA to take final, judicially reviewable action in response to the Rulemaking Petition within 30 days of this Court's decision.

Dated:  April 16, 2024

Of Counsel:

Jordan R. Goldberg
Gabriela Chartier
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
jordan.goldberg@lw.com
gabbie.chartier@lw.com

Daniel L. Nagin
Dana Montalto
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 390-2560
dnagin@law.harvard.edu
dmontalto@law.harvard.edu

Alexander L. Stout
ZWILLGEN PLLC
1900 M Street NW
Suite 250
Washington, DC 20036
(202) 296-3585
alex.stout@zwillgen.com

Respectfully submitted,

 /s/ Matthew T. Murchison
Matthew T. Murchison
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
Matthew.Murchison@lw.com

*Counsel for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2024, I caused a copy of the foregoing Petition for Writ of Mandamus to be served by FedEx upon the following:

Denis R. McDonough, Secretary
Richard J. Hipolit, General Counsel (Acting)
U.S. Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, DC 20420

*/s/* Matthew T. Murchison
Matthew T. Murchison

## CERTIFICATE OF COMPLIANCE

1.     This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 21(d)(1).  This brief contains 7,744 words, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).  Microsoft Word was used to calculate the word count.

2.     The petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This petition has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Century Schoolbook type style.

 */s/* Matthew T. Murchison
Matthew T. Murchison

# EXHIBIT A



**VA** | U.S. Department
of Veterans Affairs

JUL 14 2015

**General Counsel**
Washington DC 20420

Bradford Adams, Esq.
Direct Legal Services Manager
Swords to Plowshares
1060 Howard Street
San Francisco, CA 94103

Re: Suggested Revisions to Department of Veteran Affairs (VA) Regulations
Governing Veterans Status Determinations.

Dear Mr. Adams:

Thank you for your June 5, 2015, electronic message providing suggested revisions to the Department of Veterans Affairs (VA) Veteran status regulations and your recent message attaching a paper prepared by your organization entitled "*Serve all who Served: Fixes to the DVA's eligibility criteria for service criteria for servicemembers discharged for misconduct.*" Your paper and regulation revision request contain many helpful comments, and we appreciate both the time spent preparing these documents and your interest in this important topic. The purpose of this letter is to provide an interim response to your request that VA make revisions to 38 C.F.R. § 3.12(d), 38 C.F.R. § 3.12(a) and 38 C.F.R. § 17.34(b).

As a first step in evaluating your proposals, the Veterans Benefits Administration (VBA), which is the VA agency responsible for developing and administering VA's character of discharge policy, will obtain and review data concerning how it has applied the discretion it has under current character of discharge regulations. This information will help identify the nature and extent of any gaps in VA's current processes and aid our evaluation of your suggestions and any other potential improvements that may be warranted. We appreciate the research you have done on this subject and the data provided in your paper, and we believe the additional information gleaned from VBA's review of its prior decisions and outcomes will best ensure that VA's analysis of the need for regulatory changes is fully informed and sharply focused.

VBA anticipates that it will take at least 90 days to obtain and evaluate the information and data relevant to your request, and we will provide our final response after that takes place. Again, thank you for sharing your concerns and your suggestions and for the wonderful work Swords to Plowshares does for our Nation's Veterans.

Sincerely,

Leigh A. Bradley
General Counsel

# EXHIBIT B

December 19, 2015

The Honorable Robert McDonald
Secretary
Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, D.C. 20401

**Re: Petition to amend regulations restricting eligibility for VA benefits based on conduct in service**

Dear Secretary McDonald,

Please find enclosed a Petition asking the VA to amend its regulations restricting eligibility for VA benefits based on applicants' conduct in service. The scale of exclusion from veteran services is a historically unprecedented stain on our nation's conscience. This is due almost entirely to VA regulations, and the Petition describes how the VA can and should change those regulations to better align VA practice with its ethical mandate and its statutory obligations.

We have been grateful to see your personal commitment to serving all those who served the nation. We agree with the sentiment you shared at the Veterans Court Conference this July, that services for veterans with less than honorable discharges are "not only critical and not only smart to achieve our goals, but in my mind they are also about ethics and morals because we need to make sure that no veteran is left behind."

Like you, we remember that every one of these men and women served at a time when most in our society does not do so. While some may have forfeited rewards such as the G.I. Bill, none deserve to be left homeless without housing assistance, disabled without health care, or unable to work without disability compensation.

We think you will agree that the current situation is unacceptable:

- The VA excludes current-era veterans at a higher rate than at any prior era: three times more than Vietnam-era veterans, and four times more than WWII era veterans. Almost 7% of post-2001 service members, including at least 30,000 who deployed to a contingency operation, are considered "non-veterans" by the VA.

- Regional Offices decide that service was "dishonorable" in 90% of cases they review. Some denied 100% of the cases they reviewed in 2013.

Hon. Robert McDonald
Page 2 of 3
December 19, 2015

- Appeals decisions deny eligibility to 81% of veterans reporting PTSD; 83% of veterans with hardship deployments, including OEF, OIF and Vietnam; and 77% of veterans with combat service.

- Marines are ten times more likely to be excluded from VA services than Airmen, even when they have equivalent performance and discipline histories.

- The VA takes about four years to make an eligibility decision. Over 120,000 post-2001 veterans have not received an eligibility review and are therefore ineligible by default.

- Veterans excluded under current regulations are twice as likely to die by suicide, twice as likely to be homeless, and three times as likely to be involved in the criminal justice system.

The VA can reach these veterans. The Department has tied its own hands with unnecessarily restrictive regulations. Statutory requirements bar only about 1% of servicemembers, yet VA regulations result in the exclusion of nearly seven times this number of current-era veterans. VA regulations decide which veterans require an eligibility review, what procedures they must follow to obtain one, and what standards to apply on review. The VA can amend its regulations to reach more veterans who deserve the essential and life-saving services that the VA provides.

This Petition supplements an informal request that we made to the Department's General Counsel on May 27, 2015, which she accepted as a Petition for rulemaking in a letter dated July 14, 2015. We greatly appreciate the General Counsel's receptiveness to our concerns so far, and we look forward to continuing to collaborate on this important issue.

Deserving veterans are turned away from VA hospitals every day. We ask the VA to expedite a review and amendment of its regulation in order to ensure that we are in fact serving all who served.

Michael Blecker
Executive Director
Swords to Plowshares

Barton Stichman
Joint Executive Director
National Veterans Legal Services Program

Daniel Nagin
Clinical Professor of Law
Director, Veterans Legal Clinic
Legal Services Center of Harvard Law School

Drew Ensign
Latham & Watkins LLP

Hon. Robert McDonald
Page 3 of 3
December 19, 2015


cc: Leigh Bradley, General Counsel
    Bill Russo, Director, Office of Regulation Policy & Management
    Bradford Adams, Swords to Plowshares
    Dana Montalto, Veterans Legal Clinic, Legal Services Center of Harvard Law School

| PETITION FOR RULEMAKING |
| --- |
| TO AMEND |
| 38 C.F.R. §§ 3.12(a), 3.12(d), 17.34, 17.36(d) |
| REGULATIONS INTERPRETING 38 U.S.C. § 101(2) |
| REQUIREMENT FOR SERVICE "UNDER CONDITIONS OTHER THAN DISHONORABLE" |

I.     EXECUTIVE SUMMARY ........................................................................................ 2

II.    THE STATUTORY REQUIREMENT FOR DISCHARGE "UNDER CONDITIONS OTHER THAN DISHONORABLE" AUTHORIZES THE VA TO EXCLUDE ONLY SERVICE MEMBERS WHOSE CONDUCT WOULD JUSTIFY A DISHONORABLE DISCHARGE CHARACTERIZATION ................................................................................................ 5

III.   CURRENT REGULATIONS .................................................................................35

IV.   THE CURRENT REGULATORY SCHEME IS UNJUST, INCOMPATIBLE WITH STATUTORY OBLIGATIONS, AND UNDULY BURDENSOME ON BOTH VETERANS AND THE VA.................................................................................................................49

      A.   VA REGULATIONS ARE EXCLUDING CURRENT-ERA SERVICE MEMBERS AT A HIGHER RATE THAN AT ANY OTHER PERIOD IN THE NATION'S HISTORY ..............................................49

      B.   THE REGULATIONS ARE AN IMPERMISSIBLE INTERPRETATION OF STATUTE BECAUSE THEY DO NOT ADOPT MILITARY "DISHONORABLE" DISCHARGE STANDARDS ......................................55

      C.   THE REGULATIONS FAIL TO ACCOUNT FOR BEHAVIORAL HEALTH ISSUES SUCH AS PTSD OR TBI.................................................................................................................64

      D.   OVERBROAD AND VAGUE REGULATIONS PRODUCE INCONSISTENT OUTCOMES ..................67

      E.   THE REGULATIONS ARE INCONSISTENT WITH THE VA'S PUBLIC AND OFFICIAL COMMITMENTS.................................................................................................................71

      F.   VA REGULATIONS PREVENT THE VA FROM SERVING HOMELESS, SUICIDAL OR JUSTICE-INVOLVED SERVICE MEMBERS ...........................................................................73

      G.   THE PROCEDURES TO OBTAIN AN INDIVIDUAL REVIEW ARE EXTREMELY BURDENSOME ON SERVICE MEMBERS AND ON THE VA.................................................................75

      H.   THE REGULATIONS UNFAIRLY DISADVANTAGE SERVICE MEMBERS FROM CERTAIN MILITARY BRANCHES.................................................................................................79

      I.   THE REGULATION UNLAWFULLY DISCRIMINATES AGAINST HOMOSEXUAL CONDUCT.....................82

      J.   THE GOVERNMENT COST ASSOCIATED WITH INCREASED ELIGIBILITY WOULD BE LARGELY OFFSET BY REDUCTIONS IN NON-VETERAN ENTITLEMENT PROGRAMS AND HEALTH CARE SAVINGS .................................................................................83

V.    EXPLANATION OF PROPOSED AMENDMENTS TO ALIGN VA REGULATIONS WITH STATUTORY AUTHORITY, OFFICIAL COMMITMENTS, AND PUBLIC EXPECTATIONS FOR THE FAIR TREATMENT OF VETERANS ...................................................86

VI.   CONCLUSION .................................................................................................... 106

## I.    EXECUTIVE SUMMARY

The Department of Veterans Affairs (VA) does not recognize all former service members as veterans.  Since 2001, about 125,000 people have been discharged from active military service who do not have veteran status at the VA.  This includes at least 30,000 service members[1] who deployed to a contingency operation during their service.  The rate of exclusion from VA services is higher now than at any earlier period: it is three times as high as for Vietnam-era service members and four times as high as for WWII-era service members.

Almost all of these exclusions are the result of discretionary policies that the VA itself chose and that the VA is free to modify.  Congress identified certain forms of misconduct that must result in an exclusion from VA services.  In addition, Congress gave the VA authority to exclude other service members at its own discretion.  The VA decides which service members will require an evaluation, and it decides the standards to apply.  These discretionary standards are responsible for 85% of exclusions; only 15% are due to standards set by Congress.



These are some of the veterans most in need of its support. One study showed that Marine Corps combat veterans with PTSD diagnoses were eleven times more likely to get misconduct discharges, because their behavior changes made them unable to maintain military discipline.  Since 2009, the Army gave non-punitive misconduct discharges to over 20,000 soldiers after diagnosing them with PTSD.  Yet they can access almost no services because the VA does not recognize them as veterans.  They have access to almost no health care or disability assistance from the VA, they do not have access to services that address chronic homelessness, and they generally do not have access to specialized services like veterans treatment courts. The

---

[1] The term "service members" will be used throughout the petition to refer to all individuals who served in the armed forces at any point in their lives, not merely those currently serving, and including both those who meet the statutory definition of "veteran" and those who do not.

effects of this exclusion are devastating: the suicide rate among these veterans is twice as high as for other veterans; the rates of homelessness and incarceration are at least 50% higher.

The VA requires an individual eligibility review for about 7,000 service members discharged each year. This currently takes an average of approximately 1,200 days to complete, and VA regulations do not provide tentative eligibility for health care in the meantime. These reviews are not automatic, though, and most service members do not receive this review at all: only 10% of the post-2001 service members who require a review have received one.

The denial rate is remarkably high. In FY2013, the VA denied eligibility in 90% of the cases it reviewed. The VA's standards fail to account for essential information about a veteran's service:

- **Mental health**. The VA's standards only account for mental health problems that rise to the level of "insanity." This typically does not account for behavioral health problems associated with military service. An analysis of 999 BVA eligibility decisions issued between 1992 and 2015 found that the VA denied eligibility in 81% of cases where the veteran reported PTSD.



- **Duration and quality of service**. The VA's standards do not consider duration of service, and consider quality of service only in limited circumstances. When quality of service is considered, it applies a high standard that does not treat combat service as inherently meritorious. VA appeals decisions denied eligibility to 77% of claimants who had combat service.

- **Hardship service**. The VA's standards do not consider whether the person's service included hardship conditions such as overseas deployment. VA appeals decisions denied eligibility to 83% of those who served in Vietnam, Iraq, Afghanistan or other contingency operations.

- **Extenuating circumstances**.   The VA's standards do not consider extenuating circumstances such as physical health, operational stress, or other personal events that might explain behavior changes.

The regulation's vague terms produce inconsistent outcomes.  In FY2013, denial rates at different Regional Offices varied between 100% in Los Angeles and 65% in Boston.  Between 1992 and 2015, denial rates by individual Veterans Law Judges varied between 100% and 45%.

The VA's standards and practices violate the express instructions of Congress.  Congress instructed the VA to exclude only service members whose conduct in service would have justified a dishonorable discharge characterization.  Military law contains guidance about what conduct warrants a dishonorable characterization.  Yet the VA's regulations depart drastically from the military-law standard.  They exclude tens of thousands of service members for minor or moderate discipline problems that never would have justified a punitive characterization.  Because of differences in discharge practices between service branches, the VA excludes Marines more than ten times as frequently as Airmen.

This Petition proposes amendments to regulations that will remedy these deficiencies.  The proposed amendments make the following changes:

- <u>Standards of review</u>.   Adopt standards for "dishonorable conditions" that consider severity of misconduct, overall quality of service, behavioral health, and other mitigating factors.

- <u>Scope of review</u>.  Require individual evaluation only for service members with punitive discharges and those with administrative discharges issued in lieu of court-martial.

- <u>Access to health care</u>.  Instruct VA medical centers to initiate eligibility reviews for service members who require it, and to provide tentative eligibility.

## II.　THE STATUTORY REQUIREMENT FOR DISCHARGE "UNDER CONDITIONS OTHER THAN DISHONORABLE" AUTHORIZES THE VA TO EXCLUDE ONLY SERVICE MEMBERS WHOSE CONDUCT WOULD JUSTIFY A DISHONORABLE DISCHARGE CHARACTERIZATION

In granting and barring access to veteran services, the VA must act within the statutory authority granted by Congress. The statutory scheme for limiting eligibility based on misconduct in service has two elements: mandatory criteria and discretionary criteria.[2] The discretionary element derives from the statutory requirement to provide most services only to service members separated "under conditions other than dishonorable."[3] Congress authorized the VA to decide whether service members were separated under "dishonorable conditions," including authority to define standards of "dishonorable conditions" by regulation. These regulations must of course set forth a permissible interpretation of the statute.

This section discusses the extent of the VA's authority to define the contours of "dishonorable conditions." It explains the source of the VA's rulemaking authority, and it presents interpretive guidance from the statutory scheme, the legislative history and binding interpretive caselaw. These sources provide clear instruction to the VA on what types of conduct Congress considered "dishonorable" for the purposes of forfeiting access to veteran services. Because the VA's current regulations fail to implement Congressional intent, they should be amended.

### A.　The statute gives the VA limited discretion to deny "veteran status" to service members separated under "dishonorable conditions"

The statutory scheme for limiting eligibility for veteran services based on military misconduct includes two elements. The first element of the statutory scheme is a minimum conduct standard incorporated into the definition of a "veteran." Almost all of the services and benefits provided by the VA are furnished only to "veterans," their spouses and dependents.[4] However, not all former service members will be recognized as "veterans":

---

[2] See Section II.A below, discussing 38 U.S.C. § 5303(a) and 38 U.S.C. § 101(2).

[3] 38 U.S.C. § 101(2).

[4] E.g., id. § 101(13) ("The term 'compensation' means a monthly payment made by the Secretary to a veteran because of … ."); id. § 101(14) ("The term 'pension' means a monthly or other periodic payment made to a veteran because of … ."); id. § 1710(a)(1)(A) ("The Secretary shall furnish hospital care and medical services which the Secretary determines to be needed to any veteran for a service-connected disability … ."); id. §

> A veteran is a person who served in the active military, naval, or air service, and who was discharged or released therefrom under conditions other than dishonorable.[5]

The requirement for separation "under conditions other than dishonorable" establishes a threshold level of in-service conduct that is necessary for recognition as a "veteran," and thereby to receive veteran services.

The statute provides no definition for the term "dishonorable conditions." The use of the phrase "dishonorable <u>conditions,</u>" as opposed to "dishonorable <u>discharge,</u>" requires an independent assessment of whether actual conduct was dishonorable rather than simply adopting the judgment given by the Department of Defense (DOD) at separation.[6] The statute does not define that conduct standard explicitly, which leaves the VA with authority to adopt a standard by regulation,[7] so long as that regulation is a "reasonable interpretation of the statute."[8] Where "Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable."[9]

The second element of the statutory scheme is a list of six specific offenses that will "bar all rights of such person under laws administered by the Secretary."[10] The statute disallows services to people discharged for any of the following reasons, unless the person was "insane at the time of the offense":

- By sentence of a general court-martial;

- For conscientious objection, when the service member refused to perform military duty or refused to wear the uniform or otherwise to comply with lawful orders of competent military authority;

- For desertion;

---

2012(a)(1) ("[T]he Secretary … shall provide to a recipient of a grant … per diem payments for service furnished to homeless veterans … .").

[5] 38 U.S.C. § 101(2).

[6] See <u>Camarena v Brown</u>, No. 94-7102, 1995 U.S. App. LEXIS 16683 (Fed. Cir. July 7, 1995); see also section II.B below.

[7] 38 U.S.C. § 501.

[8] <u>Entergy Corp. v. Riverkeeper, Inc.</u>, 556 U.S. 208, 218 (2009).

[9] <u>Id</u>. at 218 n.4.

[10] 38 U.S.C. § 5303(a), (b), (c).

- For an absence without authority from active duty for a continuous period of at least one hundred and eighty days if such person was discharged under conditions other than honorable unless such person demonstrates to the satisfaction of the Secretary that there are compelling circumstances to warrant such prolonged unauthorized absence;

- By resignation by an officer for the good of the service;

- By seeking discharge as an alien during a period of hostilities.

38 U.S.C. § 5303(a), (b), (c).

The two elements of the statutory scheme differ in several ways. Whereas the first element provides a general "dishonorable conditions" standard for exclusion, the second element lists specific prohibited conduct. Because the VA has defined the first element in a regulation,[11] its criteria are commonly called the "regulatory bars"; because the second element's criteria are specifically defined in statute, with limited need for regulatory refinement for the definition, its criteria are called the "statutory bars."[12] Although they speak to the same ultimate issue (*i.e.*, whether a service member's conduct bars access to VA services), they are two distinct requirements that must be independently satisfied to establish eligibility.

The number of people excluded by each element differs substantially. Most of the statutory criteria are recorded in DOD data, so it is possible to estimate the number of people they exclude. For example, of all the service members discharged in FY2011, at most 1,297 people are barred by statutory criteria (see

Table 1). That amounts to only 1% of all enlisted service members discharged after entry level training.[13]

---

[11] 38 C.F.R. § 3.12(d). The content of this regulation is explained in section III.B below.

[12] E.g., U.S. Dep't of Veterans Affairs, Adjudication Procedures Manual, No. M21-1 pt. III.ii.7.1.a ("On receipt of a claim, review all evidence to determine if there is a statutory or regulatory bar to benefits.") [hereinafter Adjudication Procedures Manual].

[13] This excludes uncharacterized discharges. Discharge data was obtained by a DOD FOIA request, see Table 20 below.

*Table 1: Number of enlisted service members discharged in FY2011 who are excluded from VA benefits by statutory criteria*

| Statutory bar | # excluded |
|---|---|
| **Discharge by general court-martial** | < 726[14] |
| **Desertion** | < 548[15] |
| **AWOL for more than 180 days not warranted by compelling circumstances** | |
| **Conscientious objector who refused to perform military duties** | < 23[16] |
| **An alien who requests their release during wartime** | n/a[17] |
| **Total** | **< 1,297** |

In contrast, the regulatory criteria that the VA has established to define "dishonorable conditions" exclude approximately 7,000 people discharged each year since 2001—nearly seven times as many service members as excluded by the statutory bars. [18] In other words, approximately 4 out of every 5 former service members denied veteran services are excluded on the bases of the VA's own discretionary criteria rather than Congressional requirement.

---

[14] Data provided in the Annual Report of the Code Committee on Military Justice FY 2011. The actual figure is probably lower. This is the number of people sentenced to a discharge at a General Court-Martial, but some of these convictions may have been suspended or set aside on appeal.

[15] This figure is the number of enlisted separations with Interservice Separation Code 1075, based on data obtained by a FOIA request to the DOD. Interservice Separation Code 1075 is used for discharges for desertion or for AWOL for at least 180 days, therefore this figure includes two of the statutory bars. The actual figure may be less than this, because the VA has discretion to give eligibility to people who were AWOL for more than 180 days if there were "compelling circumstances" to warrant the absence.

[16] This figure is the number of enlisted separations with Interservice Separation Code 1096, based on data obtained by a FOIA request to the DOD. Interservice Separation Code 1096 is used for discharges for conscientious objectors. The actual figure may be less than this, because the statute only bars conscientious objectors who also refused to wear the uniform or perform military duties.

[17] This data is not reported by the DOD. Available information suggests it likely is a very small number.

[18] See Section IV below for a discussion of the outcomes of current regulatory standards.

*Table 2: Comparison of the two elements of the statutory scheme*

|  | **"Statutory bars"** | **"Regulatory bars"** |
|---|---|---|
| **Statutory authority** | 38 U.S.C. § 5303(a,b) | 38 U.S.C. § 101(2) |
| **Scope of prohibited conduct per statute** | Six specified bases: desertion, general court-martial sentence, etc. | Separation "under dishonorable conditions" |
| **VA's responsibility for interpretation** | Criteria are defined by Congress | Criteria are defined by VA rulemaking |
| **Regulatory implementation** | 38 C.F.R 3.12(b, c) | 38 C.F.R 3.12(a, b, d) |
| **The number of people excluded** | At most 1,297 service members discharged in FY11, or 1% of all service members.[19] | About 7,000 service members discharged in FY11, or 5.8% of all service members.[20] |

## B.    Congress intended the "dishonorable conditions" standard to exclude only people whose conduct would merit a dishonorable discharge characterization

Although the statute does not set forth an express definition for "dishonorable conditions," the statutory text, statutory framework, and legislative history leave very limited scope for interpretation.[21] The statutory context shows clearly that Congress intended the "dishonorable conditions" requirement to exclude only those whose behavior merited a dishonorable discharge characterization by military standards. Congress authorized the VA to exclude people who *did receive or should have received* a dishonorable characterization, but not to exclude those who did not deserve a dishonorable characterization.

The language of the statute itself supports this limitation. The word "dishonorable" is a term of art when used in the context of military service, and it must be assumed that Congress chose that term in order to adopt its existing meaning.[22] There is no reason to believe that

---

[19] See
Table 1 below and accompanying text.

[20] See Table 11 below and accompanying text.

[21] "Ambiguity is a creature not of definitional possibilities but of statutory context." Brown v. Gardner, 513 U.S. 115, 118 (1994) (citing King v. St. Vincent's Hospital, 502 U. S. 215, 221 (1991).

[22] "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such a case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." Morissette v. United States, 342 U.S. 246, 263 (1952);

Congress intended the VA to create a new definition for this term when "dishonorable" has a settled meaning within the context of military service. If Congress wanted to adopt a new standard it would have used a new term, such as "unfavorable," "disreputable," "unmeritorious," or "discreditable." It did not do so.

This conclusion is further supported by the legislative history of how that term was chosen. The current statutory scheme was established with the 1944 Servicemen's Readjustment Act,[23] known as the "G.I. Bill of Rights", and it remains essentially unchanged today.[24] That law enacted the two elements of the statutory scheme identified above: it made benefits available only to service members discharged under "conditions other than dishonorable,"[25] and it barred services when discharge resulted from specified conduct.[26] The Senate had originally proposed to use the term "dishonorable <u>discharge</u>" for the first element, in which case the military's discharge characterization would have conclusively resolved eligibility. Congress, however, changed the term to "dishonorable <u>conditions</u>" in response to a specific concern about people who should have obtained a dishonorable discharge but who evaded a court-martial for administrative or practical reasons. The Senate Report thus explained that:

> A <u>dishonorable discharge</u> is affected only as a sentence at a court-martial, but in some cases offenders are released or permitted to resign without trial—particularly in the case of desertion without immediate apprehension. In such cases <u>benefits should not be afforded as the conditions are not less serious</u> than those giving occasion to dishonorable discharge by court-martial.[27]

---

<u>Branch v. Smith</u>, 538 U.S. 254, 281 (2003) ("[C]ourts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes."); <u>Reno v. Koray</u>, 515 U.S. 50, 57 (1995) ("'It is not uncommon to refer to other, related legislative enactments when interpreting specialized statutory terms,' since Congress is presumed to have 'legislated with reference to' those terms." (citation omitted)).

[23] Pub. L. No. 78-346, 58 Stat. 284 (1944).

[24] A cosmetic change took place with the codification of veterans laws in 1958. Pub. L. No. 85-857, 72 Stat. 1105 (1958). The original statute had not incorporated the "dishonorable conditions" standard into a definition of "veteran," as is the case today. The original statute simply stated that a separation "under conditions other than dishonorable is a prerequisite to entitlement to veterans' benefits." The 1958 codification incorporated the criteria into the definition of "veteran." This did not change the underlying standard or the statutory framework.

[25] Pub. L. No. 78-346, § 1503.

[26] <u>Id.</u> § 300.

[27] S. Rep. No. 78-755, at 15 (1944) (emphasis added).

Congress recognized that in some circumstances a service member might receive a characterization different than what they actually deserved. To account for this, Congress gave the VA authority to deny eligibility if the service members' service was in fact dishonorable under the military standard, even if they did not receive that punishment in service.[28]

The legislators themselves said explicitly that they intended the VA to exclude only people whose service would merit a dishonorable characterization under existing standards. The House Report explained how it intended the phrase "dishonorable conditions" to be used:

> If such offense [resulting in discharge] <u>occasions a dishonorable discharge, or the equivalent</u>, it is not believed benefits should be payable.[29]

The Senate Report on the bill provided a similar explanation of the term:

> It is the opinion of the Committee that such [discharge less than honorable] should not bar entitlement to benefits otherwise bestowed <u>unless such offense was such ... as to constitute dishonorable conditions</u>.[30]

Individual legislators involved in drafting the bill repeated this in floor debates, for example:

> If [the service member] did not do <u>something that warranted court-martial and dishonorable discharge</u>, I would certainly not see him deprived of his benefits.[31]

And:

> We very carefully went over this whole matter [of choosing the "dishonorable conditions" standard].… This is one place where we can do something for the boys who probably have "jumped the track" in some minor instances, and yet <u>have done nothing that would require a dishonorable discharge</u>.[32]

---

[28] <u>See also</u> Hearings Before the H. Comm. on World War Veterans' Legislation on H.R. 3917 and S. 1767 to Provide Federal Government Aid for the Readjustment in Civilian Life of Returning World War Veterans, 78th Cong. 415-16 (1944) [hereinafter <u>House Hearings on 1944 Act</u>]; President's Comm'n of Veteran Pensions (Bradley Comm'n), <u>Staff of H. Comm. on Veterans Affairs, Discharge Requirements for Veterans Benefits</u>, Staff Report No. 12, (Comm. Print. 1956) [hereinafter <u>Bradley Commission Staff Report</u>].

[29] H. Rep. No. 78-1418, at 17 (1944) (emphasis added).

[30] S. Rep. No. 78-755, at 15 (emphasis added).

[31] <u>House Hearings on 1944 Act</u>, *supra* note 28, at 419.

[32] 90 Cong. Rec. 3077 (1944).

These statements show that Congress intended the "dishonorable conditions" requirement to adopt the existing meaning of and standard for "dishonorable" discharge.

Congress chose the "dishonorable" term deliberately. All of the services had used intermediary characterizations between "honorable" and "dishonorable" for decades, including "without honor," "bad conduct," "undesirable," "ordinary," and "under honorable conditions."[33] The drafters knew about this range of discharge characterizations,[34] and knew that an "other than dishonorable" standard would create eligibility for service members with service that was not honorable. Congress could easily have adopted any of those lesser standards for eligibility, but did not.

Congress adopted the "dishonorable" term despite specific requests to adopt more stringent standards. Senior military commanders expressly requested that Congress adopt a higher characterization as the eligibility standard, and this request was considered both in committees and in the full Senate.[35] The bill's sponsor acknowledged the commanders' request, explained to the full Senate that it had been "considered very carefully both in the subcommittee on veterans affairs and in the Finance committee and in the full committee itself," and reported that the Committee had chosen to adopt the "dishonorable" standard instead.[36] The bill passed that day.

Indeed, the bill revoked eligibility standards associated with higher discharge characterizations. Previously, each veteran benefit had its own eligibility standard, and Congress had used a variety of criteria for excluding service members based on conduct in service.[37]

---

[33] For a history of discharge characterizations, see Hearings on the Constitutional Rights of Military Personnel Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 87th Cong. 8 et seq. (1962).

[34] E.g., "Many boys who do not receive honorable discharges have capabilities of being very excellent citizens. They receive other than honorable discharges. I differentiate them from dishonorable discharges for many reasons." 90 Cong. Rec. 3076-77 (1944). "You say either honorably discharged, discharged under conditions not dishonorable, or discharged under honorable conditions. Those latter two things do not mean the same thing." House Hearings on 1944 Act, supra note 28, at 419.

[35] 90 Cong. Rec. 3076 (1944).

[36] "Mr. President, let me say that I am very familiar with the objections raised by Admiral Jacobs. In my opinion, they are some of the most stupid, short-sighted objections which could possibly be raised. They were objections that were considered very carefully both in the subcommittee on veterans affairs and in the Finance committee and in the full committee itself." Id.

[37] For a complete list of eligibility criteria for all benefits available prior to 1944, see Bradley Commission Staff Report, supra note 28, at 9.

Some benefits were available only to those who received Honorable discharge characterizations;[38] others to those who were discharged "under honorable conditions";[39] others to those who received anything better than a Bad Conduct or Dishonorable characterization;[40] others to those who received anything but a Dishonorable characterization;[41] others to those who engaged in specified dishonorable conduct regardless of characterization;[42] and some benefits had no minimum conduct standard at all.[43]  The 1944 act harmonized eligibility criteria among the various benefits by providing a single standard applicable to all benefits.  After a long period of experimentation, the 1944 G.I. Bill of Rights represented Congress's informed and experienced judgment as to the appropriate standard.  And in setting that unified standard Congress notably selected a standard that was akin to the most lenient of all of these standards, making only "dishonorable" conduct disqualifying.

---

[38] E.g., health care benefits after 1933.  Pub. L. No. 73-2, 48 Stat. 8 (1933) and Veterans' Bureau Regulation No. 6 (March 21, 1933).

[39] E.g., vocational rehabilitation services following WWI.  Pub. L. No. 66-11, 41 Stat. 158 (1919).

[40] E.g., service-connected disability compensation and health care for WWI veterans.  Pub. L. No. 65-90, 40 Stat. 398 (1917).

[41] E.g., health care benefits after 1924.  Pub. L. No. 68-242, 43 Stat. 607 (1924); Pub. L. No. 71-522, 46 Stat. 991 (1930).

[42] E.g., service-connected disability compensation and vocation rehabilitation after 1924.  Pub. L. 68-242 (1924). That statute barred services to veterans who were discharged due to mutiny, treason, spying, desertion, any offense involving moral turpitude, willful and persistent misconduct resulting in a court-martial conviction, or being a conscientious objector who refused to perform military duty or refused to wear the uniform.

[43] E.g., service-connected disability payments prior to WWI.  Pub. L. 37-166, 12 Stat. 566 (1862).

*Table 3: Evolution of conduct standards for Compensation eligibility, 1862-1944*

| Enactment | Conduct standard | Citation |
|---|---|---|
| **1862** | No exclusion | Pub. L. 37-166 |
| **1917** | Excluded Dishonorable and Bad Conduct discharges | Pub. L. No. 65-90 |
| **1924** | Excluded those discharged for specified conduct associated with Dishonorable discharges, even if no Dishonorable discharge occurred | Pub. L. 68-242 |
| **1933** | Excluded any "discharge not specifically an honorable discharge." Excluded "Bad Conduct", "Undesirable", "For the Good of the Service", and "Ordinary." | Pub. L. 73-2 (1933); 38 C.F.R. § 2.0164 (1938). |
| **1944** | Excludes only service members discharged "under dishonorable conditions" or who were discharged for specified conduct associated with Dishonorable discharges. | Pub. L. 78-346 |

Contemporaneous official statements and analyses support the conclusion that Congress intended to exclude only service members whose conduct would have justified a dishonorable characterization. In 1946 the House Committee on Military Affairs issued a report on the use of discharges that were less than honorable but better than dishonorable. The report stated:

> In passing the Veterans' Readjustment Act of 1944, the <u>Congress avoided saying that veteran's benefits are only for those who have been honorably discharged from service</u>…. Congress was generously providing the benefits on as broad a base as possible and intended that <u>all persons not actually given a dishonorable discharge</u> should profit by this generosity.[44]

The 1956 final report of the President's Commission on Veteran Pensions, chaired by General Omar Bradley, who had been the VA Administrator during implementation of the 1944 Act, explained the "Legislative Purpose" behind the "dishonorable conditions" eligibility requirement as follows:

> The congressional committees which studied the measure apparently believed that <u>if the conduct upon which the discharge was based could be</u>

---

[44] H. Rep. No. 79-1510, at 8 (1946) (emphasis added).

<u>characterized as dishonorable the veteran should be barred from any
benefit; if it could not be so characterized, the veteran should be eligible.</u>[45]

This finding is supported by a detailed Staff Report by the Commission.[46]

This conclusion is also the binding interpretation of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit").  In <u>Camarena v. Brown</u>, a veteran with a Bad Conduct discharge argued that the statute only permitted exclusion of veterans whose service was characterized as dishonorable by the DOD.  Reviewing the text and legislative history, the Court disagreed with the claimant, finding that the phrase "dishonorable conditions" gave the VA discretion to exclude people with discharge characterizations other than fully dishonorable.  The Federal Circuit, however, confirmed that congressional intent was to exclude only those who were responsible for equivalent misconduct:

> The legislative history of the enactment now before this Court shows clearly a congressional intent that if the discharge given was for conduct that was less than honorable, ... the Secretary would nonetheless have the discretion to deny benefits in appropriate cases where he found the overall conditions of <u>service had, in fact, been dishonorable.</u>[47]

These statements show that Congress wanted the "dishonorable conditions" bar to exclude only people whose conduct would have merited a dishonorable discharge characterization.  Congress did not intend for the VA to create a new standard that would be more exclusive than the military characterization standard, and indeed did not provide it any authority to do so.  Congress gave the VA independent authority to evaluate in-service conduct only in order to exclude people who should have received a dishonorable military characterization, but who avoided this due to errors or omissions by the service, and the VA's authority extends only so far as to exclude people under that standard.

---

[45] President's Comm'n of Veteran Pensions (Bradley Comm'n), <u>Findings and Recommendations: Veterans' Benefits in the United States</u> 394 (emphasis added).
[46] <u>Bradley Commission Staff Report</u>, *supra* note 28, at 9.
[47] No. 94-7102, 1995 U.S. App. LEXIS 16683, at *8 (Fed. Cir. July 7, 1995) (emphasis added).

**C.    The "dishonorable" characterization standard only excludes service members who exhibited severe misconduct aggravated by moral turpitude or rejection of military authority**

Because Congress intended the "dishonorable conditions" bar to exclude only service members whose behavior would have merited a dishonorable discharge characterization, the VA's interpretation of the term "dishonorable conditions" must replicate that standard. The statute itself, legislative history, and military practice all provide consistent guidance on what factors merit a "dishonorable" discharge.

*1.    Guidance in Statute*

The first source for interpreting what Congress intended is the text of the statute itself.[48] Although the statute does not define "dishonorable conditions," the VA's interpretation of that term must be consistent with the overall statutory framework.[49] This section will show that the statutory framework requires the term "dishonorable conditions" to encompass only conduct as severe as what is listed in the statutory bars.

This conclusion is supported by two canons of statutory construction. First, agencies and courts should not adopt an interpretation that renders any element of the same statute superfluous.[50] That result would arise if the VA's definition of "dishonorable conditions" were so much more exclusive than the statutory bars that the VA's discretionary standard effectively eclipsed Congress's mandatory standard. There is considerable evidence that the VA's standard has done just that—rendering the statutory bars a tiny fraction of the disqualifications. Second, a general statutory term cannot be interpreted so that it provides a different outcome for an issue that was expressly addressed by Congress elsewhere in statute.[51] That result would arise in this case if the VA's definition of "dishonorable conditions" excluded people who were absent

---

[48] BedRoc Ltd. v. United States, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.").

[49] "The Supreme Court has cautioned 'over and over' again that 'in expounding a statute we must not be guided by a single sentence or member of a sentence, but should look to the provisions of the whole law … .' Only by such full reference to the context of the whole can the court find the plain meaning of a part." Smith v. Brown, 35 F.3d 1516, 1523 (Fed. Cir. 1994) (quoting U.S. Nat. Bank v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439 (1993)).

[50] "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." Hibbs v. Winn, 542 U. S. 88, 101 (2004) (citation omitted).

[51] "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228 (1957) (citation omitted).

without leave for less than 180 days, because Congress has specifically spoken on this issue and expressly decided that only 180 days or more of absence should justify exclusion from eligibility.

Congress specifically endorsed this canon of interpretation in its explanation of the Act. The Senate Report explained the relationship between the "dishonorable conditions" element and the statutory bars. It stated that the statutory bars were intended to list the types of conduct that would result in a dishonorable discharge, and that the "dishonorable conditions" bar was meant to replicate this standard:

> It is the opinion of the Committee that such discharge [less than honorable] should not bar entitlement to benefits otherwise bestowed unless such offense was such, as for example those mentioned in section 300 of the bill [listing the statutory bars], as to constitute dishonorable conditions.[52]

The conduct listed in the statutory bars described the type of conduct that Congress associated with dishonorable discharges—and that Congress therefore wanted the VA to exclude.

Thus, the statutory bars provide guidance on the types and severity of misconduct that the discretionary bars may exclude. The statutory bars can be divided into two categories. One category includes conduct that rejects military authority: desertion, absence for more than six months without compelling circumstances to justify the absence, conscientious objection with refusal to follow orders, and request for separation by an alien during wartime. This does not include failures to follow rules, conflicts with superiors, or insubordination. The second category in the statutory bars includes felony-level offenses that warranted the most severe penalty: a discharge by a general court-martial or a resignation by an officer for the good of the service. Notably, that category does not exclude those discharged by special court-martial; or those discharged subsequent to a summary court-martial, both of which were already in use by 1944; or those discharged after a general court-martial that did not impose a punitive discharge. This indicates that Congress specifically intended for eligibility to be granted to people with moderate misconduct, such as misconduct that would lead to special court-martial conviction,

---

[52] S. Rep. No. 78-755, at 15 (1944) (emphasis added).

misconduct that would lead to a discharge characterization less severe than "dishonorable," or unauthorized absences of up to 179 days.

### 2.    *Guidance from Legislative History*

A second source for guidance on the type of conduct associated with a dishonorable discharge characterization is the set of examples offered by legislators when explaining the bill. They listed conduct that should lead to exclusion and conduct that should not lead to exclusion (see Table 4). These examples show that Congress understood "dishonorable conduct" to refer only to very severe misconduct. Congress explicitly anticipated that a wide range of moderate to severe misconduct would not result in a loss of eligibility because it was not fully "dishonorable."

*Table 4: Eligibility exclusion standards according to examples in the Congressional Record*

| Conduct that should result in forfeiture of eligibility | Conduct that should not result in forfeiture of eligibility |
|---|---|
| • Desertion[53]<br>• Murder[54]<br>• Larceny[55]<br>• Civilian incarceration[56]<br>• Substance abuse ("chronic drunkenness") not associated with a wartime disability[57]<br>• Shirking ("the gold-brickers, the coffee-coolers, the skulkers")[58] | • Discharge for AWOL that did not involve desertion[59, 60]<br>• Conviction of civilian offenses that did not result in incarceration[61]<br>• Conviction by special court-martial[62]<br>• Violations of military regulations[63]<br>• Substance abuse ("chronic drunkenness") associated with a wartime disability[64] |

---

[53] Id. at 15.
[54] 90 Cong. Rec. 3076-77 (1944).
[55] Id.
[56] Id.
[57] Id.
[58] H. Rep. No. 1624, at 26 (1944).
[59] House Hearings on 1944 Act, *supra* note 28, at 190.
[60] Id. at 417
[61] Id. at 415.
[62] Id.
[63] Id.
[64] Id.

Some standards can be derived from these examples.  Congress wanted to bar service members who committed crimes of moral turpitude, as shown by either civilian incarceration or a general court-martial; and Congress wanted to bar service members who rejected military authority, as shown by desertion or shirking.  On the other hand, moderate or severe misconduct such as insubordination, absence without authorization, and violations of military regulations that did not warrant a general court-martial would not have resulted in a dishonorable discharge and therefore would not result in forfeiture of veteran services.

Finally, the examples show that an assessment should be based on overall service, not merely the conduct that led to discharge.  This is shown, for example, by the fact that legislators wanted to ensure eligibility for wounded combat veterans discharged for repeated regulation violations, periods of absence without leave, or substance abuse,[65] even if that conduct might lead to exclusion for others.[66]  This is also the binding interpretation of statute by the Court of Appeals for the Federal Circuit:

> The legislative history of the enactment now before this Court shows clearly a congressional intent that if the discharge given was for conduct that was less than honorable, ... the Secretary would nonetheless have the discretion to deny benefits in appropriate cases where he found the <u>overall conditions of service</u> had, in fact, been dishonorable.[67]

### 3.   Guidance from military practice

Military law and practice provide guidelines for defining conduct that Congress considered "dishonorable."

The dishonorable discharge is authorized by Article 58a(a)(1) of the Uniform Code for Military Justice (UCMJ), and its criteria are provided in the Manual for Courts-Martial (MCM).  The 2012 MCM provides a general description of conduct that justifies dishonorable characterization:

> A dishonorable discharge should be reserved for those who should be separated under conditions of dishonor, after having been <u>convicted of</u>

---

[65] <u>House Hearings on 1944 Act</u>, *supra* note 28, at 417.
[66] 90 Cong. Rec. 3076-77 (1944).
[67] <u>Camarena v. Brown</u>, No. 94-7102, 1995 U.S. App. LEXIS 16683, at (Fed. Cir. July 7, 1995) (emphasis added).

<u>offenses usually recognized in civilian jurisdictions as felonies, or of offenses of a military nature requiring severe punishment.</u>[68]

The 1943 MCM provided a Table of Maximum Punishments to identify the offenses that were potentially eligible for a dishonorable discharge characterization.[69]  However, this table alone does not determine what conduct was "dishonorable" because a dishonorable discharge is not warranted in every case where it is authorized.  An extensive body of military law addresses the question of what misconduct is "minor" or "serious", and it is well settled that the table of maximum punishments alone does not determine serious misconduct that deserves severe punishment.[70]

Military law provides three pieces of guidance for deciding when a dishonorable characterization is justified.  First, certain conduct by its nature requires a dishonorable discharge.  This includes desertion, spying, murder and rape,[71] and other civilian felonies.[72]  It also includes severe moral turpitude: judge advocates were instructed to suspend dishonorable discharges "whenever there was a probability of saving a soldier for honorable service"[73] but not for offenses of moral turpitude.[74]  Second, there are limited cases where a dishonorable discharge is warranted for lesser offenses if their repetition shows a rejection of military authority.  The 1943 MCM stated that a dishonorable discharge might be warranted for conduct that did not itself justify a dishonorable discharge if there had been five previous convictions.[75]  The 2012 MCM states that a dishonorable discharge is authorized when there have been at least three prior convictions within the prior year for crimes that did not themselves warrant a dishonorable

---

[68] Rules for Court Martial 1003(b)(8)(B) (2012) [hereinafter RCM].

[69] Office of the Judge Advocate Gen. of the Army, "A Manual for Courts-Martial", at 97 et seq. (Apr. 20, 1943).

[70] <u>See, e.g.</u>, <u>United States v. Rivera</u>, 45 C.M.R. 582, 584 n.3 (A.C.M.R. 1972) (possession of 8.2 milligrams of heroin that could have resulted in 10 years' confinement is a minor offense); <u>United States v. Hendrickson</u>, 10 M.J. 746, 749 (N.C.M.R. 1981) (a 13-day unauthorized absence is a minor offense); <u>Turner v. Dep't of Navy</u>, 325 F.3d 310, 315 (D.C. Cir. 2003) (indecent assault was a minor offense, taking into account seven years of prior good service).

[71] <u>Manual for Courts-Martial</u> ¶ 103(a) (1943) [hereinafter <u>MCM 1943</u>].

[72] RCM 1003(b)(8)(B).  <u>See also</u> <u>United States v. Mahoney</u>, 27 C.M.R. 898, 901 (N.B.R. 1959).

[73] Cited in Evan R. Seamone, Reclaiming the Rehabilitative Ethic in Military Justice: The Suspended Punitive Discharge as a Method to Treat Military Offenders with PTSD and TBI and Reduce Recidivism, 208 Mil. L. Rev. 1, 56 (Summer 2011); see also <u>MCM 1943</u> ¶ 87b, "[T]he reviewing authority should, in the exercise of his sound discretion, suspend the execution of the dishonorable discharge, to the end that the offender may have an opportunity to redeem himself in the military service unless it was an offense of moral turpitude."

[74] <u>MCM 1943</u> ¶ 87b.  See also <u>United States v. Mahoney</u>, 27 C.M.R. 898, 901 (N.B.R. 1959).

[75] <u>Id.</u> ¶ 104c.

discharge.[76] Third, in all cases, a dishonorable discharge may only be applied after consideration of a full range of mitigating factors.[77] These include age, education, personal circumstances, work performance, quality and duration of service, and health factors.[78] In general, military law holds that misconduct is not severe where the commander responded with non-judicial punishment under Article 15 of the UCMJ. This form of punishment is only available when the commander decides, based on the circumstances of the offense, that misconduct was minor.[79] Military law treats this as compelling evidence that, when applying the required analysis of mitigating factors, the misconduct should be considered minor.[80]

Early VA practice adopted this standard. The first regulation stated that "dishonorable conditions" existed where there was a discharge for: mutiny; spying; moral turpitude; or "willful and persistent misconduct, of which convicted by a civilian or military court."[81] The first three criteria clearly reflect serious military and civilian misconduct. For the fourth criterion, the requirement for persistent convictions ensured that only misconduct severe enough to warrant repeated prosecution would be a basis for eligibility exclusion. Early VA practice applied this standard. The first review of VA practice on this matter was conducted in 1952 by an Army judge advocate.[82] The author reviewed VA decisions on this point and found that eligibility would probably be denied for a service member given a Bad Conduct discharge if the service member had previously been convicted twice for two other offenses.[83] By implication, lesser disciplinary actions, such as administrative actions, reduction in rank, non-judicial punishments, or single court-martial convictions, would not establish a history of recidivism sufficient to warrant a "dishonorable" characterization service.

---

[76] Manual for Courts-Martial ¶ 1003(d) (2012) [hereinafter MCM 2012].

[77] Id. pt. V.1.e. (An otherwise serious offense under this rule may still be considered minor based on "the nature of the offense and the circumstances surrounding its commission; the offender's age, rank, duty assignment, [and] record and experience."); RCM 1005(d)(5) ("Instructions on sentence shall include: A statement that the members should consider all matters in extenuation, mitigation and aggravation.")

[78] MCM 2012 pt. V.1.e. See, e.g., Military Judges' Benchbook, DA Pam 27-9 ¶ 2-5-13.

[79] MCM 2012 pt. V.1.e.

[80] Middendorf v. Henry, 425 U.S. 25, 31-32 (1976) (in determining whether an offense is "minor," the adjudicator will first question whether it was the subject of Article 15—nonjudicial—punishment, as "Article 15 punishment, conducted personally by the accused's commanding officer, is an administrative method of dealing with the most minor offenses" ).

[81] 11 Fed. Reg. 8731 (Aug. 13, 1946).

[82] William Blake, Punishment Aspects of a Bad Conduct Discharge, 1952 JAG J. 1, 5 (1952).

[83] Id. at 8-9.

The same standard of "dishonorable" conduct applies today.  More punitive discharges are characterized as Bad Conduct rather than Dishonorable, because the Bad Conduct discharge was not adopted across the military branches until the enactment of the Uniform Code of Military Justice in 1950.[84]  In order to account for this change, a historical comparison should look at overall punitive discharge rates, combining both Dishonorable and Bad Conduct discharges.  The rate for punitive discharges has not changed over time.

### 4.  Synthesis of guidance on standards for "dishonorable" characterization

The section above described standards for "dishonorable" conduct from statutory text, legislative history, and military practice.  These sources all provide similar standards that can be summarized as follows.

First, most misconduct is not "dishonorable."  It is only appropriate for offenses "requiring severe punishment."  This leaves a large range of misconduct that is culpable, that is punishable, that is not honorable, and that may justify separation, but that does not warrant a "dishonorable" characterization.  This has been a fact of military justice and administration since 1896.[85]  Congress and the military services had long recognized that "dishonorable" only describes the most severe forms of misconduct.  The 1944 G.I. Bill of Rights clearly states that lesser forms of misconduct should not forfeit eligibility.

Second, a dishonorable characterization is appropriate after a single offense for military offenses that show a rejection of military authority: desertion, spying, mutiny, and absence without leave for 180 days.  This does not include military offenses of insubordination, conflicts with chain of command, or absence without authority for less than 180 days.  Military law treats these as discipline problems, not as evidence of dishonorable character.

Third, a dishonorable characterization is appropriate after a single offense for crimes of moral turpitude or civilian felonies.

---

[84] The Bad Conduct discharge had been used in the Navy and Marine Corps since the18th century, but was not adopted by the Army and the Air Force until the enactment of The Uniform Code of Military Justice, Pub. L. 81-506, 64 Stat. 107 (1950).
[85] 1 William Winthrop, Military Law and Precedents 848-49 (2d ed. 1896).

Fourth, repeated misconduct shows dishonorable character only where each act is itself severe enough to warrant punitive action through court-martial, and only after repeated failures to rehabilitate.  In general, misconduct that is punished with non-judicial punishment under Article 15 of the UCMJ is minor and does not show dishonorable character.

Finally, a "dishonorable" characterization is only appropriate after considering a full range of mitigating factors.

### D.    Administrative discharges for misconduct generally do not indicate "dishonorable conditions."

By only excluding service members whose conduct would justify a dishonorable discharge, Congress intended the VA to grant eligibility to most people with administrative discharges for misconduct.

There are two categories of military discharges: punitive and administrative.  "Punitive discharges" are issued as a sentence at a court-martial.  Punitive discharges may be characterized as "Dishonorable" or as "Bad Conduct."[86]  All other forms of discharge are administrative discharges, issued not as a punitive sentence at court-martial but as a purely administrative action when a person is not considered suitable for continued service.[87]  The DOD has provided the military branches with instructions on what circumstances might justify an administrative separation, such as end of enlistment[88] or pregnancy.[89]  These administrative discharges may be characterized as "Honorable," "General (Under Honorable Conditions)," or "Other Than Honorable."[90]

Under military law and regulations, some misconduct may warrant an administrative non-punitive discharge.  The DOD authorizes administrative discharges for misconduct that does not involve a court-martial conviction.[91]  These discharges may be characterized as Other Than

---

[86] UCMJ art. 56a.

[87] "It is DOD Policy that … Separation promotes the readiness of the Military Services by providing an orderly means to Evaluate the suitability of persons to serve in the enlisted ranks of the Military Services based on their ability to meet required performance, conduct, and disciplinary standards."  U.S. Dep't of Def., DOD Instruction 1332.14 – Enlisted Administrative Separations ¶ 3.a.1. (Jan. 27, 2014) [hereinafter DODI 1332.14].

[88] Id., Enclosure 3 ¶ 1.

[89] Id., Enclosure 3 ¶ 3.a.4.

[90] Id., Enclosure 4 ¶ 3.a.1.a.

[91] Id., Enclosure 3 ¶ 10.

Honorable,[92] which indicates a "significant departure from the conduct expected of" service members,[93] but not misconduct so severe that it warrants a punitive discharge, such as "minor disciplinary infractions,"[94] "conduct prejudicial to good order and discipline,"[95] or "discreditable involvement with civil or military authorities." [96]   Although this discharge has negative consequences for the service member, including stigmatization, it is not intended as punishment; its purpose is to separate a service member whose behavior, while not dishonorable, does not conform to expectations for military conduct.[97]   This intermediary category of discharge—neither under honorable conditions nor dishonorable—is not an error or oversight.   Military justice and administration recognize that some misconduct is *undesirable* without being *dishonorable*, and the administrative separation for misconduct exists to provide a proportional response to this intermediary level of indiscipline.[98]   Although the names and criteria for these non-punitive discharges have changed over time, this basic structure of military discharges has been in place for over a century.[99]

The question that the 1944 G.I. Bill answered is what support, if any, should be provided to service members in this intermediary category, whose service was neither under honorable conditions nor dishonorable.   Its clear answer is that most or all service members in this category should receive these readjustment services.

First, this is shown by the fact that Congress chose the "dishonorable" characterization standard, rather than other standards that were available at the time.   Previous laws had excluded service members with administrative discharge characterizations less than Honorable.[100]   The Compensation eligibility regulation in place when the G.I. Bill was enacted excluded these

---

[92] Id., Enclosure 3 ¶ 10.c.

[93] Id., Enclosure 4 ¶ 3.b.2.c.1.a.

[94] Id., Enclosure 3 ¶ 10.a.1.

[95] Id., Enclosure 3 ¶ 10.a.2.

[96] Id.

[97] E.g., "[A] Chapter 10 [administrative discharge for misconduct] is administrative and non-punitive."   United States v. Smith, 912 F. 2d 322, 324 (9th Cir. 1990); "An undesirable discharge does not involve punishment. It reflects only that the military has found the particular individual unfit or unsuitable for further service."   Pickell v. Reed, 326 F. Supp. 1086, 1089-90 (N.D. Cal.), aff'd, 446 F.2d 898 (9th Cir.), cert. denied, 404 U.S. 946 (1971).

[98] See RCM 306(c), advising separation as one of several methods for disposing of misconduct through administrative action rather than punishment.

[99] 1 William Winthrop, Military Law and Precedents 848-49 (2d ed. 1896) (describing the use of the "Without Honor" characterization by the Army).

[100] See Section II.B above.

discharges by name, barring eligibility for "an 'undesirable discharge,' separation 'for the good of the service,' an 'ordinary discharge' (unless under honorable conditions) or other form of discharge not specifically an honorable discharge."[101]  By revoking this standard, the 1944 bill clearly intended to create eligibility for these characterizations.

Second, Congress only justified excluding service members with discharges better than "dishonorable" when the military branch erred.  Legislators stated that they wanted to exclude those who received discharges better than dishonorable only when the service members should have received a dishonorable discharge, but administrative error or omission by the military branch prevented this.[102]  If, however, a service member correctly received a non-punitive discharge for misconduct—because their conduct was undesirable but not dishonorable—then Congress wanted them to retain eligibility.  While Congress knew that *some* errors or omissions would occur, and gave the VA authority to account for those, Congress never alleged that *most* such discharges were erroneous.[103]  Because most discharges are correctly issued, and correctly-issued administrative discharges for misconduct should be eligible, most such discharges should provide eligibility.

Third, Congress recognized that administrative separation procedures have fewer safeguards against error or unfairness than punitive discharges, and they explicitly wanted to give veterans the benefit of the doubt by providing eligibility to these service members.  Congress listed several examples of situations where a person might unfairly receive an administrative discharge for misconduct, such as when they received unfavorable discharges because it was an expedient way to downsize units,[104] or when service members "run afoul of temperamental commanding officers."[105]  Congress knew that these unfair situations arise, and extended eligibility to service members with administrative discharges for misconduct to ensure that they were not excluded.  The sponsor of the House bill said:

---

[101] 38 C.F.R. § 2.0164 (1938).
[102] See Section II.B above.
[103] This is consistent with the presumption of regularity that governs VA interpretations of DOD actions.  "The 'presumption of regularity' supports official acts of public officers. In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties.  United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926)."  Butler v Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001).
[104] 90 Cong. Rec. 4348 (1944); 90 Cong. Rec. 4454 (1944).
[105] 90 Cong. Rec. 4454 (1944).

> I want to comment on the language 'under conditions other than dishonorable.' <u>Frankly, we use it because we are seeking to protect the veteran against injustice</u>.... We do not use the words 'under honorable conditions' because <u>we are trying to give the veteran the benefit of the doubt, because we think he deserves it… we do not want the committee or the Congress to cut off a hand in order to cure a sore thumb.</u>[106]

The Chairman of the House Committee echoed this sentiment, with reference to the number of petitions relating to unfair discharges that would otherwise arise:

> I am for the most liberal terms, and I will tell you why… If this is not the case, we would have 10,000 cases a year, probably, of private bills [from people seeking record corrections to obtain veteran benefits]. I believe that <u>the most liberal provision that could go into this bill should be adopted, and the most liberal practice that could be reasonably followed should be pursued.</u>[107]

Congress gave this "benefit of the doubt" by extending eligibility to people with administrative discharges less than "under honorable conditions."[108] This intent is only effectuated when most or all administrative discharges for misconduct receive eligibility.

Congress's skepticism about the fairness of administrative discharge characterizations is still valid today. Unlike punitive discharges, where judicial proceedings ensure some degree of consistency and fairness, administrative discharge regulations permit widely divergent outcomes based on the same circumstances. Consider the case of a single positive drug test: one commander could refer the service member to a special court-martial which could sentence a Bad Conduct discharge under UCMJ Article 112a; another commander could withdraw the court-martial referral and convene an administrative separation board in lieu of court-martial, which generally receives an Other Than Honorable discharge;[109] another commander could refer the service member to rehabilitation, and if the person uses drugs again the commander could

---

[106] <u>House Hearings on 1944 Act</u>, *supra* note 28, at 415, 417.

[107] <u>Id.</u> at 419-20.

[108] This does not refer to the "benefit of the doubt rule," 38 U.S.C. § 5107. That rule is an instruction to the VA for how to evaluate uncertain facts against clear eligibility criteria. Nor does this refer to 'Gardner's Rule' of statutory construction, where ambiguity in legislation should be construed in veterans' favor. <u>Brown v. Gardner</u>, 513 U.S. 115, 118 (1994). Here, the congressional standard is already clear, and Congress referred to the "benefit of the doubt" only to explain why it set its clear standard as liberally as it did. The VA does not need to apply any "benefit of the doubt" in order to arrive at a liberal eligibility standard, because Congress incorporated its "benefit of the doubt" into clear statutory instructions.

[109] <u>DODI 1332.14</u>, Enclosure 3 ¶ 11.b.

pursue an administrative separation for Drug Rehabilitation Failure, which generally receives an Honorable or General characterization;[110] and finally another commander could impose non-judicial punishment and permit the service member to complete their service. This degree of command discretion in administrative separation proceedings permits wide discrepancies in how individuals are treated based on race,[111] their mental health condition,[112] leaders' personalities,[113] history of sexual assault,[114] or other factors. The uneven application of administrative discharge standards is clearly apparent in discharge rates between military branches. While services' punitive discharge rates are generally similar, varying between 0.3% in the Navy and 1.1% in the Marine Corps, their use of administrative discharges varies tremendously. The use of administrative disparity is *20-fold*: between 0.5% in the Air Force and 10% in the Marine Corps.

***Table 5: Discharge characterizations, FY2011***

|  | Honorable | General | Other Than Honorable | Bad Conduct | Dishonorable |
|---|---|---|---|---|---|
| **Army** | 81% | 15% | 3% | 0.6% | 0.1% |
| **Navy** | 85% | 8% | 7% | 0.3% | 0.0% |
| **Air Force** | 89% | 10% | 0.5% | 0.5% | 0.0% |
| **Marine Corps** | 86% | 3% | 10% | 1.0% | 0.1% |
| **Total** | **84%** | **10%** | **5%** | **1%** | **0.1%** |

This difference between services is due to administrative policies, not individual merit. The Government Accountability Office has done a thorough study on discharge characterization

---

[110] Id., Enclosure 3 ¶ 8.b.

[111] M.R. Walker, An Analysis of Discipline Rates Among Racial/Ethnic Groups in the U.S. Military, Fiscal Years 1987-1991 (1992); Def. Equal Opportunity Mgmt. Inst., Dep't of Def., Report of the Task Force on the Administration of Military Justice in the Armed Forces (1972). Racial disparities in discharge characterizations still exist.

[112] Combat veteran Marines with PTSD diagnoses are 11 times more likely to be discharged for misconduct. R.M. Highfill-McRoy, G.E. Larson, S. Booth-Kewley, C.F. Garland, Psychiatric Diagnoses and Punishment for Misconduct: the Effects of PTSD in Combat-Deployed Marines, BMC Psychiatry (Oct. 25, 2010).

[113] For a discussion of how command philosophies result in differing outcomes for equivalent facts, see Gen. Accountability Office, Rep. No. FCP-80-13, Military Discharge Policies and Practices Result in Wide Disparities: Congressional Review Is Needed (1980) [hereinafter GAO Report].

[114] See Human Rights Watch, Embattled: Retaliation Against Sexual Assault Survivors in the US Military (2015).

disparities between services.[115]  It documented that this range of discharge practices reflects differences in leadership and management styles, not degrees of "honor" in different services:

> Simply stated, different people get different discharges under similar circumstances, and the type of discharge an individual gets may have little to do with his behavior and performance on active duty.[116]

The GAO compared discharges of Marines and Airmen with the same misconduct history, service length, and performance history, and found that the Air Force was 13 times more likely than the Marine Corps to give a discharge under honorable conditions.[117]  Military leaders justified their practices with unit-level considerations, not individual merit: some believed that expeditious termination was in the best interest of the services, while others believed that maximizing punishment helped reinforce unit discipline.[118]

The clear implication of an "other than dishonorable" standard is that Congress intended service members with characterizations higher than "dishonorable" to retain eligibility.  This includes those who were administratively separated for misconduct with Other Than Honorable discharges, a non-punitive characterization two steps above "dishonorable."  While Congress anticipated that some people in this category would receive those characterizations in error, exclusion of those service members was meant to be the exception rather than the rule.

**E.    The clear intent of Congress to exclude only service members whose conduct merits a dishonorable characterization advances the statute's purpose and goal.**

The purpose of the statute was to support the "readjustment" of people leaving the military.[119]  The services created in the bill were intended to compensate, indemnify, or offset actual losses experienced by service members: compensation if a disability limits a service member's ability to work; health care if they were disabled during service; vocational rehabilitation for those whose disabilities require them to learn new trades; income support for those whose careers were disrupted by wartime military service; education for those who do not

---

[115] GAO Report, *supra* note 113.  While that study is now 35 years old, the disparities between services' discharge characterizations has only widened since that time, indicating that its findings are still valid.
[116] Id. at ii.
[117] Id. at 29-33.
[118] Id. at 32.
[119] Pub. L. No. 78-346, 58 Stat. 284 (1944).

have a civilian trade after several years of military service.  These were not rewards for good performance, they were basic services to make up for actual losses or harms experienced while in the military.

Because the services were intended to help readjust from actual harms or losses, it is appropriate that Congress should withhold that support only in the most severe cases of misconduct.  The question is not whether a service member performed so well that they earned a reward, but whether they performed to poorly that they should forfeit care and support services.  As one of the House drafters explained:

> "[A service member] gets an unfavorable discharge, and yet he may have been just as dislocated as anyone else.  He may be just as needy of the help and the benefits that are provided under this act."[120]

The House Committee on Military Affairs reaffirmed this position two years later:

> Every soldier knows that many men, even in his own company, had poor records, but no on ever heard of a soldier protesting that only the more worthy should receive general veterans' benefits.  "This man evaded duty, he has been a 'gold bricker,' he was hard to live with, yet he was a soldier. He wore the uniform.  He is one of us."  So they feel.  Soldiers would rather some man got more than he deserves than that any soldier should run a chance of getting less than he deserves.[121]

Legislators also justified the expansive eligibility standard in terms of social cost.  If the government does not correct for these actual losses experienced during service, then worse outcomes are likely to follow.[122]  A Senator explained that purpose this way:

> We might save some of these men. . . . We may reclaim these men but if we blackball them and say that they cannot have [veteran services] we will confirm them in their evil purposes.[123]

---

[120] House Hearings on 1944 Act, *supra* note 28, at 416.

[121] House of Representatives Committee on Military Affairs Report No. 1510, 79th Congress 2d Session, "Investigation of the National War Effort" (January 30, 1946) at 9.

[122] For a discussion of the social costs that result from military criminalization of behavioral health problems, see Evan R. Seamone, et al., Moving Upstream: Why Rehabilitative Justice in Military Discharge Proceedings Serves a Public Health Interest, 104 Am. J. Public Health 1805 (Oct. 2014).

[123] 90 Cong. Rec. 3077 (1944).

By creating a "dishonorable" standard, Congress decided that forfeiture of these readjustment services should be rare. This ensured fairness to service members who have in fact made sacrifices for the military, and it minimized the social cost that may result from abandoning veterans who need services.

Congress created other benefits that it intended only as a reward for exceptional performance, and for these benefits it created a higher eligibility standard. The 1984 Montgomery G.I. Bill was intended to incentivize enlistment and reward good service, rather than offset actual losses.[124] Congress created an elevated eligibility standard for that benefit, requiring a fully Honorable discharge characterization of service.[125] Similarly, Congress limits unemployment benefits[126] and Federal veteran hiring preferences[127] to those discharged under honorable conditions. These elevated standards are appropriate where the purpose of the benefit it to induce and reward good service.

Congress specifically rejected the idea that readjustment services should be given only as rewards for good service. The chief of the Bureau of Naval Personnel had requested that services only be provided to veterans discharged under honorable conditions, so that they could be used as rewards for good service:

> [Under the "other than dishonorable" standard] benefits will be extended to those persons who will have been given bad-conduct and undesirable discharges. This might have a detrimental effect on morale by removing the incentive to maintain a good service record.[128]

He requested that Congress adopt an "honorable conditions" standard, and that request was formally considered both in committee and by the full Senate at floor debates. Congress rejected this request. The Senator who sponsored the bill was a former Army Colonel and future judge

---

[124] "The purpose of this chapter are ... to promote and assist the All Volunteer Force Concept of the Armed Forces by establishing a new program of educational assistance based upon service on active duty .... to aid in the recruitment and retention of highly qualified personnel." 38 U.S.C. § 1401(2) (1985) (as enacted by Pub. L. No. 98-525, § 702(a)(1) (Oct. 19, 1984), now codified as 38 U.S.C. § 3001(4) (2015)).

[125] 38 U.S.C. § 3011(a)(3) (2015). Other education benefits since then have also used the Honorable discharge characterization standard.

[126] 5 U.S.C. § 8521(a)(1)(A).

[127] Id. § 3304(f)(1).

[128] 90 Cong. Rec. 3077 (1944).

on the U.S. Court of Appeals for the D.C. Circuit. He summarized the drafting committee's response as follows:

> I am very familiar with the objections raised by Admiral Jacobs. In my opinion, <u>they are some of the most stupid, short-sighted objections which could possibly be raised</u>. They were objections that were considered very carefully both in the subcommittee on veterans affairs and in the Finance committee and in the full committee itself.[129]

Faced with a request to limit eligibility to veterans discharged under honorable conditions, Congress rejected this in the strongest possible terms.

In sum, Congress provided several justifications for expanding eligibility for readjustment services so that they only exclude those who showed dishonorable conduct. First, the services respond to actual harms or losses, and support for these disabilities or opportunity costs should be withheld only reluctantly. Second, service is inherently praise-worthy and every service member has earned at least some gratitude from the nation. Third, military commanders' administrative decisions are highly uneven, and so guaranteeing that all deserving veterans receive timely services means serving some who might not be as deserving. Finally, our society suffers when military veterans are denied mental health or other services, and it is in everyone's interest that these needs be met. The purpose of the 1944 G.I. Bill was to correct, compensate, or indemnify actual losses incurred by those who served our nation's armed forces, and narrow or burdensome eligibility criteria would frustrate that purpose if they prevented deserving service members from accessing services they need.

### F.    Neither Congress nor the Courts have endorsed the VA's interpretation of this statute

Congressional intent may be inferred when Congress endorses an agency's interpretation. In this case, Congress has repeatedly re-enacted the same statutory language as originally adopted in 1944. Ordinarily this might suggest that Congress agrees with the VA's interpretation of the statute. However, two facts contradict this.

---

[129] <u>Id.</u> at 3076-77 (emphasis added).

First, neither of the two Congressional committees with jurisdiction over this statute have ever held a hearing on it. Witnesses periodically raise the issue,[130] and occasionally the issue arises tangentially to a different matter under investigation,[131] but neither Committee has directly investigated it in a hearing. The most closely-related hearings were those held in 1977 to discuss special discharge upgrade programs that had changed characterizations for certain Vietnam-era veterans. Those hearings resulted in legislation that prohibited the VA from granting eligibility to people who received those discharge upgrades unless they were also found eligible under existing "other than dishonorable" standards.[132] However, none of the hearings discussed the adequacy of the VA's standards. Instead, the legislators' interest was to avoid unequal treatment for different wartime eras. In fact, they specifically encouraged the VA to adopt more inclusive standards. The House Report on the bill stated:

> One of the most disturbing aspects of the special discharge review program is the singling out of a limited class of former military personnel as the beneficiaries of favorable treatment. . . . [T]he President could partially remove one of the greatest injustices in the program by providing that the same criteria for upgrading the discharges of this special class of service persons as a matter of equity be made available to veterans of all periods of war.[133]

Not only did Congress not endorse the VA's standards at the time, they invited the Executive to expand eligibility more broadly. It has not done so.

Second, public and official statements by the VA have misrepresented its practices in critical aspects. As discussed in detail in Section IV.E below, official communications to the Senate Veterans Affairs Committee in 2013[134] and the House Minority Leader in 2015[135] both

---

[130] See, e.g., Viewpoints on Veterans Affairs and Related Issues: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Veterans' Affairs, 103d Cong. 116 (1994) (written testimony of Jonathan Shay, M.D., Ph.D.); Health Care, Economic Opportunities, and Social Services for Veterans and Their Dependents: A Community Perspective: Hearing Before the H. Subcomm. on Oversight and Investigations of the Comm. on Veterans' Affairs, House of Representatives, 103d Cong. 106 (1993) (written testimony of Warren Quinlan, New England Shelter for Homeless Veterans).

[131] See, e.g., Hearing on S. 1307 Before the S. Comm. on Veterans Affairs Eligibility for Veterans' Benefits Pursuant to Discharge Upgrading, 95th Cong. 344 et seq. (1977).

[132] Pub. L. No. 95-126, § 4, 91 Stat. 1106, 1108 (1977).

[133] H. Rep. No. 96-580, at 13 (1977), reproduced in Hearing on S. 1307 Before the S. Comm. on Veterans Affairs Eligibility for Veterans' Benefits Pursuant to Discharge Upgrading, 95th Cong. 597 (1977).

[134] Attached herein as Appendix B.

[135] Attached herein as Appendix C.

made significant, substantive errors in describing how it implements this statute. Under these conditions, Congressional approval cannot be inferred from Congressional silence.

Nor have the Courts ever endorsed the VA's interpretation of this statute. No court has ever passed on the interpretive questions raised by this Petition. Instead, the only remotely related case decided merely that the VA had authority to promulgate regulations that could exclude service members with discharge characterizations other than dishonorable *at all*.[136] The Federal Circuit did not address the limits of the VA's authority to do so, only deciding that the Department was not categorically barred from disqualifying former servicemembers with discharge characterization better than dishonorable. Petitioners do not dispute that the VA has that authority. But, as explained above, the VA may only lawfully exercise that authority where the conduct at issue would have justified a dishonorable discharge.

The VA's interpretation of this statute is unlikely to receive deferential treatment. Courts defer to Agency interpretations of statutory terms only when Congress delegated interpretive authority,[137] when the text, context and history of the statute leave doubt as to Congressional intent,[138] and when the Agency proposes a permissible interpretation of the statute.[139] Here, Congress has provided the VA with a specific standard that has existing meaning under law, the Department squarely lacks authority to adopt a different standard.[140] Furthermore, the text, context and history of the statute provide clear guidance—in some cases numerical standards[141]—on what that standard should be. If any ambiguity remains, courts will resolve that doubt in favor of the former service member. The Supreme Court has long ago recognized that the "solicitude of Congress" to service members requires courts and agencies to

---

[136] Camarena v Brown, No. 94-7102, 1995 U.S. App. LEXIS 16683 (Fed. Cir. July 7, 1995).

[137] United States v. Mead Corp., 533 U.S. 218, 226-27 (2001).

[138] Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-44 (1984).

[139] Id.

[140] The VA's authority to define "dishonorable conditions" is further eroded by the fact that the DOD, a different agency, has principal responsibility for administering that standard. The VA does not have the technical expertise that typically justifies Chevron deference. A similar situation exists under immigration statutes, where the Bureau of Immigration Affairs must decide some cases based in part on criminal histories. Because the BIA does not adjudicate criminal offenses, Courts have held that the BIA has no special administrative competence to define criminal law terms and the BIA's regulatory interpretations of those terms deserve no special deference. See, e.g., Marmolejo-Campos v. Holder, 558 F.3d 903, 907-8 (9th Cir. 2009).

[141] I.e., the standard for how long an absence without leave should justify exclusion, 38 U.S.C. § 5303(a).

interpret veteran legislation generously.[142]    That is particularly true here as the relevant question is whether the government will recognize a veteran's service at all.[143]    Such a grave decision cannot be made without express Congressional instruction, and the VA would be acting outside its authority to create new exclusions that Congress did not provide.

---

[142] Henderson v. Shinseki, 562 U.S. 428, 440-1 (2011) (explaining "the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor."); see also Kirkendall v. Dep't of the Army, 479 F.3d 830, 844 (Fed. Cir. 2007) (en banc) (applying the "canon that veterans' benefits statutes should be construed in the veteran's favor").

[143] This canon was applied to the question of whether a service member's conduct forfeits eligibility for basic veteran benefits in Wellman v. Wittier, 259 F.2d 163 (D.C. Cir. 1953). A 1943 Act barred veteran benefits to former service members "shown by evidence satisfactory to the Administrator of Veterans' Affairs to be guilty of mutiny, treason, sabotage, or rendering assistance to an enemy of the United States." 57 Stat. 554, 555 (1943). The VA terminated benefit eligibility to a WWII veteran who was found to have "rendered assistance to an enemy of the United States" based on his participation in Community Party activities in Michigan during the Korean conflict. The Court held that "while [the statute] authorizes a determination by the Administrator upon 'evidence satisfactory to' him, his ruling … is not simply discretionary with him. If it depends upon an erroneous interpretation of the law, it may be subject to review by the courts." Wellman at 167-68. The Court found that the VA's interpretation of the statue was invalid because it imputed a more exclusive standard than Congress had expressly provided. "The strict interpretation necessary as to so drastic a forfeiture statute … requires that it be limited in its application to the specific grounds spelled out by Congress, with clear proof of the overt acts relied upon. Thus, if the Administrator has exceeded his authority in the determination he makes, his ruling becomes arbitrary or capricious in the legal sense. He may not deny a right which the statute creates, except for validly and legally sufficient grounds." Id.

**III.    CURRENT REGULATIONS**

The VA has defined the term "dishonorable conditions" with three regulations.  One regulation, 38 C.F.R 3.12(a), defines what service members will require an individual review prior to receiving services.  A second regulation, 38 C.F.R 3.12(d), lists conduct that shows "dishonorable" service.  A third regulation, 38 C.F.R 3.12(b), rebuts a "dishonorable" characterization where mental health problems rise to the level of "insanity."  In addition, VA policies have created an implied requirement for "honorable" service.  The following sections describe these standards and how they are applied.

**A.    Requirement for individual review: 38 C.F.R. § 3.12(a)**

VA regulations first divide service members into two broad groups: those that it treats as presumptively eligible, and those that require individual review of conduct prior to recognition as a "veteran."  Nothing in statute instructs the VA to automatically include or exclude anybody, and discharge characterizations mean different things in each service,[144] so in principle the VA could require individual character of discharge reviews for every service member.  But that would be highly inefficient, and the VA has reasonably adopted a rule providing presumptive eligibility in many instances.

The VA's current regulations waive pre-eligibility review for service members with "Honorable" and "General Under Honorable Conditions" discharge characterizations.  This is accomplished by 38 C.F.R. § 3.12(a):

> A discharge under honorable conditions is binding on the Department of Veterans Affairs as to character of discharge.

The use of the phrase "is binding" might suggest that this requirement is imposed by statute or caselaw.  It is not.  The VA adopted this regulation in 1964 voluntarily, without any statutory obligation to do so.[145]

---

[144] See Section IV.H below for a discussion of differences between discharge characterizations in different branches.

[145] This rule was added in 28 Fed. Reg. 123 (Jan. 4, 1963).  Compare 38 C.F.R § 3.12 (1963) with 38 C.F.R § 3.12 (1964).  The authority for that rule making was the Secretary's general authority to make rules of adjudication, 38 U.S.C. § 501(a), not any specific Congressional mandate.

This rule does not guarantee eligibility for these service members. Veterans Health Administration (VHA) eligibility staff and Veterans Benefits Administration (VBA) rating officials typically approve eligibility for service members with Honorable and General characterizations without further evaluation,[146] but this does not guarantee eligibility. The regulation only waives the regulatory bars, not the statutory bars, because the VA does not have the authority to waive statutory criteria. Thus, a service member who violated a statutory bar, but who nevertheless received a General or Honorable characterization at discharge[147] or from a Discharge Review Board,[148] is ineligible for VA services, notwithstanding the VA's waiver of individual review under 38 C.F.R 3.12(a). Furthermore, Congress has prohibited the VA from binding itself to discharge characterizations issued by certain Vietnam-era discharge review programs.[149] For these reasons, 38 C.F.R 3.12(a) does not guarantee eligibility for people with Honorable and General discharges. Instead, it creates presumptive eligibility so that they may receive services without a prior eligibility review. If the VA later identifies that the person's eligibility is in question, it will conduct a review and terminate eligibility if required. This is a practical measure to ensure that services for the large percentage of eligible veterans are not delayed because of concerns about the few who are ineligible.

> **Josh Redmyer.** *Marine rifleman with over seven years of service. After four years of service and three combat tours to Iraq and Afghanistan, he started using drugs to self-medicate symptoms of PTSD and received an OTH discharge. His drug use and behavior problems led to divorce from his wife and separation from children. He sought PTSD treatment from the VA and was turned away because of his discharge. An independent advocate helped him start an eligibility application. Although the duration of his service makes it likely that he will become eligibility for VA benefits, the VA will not provide services until it completes its COD review, typically a 3-year process.*

---

[146] Adjudication Procedures Manual, M21-1MR pt. III.v.1.B.5.c (a formal finding to determine veteran status is not required for Honorable and General discharge characterizations) [hereinafter Adjudication Procedures Manual]; Eligibility Determination, VHA Handbook 1601A.02 ¶ 6(c) (2009) (a Character of Discharge review is not required for Honorable and General discharge characterizations).

[147] See, e.g., Title Redacted by Agency, No. 10-32 746 (Bd. Vet. App. Dec. 7, 2012) (ordering a remand for a conscientious objector with an Honorable discharge characterization do determine whether the service member is barred from VA services by the statutory bar at 38 U.S.C. § 3505(a), 38 C.F.R. § 3.12(c)(1)).

[148] Discharge characterizations provided by Discharge Review Boards do not waive statutory bars. 38 U.S.C. § 5303(a); 38 C.F.R. § 3.12(f), (g)). Discharge characterizations provided by Boards for Correction of Military (Naval) Records do waive statutory bars. 38 U.S.C. § 5303(a); 38 C.F.R. § 3.12(e).

[149] 38 U.S.C. § 5303(e) (1977); 38 C.F.R 3.12(h); Adjudication Procedures Manual supra note 146 pt. III.v.1.B.9.

In contrast, the regulation prohibits most services from being provided to people with Other Than Honorable, Bad Conduct, or Dishonorable characterizations until they receive an individual review—a process that the VA calls a "Character of Discharge Determination" (COD).[150]  The procedure for reviewing conduct is highly burdensome on both the VA and the service member.  For the VA, it requires a separate adjudication based on a close reading of a full service record and any other evidence that the service member submits.  The VA is unequipped to actually adjudicate all of these claims: although the VA requires eligibility review for about 7,000 service members discharged each year,[151] the VA only completes reviews for about 4,600 per year.[152]  For the service member, it creates a major delay to receiving services.  The average length of pending claims is currently 600 days,[153] indicating that the average time to complete one of these claims is almost four years.

The obstacles are even greater for service members seeking health care. Whereas the VBA routinely commences an eligibility review whenever a less-than-honorably discharged service member files a claim for compensation or pension, the hospital facilities of the VHA do not. Instead, the VHA regularly turns away such service members when they seek health care and treatment and does not initiate a COD Determination at all. Indeed, the VHA amended its Eligibility Determination Handbook in April of this year to remove instructions about how to initiate an eligibility determination.[154]  In its place, the Handbook now refers generally to the "other than dishonorable" requirement but does not instruct staff to request an eligibility determination. VHA staff are left piecing together disparate regulations to figure out, for example, how to start that service member's enrollment process and whether he or she may be eligible based on a prior term of service.[155]  As a result, there is a de facto denial of health care for deserving service members; they will be denied by default and may believe—incorrectly— that they are categorically ineligible.

---

[150] See Adjudication Procedures Manual *supra* note 146 pt. III.v.1.B.
[151] See Table 20 below and accompanying text.
[152] See Table 17 below and accompanying text.
[153] As of September 2015, the average claim pending time for End Product that include character of discharge decisions was over 600 days.  This indicates that the time to completion is about 1,200 days.
[154] Compare Eligibility Determination, VHA Handbook 1601A.02 ¶ 6(c) (Nov. 5, 2009) with Eligibility Determination, VHA Handbook 1601A.02 ¶ 5(c) (Apr. 3, 2015).
[155] Cf. 38 U.S.C. §§ 5100, 5102, 5107; 38 C.F.R. §§ 3.150, 17.34, 17.36(d)(1).

Even if the VHA does initiate an eligibility review, present policies prohibit VHA medical centers from providing tentative eligibility for health care while COD review is underway. When an application for health care is filed and eligibility cannot immediately be established, current regulations allow a VA facility to provide care based on "tentative eligibility" to those who will "probably" be found eligible.[156] But the regulation limits "tentative eligibility" to emergency circumstances and recently discharged service members, and implementing guidance excludes less-than-honorably discharged veterans from receiving tentative eligibility.[157] Some service members may be granted "humanitarian care," but this is only available for emergency treatment, it is provided at the hospital's discretion, it may be revoked at any time, and the service member must pay for any services provided.[158] Service members in that situation, even ones who may ultimately be found eligible, are simply unable to receive timely health care from the VA.

> ***E. I.*** Army sniper who earned the Combat Infantryman Badge in Iraq. After one year in Iraq, he received an OTH discharge after a series of 4 arguments with his supervisor on one day. He was denied VA eligibility three times, until an attorney assisted him and a Senator intervened on his behalf.
>
> ***K. E***. Served the Navy for five years, but a positive drug test and an off-duty citation for public drunkenness led to an OTH discharge. He is now homeless in San Francisco but unable to access VA health care.

### B.    Definition of conduct rising to the level of "dishonorable conditions" of service: 38 C.F.R 3.12(d)

VA regulations describe what conduct shows "dishonorable conditions" as follows:

(d)  A discharge or release because of one of the offenses specified in this paragraph is considered to have been issued under dishonorable conditions.

---

[156] 38 C.F.R. § 17.34.

[157] Eligibility Determination, VHA Handbook 1601A.02 ¶ 5(b) (Nov. 5, 2009); 38 C.F.R. § 17.34; 38 FR 28140, 28141 (May 14, 2013) (explaining that only Honorable and General discharges qualify for tentative eligibility because those are the only cases where eligibility "probably will be established").

[158] 38 U.S.C. § 1784; 38 C.F.R. § 17.101.

(1) Acceptance of an undesirable discharge to escape trial by general court-martial.

(2) Mutiny or spying.

(3) An offense involving moral turpitude. This includes, generally, conviction of a felony.

(4) Willful and persistent misconduct. This includes a discharge under other than honorable conditions, if it is determined that it was issued because of willful and persistent misconduct. A discharge because of a minor offense will not, however, be considered willful and persistent misconduct if service was otherwise honest, faithful and meritorious.

(5) Homosexual acts involving aggravating circumstances or other factors affecting the performance of duty. Examples of homosexual acts involving aggravating circumstances or other factors affecting the performance of duty include child molestation, homosexual prostitution, homosexual acts or conduct accompanied by assault or coercion, and homosexual acts or conduct taking place between service members of disparate rank, grade, or status when a service member has taken advantage of his or her superior rank, grade, or status.

There are no data as to which bases are most frequently applied in Regional Office decisions. However, an analysis of all Board of Veterans' Appeals (BVA) decisions on this issue between 1992 and 2015 shows that the "willful and persistent misconduct" element is the basis for 84% of "dishonorable conditions" decisions by BVA judges.

*Table 6: Denials based on regulatory bars in BVA decisions, 1992-2015[159]*

| 38 C.F.R. § 3.12(d) criteria | Percentage |
|---|---|
| (1) OTH discharge in lieu of GCM | 6% |
| (2) Mutiny or spying | 0% |
| (3) Moral Turpitude | 10% |
| (4) Willful and Persistent Misconduct | 84% |
| (5) Aggravated Homosexual Acts | 0.2% |

[159] Source: analysis of 999 BVA decisions issued between 1992 and 2015, on file with author. These figures do not include decisions where eligibility was denied based on the statutory bars, nor decisions where eligibility was denied without a specific factual finding under 38 C.F.R. § 3.12(c) or (d).

*1. Willful and persistent misconduct*

The "willful and persistent misconduct" bar is the most common basis for denial because it is an extremely expansive and vague standard. It plausibly encompasses almost all conduct that would lead to any form of misconduct discharge.

The VA has defined "willful misconduct" to include intentional action that is known to violate any rule, or reckless action that has a probability of doing so.[160] It does not require that the conduct have led to a court-martial or even a non-judicial punishment. The only substantive limitation is that "misconduct" does not include "mere technical violation of police regulations,"[161] and it does not include "isolated and infrequent use of drugs."[162] If the misconduct is "a minor offense" then the adjudicator may consider whether overall quality of service mitigates the misconduct, as discussed below, but this does not mean that "minor" misconduct is ignored. Even minor offenses constitute "willful misconduct" that can be a basis for finding "dishonorable" service. For example, BVA decisions have justified eligibility denial in part on absences as short as 2 hours and 18 minutes,[163] and 30 minutes.[164]

> **_J. E._** *Marine with two Iraq deployments who was diagnosed with PTSD while still in service. He was cited for talking to his sergeant with a toothpick in his mouth, and was then discharged for a single positive drug test. Denied VA eligibility for "willful and persistent misconduct."*

The term "persistent" only means multiple incidents of misconduct, or misconduct that lasts more than one day. It may mean any sequence of any misconduct citations, even if they are not related to each other and even if they are spread out over time. For example, "willful and persistent misconduct" was found for a service member who had a non-judicial punishment in 1998 for off-duty alcohol use, a second non-judicial punishment in 1999 for visiting an unauthorized location, and a discharge in 2001 for a positive drug test.[165] The term "persistent"

---

[160] 38 C.F.R. § 3.1(n)(1) ("Willful misconduct means an act involving conscious wrongdoing or known prohibited action … (1) It involves deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences.").

[161] 38 C.F.R. § 3.1(n)(3).

[162] 38 C.F.R. § 3.301(c)(3).

[163] Title Redacted by Agency, No. 12-19246 (Bd. Vet. App. May 5, 2015).

[164] Title Redacted by Agency, No. 96-01792 (Bd. Vet. App. Jan. 30, 1996).

[165] Title Redacted by Agency, No. 04-04453 (Bd. Vet. App. Feb. 17, 2004).

has also been interpreted by some Veterans Law Judges to mean a single absence without leave lasting more than a day, effectively depriving the "persistent" term of genuine force.[166] Although other decisions have applied the "persistent" standard more narrowly,[167] the regulation permits a very expansive interpretation of this term.

The regulation provides a limited opportunity to consider the quality of overall service as a mitigating factor if discharge resulted from "a minor offense." The Court of Appeals for Veterans Claims (CAVC) has interpreted "a minor offense" to mean only misconduct that does not "interfere[] with … military duties."[168] Because most military misconduct relates to military duties in some way, this exception is very limited. In practice, the standard for "minor offense" varies widely. One decision found that an absence of one week was "not minor,"[169] while another concluded that an unauthorized absence for 5 months was "minor."[170] If misconduct was not "minor," then there is no opportunity to consider overall service. For example, one BVA decision noted "exemplary service" during the first Persian Gulf War, but denied eligibility because the underlying misconduct, absence without leave of one week, was "not minor."[171] Even when the misconduct is found to be "minor," the regulation allows it to be mitigated only by service that is "meritorious." That is a very high standard. The VA does not consider all military service as inherently meritorious: even combat service is not meritorious because that is simply the required service of an infantryman and thus not "deserving praise or reward."[172] Even many years of proficient service cannot be considered as a potential mitigating factor.

In combination, the imprecise and expansive standards for the terms "willful," "persistent," "minor" and "meritorious" permit almost any disciplinary problems to be considered "willful and persistent misconduct." The VA trains its staff to apply the regulation according to this highly exclusive standard. For example, its training materials on this topic state

---

[166] See, e.g., Title Redacted by Agency, No. 00-23 239, Bd. Vet. App. (Bd. Vet. App. Sept. 11, 2001) ("[B]ecause he spent 45 days of his service time in an AWOL status, the offense essentially occurred 45 times, i.e. once for each day he was gone, it is persistent.").

[167] For example, some decisions have found that an absence without leave is not "persistent" if its duration was less than 6% of the total service period. Title Redacted by Agency, No. 0108534 (Bd. Vet. App. Mar. 22, 2001) (finding 117 days of AWOL, which constituted 5.8% of the claimant's service, not to be willful and persistent).

[168] See, e.g., Cropper v. Brown, 6 Vet. App. 450, 452-3 (1994).

[169] Title Redacted by Agency, No. 97-28543 (Bd. Vet. App. Aug. 18, 1997).

[170] Title Redacted by Agency, No. 06-19120 (Bd. Vet. App. July 7, 2006).

[171] Title Redacted by Agency, No. 97-28543 (Bd. Vet. App. Aug. 18, 1997).

[172] See, e.g., Title Redacted by Agency, No. 0309368 (Bd. Vet. App. June 19, 2009).

that "willful and persistent misconduct" is present when there are "multiple failures to be at appointed place."[173]

> ***Orlando Tso***. *Marine rifleman who developed a drinking problem after being encouraged to join in violent and drunken hazing activities in his unit. He went to over 100 AA meetings over the course of two years, but was arrested for drinking under the influence and was given an OTH discharge after 3 years of service. Denied VA eligibility.*

### 2. Moral turpitude

Internal VA materials provide some additional definition of the term "moral turpitude." The M21-1 "Adjudication Procedures Manual" defines "moral turpitude" as "a willful act committed without justification or legal excuse [that] violates accepted moral standards and would likely cause harm or loss of a person or property."[174]  The Manual refers to VA General Counsel Precedential Opinion 6-87, discussing the definition of "moral turpitude," but the M21-1 Manual incorrectly states the Precedential Opinion's holding, which defines "moral turpitude" as conduct that "gravely violates accepted moral standards."[175]  The M21-1 omits the "gravely" qualifier, failing to capture high standard of misconduct implied by the term "turpitude."  The VA has proposed a new definition that further dilutes the term by removing any reference to community standards at all.  The proposed Part 5 Rewrite Project would define the moral turpitude as conduct that is "unlawful, willful, committed without justification or legal excuse … which a reasonable person would expect to cause harm or loss to person or property."[176]  This proposed definition removes any reference to misconduct of an amoral character, departing significantly from accepted military, criminal, and civil caselaw that limits "moral turpitude" to offenses that involve some fraudulent, base, or depraved conduct with intent to harm a person.[177]

---

[173] Character of Discharge Determination Trainee Handouts, at 7 (July 2012) (on file with authors).
[174] Adjudication Procedures Manual *supra* note 146 pt. III.v.1.B.3.c.
[175] VA Gen. Counsel Precedential Op. 6-87 (Feb. 5, 1988).
[176] 78 Fed. Reg. 71,042, 71,172 (Nov. 27, 2013) (proposed rule to be codified at 38 C.F.R. § 5.30(f)(3)).
[177] See John Brooker, Evan Seamone, and Leslie Rogall, Beyond TBD: Understanding VA's Evaluation of a Former Servicemember's Benefit Eligibility Following Involuntary Or Punitive Discharge From The Armed Forces, 214 Mil. L. Rev. 1, 171 et seq. (2012) (hereinafter "Beyond TBD").

### 3. *Aggravated homosexual conduct*

This regulatory bar singles out one class of service members based on their sexual orientation, and excludes them for conduct that might not be used to exclude other service members with heterosexual orientation. This definition notably has not changed since (1) the repeal of "Don't Ask, Don't Tell" and (2) the Supreme Court's decisions in *Obergefell v. Hodges*, 135 S.Ct. 2071 (2015) and *United States v. Windsor* 133 S.Ct. 2675 (2013).

### 4. *Absence of provision for considering extenuating factors*

This regulatory paragraph contains no provision for considering extenuating or mitigating factors. The text of the regulation simply states that a discharge is considered to be "under dishonorable conditions" when any of the listed conduct is shown, without giving an opportunity to consider other factors. The "willful and persistent misconduct" bar includes a limited provision for considering overall service, as discussed above, but this does not apply to any other bars.

> *__Stephen Raimand__. Combat veteran with multiple OIF and OEF deployments. He took unauthorized absence when his wife, who had eight miscarriages, threatened to commit suicide if he went on another deployment. He returned voluntarily and was sentenced to a Bad Conduct discharge. His nightmares sometimes make him vomit in the morning and he cannot drive a car safely. The VA labels him a "non-veteran" and denies all services.*

This contrasts with other provisions, where the VA has adopted a comprehensive analysis of extenuating circumstances. The VA adopted a list of factors that might mitigate the statutory bar against services to those who were absent without leave for more than 180 days. This list of mitigating factors considers hardship service conditions, disabilities, personal stressors, age, and educational background.[178] But the VA did not extend that standard to its regulatory definition of

---

[178] 38 U.S.C. § 5303(a) states that an absence without leave of 180 days or more will bar services "unless warranted by compelling circumstances." The VA has defined that term at 38 C.F.R. § 3.12(c)(6): "The following factors will be considered in determining whether there are compelling circumstances to warrant the prolonged unauthorized absence. (i) Length and character of service exclusive of the period of prolonged AWOL. Service exclusive of the period of prolonged AWOL should generally be of such quality and length that it can be characterized as honest, faithful and meritorious and of benefit to the Nation. (ii) Reasons for going AWOL. Reasons which are entitled to be given consideration when offered by the claimant include family emergencies or obligations, or similar types of obligations or duties owed to third parties. The reasons for going AWOL should be

"dishonorable conditions," and the CAVC has held that this omission prohibits the VA from considering these factors under its "dishonorable conditions" analysis. [179]    Therefore no regulatory provision allows adjudicators to consider these extenuating factors in their eligibility decisions.

The following Board of Veterans' Appeals decision provides an example of how these considerations are formally excluded from the analysis under the VA's regulatory bars:

> The governing law and regulations do not provide for any mitigating factors in determining whether actions that are not minor offenses are willful and persistent misconduct.  Therefore, assuming that the appellant now suffers from PTSD, his in-service marital problems and any PTSD are irrelevant.[180]

Similarly, the VA denied eligibility to another service member based on one fight with a noncommissioned officer and a single one-week absence, despite significant external pressures such as a PTSD diagnosis in service, "exemplary" service during the first Persian Gulf war, and having three family members murdered within the prior two years.[181]

> **_Richard Running_**.  _Army combat medic during invasion of Iraq, cited for "discipline, dedication, and bravery" under fire.  Started to self-medicate with drugs after his return, leading to OTH discharge.  He was unable to keep a job for more than 6 months after service, started to use drugs more, and ended up incarcerated.  The VA labels him a "non-veteran" and denies eligibility._

---

evaluated in terms of the person's age, cultural background, educational level and judgmental maturity. Consideration should be given to how the situation appeared to the person himself or herself, and not how the adjudicator might have reacted. Hardship or suffering incurred during overseas service, or as a result of combat wounds of other service-incurred or aggravated disability, is to be carefully and sympathetically considered in evaluating the person's state of mind at the time the prolonged AWOL period began.  (iii) A valid legal defense exists for the absence which would have precluded a conviction for AWOL. Compelling circumstances could occur as a matter of law if the absence could not validly be charged as, or lead to a conviction of, an offense under the Uniform Code of Military Justice. For purposes of this paragraph the defense must go directly to the substantive issue of absence rather than to procedures, technicalities or formalities."

[179] Winter v. Principi, 4 Vet. App. 29, 32 (1993).

[180] E.g., Title Redacted by Agency, No. 12-36342 (Bd. Vet. App. Oct. 19, 2012) ("The governing law and regulations do not provide for any mitigating factors in determining whether actions that are not minor.").

[181] Title Redacted by Agency, No. 97-28543 (Bd. Vet. App. Aug. 18, 1997).

### C.    Rebuttal of "dishonorable conditions" in cases of "insanity" - 38 C.F.R. § 3.12(b)

VA regulations provide only one opportunity to consider whether mental health mitigates the discipline issues that led to discharge. Congress created an exception to the statutory bars in cases where the service member was "insane" at the time of the misconduct,[182] and the VA extended that exception to its regulatory bars as well.[183]

Although the VA adopted a regulatory definition of "insanity" that could potentially reach a range of mental and behavioral health issues,[184] the VA Office of General Counsel issued a Precedential Opinion that interprets the term to require a very high degree of mental impairment.[185] In practice, Veteran Law Judges applying the Precedential Opinion's holding characterize the "insanity" exception as "more or less synonymous with psychosis,"[186] and "akin to the level of incompetency generally supporting appointment of a guardian."[187] The VA has proposed to formalize this narrow interpretation by changing its regulatory definition of "insanity" to conform with the standard for criminal insanity, requiring such "defect of reason" that the person did not "know or understand the nature or consequence of the act, or that what he or she was doing was wrong."[188]

> ***Ted Wilson****. Marine rifleman with two purple hearts and four campaign ribbons for service in Vietnam. He was sent to combat while still 17 years old, and had a nervous breakdown and suicide attempt before his 18th birthday. He was sent back to Vietnam for a second tour involuntarily, and had a third nervous breakdown that led to an AWOL and an OTH discharge. Denied Compensation for PTSD because of his discharge.*

---

[182] 38 U.S.C. § 5303(b).

[183] 38 C.F.R. § 3.12(b).

[184] "Definition of insanity. An insane person is one who, while not mentally defective or constitutionally psychopathic, except when a psychosis has been engrafted upon such basic condition, exhibits, due to disease, a more or less prolonged deviation from his normal method of behavior; or who interferes with the peace of society; or who has so departed (become antisocial) from the accepted standards of the community to which by birth and education he belongs as to lack the adaptability to make further adjustment to the social customs of the community in which he resides."  38 C.F.R 3.354(a).  The Court of Appeals of Veterans Claims has held that this definition is lower than the criminal insanity standard used in the Model Penal Code.  See Gardner v Shinseki, 22 Vet. App. 415 (2009).

[185] VA Gen. Counsel Precedential Op. 20-97 (May 22, 1997).

[186] E.g., Title redacted by agency, No. 10-16336 (Bd. Vet. App. May 3, 2010).

[187] E.g., Title redacted by agency, No. 15-19246 (Bd. Vet. App. May 5, 2015).

[188] 71 Fed. Reg. 16,464, 16,468 (Mar. 31, 2006).

The narrow scope of the "insanity" exception results in limited application to behavioral health issues such as PTSD and TBI. From 1992 to 2015, the Board of Veterans' Appeals denied eligibility to 88% of service members who claimed PTSD. The BVA granted eligibility to only 3% of claimants on the basis of an "insanity" finding; 10% were granted eligibility for other reasons. For 24% of claimants with PTSD, the "insanity" exception was not even considered.

*Table 7: Results of "insanity" determinations by the BVA in cases where PTSD was claimed*[189]

| | % of cases involving PTSD |
|---|---|
| **Eligibility denied – not "insane"** | 63% |
| **Eligibility denied – "insanity" not considered** | 24% |
| **Eligibility granted – "insane"** | 3% |
| **Eligibility granted – other reasons** | 10% |

Three features of the regulation limit the applicability of the "insanity" exception. First, it requires that a medical doctor state that the veteran was "insane" in service,[190] even though this is not a clinically approved diagnostic term.[191] In our experience, this has made doctors reluctant to give medical opinions on this issue. Second, service members must self-identify as "insane," which is unlikely to occur in cases of behavioral health problems such as PTSD or TBI. Third, in practice the VA rarely interprets the term "insanity" as broadly as regulation allows. Veteran Law Judges typically define the term "insanity" narrowly to include only psychoses or inability to comprehend one's actions.[192] This interpretation excludes cognitive and behavioral health problems often associated with post-traumatic or operational stress that leads to misconduct discharges.

One BVA decision illustrates why the "insanity" exception has only limited applicability:

---

[189] Data on file with authors.

[190] Whether a person is "insane" is a medical question that must be established by competent medical opinion. See Zang v. Brown, 8 Vet. App. 246, 254-55 (1995).

[191] Medical opinions relating to mental health must apply the diagnostic criteria of the Diagnostic and Statistical Manual 5th Edition. 38 C.F.R § 4.125(a). "Insane" is not a diagnosis in the DSM-5, nor in prior editions.

[192] E.g., Title Redacted by Agency, No. 1004564 (Bd. Vet. App. 2010) ("Generally, the predicate for insane behavior within the meaning of VA law and regulations is a persistent morbid condition of the mind characterized by a derangement of one or more of the mental faculties to the extent that the individual is unable to understand the nature, full import and consequences of his acts, such that he is a danger to himself or others.").

> Initially, the Board points out there is no claim or evidence that the appellant was insane at the time of the offenses in question that resulted in his OTH discharge. The appellant has not produced any evidence from a qualified medical doctor who has expressed an opinion that he was insane prior to, during, or after his period of AWOL.… Additionally, when asked during the Board hearing, the appellant stated he was not insane. He did say that he had been harassed and that he might have been suffering from the symptoms and manifestations of PTSD, but he was not insane.[193]

Because of these limitations, the "insanity" exception is rarely used in practice.

### D.     Implied requirement for "honorable" service

Some eligibility decisions have mistakenly adopted an "honorable service" requirement. Nothing in statute or regulation requires "honorable" service. Instead, statute and regulation only require that "dishonorable" service be excluded, and military law has long established that some service is less than "honorable" without being "dishonorable."[194] Nevertheless, VA adjudicators routinely state that "only veterans with honorable service are eligible for VA benefits"[195] and deny eligibility when service was "not honorable for VA purposes." Some BVA decisions also explicitly adopt an "honorable service" standard, as in the following example: "[the service member's misconduct] was not consistent with the honest, faithful, and meritorious service for which veteran's benefits are granted. Moreover, the other incidents of misconduct reflect an ongoing pattern of disciplinary offenses which were not of an honorable nature."[196]

> **_Terrance Harvey_**.  _Army soldier who earned the Combat Infantryman Badge for service in the First Gulf War. On his return he started experiencing post-traumatic stress symptoms and attempted suicide. He was denied leave to be with his family, but left anyway. After a 60 day absence he returned and was given an OTH discharge. He was denied services for 20 years until an attorney helped him get a discharge upgrade; his VA eligibility application was never decided._

---

[193] Title Redacted by Agency, No. 1008205 (Bd. Vet. App. 2010).
[194] See Section II.D above.
[195] See sample COD decision included as Appendix A.
[196] Title Redacted by Agency, No. 06-39238 (Bd. Vet. App. Dec. 18, 2006).

Two elements of the regulatory scheme produce this outcome. First, the regulatory definition of "dishonorable conditions" is so expansive that almost any misconduct that justifies a discharge would also justify a "dishonorable conditions" finding.[197] This is evident from the standards themselves, which provide so little substantive limitation on what conduct might be considered "dishonorable." It is also shown by the decision rates: in FY2013, the VA found that service members were ineligible in 90% of all cases it reviewed.[198] A regulatory scheme that excludes up to 90% of service members with intermediate discharges cannot be measuring "dishonorable" service, it is measuring "honorable" service.

The second feature of VA policy that encourages the use of an implied "honorable conditions" standard is that the VA's internal designation for eligible service is "Honorable for VA Purposes." A service member with a discharge characterization that is not presumptively eligible under 38 C.F.R. § 3.12(a)—those with Other Than Honorable, Bad Conduct, or Dishonorable discharge characterizations—is labeled "Dishonorable for VA Purposes" in VA's eligibility databases.[199] If the Character of Discharge review is favorable, their status will be changed to "Honorable for VA Purposes."[200] This terminology suggests that service members must show that their service was "honorable." Although this designation is administrative, it has been adopted by numerous adjudicators, for example Veterans Law Judges who state "when a service member receives discharge under other than honorable circumstances, VA must decide whether the character of such discharge is honorable or dishonorable."[201] This binary analysis is inconsistent with statute. The 1944 statute does not require that service be "honorable", it only requires that it be better than "dishonorable." Nor does the statute create new definitions of the terms honorable and dishonorable "for VA purposes." Instead, the statute requires the VA to exclude service that was "dishonorable" according to existing military law standards. The mischaracterization of service eligibility in the VA's eligibility database likely contributes to incorrect application of eligibility criteria.

---

[197] The authorized bases for a non-punitive administrative discharge for misconduct are provided in DODI 1332.14 ¶ 10(a) (2014).

[198] VA FOIA Request, on file.

[199] The VHA eligibility database is Hospital Inquiry (HINQ); the VBA eligibility database is Beneficiary Identification and Records Locator Subsystem (BIRLS).

[200] See Adjudication Procedures Manual supra note 146 pt. III.v.1.A.4.e.

[201] E.g., Title Redacted by Agency, No. 15-19246 (Bd. Vet. App. May 5, 2015).

IV.    THE CURRENT REGULATORY SCHEME IS UNJUST, INCOMPATIBLE WITH STATUTORY OBLIGATIONS, AND UNDULY BURDENSOME ON BOTH VETERANS AND THE VA

A.    VA regulations are excluding current-era service members at a higher rate than at any other period in the nation's history

More service members are excluded from the VA's care and support than Congress intended, more than the American public would expect, and more than at any point in history. This is due entirely to the VA's discretionary eligibility regulations.

Overall, the VA decides that service was "dishonorable" in the vast majority of cases in which it conducts a COD review.    In FY 2013, VA Regional Offices found service "dishonorable" in 90% of all cases (see Table 8).    Board of Veterans' Appeals decisions since 1992 have found service "dishonorable" in 87% of its cases (see Table 9).    The average for all decisions, from all eras, was 85% "dishonorable" (see Table 10).

*Table 8: Character of Discharge decision outcomes at Regional Offices, FY2013[202]*

| Outcome | Number of decisions | % |
|---|---|---|
| Ineligible ("dishonorable") | 4,156 | 90% |
| Eligible ("other than dishonorable") | 447 | 10% |
| Total | 4,603 | |

*Table 9: Character of Discharge decision outcomes by the BVA, 1992-2015[203]*

| Outcome | Number of decisions | % |
|---|---|---|
| Ineligible ("dishonorable") | 870 | 87% |
| Eligible ("other than dishonorable") | 129 | 13% |
| Total | 999 | |

---

[202] FOIA request to the VA on file with authors.
[203] Analysis of BVA decisions on file with authors.

*Table 10: Character of Discharge decision outcomes based on era of service*[204]

|  | **Number of decisions** | **"Dishonorable"** |
|---|---|---|
| **WWII** | 3,600 | 89% |
| **Korean War** | 6,807 | 85% |
| **Vietnam War** | 35,800 | 78% |
| **"Peacetime"** | 44,310 | 78% |
| **Gulf War** | 19,269 | 71% |
| **Post-2001** | 13,300 | 65% |
| **Total**[205] | **155,416** | **85%** |

Those figures do not paint a full picture, however, because the number of people actually excluded from VA services also depends on the percentage of veterans who *require* a review and the percentage who *receive* one.  Table 11 shows that the actual exclusion rate for current-era veterans is 6.5% of all service members who completed entry level training.[206]  This occurs because, first, the VA presumes ineligibility for the 6.8% of all service members with characterizations less than General, including the large number of people with non-punitive, administrative discharges characterized as Other Than Honorable; and then, second, the VA has completed COD reviews for only 10% of those presumptively ineligible service members (see Table 10). This leaves 6% of all Post-9/11 veterans ineligible for VA services by default, because the VA requires a review but has not conducted it.  While the VA has granted eligibility to 35% of current-era veterans whose service it has reviewed, this only amounts to an additional 0.3% of all service members since so few have received a review.  The bottom line is that 6.5% of current era veterans who seek health care, housing or other services will be turned away.

---

[204] Telephone interview with Stacy Vazquez, Director, Interagency Strategic Initiatives, Department of Veterans Affairs (June 16, 2014).  Data accurate as of May, 2013.

[205] This figure is greater than the sum of each era listed above because it includes service members discharged outside those periods, such as between the Korean War period and the Vietnam War period.

[206] Service members discharged during entry level training typically received an "Uncharacterized" discharge.  This petition does not address the regulations that govern this type of discharge.  38 C.F.R § 3.12(k).

*Table 11: Current VA eligibility status of post-2001 service members who completed entry level training*[207]

|  | Number | % of service members |
|---|---|---|
| ***Recognized as a "veteran"*** |  | ***93.5%*** |
| Presumed eligible (Honorable or General) | 1,668,050 | 93.2% |
| Found "other than dishonorable" by COD | 4,600 | 0.3% |
| ***Not recognized as a "veteran"*** |  | ***6.5%*** |
| Found "dishonorable" by COD | 8,700 | 0.5% |
| Presumed ineligible (OTH, BCD or DD, and no COD has occurred) | 108,190 | 6% |

This is the highest exclusion rate that has ever existed. Although the VA is granting eligibility to current era veterans at a somewhat higher rate than previously (see Table 10), the VA is requiring eligibility reviews for more service members than ever before. Even when eligibility was only provided to servicemembers with fully Honorable discharge characterizations, as was the case in the Second World War period immediately prior to enactment of the current standards,[208] the exclusion rate was only 2% because 98% received "Honorable" characterizations. We have determined exclusion rates for years since then, where data is available. Table 12 summarizes that analysis.

---

[207] DOD FOIA Response 14-0557; telephone interview of Stacy Vazquez, Director, Interagency Strategic Initiatives, VA of Veterans Affairs on June 16, 2014.

[208] See Table 3 above and accompanying text. Prior to the 1944 statute, each benefit for veterans of each wartime period had different eligibility criteria. However the most recent eligibility laws enacted prior to WWII had required "honorable."

*Table 12: Exclusion rates for selected periods of service[209]*

| | Recognized as "veteran" | | | | Not recognized as "veteran" | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Presumed eligible[210] | Found eligible by COD[211] | Total | | Found ineligible by COD[212] | Presumed ineligible, no COD | Total |
| **WWII** ('41-'45)[213] *Pre-1944 standard* | 6,762,863 | 0 | **98%** | | | 131,306 | **1.9%** |
| *Post-1944 standard* | 6,775,842 | 400 | **98%** | | 16 | 117,911 | **1.7%** |
| **Korean War**[214] ('50-'55) | 4,004,394 | 997 | **97%** | | 5,810 | 130,707 | **3.3%** |
| **Vietnam War**[215] ('65-'75) | 9,047,198 | 7,800 | **97%** | | 28,000 | 232,180 | **2.8%** |
| **"Peacetime"**[216] (76-90) | 6,857,655 | 44,310 | **96%** | | 34,630 | 277,111 | **4.3%** |
| **GWOT**[217] ('02-'13) | 1,668,050 | 4,600 | **93%** | | 8,700 | 108,190 | **6.5%** |

The goal of the G.I. Bill of Rights was to expand access to veteran services for service members—the data show that the regulations do exactly the opposite. A dishonorable discharge characterization was and remains a rare punishment. By adopting "other than dishonorable conditions" as its eligibility standard, Congress deliberately chose to exclude people only rarely.

---

[209] Complete discharge characterization data is not available for 1946-1950 and 1991-2000; COD rates are not available for 1956-1960.

[210] Service members who received characterizations other than Honorable, General Under Honorable Conditions, or Under Honorable Conditions.

[211] Telephone interview with Stacy Vazquez, Director, Interagency Strategic Initiatives, Department of Veterans Affairs, June 16, 2014.

[212] Id.

[213] Staff of H. Comm. on Veterans' Affairs, Eligibility for Veterans' Benefits Pursuant to Discharge Upgradings, Hearing Before the Committee on Veterans' Affairs on S. 1307 and Related Bills, Rep. No. 97-887, at 600-01 (Comm. Print 1977).

[214] Staff of H. Comm. on Armed Servs., Administrative Discharge Procedures and Discharge Review, Hearings on H.R. 52 Before the Subcommittee on Military Personnel of the Committee on Armed Services, Rep. No. 95-79, at 198-205 (Comm. Print 1975).

[215] Id.

[216] U.S. Census Bureau, Statistical Abstract of the United States, at Table 622 – Discharges of Enlisted Personnel, by Type: 1965 to 1979 (1980); U.S. Census Bureau, Statistical Abstract of the United States, at Table 561 – Discharges, Desertion and Absent-Without-Authority Rates for Military Personnel: 1970 to 1988 (1988); DOD FOIA Request No. 09-F-1815, Administrative Separations by Character of Service and Reason. Punitive discharge rates for 1981, 1999 and 2000 were interpolated from adjacent years' rates.

[217] DOD FOIA Response 14-0557.

This was a more inclusive standard than had prevailed in prior veteran benefit laws, and Congress knew that its new standard would expand eligibility. The Congressional record provides multiple examples of legislators explicitly acknowledging and justifying this decision, as recognized by the Federal Circuit's binding interpretation of the statute as a "liberalizing" rule.[218] The VA's current regulations violate Congress's intent by transforming that less stringent standard into a more restrictive standard, increasing more than three-fold the share of service members that are unable to receive veteran services.

*Figure 1: Service members excluded from VA benefits, selected periods*[219]

The historical increase in exclusion rates is due largely to the fact that VA regulations have not adapted to changes in how military branches use the administrative discharge system. When the statute was enacted, the military justice system prioritized retention and retraining.[220] Half of the soldiers who were sentenced to a dishonorable discharge by general court-martial

---

[218] "The current language of the statute derives from the Servicemen's Readjustment Act of 1944, Pub. L. No. 346, 58 Stat. 284-301 (1944). In this enactment, Congress liberalized the discharge eligibility requirement to give the VA greater discretion in determining whether an individual's discharge was issued under 'dishonorable conditions.'" Camarena v. Brown, No. 94-7102, 1995 U.S. App. LEXIS 16683, at *8 (Fed. Cir. July 7, 1995) (emphasis added).

[219] Sources: see Table 12.

[220] For a discussion of the history of rehabilitation and retention policies in the military, see Evan R. Seamone, Reclaiming the Rehabilitative Ethic in Military Justice: The Suspended Punitive Discharge as a Method to Treat Military Offenders with PTSD and TBI and Reduce Recidivism, 208 Mil. L. Rev 1, 40 et seq. (2011).

during WWII had their sentences suspended so that they could go on to earn an Honorable discharge.[221]  Over time, the military services gradually adopted more exclusive standards.  A major change happened after 1975, when the draft was repealed and the military shifted to an all-volunteer force.  The professionalized volunteer military has adopted low- or zero-tolerance policies,[222] even for issues like off-duty driving while intoxicated that have no direct bearing on military service,[223] resulting in more frequent administrative separations for conduct that does not approach dishonorable characterization.  Current-era veterans are not more dishonorable than those of prior eras: the rate of punitive discharges for misconduct has stayed nearly the same throughout this period (see Figure 2).  Instead, administrative discharges for misconduct have increased simply because the military is more likely to discharge service members for minor or moderate discipline problems.

*Figure 2: Separations related to discipline, by type, selected periods[224]*



---

[221] Id. at 78.

[222] See, e.g., Navy Alcohol and Drug Abuse Prevention and Control, OPNAVINST 5350.4D ¶ 6.h (June 4, 2009) ("Navy's policy on drug abuse is 'zero tolerance.' Navy members determined to be using, possessing, promoting, manufacturing, or distributing drugs and/or drug abuse paraphernalia ... shall be disciplined as appropriate and processed for [Administrative Separation] as required.").

[223] See, e.g., C.H. Oliver, Marine Heavy Helicopter Squadron 362 Commanding Officer's Driving Under the Influence (DUI) Policy, http://www.1stmaw.marines.mil/Portals/65/Docs/MAG-24/HMH-362/HMH-362%20DUI%20Policy.docx (last accessed Dec. 16, 2015).

[224] See Table 12 above for data sources.

This increase in separations for minor or moderate misconduct has caused the VA's presumptive ineligibility standard to depart dramatically from Congress's intended standard. This is shown both by the aggregate exclusion data cited above, and by comparing the VA's regulatory exclusion criteria with the statutory exclusion criteria. Congress explained that it intended to discharge only service members whose misconduct was of similar severity to what it listed in its statutory bars.[225] While Congress recognized that the actual exclusion rate might be higher than the statutory exclusion rate, they should be similar. They are not. For discharges in FY2011, the statutory bars require exclusion of 1% of service members.[226] This is similar to the historical punitive discharge rate, confirming that the incidence of misconduct that Congress intended to exclude has not changed. But the VA's presumptive ineligibility standard now excludes an additional 5.5% over the number excluded by statute. This represents an extreme departure from statutory guidance.

The VA has dramatically increased the exclusion of service members, despite Congressional intent to expand access to readjustment services. This is the result of the VA's presumptive exclusion of servicemembers with administrative, non-punitive discharges for misconduct, a category that Congress intended to receive eligibility and that the military branches have increasingly relied upon to manage minor discipline issues. To reach the exclusion rates that Congress intended, and the exclusion standard that Congress intended, the VA will need to admit most or all veterans with Other Than Honorable characterizations.

### B. The regulations are an impermissible interpretation of statute because they do not adopt military "dishonorable" discharge standards

The VA only has authority to adopt rules implementing the Servicemen's Readjustment Act of 1944 that are reasonable interpretations of statute. Regulations "must always "give effect to the unambiguously expressed intent of Congress."[227] Here, Congress has unambiguously circumscribed VA authority to exclude service members to those whose conduct merited a dishonorable discharge characterization.[228] The VA's current regulations exceed the

---

[225] See Section II.C.1 above.
[226] See Table 1 above and accompanying text above.
[227] Util. Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2445 (2014) (citation omitted).
[228] See Part II.A above.

Department's authority because they exclude service members whose conduct would not merit a dishonorable discharge characterization.

Part II.B of this Petition described the conduct that merits a dishonorable discharge characterization under standards in place when Congress enacted this statute and under current standards. It was a penalty reserved for the most severe misconduct. The authorities discussed in that section identified three factors that determine when a dishonorable characterization may be warranted:

> <u>Based on the nature of the offense</u>: cases of rejection of military authority, crimes of moral turpitude, or civilian felonies;
>
> <u>Based on repeated discipline problems</u>: where there were at least three convictions for misconduct within one year; and
>
> <u>Not where mitigating factors are present</u>: mitigating factors include duration of service, quality of service, hardship conditions of service, disabilities, age, education level, extenuating circumstances.

Three features of the current regulation are incompatible with this statutory standard: (1) the "willful and persistent" bar as written and as applied denies eligibility based on conduct that would not justify a dishonorable characterization; (2) the regulation does not permit consideration of mitigating factors, including overall service, for the vast majority of cases; and (3) the regulations presume dishonorable conduct for non-punitive, administrative discharges for misconduct.

### 1.   *The "willful and persistent misconduct" bar encompasses conduct that would never qualify for a dishonorable characterization.*

The exclusion for "willful and persistent" misconduct is by far the most common basis for denying eligibility[229]—and it departs grossly from military-law standards for the types of repeated misconduct that would justify a dishonorable characterization. Its use renders the entire scheme defective.

As discussed in Section III.B.1 above, the primary elements of the regulation— willfulness and persistence—include no substantive minimum standard of misconduct. It can be

---

[229] <u>See</u> Table 6 above.

triggered by issues as minor as reprimands for arriving late to formation,[230] and can involve unrelated offenses spread out over the course of many years.  It does not exclude minor misconduct, although it does allow minor misconduct to be offset by otherwise exceptional performance.  Its definition of "minor" only requires the VA to overlook conduct that does not "interfere with military duties."

In contrast, military law strictly limits when a dishonorable characterization may be provided based on repeated low-level misconduct.[231]  The 2012 Manual for Courts-Martial authorizes a dishonorable characterization when there have been three convictions within the prior year.  This standard limits both the severity and the timing of misconduct that might justify a dishonorable characterization.  Under military law, as interpreted by the Supreme Court, an offense that leads to a non-judicial punishment (UCMJ Article 15) is a minor offense.  Therefore the requirement for three court-martial convictions ensures that minor offenses cannot lead to a dishonorable characterization.  Its requirement for those convictions to arise within one year prevents service members from being judged "dishonorable" based on isolated mistakes over the course of several years.  The 1943 Manual for Court-Martial permitted a dishonorable characterization after three convictions where each offense was eligible for a dishonorable characterization or after five offenses where each offense was not eligible for a dishonorable characterization.  The VA's original regulatory standard for "dishonorable conditions" adopted this standard by only considering misconduct that had resulted in a court-martial conviction.

The incompatibility between the "willful and persistent" regulatory bar and its authorizing statute is shown most clearly by how the regulation treats periods of absence without leave.  Congress stated explicitly in the legislative history, and implicitly in the structure of the statute, that the "dishonorable conditions" standard should exclude behavior similar to what it listed in its statutory bars.[232]  In the statutory bars, Congress provided a specific standard for how much absence without leave was sufficiently severe to forfeit eligibility: at least 180 days, and even then it can be overlooked if the absence was warranted by compelling circumstances.[233]  In

---

[230] Character of Discharge Determination Trainee Handouts, at 7 (July 2012) (on file).
[231] See Section II.C.3 above.
[232] See Section II.C.1 above.
[233] 38 U.S.C. § 5303(a); 38 C.F.R. § 3.12(c)(6).

doing so, Congress itself drew the line between AWOL that was severe enough to merit separation, and conduct that was severe enough to also warrant forfeiture of readjustment services. The statute speaks clearly "to the precise question at issue," and the VA "must give effect to the unambiguously expressed intent of Congress."[234] Indeed, as the Supreme Court has explained, "[i]t is hard to imagine a statutory term less ambiguous than … precise numerical thresholds."[235] Yet the CAVC has interpreted the "willful and persistent" regulatory standard to be satisfied with periods of absence without leave of only thirty days,[236] and the BVA has found an absense of one week to be willful and persistent[237]—entirely eclipsing the statutory 180-day standard. By "replac[ing] those numbers with others of its own choosing, [the VA has gone] well beyond the 'bounds of its statutory authority.'"[238]

Rather than adopt the military standard for a "dishonorable" characterization, the "willful and persistent" regulation more closely replicates the standard for an Other Than Honorable characterization: a non-punitive, administrative discharge *two* levels above "Dishonorable." The lowest criteria that can justify an Other Than Honorable characterization under military regulation is "Minor Disciplinary Infractions: A pattern of misconduct consisting solely of minor disciplinary infractions."[239] Like the "willful and persistent" regulation, this does not require that misconduct rise above the level of minor misconduct, it does not require any court-martial proceedings, it does not require that the offenses occur within any specific timeframe, and it can result in a higher characterization if service was "honest and faithful … [and] the positive aspects of the enlisted Service member's conduct or performance of duty outweigh negative aspects."[240] By hewing closely to the lowest standard for an Other Than Honorable characterization, the "willful and persistent" regulation plausibly excludes every service member with an Other Than Honorable characterization. This standard is facially incompatible with Congressional intent to

---

[234] Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).
[235] Util. Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2445 (2014).
[236] See, e.g., Winter v. Principi, 4 Vet. App. 29, 32 (1993).
[237] Title Redacted by Agency, No. 97-28543 (Bd. Vet. App. Aug. 18, 1997).
[238] Id. (citation omitted).
[239] DoDI 1332.14, Enclosure 3 ¶ 10.a.1 (Jan. 27, 2014).
[240] Id., Enclosure 4 ¶ 3.b.2.b (referenced by Enclosure 3 ¶ 10.c).

expand eligibility to service members with administrative, non-punitive discharges for misconduct.[241]

There are certainly VA adjudicators who produce fair outcomes by inferring substantive standards that do not exist in the regulations.  They may disregard discipline issues in the record, or conclude that certain discipline issues are insufficient to justify exclusion.  For example, one Veterans Law Judge explained why he was granting eligibility to a servicemember with several absences, including an absence of eighteen days:

> It is apparent that the appellant was out of place in a military environment, and it was entirely appropriate that he be administratively separated from service because of this.  However, his conduct in service was not so egregious that he should be disqualified from receiving VA benefits.[242]

This is exactly the analysis that led Congress to create its "other than dishonorable" standard: some misconduct justifies separation but does not justify withholding readjustment services.  However, the Veterans Law Judge made this argument to explain an outcome that the regulations did not require, or potentially even permit.  Data on decision outcomes show that this type of exceptional analysis does not happen often.  Numerous BVA decisions have denied eligibility due to similar or less severe misconduct because they followed the regulations as written—as, for example, the case of a veteran with "exceptional" service in the Persian Gulf, a PTSD diagnosis in service, and multiple deaths in his family, due to a one-week unauthorized absence.[243]  While the first example granting eligibility is a correct application of statute, the second example denying eligibility is a correct application of the regulation—but a violation of the statute.  A regulation that is facially incompatible with its organic statute is not remedied because adjudicators sometimes construe, or outright misapply, the regulation in a manner that it renders it lawful.

Data on VA decisions support this analysis.  In FY2013, VA Regional Offices denied eligibility to 90% of people with characterizations less than "under honorable conditions"; the denial rate for all appeals since 1992 is 87%.  Rather than exclude the people who should have

---

[241] *See* Section II.D above.
[242] <u>Title Redacted by Agency</u>, No. 02-07752 (Bd. Vet. App. July 12, 2002).
[243] <u>Title Redacted by Agency</u>, No. 97-28543 (Bd. Vet. App. August 18, 1997).

received a dishonorable characterization, the VA is only including the people who should have received an honorable characterization.  This is antithetical to Congress's statutory instruction.

> ### 2. *The regulatory definition of "dishonorable conditions" does not consider mitigating circumstances such as overall service, extenuating circumstances, or the service member's age.*

Military law permits a dishonorable characterization only after considering a broad range of mitigating factors, to include age, education, personal circumstances, work performance, quality and duration of service, and health factors.[244]  Because the regulatory standard permits almost none of these to be considered for most service members, it is an impermissible interpretation of the governing statute.[245]

The regulation permits only one factor to be considered in mitigation—overall quality of service—and it permits this to be considered only for the "willful and persistent" regulatory bar, only when the "willful and persistent" misconduct consisted of "a minor offense."[246]  This limited scope for any mitigating conditions departs significantly from the standard under military law which requires a consideration of a wide range of mitigating factors before imposing a dishonorable characterization.  It also departs from Congressional intent as shown in the examples given by legislators of conduct that they believed should result in eligibility.

The failure of regulations to account for mitigating circumstances is shown by how combat deployments fail to influence the outcome of Character of Discharge decisions. Congress specifically stated that combat veterans should receive veteran services even if they are guilty of unexcused absence, violations of military regulations and substance abuse.[247]  Under current regulations, however, contingency and combat deployments appear to have little influence on whether service is considered "other than dishonorable."

---

[244] See Section II.C.3 above.

[245] See Util. Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2442 (2013) ("[A]n agency interpretation that is inconsistent with the design and structure of the statute as a whole does not merit deference." (quotation marks, citation and alteration omitted)).

[246] See Section III.B.4 above.

[247] House Hearings on 1944 Act, *supra* note 28, at 417.

**Table 13: Results of BVA COD decisions for service members with selected contingency deployments**[248]

|  | % "dishonorable" |
|---|---|
| All service members | 87% |
| Vietnam deployment | 85% |
| Any combat service | 77% |
| OIF/OEF deployment | 65% |

Vietnam deployments have had no statistically significant impact on BVA evaluations of service quality. Combat service and post-9/11 deployments had only marginal effects: two out of every three service members with OEF/OIF deployments, and three out of every four with combat service, were so "dishonorable" under existing regulations that they forfeit recognition as a "veteran." This contradicts the express intention of Congress, to say nothing of public expectations for how the VA should treat former service members.

The results are even more striking if mental health is removed from the analysis. Cases where mental health may have contributed to behavior deserve special consideration, discussed in Section IV.C below. However, an assessment of overall service should take into account hardship service, even if it does not result in a mental disability. Setting aside cases where the service member claimed that PTSD was a factor, the data shows that hardship service had almost no impact on BVA eligibility decisions, and in some cases *hardship service made the BVA less likely to grant eligibility*.

**Table 14: Results of BVA COD decisions for selected service members who did not claim existence of PTSD**[249]

|  | % "dishonorable" |
|---|---|
| Vietnam deployment | 92% |
| All service members | 89% |
| Combat service | 85% |
| OIF/OEF deployment | 70% |

---

[248] Analysis of all Board of Veterans' Appeals decisions between 1992 and 2015, downloaded from U.S. Dep't of Veterans Affairs, The Board of Veterans' Appeals Decision Search Results, http://www.index.va.gov/search/va/bva.jsp on September 10, 2015.
[249] Id.

The absence of mitigating factors within the VAs' discretionary criteria contrasts with the existence of mitigating factors under one of the statutory bars. Congress barred services to those who were absent without leave for more than 180 days unless the absence was "warranted by compelling circumstances."[250] The VA defined "compelling circumstances" by regulation, instructing adjudicators to look at the age, judgment, education level, service history, and health conditions of the service member to decide whether "compelling circumstances" existed, and to consider those circumstances from the perspective of the service member at that time.[251] The VA did not extend this "compelling circumstances" analysis to its regulatory bars; as a result, the VA is prohibited from considering those factors when deciding whether conduct was "dishonorable."[252]

Some VA adjudicators, recognizing the injustice and inconsistency of the regulatory scheme, take mitigating factors into account even though regulations do not permit it. For example, one Veterans Law Judge felt compelled to evaluate mitigating circumstances "in an effort of fairness":

> The Board notes that the "compelling circumstances" exception does not apply to 38 C.F.R. § 3.12(d)(4). Even so, as it appears that his February 1970 to October 1970 AWOL offense was a primary reason for his separation, the Board will, in an effort of fairness, review the record to determine whether the appellant's AWOL was based on "compelling circumstances" as understood by VA.[253]

Although adjudicators should be commended on applying the spirit of the law, rather than the letter of the regulation, the spontaneous goodwill of adjudicators does not remedy facially impermissible regulations. At best, it creates arbitrary and inconsistent outcomes, itself a regulatory deficiency discussed in section IV.D below.

---

[250] 38 U.S.C. § 5303(a)
[251] 38 C.F.R § 3.12(c)(6)(i), (i), (iii).
[252] Winter v. Principi, 4 Vet. App. 29 (1993).
[253] Title Redacted by Agency, No. 09-30611 (Bd. Vet. App. Aug. 14, 2009).

### 3. The regulations flip the presumption of eligibility, improperly excluding more and more service members over time

Congress instructed the VA to grant eligibility to service members with intermediate characterizations—less than Honorable but better than Dishonorable—unless that characterization was granted due to an error or omission by the military.[254]  In effect, Congress presumed that intermediate characterizations were properly issued and then authorized the VA to rebut the presumption.[255]  The VA's regulations reverse this.  It has created a rebuttable presumption of *ineligibility* for characterizations that Congress decided should generally be *eligible*, turning Congressional intent on its head.

This presumption exist both in law and in fact.  It exists in law because servicemembers with Other Than Honorable discharges—administrative, non-punitive discharges for conduct that did not result in a court-martial—are classified as "Dishonorable for VA Purposes" unless and until they successfully show that their service was "Honorable for VA Purposes."[256]  A veteran with an OTH discharge, even one that is disabled, that served multiple enlistments, that deployed to combat, is ineligible until he or she proves eligibility.  The presumption also exists in fact, because denial rates of 90%, and reaching 100% in some Regional Offices, show that the VA places a high burden of proof on service members to overcome an assumption of ineligibility.

The effect of this error was relatively minor when military services did not use administrative, non-punitive discharges as frequently as they do today.  As discussed in section IV.A above, at the time of the enactment of the G.I. Bill, it was relatively uncommon for military services to give administrative discharges for minor or moderate misconduct.  Because military service used this discharge characterization rarely, the VA's reversed presumption impacted relatively few people.  Over time, and particularly after the end of the draft, the use of Other Than Honorable discharges to separate people for minor or moderate misconduct has increased dramatically, now representing twice as many service members as in 1964, and six times as many as in 1944.  Now, nearly 6% of all service members receive administrative, non-punitive

---

[254] See Section II.B above.
[255] See Section II.D above.
[256] See Section III.D above.

discharges for misconduct, and the effect of the reversed presumption has ballooned. That controverts statutory intent and therefore must be revised.

## C. The regulations fail to account for behavioral health issues such as PTSD or TBI

A dishonorable discharge characterization can only be issued after considering whether mental health conditions mitigate the misconduct. It is deeply unfair to exclude service members for behavior that is symptomatic of mental health conditions acquired in service.

It is well established that PTSD and operational stress can lead to behavior changes that military commanders incorrectly attribute to misconduct alone. PTSD, TBI, and Major Depression produce behavioral dysfunction through an exaggerated startle response, inability to control reflexive behavior, irritability, attraction to high-risk behavior, or substance abuse.[257] Some treatments induce fatigue or lethargy that also interfere with basic functioning. In fact, interference with social and occupational functioning is a primary measure of the severity of these conditions.[258] For service members on active duty, these behavioral disorders may result in infractions of unit discipline, and military services often do not treat these disciplinary infractions as symptoms of mental health risk: a 2005 study of Marines who deployed to Iraq showed that those diagnosed with PTSD were eleven times more likely to get misconduct discharges than those who did not have a diagnosis.[259] Recent press reports provide many examples of service members with early mental health trauma where their behavior in service was managed as a discipline problem rather than a mental health problem.[260] Service members

---

[257] James et al., Risk-Taking Behaviors and Impulsivity Among Veterans With and Without PTSD and Mild TBI, Mil. Med., 179, 4:357 (2014); Elbogen et al., Violent Behavior and Post-Traumatic Stress Disorder in US Iraq and Afghanistan Veterans, British J. Psychiatry, 204, 368-75 (2014); Tateno et al., Clinical Correlates of Aggressive Behavior After Traumatic Brain Injury, J. Neuropsychiatry & Clinical Neurosciences (2003).

[258] See General Ratings Formula for Mental Disorders, 38 C.F.R. § 4.150 (2009).

[259] R.M. Highfill-McRoy et al., *supra* note 112.

[260] Jeremy Schwartz, "Bad Paper" Discharges Can Stymie Veterans' Health Care: Diagnosed with Post-Traumatic Stress Disorder Before He Was Kicked Out of Marines for Failing a Drug Test Without Counseling, Austin Statesman Oct. 3, 2010; Dave Philipps, Other than Honorable, Colorado Springs Gazette, May 19, 2013; Hal Bernton, Troubled Veterans Left Without Health-Care Benefits, Seattle Times, Aug. 11, 2013; Quil Lawrence, Veterans and Other than Honorable Discharges, Nat'l Pub. Radio (2013); Daniel Zwerdling, Missed Treatment: Soldiers with Mental Health Issues Dismissed for "Misconduct", Nat'l Pub. Radio (Dec. 4, 2015).

"at mental health risk" are 32% more likely to be separated from service within a year of deployment than service members not "at mental health risk."[261]

The current regulatory scheme does not take into consideration the types of mental and behavioral health problems that are most likely to cause disciplinary issues leading to discharge. The regulatory scheme provides only one opportunity for considering mental health as a mitigating factor, the "insanity" exception.  As discussed above,[262] the "insanity" exception is inadequate because (1) it requires medical personnel and service members to characterize behavior as "insane," something that is not supported by psychological practice and is not common for people to do; and (2) the "insanity" exception as applied by Veteran Law Judges is so stringent that it in practice excludes the types of behavioral health problems commonly associated with PTSD, TBI, and operational stress: irritability, aggressiveness, self-medication with alcohol or drugs, self-harm or risk-seeking behavior.  As a result, the "insanity" exception does not adequately account for common behavioral health problems that often explain in-service misconduct.  The BVA found that the service member was "insane" in only 3% of cases where PTSD was claimed; in 24% of PTSD-related claims no "insanity" determination was made at all.[263]

Because the regulatory provision for "insanity" is so narrow, mental health appears to have little effect on eligibility decision outcomes.  In cases where the service member alleged the existence of some mental health condition, the BVA found "dishonorable" service 84% of the time, which is scarcely different from the global average of 87% for all COD decisions.[264]  The rates for specific conditions, including PTSD, are similar.  The rate in cases of TBI is lower, however it still shows that three out of every four service members whose misconduct may be attributed to TBI are nevertheless denied eligibility.

---

[261] C.S. Milliken, J.L. Auchterlonie & C.W. Hoge, Longitudinal Assessment of Mental Health Problems Among Active and Reserve Component Soldiers Returning from the Iraq War, J. Am. Med. Ass'n (2007).

[262] See Section III.C above.

[263] See Table 7 above and accompanying text.

[264] This includes PTSD, TBI, schizophrenia, schizoaffective disorder, personality disorder, adjustment disorder, depression and anxiety.

*Table 15: BVA COD decision rates for service members who allege selected mental health conditions, 1994-2015*

| Claimed mental health condition | Percent "dishonorable" |
|---|---|
| Average for all COD decisions | 87% |
| Personality Disorder or Adjustment Disorder | 84% |
| Any Mental Health condition | 84% |
| Post-Traumatic Stress Disorder | 81% |
| Traumatic Brain Injury | 72% |

The inadequacy of current regulations is even more clear when mental health is combined with hardship deployment or combat service.  BVA decisions found that service was "dishonorable" for nearly 3 out of every 4 combat veterans with PTSD.  That exceptionally high rate of disqualification not only violates Congress's intent but is also exceedingly poor public policy.  Those are the veterans *most* in need of the mental health and medical services Congress intended to provide.  And leaving so much service-acquired PTSD untreated poses risks both to the former service members and to the public at large.[265]

*Table 16: BVD COD decision rates for service members who allege PTSD, 1994-2015*

| | Percent "dishonorable" |
|---|---|
| With combat service | 73% |
| Contingency deployment[266] without combat service | 93% |

In some of these cases the mental health condition was identified only by self-reported symptomology, not a medical opinion.  Thus, some of these claimed conditions may not in fact have existed at the time of misconduct.  However, if even a fraction of these assertions were correct, and if the regulations were taking those conditions into account, then there would be a

---

[265] See Evan R. Seamone, Dismantling America's Largest Sleeper Cell: The Imperative to Treat, Rather than Merely Punish, Active Duty Offenders with PTSD Prior to Discharge from the Armed Forces, 37 Nova L. Rev. 479 (2013).

[266] Includes Vietnam, Grenada, Somalia, Iraq, and Afghanistan.  Does not include Korea, because it was not possible to reliably distinguish wartime deployments to Korea from peacetime deployments.

substantial difference in exclusion rates for people claiming mental health conditions.  There is not.

This is inconsistent with other VA regulations that relate to PTSD and behavior change. The VA recognizes that PTSD can lead to behavior changes including substance abuse, conflicts with colleagues, and avoidance of colleagues or work spaces.[267]  In fact, a veteran can use evidence of this type of discipline problem as proof that they acquired PTSD in service in order to show service-connection for purposes of disability benefits.[268]  Perversely, if those symptoms were so severe that the discipline problems led to an administrative separation for misconduct, the VA would likely characterize the service as "dishonorable" and deny eligibility.  Similarly, the VA recognizes that mental health problems can present a "compelling circumstance" that would exonerate a violation of the statutory bar in cases of AWOL longer than 180 days,[269] but if that resulted in an absence of *less than* 180 days then VA regulations do not consider mental health and eligibility would most likely be denied.  That result is neither permissible nor rational.

In order to remedy these deficiencies, the VA should adopt a provision providing for consideration of mental health as potential mitigation apart from the "insanity" exception, specifically instruct adjudicators to consider behavioral health issues and operational stress, and consider a medical opinion to be probative but not required.

### D.    Overbroad and vague regulations produce inconsistent outcomes

The regulations' broad and vague criteria produce profoundly inconsistent results.  The degree of variation is so broad that the standards must be considered impermissibly arbitrary and capricious.

The sections above provided examples of contradictory results relating to what constitutes "minor" offense, how long of an absence is "persistent," whether the "insanity" exception is invoked when a person claims a mental health condition, and how severe misconduct must be to justify exclusion.[270]  Inconsistency in individual decisions is most clear in

---

[267] 38 C.F.R § 3.304(f)(5).
[268] Id.
[269] 38 C.F.R § 3.12(c)(6)(ii).
[270] See Section III above.

cases of absence without leave, because the severity of the offense is quantifiable and therefore comparable. There are extreme variations in outcomes: for example, one BVA decision has found that an unauthorized absence of more than 500 days is not "willful and persistent misconduct,"[271] but another BVA decision has found that an absence of only 32 days was "willful and persistent misconduct."[272] Veterans' advocates also see wide and unexplainable differences in how cases are decided, in particular wide variation in how mental health, drug use, and extenuating circumstances are accounted for, if at all.

The VA has formally acknowledged this inconsistency. In hearings before the House Armed Services Committee, which was considering changes to DOD administrative discharge rules, a VA General Counsel representative discussed how the VA treats different characterizations. The General Counsel representative acknowledged that its regulations were producing inconsistent results:

> [Congressman] White: Does the Veterans' Administration codify the criteria at all for these to be determined judgments or are these strictly human judgments?
>
> [VA Associate General Counsel] Warman: We do have a regulation that is very general.
>
> White: So there is a great room for variance?
>
> Warman: Yes, there is.[273]

The VA General Counsel made a similar statement to the House Veterans Affairs Committee in 1977 when trying to explain what kinds of conduct would result in a denial of eligibility:

> One of the problems that we have frankly is that these terms are very broad and very imprecise."[274]

---

[271] Title Redacted by Agency, No. 12-32892 ( Bd. Vet. App. Sept. 24, 2012).

[272] Winter v. Principi, 4 Vet. App. 29, 32 (1993).

[273] Staff of H. Comm. on Armed Servs. , Hearings on H.R. 523 to Limit the Separation of Members of the Armed Forces under Conditions Other Than Honorable, Rep. No. 92-23, at 6009-10 (Comm. Print 1971).

[274] Staff of S. Comm. on Veterans Affairs, Eligibility for Veterans' Benefits Pursuant to Discharge Upgradings, Rep. No. 97-387, at 355 (1977) (quoting statement by VA Gen. Counsel McMichael to the H. Comm. on Veterans Affairs).

But the VA has not done anything in the subsequent four decades to remedy this acknowledged problem.

Arbitrariness is also shown by wide differences between Regional Offices. In FY2013, Regional Offices adjudicated 4,603 COD decisions, and found that service was "other than dishonorable" in 10% of cases.[275] However, in the Los Angeles Regional office this figure was 0%. In Muskogee it was 2%, in San Diego it was 18%, in Boston it was 31%. These regional disparities have persisted for decades.[276]

*Table 17: Selected Regional Office COD decisions, FY2013*[277]

| Regional Office | Number of COD decisions | % found "dishonorable" |
|---|---|---|
| Los Angeles | 80 | 100% |
| Muskogee | 100 | 98% |
| Nashville | 132 | 98% |
| Cleveland | 125 | 95% |
| St. Petersburg | 400 | 91% |
| *Average* | | *90%* |
| Buffalo | 139 | 86% |
| Philadelphia | 258 | 84% |
| San Diego | 99 | 82% |
| Boston | 39 | 69% |
| All | 4,603 | 90% |

Similarly, published decisions by the Board of Veterans' Appeals show a wide disparity in outcomes between adjudicators. Looking only at decisions by members of the Board who have decided over ten such cases, the rate of "dishonorable" findings ranges from 55% to 100%.

---

[275] FOIA response, available on file with the authors.
[276] See 123 Cong. Rec. 1657 (1977) (statement of Sen. Hart) ("For example, the Denver Regional Office has indicated that in the adjudication of other-than-honorable discharge cases in 1975, only 10 percent were ruled eligible for benefits. The Minnesota VA Regional Office, on the other hand, ruled that 25 percent of those veterans with other-than-honorable discharges were eligible for VA benefits.").
[277] FOIA response, available on file with the authors.

**Table 18: Outcomes of COD decisions by selected members of the Board of Veterans' Appeals, 1990-2015**

| Judge | % "dishonorable" |
|---|---|
| **Ma\*\*\*** | 100% |
| **Br\*\*\*** | 100% |
| **Wi\*\*\*** | 100% |
| **Pe\*\*\*** | 94% |
| **La\*\*\*** | 91% |
| **Br\*\*\*** | 90% |
| *Average* | *87%* |
| **Ph\*\*\*** | 85% |
| **Du\*\*\*** | 82% |
| **Se\*\*\*** | 67% |
| **Da\*\*\*** | 64% |
| **Hi\*\*\*** | 55% |

The appeal process does not remedy these inconsistencies. The CAVC has jurisdiction to evaluate questions of law, but only has jurisdiction to evaluate questions of fact for "clear error."[278] It must accept any "plausible" factual determination by the BVA. Nor can the Federal Circuit review factual findings at all.[279] The most common basis for a "dishonorable" finding, the willful and persistent regulatory bar, is a factual standard that the CAVC cannot overturn unless the BVA result is "implausible."[280] Appellate review has thus failed to refine and remedy the prevailing standards and instead has enabled enormous disparities persist for decades.

This degree of inconsistency does not reflect error or bad faith on the part of Regional Offices or Veterans Law Judges. Instead, it is the product of the regulation's vagueness and lack of appropriate standards. Because the regulations fail to account for essential considerations, such as mitigation, overall service, and severity of conduct, adjudicators are left to impute threshold standards or impute mitigation analysis by simply overlooking certain behavior, when

---

[278] 38 U.S.C. § 7261(a)(4).

[279] 38 U.S.C. § 7292(d)(2).

[280] "The BVA's determination whether a discharge is based on willful and persistent misconduct is a matter of fact which the Court reviews under the 'clearly erroneous' standard of review. Under this standard if there is a plausible basis in the record for the factual determinations of the BVA the Court cannot overturn them." Stringham v. Brown, 8 Vet. App. 445, 447-48 (1995) (internal quotations and citations omitted).

the facts of a claim are overwhelming. While this produces some appropriate outcomes, it does so rarely and inconsistently.

The VA can remedy this arbitrariness by providing clear severity standards, by mandating evaluation of overall service, and requiring consideration of mitigating factors. Relying on individual adjudicators to impute such standards, in violation of the text of the regulations, is neither lawful nor reliable.

### E.    The regulations are inconsistent with the VA's public and official commitments

The VA's public and official communications incorrectly describe its Character of Discharge regulations. Contrary to the plain text of its regulations and the actual practice of its adjudicators, these public commitments state that behavioral health, overall service, mitigating circumstances, and hardship service are all taken into account, and that service members can receive interim health care while eligibility is decided. Those assurances are not borne out in practice.

The table on the following page compares the actual practice discussed above with public and official statements by the VA from three sources: its public fact sheet "Claims For VA Benefits And Character Of Discharge: General Information"[281]; a presentation delivered by VA staff to the Senate Veteran Affairs Committee on May 5, 2014, "Impact of Military Discharges on Establishing Status as a Veteran for Title 38 Disability and/or Healthcare Benefits";[282] and a letter from Undersecretary for Benefits Allison Hickey to House Minority Leader Nancy Pelosi on July 31, 2015.[283]

---

[281] U.S. Dep't of Veterans Affairs, Claims for VA Benefits and Character of Discharge (Mar. 2014), http://www.benefits.va.gov/BENEFITS/docs/COD_Factsheet.pdf [hereinafter COD Fact Sheet]

[282] Included with this Petition as Attachment B [hereinafter SVAC Presentation].

[283] Included with this Petition as Attachment C [hereinafter Pelosi Letter].

*Table 19: Comparison of public and official statements with actual practice on selected issues*

| Issue | "VA COD Fact Sheet" [i] | Official statements | Actual practice |
|---|---|---|---|
| **Are mental health conditions such as PTSD and TBI taken into account?** | "[T]he impact of disabilities may be considered during the analysis of any mitigating or extenuating circumstances that may have contributed to the discharge." | "VA considers medical issues, such as PTSD and TBI." (SVAC Presentation [ii])<br><br>"VA may consider behavioral health issues, specifically PTSD." (Pelosi Letter [iii]) | Mental health is considered only if service members state that they were "insane" and obtain a medical opinion diagnosing "insanity." [iv]  PTSD has very little effect on decision outcomes. [v] |
| **Is the quality of prior service accounted for, including hardship service such as combat deployments?** | "VA considers… performance and accomplishments during service … and character of service preceding the incidents resulting in discharge." | "VA weighs the reason for separation against the overall nature of the quality of service." (Pelosi Letter) | The quality of prior service is considered only under one of the exclusions and only when the misconduct was "minor." [vi] Combat is not inherently "meritorious" and has little effect on decision outcomes. [vii] |
| **Is the length of service accounted for?** | "VA considers…. length of service." | | There is no criteria for considering length of prior service. |
| **Are mitigating factors taken into account?** | "VA considers … any mitigating or extenuating circumstances." | "VA considers … any mitigating factors."  (SVAC Presentation)<br><br>"VA weighs the reason for separation against … any mitigating factors, including those related to AWOL for periods exceeding 180 days." (Pelosi Letter) | The only mitigating factors that may be considered are "insanity" and overall service when misconduct was "minor." The "compelling circumstances" related to absence without leave for more than 180 days may not be applied to any regulatory bars. [viii] |
| **Can service members obtain tentative eligibility for health care?** | | "[A] former Service member may be provided health care at a VA medical facility based on a tentative eligibility determination in emergency circumstances." (Pelosi letter) | VA regulations prohibit granting tentative eligibility to service members when the pending eligibility issue relates to character of discharge.[ix] |

[i] Available at http://www.benefits.va.gov/BENEFITS/docs/COD_Factsheet.pdf.  [ii] Attachment B.  [iii] Attachment C. [iv] See section III.C. [v] See section IV.C. [vi] See section III.B.1. [vii] See section IV.B.2. [viii] See section III.B.4. [ix] See section III.A.

### F.    VA regulations prevent the VA from serving homeless, suicidal or justice-involved service members

The category of presumptively-ineligible service members includes people at elevated risk of suicide, homelessness and incarceration.  The denial of medical and mental health care, housing assistance, disability compensation and vocational rehabilitation for these vulnerable veterans is particularly troubling.

### 1.    Veteran Suicide

The past few years have revealed an epidemic of veteran suicide,[284] and the government has rightly prioritized addressing this crisis.  Congress passed legislation this year expanding services to veterans,[285] the VA has created additional suicide-prevention outreach and counseling services, and the President has acknowledged the moral imperative of supporting service members at mental health risk:

> Every community, every American, can reach out and do more with and for our veterans.  This has to be a national mission.  As a nation, we should not be satisfied -- will not be satisfied -- until every man and woman in uniform, every veteran, gets the help that they need to stay strong and healthy.[286]

The VA's character of discharge regulations prevent it from achieving this goal.  The most effective response to veteran suicide is bringing those at mental health risk into VA care: veterans outside of VA care have a 30% higher rate of suicide than those under VA care.[287]  Yet the VA turns away veterans who are at highest risk of suicide: service members discharged for misconduct are twice as likely to commit suicide as those with Honorable or General discharges.[288]  This happens because behavioral dysfunction that is symptomatic of early mental health problems is often treated as misconduct by military commands and managed through

---

[284] Alan Zarembo, Detailed Study Confirms High Suicide Rate Among Recent Veterans, L.A. Times, Jan. 15, 2015.

[285] Clay Hunt Suicide Prevention for American Veterans Act, Pub. L. No. 114-2, 129 Stat. 30 (2015).

[286] White House, Remarks by the President at Signing of the Clay Hunt SAV Act (Feb. 12, 2015).

[287] Janet E. Kemp, Veterans Health Admin., Suicide Rates in VA Patients Through 2011 with Comparisons with Other Americans and Other Veterans Through 2010 (Jan. 2014), http://www.mentalhealth.va.gov/docs/suicide_data_report_update_january_2014.pdf.

[288] M.A. Reger et al., Risk of Suicide Among US Military Service Members Following Operation Enduring Freedom or Operation Iraqi Freedom Deployment and Separation from the US Military, J. Am. Med. Ass'n Psychiatry (2015).

administrative separations.[289]  The VA's regulations have created a suicide pipeline: the people most at risk of suicide are the ones most likely to be turned away from the most effective suicide prevention care.

## 2.    *Veteran Homelessness*

Swords to Plowshares operates veteran homeless shelters funded by the VA and by other sources.  Approximately 15% of its occupancy is former service members who are excluded from VA services due to their discharge characterization.  Other veteran homeless shelter providers have said informally that they have similar levels of occupants that are ineligible for VA services based on character of discharge.[290]  Because these characterizations only represent up to 5% of all characterized discharges, we estimate that service members with these discharges are at least twice as likely to be homeless.[291]

This prevents the VA from eliminating veteran homelessness.  One of President Obama's major policy goals, in which he is joined by mayors and governors across the country, is ending veteran homelessness. The only program that provides permanent housing support, and therefore an essential part of the effort to end chronic homelessness, is the HUD-VASH program, which combines the value of a Section 8 housing voucher with the wrap-around support of VA social work and health care services. That program employs VA's health care eligibility standard and funnels eligibility determinations through VHA. For service members with Other Than Honorable discharges, who may be health care-eligible based on a service-connected disability or pursuant to a Character of Discharge Review, there is no clear path for that individual to apply for HUD-VASH, undergo an eligibility determination, and gain access to that program. As a result of VA's restrictive policies regarding eligibility and applications, national efforts to end veteran homelessness are hampered.

---

[289] See Section IV.C.

[290] Research shows that veterans separated for misconduct are much more likely to be homeless. Of the subset of veterans eligible for VHA services, 5.6% were separated for misconduct – but they make up 25.6% of the homeless veteran population at first VHA encounter. Adi V. Gundlapalli et al., Military Misconduct & Homelessness Among US Veterans Separated from Active Duty 2001-2012, 314 J. Am. Med. Ass'n 832 (Aug. 2015).

[291] The VA's policy for eligibility in its GPD program has changed at least twice since January 2014.  In its current practice, it is granting eligibility to some service members that are not eligible for VA benefits according to the criteria discussed in this document.  More information on the evolution and current status of GPD eligibility is available from the author.

3.    *Veteran Incarceration*

According to the Bureau of Justice Statistics, 23.2% of service members in prison, and 33.2% of service members in jail, have discharge characterizations less than General, indicating that they are presumptively ineligible for VA services.[292]  The corresponding figure in the non-incarcerated population is 7%, indicating that the risk of incarceration for this group is three times the risk for other former service members.

The VA's eligibility criteria prevent it from helping veterans avoid incarceration.  The VA's Veteran Justice Outreach workers, who support diversionary Veteran Justice Courts, are only able to work with VA-eligible veterans.  If a local veteran's court is unable to connect a defendant with non-VA services, then they may not be able to take advantage of that treatment court.  In San Francisco, 27% of veterans who are eligible to participate in the veteran's treatment court are not VA-eligible.[293]  The city obtained separate funding to ensure that these veterans can take advantage of the opportunity provided by the veteran treatment court, one of the only jurisdictions in the country to do so.  In other cities, these service members may not be able to participate in the diversionary court and are more likely to be incarcerated.

## G.    The procedures to obtain an individual review are extremely burdensome on service members and on the VA

Whereas VA regulations waive eligibility review for service members with Honorable and General discharge characterizations, [294] service members with other discharge characterizations must undergo a years-long adjudication that compares their individual service to the statutory and regulatory bars. During that period, the service member is unable to access care or support through VA because agency regulations preclude "tentative eligibility" for such

---

[292] DOJ Bureau of Justice Statistics Special Report, Veterans in Prison and Jail, 2011–12 (Dec. 2015).
[293] S.F. Cty. Sup. Ct., San Francisco Collaborative Courts Veteran Justice Court Fact Sheet (Aug. 2015),
    http://www.sfsuperiorcourt.org/sites/default/files/images/VeteransJusticeCourtFACT%20SHEETAugust2015.pdf.
[294] 38 C.F.R § 3.12(a); Adjudication Procedures Manual pt. III.v.1.B.5.c.  Service members with these
    characterizations enjoy a rebuttable presumption of honorable service.  That presumption may be rebutted in cases
    when a service member received a misconduct discharge but then received a discharge upgrade from the Secretary
    of Defense based on certain "amnesty" or "automatic" discharge upgrade programs implemented in the 1970s.
    Congress mandated that the VA may not base its eligibility determination on a DOD discharge characterization
    issued under those circumstances.  38 U.S.C. § 5303(e); 38 C.F.R § 3.12(k).  The VA must apply the usual
    character of service review standards as described in this document.  If the VA finds that the service member does
    not pass the statutory or discretionary bars, their service will be found Dishonorable for VA Purposes and they
    will be ineligible for most or all benefits.

veterans.[295]    Sometimes, the adjudication process never even commences because service members are provided misinformation and the regulations do not give VA staff concise, helpful instructions.

In practice, the large majority of veterans placed in the presumptively ineligible category never receive an eligibility evaluation from the VA. Of the 121,490 service members discharged since 2001 in that group, the VA has completed reviews for only 13,300, or 10.9%.[296]    That means that about nine out of every ten veterans discharged for misconduct are denied VA eligibility without even receiving an evaluation.

There are three main reasons for why so few receive eligibility evaluations. First, in our experience, most veterans seeking health care are never considered for eligibility. VA hospitals and clinics are probably the most prominent, well-known, accessible points of entry for veterans interested in service-related benefits. When a service member with a discharge characterization less than Honorable or General goes to a VHA facility, various legal provisions counsel that VA should ask him or her about enrolling in health care; provide an application and instructions on how to apply for benefits; initiate an eligibility review; and make a written determination as to eligibility.[297]    Yet, time and time again, we have seen that hospital eligibility and enrollment staff simply turn away these service members outright without providing an application or instructions and without initiating a request for eligibility review. The judgment as to ineligibility is made solely on the basis of the assigned character of service, without reference to the governing regulations or consideration of other bases for eligibility--which include a prior term of service or health care for a service-connected injury for those with Other Than Honorable discharges.[298] The failure to refer directly decreases the number of eligibility reviews conducted, and secondarily reduces the likelihood that such a veteran will apply again later or elsewhere.

---

[295] See Section III.A above.

[296] See Table 10 above and accompanying text.

[297] See 38 U.S.C. §§ 5100, 5102, 5104, 5107; 38 C.F.R. §§ 3.150, 17.36. See also Eligibility Determinations VHA Handbook 1601A.02 ¶ 6(3)(c) (Nov. 5, 2009); VA Health Care, No. IB 10-448, Other Than Honorable Discharges: Impact on Eligibility for VA Health Care Benefits (Dec. 2011), http://www.va.gov/healthbenefits/assets/documents/publications/ib10-448.pdf.

[298] See Pub. L. No. 95-126, § 2, 91 Stat. 1106, 1107-08 (1977); see generally Eligibility Determinations, VHA Handbook 1601A.02 ¶ 5.

Second, veterans seeking homeless housing services from the VA have no method for requesting an evaluation of eligibility. For example, The Grant and Per Diem (GPD) program is implemented by grantees, not by the VA itself.  GPD providers must confirm veteran eligibility through the local VHA "GPD Liaison" within three days of the client's admission.[299]  The GPD Liaison's role is limited to verifying eligibility status, not adjudicating eligibility.[300]  In practice, the Liaisons report that a service member is ineligible if he or she lacks a Honorable or General Discharge without conducting any individualized COD analysis.

Third, veterans are often misinformed about the fact that they may be eligible for benefits and therefore never apply.  The misperception that service members without Honorable or General discharges are categorically ineligible is widespread, and even occasionally promoted by the VA's own statements.  In addition to the example discussed above of VHA eligibility staff turning people away, the VA's website incorrectly states that service members with discharge characterizations less than Other Than Honorable are only eligible for insurance programs.[301] Finally, the low rates of successful eligibility reviews contribute to this misperception of ineligibility.

Even now, the law is clear that any person who served may be eligible for some benefits. What is unclear is how to initiate, navigate, and adjudicate that eligibility review process. Whether the review process starts presently depends on whether the veteran applies for service-connected compensation or pension or for housing or health care, and whether the person he or she talks to has the right information.  The process of getting health care is particularly burdensome for veterans as well as staff.  A recent change to the VHA Handbook worsened the problem by removing the most instructive direction to Enrollment Staff about how to process applications by such veterans in accordance with governing law.[302] Instead, staff apparently have

---

[299] VHA Handbook 1162.01(1), Grant and Per Diem Program Program ¶ 12(*l*) (July 12, 2013).

[300] Id. ¶ 6(e)(2).

[301] The VA's benefits website states, for example: "Specific Benefit Program Character of Discharge Requirements: Discharge Requirements for Compensation Benefits: To receive VA compensation benefits and services, the Veteran's character of discharge or service must be under other than dishonorable conditions (e.g., honorable, under honorable conditions, general)."  U.S. Dep't of Veterans Affairs, Applying for Benefits and Your Character of Discharge, http://www.benefits.va.gov/benefits/character_of_discharge.asp (last updated May 19, 2015).

[302] Compare Eligibility Determination, VHA Handbook 1601A.02 ¶ 6(c) (Nov. 5, 2009) with Eligibility Determination, VHA Handbook 1601A.02 ¶ 5(c) (Apr. 3, 2015).

to piece together various laws, regulations, and guidance to figure out how to initiate a review, make a determination, and inform the veteran of that decision.

What is more, there is scant guidance regarding veterans seeking health care for service-connected injuries, including those related to combat and Military Sexual Trauma.[303] It is important to remember that Congress specifically provided that service members discharged under Other Than Honorable conditions—even those whose service is adjudicated "dishonorable"—are eligible for a health care benefits package to treat their service connected injuries. Current regulations do not implement that critical statutory mandate, leaving veterans and VHA staff without sufficient guidance.

Even when an eligibility review does commence, the process is long and onerous—for the VA as well as for the veteran. The administrative burden of adjudication is high. Regional Offices place eligibility evaluations in the Administrative Decision lane, where, compared to other claims, adjudication takes twice as long to complete.[304] The average processing time is 1,200 days—nearly four years long.[305] During that adjudication, the VA must send out multiple notices seeking information and providing opportunities for submission of evidence and hearings. Veterans may respond to those notices and expend energy collecting various records, reports, and statements. Given the correlation between a less-than-fully-Honorable discharge and conditions such as homelessness, incarceration, and suicide, the burden of responding fully and in a timely manner to those notices is quite high. In the meantime, those veterans are barred from receiving tentative eligibility for health care. Given the high rates of suicidal ideation, Post-Traumatic Stress, and other mental health conditions among this population,[306] any delay in or denial of care can have a serious impact on service members, their families and communities.

Because of these numerous obstacles, most veterans have not received an eligibility review. If the VA were to do so now, organizational overload could result. Between 2001 and

---

[303] See Pub. L. No. 95-126, § 2, 91 Stat. 1106, 1107-08 (1977); 38 U.S.C. § 1720D; Military Sexual Trauma (MST) Programming, VHA Directive 2010-033 (July 14, 2010).

[304] Data from the VA ASPIRE Dashboard.

[305] In September 2015, the average claim age was approximately 600 days. This indicates that the average time to complete is about 1,200 days.

[306] See Section H below; R.M. Highfill-McRoy et al., *supra* note 112; R.A. Kukla et al., Contractual Report of Findings from the National Vietnam Veterans' Readjustment Study: Volumes 1-4 (1988).

2013, 121,490 service members received discharges that will require pre-eligibility review because of 38 C.F.R. § 3.12(a).[307] That means that, on average, more than 10,000 veterans each year require VA eligibility reviews before they can obtain services. The VA has only adjudicated one in ten of these, suggesting that the VA would be simply incapable of actually adjudicating them all.

### H.    The regulations unfairly disadvantage service members from certain military branches

The current regulations privilege some service branches over others by creating a presumption of ineligibility for service members with administrative discharges under Other Than Honorable conditions. This perpetuates one of the problems that the statute was intended to ameliorate: unfair exclusion of service members based on based on military policy decisions that have nothing to do with the former service member's actual service.

The current regulations effectively impose an "honorable conditions" standard. This is accomplished by providing presumptive eligibility to all service members with "Honorable" or "General" characterizations[308] and by adopting highly exclusive standards that deny eligibility to almost all of the remaining service members. For example, for post-2001 veterans, the VA currently recognizes "other than dishonorable" service for 100% of the service members with Honorable and General characterizations, but denies eligibility for 96.5% of the service members with other characterizations.[309]

This standard produces unfair outcomes because each service has different standards for administrative discharges. The first three discharge characterizations—Honorable, General, and Other Than Honorable—are all administrative, non-punitive discharges. The Secretary of Defense has issued guidance on how service commanders should use these characterizations.[310] But that guidance delegates wide discretion to services and to commanders to choose whether to seek discharge, what basis for discharge to adopt, and what characterization to provide. Punitive discharges—Bad Conduct and Dishonorable—are governed by the Uniform Code of Military

---

[307] See Table 11 above.
[308] 38 C.F.R. § 3.12(a).
[309] See Section III.D above.
[310] DODI 1332.14 (2014).

Justice and are therefore subject to uniform procedural and substantive standards. Punitive discharge rates vary between 0.3% in the Navy and 1.1% in the Marine Corps. In contrast, administrative discharges provide very little safeguards for consistency between services or between commanders, resulting in a *20-fold* variance between military branches: between 0.5% in the Air Force and 10% in the Marine Corps.

***Table 20: Discharge characterizations, FY2011***

|  | Honorable | General | Other Than Honorable | Bad Conduct | Dishonorable |
|---|---|---|---|---|---|
| **Army** | 81% | 15% | 3% | 0.6% | 0.1% |
| **Navy** | 85% | 8% | 7% | 0.3% | 0.0% |
| **Air Force** | 89% | 10% | 0.5% | 0.5% | 0.0% |
| **Marine Corps** | 86% | 3% | 10% | 1.0% | 0.1% |
| **Total** | **84%** | **10%** | **5%** | **1%** | **0.1%** |

This difference between services is due to administrative policies, not individual merit. The Government Accountability Office has done a thorough study on discharge characterization disparities between services.[311] It documented that this range of discharge practices reflects differences in leadership and management styles, not degrees of "honor" in different services:

> Simply stated, different people get different discharges under similar circumstances, and the type of discharge an individual gets may have little to do with his behavior and performance on active duty.[312]

The GAO compared discharges of Marines and Airmen with the same misconduct history, service length, and performance history, and found that the Air Force was 13 times more likely to give a discharge under honorable conditions than the Marines.[313] Military leaders justified their practices with unit-level considerations, not individual merit: some believed that expeditious termination was in the best interest of the services, while others believed that maximizing punishment helped reinforce unit discipline.[314]

---

[311] GAO Report, *supra* note 113.
[312] Id. at ii.
[313] Id. at 29-33.
[314] Id. at 32.

Because the VA's regulations rely so heavily on the distinction between Other Than Honorable and General administrative discharges, and because different services have very different standards for each of these, there are major disparities in VA eligibility between services. For service members discharged between 2001 and 2013, 12% of Marines would get turned away from a VA hospital if they sought care after leaving the service, but the equivalent figure for Airmen is only 1.7%.

*Table 21: DOD discharge characterizations and initial VA eligibility by service branch, 2001-2013*

|  | Presumptively VA-eligible | | | Presumptively VA-ineligible | | | |
|---|---|---|---|---|---|---|---|
|  | Honorable | General | Total | OTH | BCD | Dishonorable | Total |
| **USAF** | 90% | 8% | 98% | 1% | 0.7% | 0.08% | 1.7% |
| **Army** | 84% | 11% | 95% | 5% | 0.2% | 0.04% | 5% |
| **All branches** | **85%** | **8%** | **93%** | **6%** | **0.9%** | **0.07%** | **7%** |
| **Navy** | 82% | 7% | 89% | 10% | 0.7% | 0.00% | 11% |
| **USMC** | 85% | 3% | 88% | 9% | 2.9% | 0.19% | 12% |

Knowing that the Marine Corps gives more severe discharge characterizations than other services, and has done so for over half a century, the VA should be expected to grant eligibility to Marines at a higher rate than for other services when it conducts individual COD review. This expectation is also reasonable given that, for the current wartime period at least, the Marine Corps has endured harder conditions of service than most,[315] and given that Congress has singled out combat veterans for special consideration.[316]   But—contrary to those expectations—this is not the case. In truth, VA COD decisions exclude Marines *at a higher rate* than any other military personnel. Far from ameliorating disparities, the current system is making them worse.

---

[315] "The ground forces, composed predominantly of personnel from both the Army and the Marine Corps, have borne the brunt of the conflict."  RAND Ctr. for Military Health Policy Research, <u>Invisible Wounds of War: Psychological & Cognitive Injuries, Consequences, & Services to Assist Recovery</u> 23 (Terri Tanielian & Lisa H. Jaycox eds. 2008).  The death rate for Marines in Iraq was more than twice that of any other service branch, and 23 times that for Airmen, as of 2007.  Emily Buzzell & Samuel H. Preston, <u>Mortality of American Troops in the Iraq War</u>, 33 Population & Dev. Rev. 555, 557 (2007).

[316] <u>E.g.</u>, Combat-Related Special Compensation, an increased compensation payment for disabilities that resulted from combat, Pub. L. 110-181, ¶ 641, 122 Stat. 3 (Jan. 28, 2008).

***Table 22: Board of Veterans' Appeals COD decisions by military service branch, 1990-2015***

|  | "Other than dishonorable" |
|---|---|
| Navy | 16% |
| Not specified | 15% |
| Average | 13% |
| USAF | 12% |
| Army | 12% |
| USMC | 7% |

Congress enacted a single, uniform standard for eligibility and gave the VA responsibility for individualized, independent review of conduct precisely to avoid the injustices that result from unequal treatment by the military services. The current VA regulations simply perpetuate—and in some cases actually exacerbate—those disparities. The VA does so by giving enormous, and typically controlling, weight to the discharge characterization even though they mean vastly different things between the services.

## I.     The Regulation Unlawfully Discriminates Against Homosexual Conduct

The VA's current regulations continue to enable it to deny benefits to claimants whose military discharge or release was for "homosexual acts involving aggravating circumstances or other factors affecting the performance of duties."[317] This rule singles out gay service members for special, disfavored treatment and is plainly unlawful in light of recent Congressional actions and court decisions. The VA has known since at least 2004 that this provision was outdated and inappropriate. In 2004 the VA issued a notice of proposed rulemaking that would have stricken the word "homosexual" in favor of the all-inclusive "sexual," noting that "all of the sexual offenses listed in this paragraph are egregious no matter who commits them."[318] The VA has failed for more than a decade to finalize that proposed rule, however—a delay that has long since become unlawful.

The unequal treatment of claimants discharged for homosexual acts is contrary to Congressional intent in enacting a repeal of the prior "Don't Ask, Don't Tell" ("DADT") policy.

---

[317] 38 C.F.R. § 3.12(d)(5).
[318] Service Requirements for Veterans, 69 Fed. Reg. 4820 (Jan. 30, 2004).

Through that enactment, Congress clearly intended to eliminate differential treatment between heterosexual and homosexual conduct. Moreover, the VA's unequal treatment of homosexual conduct clearly violates the Fifth Amendment's guarantee of due process, which incorporates the requirements of the Equal Protection Clause. In 2013, the Supreme Court struck down the Defense of Marriage Act ("DOMA"), which denied federal benefits to same-sex couples, as an "unconstitutional … deprivation of liberty … protected by the Fifth Amendment of the Constitution."[319]

### J.    The government cost associated with increased eligibility would be largely offset by reductions in non-veteran entitlement programs and health care savings

Increasing the number of eligible veterans would increase direct costs to the VA, but the net cost to the Government would be offset by reductions in other entitlement programs and savings associated with more cost-effective health care delivery. An initial estimate shows that a 1% increase in eligibility may result in a net per capita expenditure increase of only 0.3%.

Benefits eligibility rules provide a starting point for analyzing how different programs would be affected. Expanding "veteran" eligibility does not create eligibility for the G.I. Bill, one of the more expensive VA benefits, nor for unemployment benefits. There would not be a significant increase in overhead costs, because the overall percentages concerned are relatively small. The services that are most likely to see a cost increase as a result of an expansion of eligibility are Health care, Compensation and Pension.

- Health care: Net government savings. It is not likely that service members with stable employer-paid insurance will migrate to VA health care as a result of this change. The service members who are likely to adopt VA health care are those on Medicare or Medicaid. VA health care is known to be about 21% more cost-effective than Medicare and Medicaid.[320] Therefore each increased dollar in VA health care services represents a total government savings of about $0.20.

---

[319] See generally Obergefell v. Hodges, 135 S.Ct. 2071 (2015); United States v. Windsor, 133 S.Ct. 2675 (2013) (striking down Defense of Marriage Act ("DOMA"), which denied federal benefits to same-sex couples, as an "unconstitutional … deprivation of liberty … protected by the Fifth Amendment of the Constitution.").

[320] See Congressional Budget Office, Comparing the Costs of the Veterans' Health Care System with Private-Sector Costs, at 5 (Dec. 2014).

- Pension: Small net government cost increase.  The eligibility criteria for VA Pension are similar to the criteria for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI).[321]  It is very likely that any service member who will become eligible for Pension is already receiving SSI/SSDI.  Because those benefits cannot be received concurrently, the increase in Pension utilization will be offset by a reduction in SSDI/SSDI utilization.[322]  There will be a net increase in government cost only to the extent that VA Pension provides more money than the SSI/SSDI benefit.  SSI amounts vary by location, and SSDI amounts vary by work history; in California in 2015, veterans on SSI typically receive about $850, and veterans on SSDI typically receive about $950.  This is only marginally below the current Pension rate of $1,072.  Therefore each dollar increase in the Pension benefit only represents a net government cost increase of about $0.15.

- Compensation: Net increase in government cost.  Service-connected disability compensation would be offset by reductions to SSI, although it is not possible to estimate how may new recipients are now receiving SSI.

Using these cost estimates as an illustrative guide, and assuming that utilization of these services would be the same as for currently-eligible servicemembers, the following table estimates the increased VA cost and net government cost for each 1% increase in the eligible veteran population.

---

[321] The "total disability" requirement for VA Pension is presumptively satisfied if the claimant is receiving SSI or SSDI.  Brown v. Derwinski, 2 Vet. App. 444, 448 (1992).

[322] 38 C.F.R. § 3.262(f).

*Table 23: Initial cost model for one-percent increase in eligibility ($ millions, 2010 baseline)*

| | Baseline expenditure [323] | VA cost increase from 1% eligibility increase | | Net per capita government cost from 1% eligibility increase | |
|---|---|---|---|---|---|
| **Compensation** | 37,960 | 1% | 38,340 | 1% | 38,340 |
| **Pension** | 9,941 | 1% | 10,040 | 0.15% | 11,432 |
| **Health Care** | 46,923 | 1% | 47,392 | -0.21% | 46,829 |
| **Other** | 13,937 | 0% | 13,937 | 0% | 96,601 |
| **Total** | **108,761** | **0.9%** | **109,709** | **0.3%** | **38,340** |

Therefore while a 1% increase in eligibility would result in a 0.9% increase in direct costs to the VA, the net government per capita cost would only increase by 0.3%.

This does not include indirect savings that would result from veteran-specific care, better homelessness services, increased access to prison diversion programs, and other support services. VA health care is more effective at treating veteran-related health problems[324] and VHA users typically use more preventative care,[325] resulting in better health outcomes. Improved health outcomes result in lower lifetime health costs [326] and improved downstream effects on employment, housing, and family well-being.[327] Veterans in VA homelessness services also report better health outcomes than veterans in non-VA homeless services.[328] Prison diversion programs enable long-term employment and financial stability. The benefits of these positive downstream effects will accrue not only to veterans individually but also to the VA, to local veteran-focused organizations, and to veterans' family members and communities.

---

[323] Expenditure data from U.S. Census Bureau, Statistical Abstract of the United States, at Table 523 – Veterans Benefits--Expenditures by Program and Compensation for Service-Connected Disabilities: 1990 to 2010 (2012).

[324] For example, the suicide rate of veterans under VHA care is 50% less than the suicide rate for veterans outside of VHA care. I. Katz, Suicide Among Veterans in 16 States, 2005 to 2008: Comparisons Between Utilizers and Nonutilizers of Veterans Health Administration (VHA) Services Based on Data From the National Death Index, the National Violent Death Reporting System, and VHA, Am. J. Pub. Health (Mar. 2, 2012).

[325] Because VHA has low out-of-pocket costs and because many of VHA's enrollees belong to those affected groups, the Congressional Budget Office (CBO) has found that "there may be some offsetting savings over the longer run." Congressional Budget Office, Comparing the Costs of the Veterans' Health Care System with Private-Sector Costs, at 3 (Dec. 2014).

[326] "VHA is more likely than private insurers to capture those longer-term savings" because veterans stay in the VA health care system. Id.

[327] See Ctrs. for Disease Control & Prevention, The Power of Prevention (2009).

[328] Byrne et al., Health Services Use Among Veterans Using VA and Mainstream Homeless Services, World Med. & Health Policy Vol. 5(4), 347–361 (2013).

## V.  EXPLANATION OF PROPOSED AMENDMENTS TO ALIGN VA REGULATIONS WITH STATUTORY AUTHORITY, OFFICIAL COMMITMENTS, AND PUBLIC EXPECTATIONS FOR THE FAIR TREATMENT OF VETERANS

This section proposes changes that will align VA practice with its statutory obligations, its official commitments, and public expectations.  All of the changes proposed below are within the VA's rulemaking authority.

Summary of proposed changes:

- *Changes to 38 C.F.R. § 3.12(d).* Adopt a definition for "dishonorable conditions" that excludes service members based only on severe misconduct and that considers mitigating circumstances such as behavioral health, hardship service, overall service, and extenuating circumstances.

- *Changes to 38 C.F.R. § 3.12(a).*  Reduce the number of service members that are presumptively ineligible by only requiring prior review for those with punitive discharges or discharge in lieu of court-martial.

- *Changes to 38 C.F.R. § 17.34.* Provide tentative eligibility for health care to all who were administratively discharged, who probably have a service-connected injury, or who probably honorably completed an earlier term of service pending eligibility review.

- *Changes to 38 C.F.R. § 17.36.*  Ensure that service members seeking health care receive an eligibility review.

The full text of proposed regulations are attached.  This Part provides justification for the suggested language.

### A.    Standards for "dishonorable conditions" – 38 C.F.R. § 3.12(d)

We propose to amend this paragraph with three major changes: (1) in the header paragraph, state that a "dishonorable conditions" finding is only appropriate for severe misconduct; (2) change the itemized forms of disqualifying conduct so that they are based on equivalent standards used in military law; and (3) add a section that lists mitigating circumstances, adopting standards applied in military law and similar VA regulations.

*1.    The header paragraph should instruct adjudicators to only deny eligibility based on severe misconduct*

The current header paragraph states:

>A discharge or release because of one of the offenses specified in this paragraph is considered to have been issued under dishonorable conditions.

We propose to replace the header paragraph with this text:

>(d)    The VA may find that a separation was under dishonorable conditions only if overall service warranted a Dishonorable discharge characterization.  This is the case if discharge resulted from any of the conduct listed in paragraph (1), and that if that misconduct outweighs the mitigating factors listed in paragraph (2).  Administrative discharges are not under dishonorable conditions unless evidence in the record indicates that a dishonorable discharge was merited and that the better discharge was issued for reasons unrelated to the service member's character.

The legislative history makes clear that Congress only wanted to exclude service members whose conduct would have justified a Dishonorable discharge characterization.[329]  The current regulations do not contain any instruction that limits exclusion to cases of severe misconduct.[330]  In particular, the overbroad standards result in the exclusion of most service members with administrative, non-punitive discharges for misconduct,[331] a level of service the Congress specifically intended to include in eligibility for basic veteran services.[332] Furthermore, the absence of substantive conduct standards has contributed to widely inconsistent decision outcomes.[333]

The proposed header paragraph remedies this deficiency this with three statements.  First, it conveys the express language of Congress that exclusion should only occur for service members whose conduct would merit a dishonorable characterization.  Second, it instructs the adjudicator to balance the enumerated forms of negative conduct against enumerated forms of mitigating circumstances, discussed below.  Third, in order to avoid improperly excluding those whose conduct was below honorable but better than dishonorable, a category that Congress intended to receive eligibility, it explains that administrative discharges generally do not indicate dishonorable conditions.

---

[329] See Section II.B above.
[330] See Section III.B.1 above.
[331] See Section IV.A above.
[332] See Section II.D above.
[333] See Section IV.D above.

*2. The definitions of disqualifying conduct should adopt specific standards imported from military law*

We propose to retain the same categories of disqualifying conduct that currently exist, but provide more specific standards that conform with military law criteria for dishonorable characterizations.

## Discharge to escape trial by general court-martial

The current paragraph states:

> Acceptance of an undesirable discharge to escape trial by general court-martial

We propose to replace this paragraph with the following text:

> Acceptance of a discharge to avoid trial by general court-martial. Avoidance of a trial by general court-martial is shown by documentation that charges had been referred to a general court-martial by a general court-martial convening authority.

This change clarifies the existing standard by explaining the evidence required under military law to show that the matter had been placed under general court-martial jurisdiction. A charge sheet alone does not indicate that a general court-martial has been recommended, because the matter could be referred to a special or summary court-martial. We have seen cases where a person is excluded on this regulation when charge sheets have been proffered but no general court-martial recommendation has been made. This amendment would clarify the correct analysis that adjudicators must make to apply the existing standard.

## Mutiny or spying

No proposed changes.

## Moral Turpitude

The current paragraph states:

> An offense involving moral turpitude. This includes, generally, conviction of a felony.

We propose to replace this paragraph with this text:

> An offense involving moral turpitude. Moral turpitude is conduct that involves fraud, or conduct that gravely violates moral standards and involves the intent to harm another person.

This change replaces a vague term with a more specific definition derived from extensive caselaw on this question. We note that the Office of General Counsel has produced a Precedential Opinion on the definition of "moral turpitude."[334] However, the holdings of that Opinion have not been incorporated into the regulation or the training materials on this topic, and it has been inaccurately incorporated into the Adjudication Procedures Manual used by front-line adjudicators.[335] Therefore the Precedential Opinion has little impact on most decisions. We also note that the definition of moral turpitude proposed in the Part 5 Manual Rewrite does not adopt the standards of the Precedential Opinion.[336]

We propose a concise but specific definition that is based on the existing caselaw on this question, and that is consistent with the standards provided in the Precedential Opinion. The most extensive body of legal analysis on this question can be found in immigration law, where Congress has mandated certain responses when non-citizens commit "crimes involving moral turpitude."[337] The 9th Circuit Court of Appeals has produced certain guidelines for determining whether a crime involves moral turpitude. "[T]he federal generic definition of a [crime involving moral turpitude] is a crime involving fraud or conduct that (1) is vile, base, or depraved and (2) violates accepted moral standards … [and (3)] 'almost always involve[s] an intent to harm someone.'"[338] Turpitude does not encompass "all offenses against accepted rules of social conduct."[339] Rather, "[o]nly truly unconscionable conduct surpasses the threshold of moral turpitude."[340] Crimes against property that do not involve fraud are generally not considered crimes of moral turpitude.[341]

The Precedential Opinion adopted the term "gravely violates moral standards," in place of the 9th Circuit's phrase "vile, base or depraved conduct that violates accepted moral

---

[334] VA Gen. Counsel Precedential Op. 06-87 (1987).
[335] See Section III.B.2 above.
[336] Id.
[337] 8 U.S.C. § 1227(a)(2)(A)(i).
[338] Saavedra-Figueroa v. Holder, 625 F.3d 621, 626 (9th Cir. 2010) (citation omitted).
[339] Robles-Urrea v. Holder, 678 F.3d 702, 708 (9th Cir. 2012).
[340] Turijan v. Holder, 744 F.3d 617, 621 (9th Cir. 2014) (citation omitted).
[341] See Rodriguez-Herrera v. INS, 52 F.3d 238, 240 n.5 (9th Cir. 1995).

standards." We propose to adopt the Precedential Opinion's phrasing for ease of administration. However we believe that it is important to reassert the principle, omitted from the Part 5 Manual Rewrite, that crimes against property are not moral turpitude unless they involve fraud. Therefore the combined proposed language derives from the 9th Circuit caselaw, but is condensed as: fraud, or conduct that gravely violates moral standards and that involves the intent to harm another person.

### Repeated offenses ("willful and persistent misconduct")

The current paragraph states:

> Willful and persistent misconduct. This includes a discharge under other than honorable conditions, if it is determined that it was issued because of willful and persistent misconduct. A discharge because of a minor offense will not, however, be considered willful and persistent misconduct if service was otherwise honest, faithful and meritorious.

We propose:

> Three or more separate incidents of serious misconduct that occurred within one year of each other. Misconduct is serious when it is punishable by at least one year of confinement under the Uniform Code of Military Justice.

We propose this language because it is specific, predictable, and derived from military law. The current language deviates greatly from the corresponding standard in military law, produces inconsistent results, and results in the exclusion of service members that congress intended for the VA to include. [342]

We recognize that the purpose of this regulation is to identify people who have engaged in a series of acts of misconduct where no individual act justifies a dishonorable characterization, but where the accumulation of misconduct shows a rejection of military authority amounting to dishonorable character. However, the current regulation fails to achieve this purpose. Its language is so expansive that almost any series of discipline problems is a plausible basis for exclusion. [343] It fails to distinguish truly dishonorable conduct from conduct that is merely

---

[342] See Section IV.B.1 above.
[343] See Section III.D above.

improper and that justifies a lesser punishment. Like a dishonorable characterization, a finding of "dishonorable conditions" should be rare, and most forms of misconduct do not justify it. This distinction exists in military law, it existed for the Congress that wrote the law, and a correct regulatory interpretation of the statute must incorporate it.[344]

Military law contains a clear standard for when repeated, less-than-severe misconduct might justify a dishonorable characterization. The Manual for Courts-Martial in place at the time Congress enacted the statute instructed a dishonorable characterization for repeated offenses that did not involve moral turpitude only if there had been five prior convictions for minor offenses.[345] Current regulations allow for a dishonorable characterization for repeated offenses if there have been three convictions within the past year.[346] Non-judicial military punishment is only available for minor offenses, as determined by the military commander.[347] Because misconduct that results in a non-judicial punishment is not serious misconduct, it cannot be the basis for a dishonorable characterization. The original regulations adopted by the VA respected this principle by only considering misconduct that resulted in a conviction.[348]

Our proposed regulation would adopt the current military law standard but omit the requirement for court-martial convictions. The proposed language would find "dishonorable conditions" if within one year prior to discharge there had been three documented cases of misconduct that was eligible for at least one year of confinement, regardless of whether that conduct was actually punished by court-martial. This would avoid cases where service members are excluded because of misconduct that occurred long before discharge, or for misconduct that was too minor by military standards to contribute to a finding of dishonorable character.

Our proposed language removes this paragraph's mitigating circumstances exception. We do this for two reasons. First, the mitigating circumstances exception in the current regulation is far narrower than what is required by statute, what the VA has officially committed to, and what the public expects.[349] It is only available in limited circumstances; the only

---

[344] See Section II.D above.
[345] MCM 1943 ¶ 104c(B).
[346] RCM 1003(d)(1).
[347] MCM 2012 pt. V.1.e.
[348] 11 Fed. Reg. 8729, 8731 (Aug. 13, 1946).
[349] See Section IV.B.2 above.

mitigating factor is quality of service, without considering mental health, operational stress, duration of service, or extenuating circumstances; and the standard for quality of service is far too high, not even considering combat service as inherently "meritorious."  Second, because military law requires that mitigating factors be considered prior to all dishonorable characterizations,[350] we have proposed below to include a comprehensive mitigating analysis element that applies to all categories of disqualifying conduct.  This makes a limited mitigation exception in this paragraph superfluous.

## Sexual misconduct

The current paragraph states:

> Homosexual acts involving aggravating circumstances or other factors affecting the performance of duty. Examples of homosexual acts involving aggravating circumstances or other factors affecting the performance of duty include child molestation, homosexual prostitution, homosexual acts or conduct accompanied by assault or coercion, and homosexual acts or conduct taking place between service members of disparate rank, grade, or status when a service member has taken advantage of his or her superior rank, grade, or status.

We propose to eliminate this section.

A conduct prohibition that singles out homosexual conduct is unconstitutional.[351] Preserving the regulation without its discriminatory content is unnecessary.  The aggravating circumstances listed in this regulation are likely encompassed within the "moral turpitude" prohibition, or are subject to general courts-martial, and are therefore superfluous; if not, then the conduct not "dishonorable" and should not be a basis for denying veteran service.

Furthermore, the purpose of this regulation was to discriminate against homosexual conduct, and without its discriminatory purpose there is no reason to retain it in any form.  The regulation originally targeted "homosexual acts or tendencies,"[352] was then limited to "homosexual acts,"[353] and was then limited to "aggravated" homosexual acts.[354]  Now that the

---

[350] See Section II.C.3 above.
[351] See Section IV.I above.
[352] 11 Fed. Reg. at 8,731.
[353] 28 Fed. Reg. 123 (Jan. 4, 1963).

underlying conduct is permitted, there is no reason to retain the limiting factors as a stand-alone prohibition.  A simplified regulation would omit this paragraph entirely.

### 3. The regulations should require adjudicators to consider mitigating circumstances

There is no provision in regulation requiring consideration of mitigating factors.

We propose to add the following paragraph:

> (2) The severe punishment of a dishonorable characterization is not justified where extenuating circumstances explain or mitigate the misconduct.  The Secretary must consider any information that would justify a reduction in the severity of punishment.  The following circumstances may show that service was not dishonorable
>
>> (i) The individual contributed substantial favorable service to the nation.  A determination of favorable service to the nation will consider:
>>
>>> (A) The duration and quality of service prior to the misconduct that resulted in discharge, and
>>>
>>> (B) Whether the service included hardship conditions, such as overseas deployment.
>>
>> (ii) The person's state of mind at the time of misconduct was adversely affected by mental or physical disabilities or operational stress.
>>
>> (iii) The person's actions were explained by extenuating circumstances, taking into consideration the person's age, maturity, and intellectual capacity.

We propose this language to harmonize the regulation with military law, other VA regulations, the VA's commitments, and public expectations.  The current regulatory definition of "dishonorable conditions" does not include a general provision for considering mitigating circumstances.[355]  This is inconsistent with military law, where a dishonorable characterization is only justified after consideration of a full range of mitigating circumstances.[356]  Nor is the

---

[354] 45 Fed. Reg. 2318 (Jan. 11, 1980).
[355] See Section III.B.4 above.
[356] See Section II.C.3 above.

current regulation consistent with the VA's own regulations.  The VA has adopted a list of mitigating circumstances that may excuse an absence of over 180 days, as required by a statutory bar, but it has not applied these mitigating circumstances to absences that are less than 180 days and therefore subject to review under its regulatory bars.[357]  This produces the perverse outcome where the VA is more lenient on more severe misconduct.

We propose a list of mitigating circumstances that incorporates terms from military law and from other VA regulations.  The Military Judges' Benchbook provides model sentencing instructions that list the following mitigating factors: age, family/domestic difficulties, good military character, financial difficulties, mental/behavioral condition, personality disorder, physical impairment, addiction, education, and performance evaluations.[358]  The VA's regulations defining "compelling circumstances" for the purposes of mitigating an unauthorized absence of more than 180 days lists the following factors: duration and character of service prior to absence, service of such quality that it is of benefit to the nation, family emergencies or obligations, obligations or duties owed to third parties, age, cultural background, educational level, judgmental maturity, hardship or suffering incurred during overseas service, combat wounds, and other service-incurred or aggravated disabilities.[359]

The proposed regulation adopts these factors from military law and VA regulations and groups them under three headers: factors that show favorable service to the nation; factors relating to the veteran's state of mind, as determined by their mental and physical health; and extenuating circumstances.  The only term in the proposed regulation that is not adopted directly from existing military and VA sources is the factor considering "operational stress."  "Operational stress" is similar to the consideration of "hardship … incurred during overseas service" that is listed among the "compelling circumstances" factors.  We propose to add this term because the military services have recently recognized "operational stress" as a distinct phenomenon, particularly in the current era of repeated deployments, that can justifiably result in behavior changes among otherwise honorable service members.[360]  It is important that the VA's

---

[357] See Section IV.B.2 above.
[358] See, e.g., Military Judges' Benchbook, DA Pam 27-9 ¶ 2-5-13.
[359] 38 C.F.R § 3.12(c)(6)(i, ii, iii).
[360] U.S. Dep't of the Army, Field Manual 4-02.51 (FM 8-51):  Combat and Operational Stress Control (2006). ("Soldiers, however good and heroic, under extreme combat stress may also engage in misconduct.").  U.S. Dep't

regulations reflect current understanding and terminology for how the demands of military service may explain behavior changes.

We do not propose to retain the language that currently exists in the "willful and persistent misconduct" bar, whereby some misconduct is mitigated where service is "otherwise honest, faithful and meritorious." While these are certainly positive qualities, these terms are not mitigating factors under military law. Moreover, those terms have been interpreted by Veteran Law Judges as imposing a much higher standard for mitigation than exists under military law or under other VA regulations. For example, adjudicators have found that even combat service is not "meritorious" enough to benefit from this exception, if the service member did not also earn awards for valor.[361] By only rewarding exceptional performance, it fails to acknowledge that military service is inherently beneficial to the nation. A proper mitigation analysis must give some credit to the fact of service, and to the duration of proficient service. This "meritorious" standard departs so significantly from military law and congressional intent that it must be replaced.

## B.    Which service members require individual review – 38 C.F.R. § 3.12(a)

We propose to amend this paragraph so that individual review is not required for people who are very unlikely to be excluded based on revised standards. The current paragraph states:

> If the former service member did not die in service, pension, compensation, or dependency and indemnity compensation is not payable unless the period of service on which the claim is based was terminated by discharge or release under conditions other than dishonorable. (38 U.S.C. § 101(2)). A discharge under honorable conditions is binding on the VA of Veterans Affairs as to character of discharge.

We propose the following text that replaces the final sentence:

> If the former service member did not die in service, pension, compensation, or dependency and indemnity compensation is not payable unless the period of service on which the claim is based was terminated by discharge or release under conditions other than dishonorable. (38 U.S.C.

---

of the Navy & U.S. Marine Corps, Combat and Operational Stress Control: NTTP 1-15M, MCRP: 6-11C (Dec. 2010) (identifying behavior that characteristically results from operational stress, including "losses of control," "intense and uncharacteristic anger," and "sudden outbursts of rage").

[361] See Section III.B.1 above.

> § 101(2)). An administrative discharge shall be a discharge under conditions other than dishonorable unless it is issued in lieu of court-martial. Administrative discharges issued in lieu of court-martial, Dishonorable discharges, and Bad Conduct Discharges must be reviewed under the criteria in paragraph (d) in order to determine whether the separation was under dishonorable conditions.

This change will ensure that people who are not at risk of being found "dishonorable" are able to access care and services without requiring an individual review by the VA.

The VA is currently excluding more veterans than at any point in the nation's history, more than three times as many people as were being excluded when the current "liberalizing" law was enacted.[362] This is not because service members are behaving worse, or because VA adjudicators are evaluating them more severely. It is solely because the VA's regulations set aside an increasing share of service members that require adjudication—many more than behaved "dishonorably," and many more than the VA can actually adjudicate.[363] It is both impractical and contrary to statue for the VA to require eligibility adjudications for categories of service members that Congress specifically intended to receive eligibility.

It is also unjust. All of these men and women served the nation, and it is shameful for them to be left without health care for disabilities, without housing if they are homeless, without income support if they are unable to work. The injustice is most acute for service members denied eligibility despite having served under hardship conditions. Over 33,000 service members discharged since 2001 served on a contingency deployment and yet received a discharge characterization that the VA treats as presumptively ineligible.[364] Because the VA has granted eligibility to only 4,600 veterans of this era,[365] there are probably over 30,000 service members who deployed to contingency operations since 2001 but who are currently ineligible for VA services.

---

[362] See Table 10 above.
[363] See Section IV.A above.
[364] DOD FOIA Response 14-0557.
[365] See Table 10 above.

***Table 24: Selected discharge characterizations of service members who deployed to contingency operations, 2001-2014***[366]

| Characterization | |
|---|---:|
| *Presumptively VA-ineligible* | **33,977** |
| Other Than Honorable | 29,364 |
| Bad Conduct | 4,265 |
| Dishonorable | 348 |

The dramatically increasing rate of exclusion from VA services results from the military's increasing use of administrative separations to deal with discipline issues that previously led to retention, retaining, and Honorable or General characterizations.[367] The use of the discharge characterization has increased from less than 1% of all discharges to 5.5%.[368] Because Congress instructed the VA to exclude these service members only on an exceptional basis, and because this represents such a large portion of all service members, it is no longer appropriate for the VA to presume ineligibility for all of them. In order to approach the rate of exclusion intended by Congress, and the standards it intended, the VA must recognize eligibility for a large number of these people separated for non-punitive administrative discharges.

As for people with General and Honorable discharges—some of whom may prove to be ineligible, but all of whom can receive services prior to eligibility determinations—the VA should identify additional categories of discharges that are very likely to be found eligible and who will not require eligibility review.

We propose to limit pre-eligibility reviews to people with punitive discharges (Bad Conduct or Dishonorable) and Other Than Honorable discharges issued in lieu of court-martial. This is an easily-administered standard that would ensure prompt eligibility for large numbers of people who are not at risk of exclusion.

---

[366] DOD FOIA Response 14-0557.
[367] See Section II.D above.
[368] See Figure 2.

DOD instructions allow administrative discharges for misconduct under two scenarios: where the discharge is "In lieu of court-martial"[369] and where there is generic "Misconduct"[370] that the commander did not see fit to refer to court-martial. The first category includes cases where court-martial charges have been alleged, a preliminary investigation has occurred, and the service member, under advice from defense counsel, has admitted guilt and requested separation.[371] When this occurs, the separation documentation clearly states "Discharge in Lieu of Court Martial." This is a category that may involve serious misconduct, including conduct that is morally turpitudinous or that might have been referred to a general court-martial. It is therefore proper for the VA to require an individual evaluation for these service members to determine whether their conduct was in fact dishonorable.

In contrast, the second category of misconduct that might lead to an Other Than Honorable discharge does not likely involve conduct at risk of exclusion under "dishonorable" standards. DOD Instructions list several types of conduct that might justify separation under the generic "Misconduct" paragraph, including "Minor disciplinary infractions,"[372] and "Pattern of misconduct … consisting of discreditable involvement with civil or military authorities or conduct prejudicial to good order and discipline."[373] This includes the types of misconduct that justify separation but that do not show "dishonorable" service, and which Congress instructed the VA to grant eligibility. They are all, moreover, situations where the commander, considering all mitigating and extenuating factors, decided not to convene a court-martial. In order to conform with statutory instructions, and in order to grant eligibility in a fair and efficient manner, the VA should not withhold eligibility for these service members pending individual review.

For ease of administration, we do not propose listing and categorizing all possible bases for administrative discharges. There are several designations that might appear on a DD214 when generic "Misconduct" was the basis for discharge. Military branches might use different terms for similar situations. Instead, we propose to set aside administrative discharges issued in lieu of court-martial, and to waive individual review for all others.

---

[369] DODI 1332.14, Enclosure 3 ¶ 11.
[370] Id., Enclosure 3 ¶ 10.
[371] Id., Enclosure 3 ¶ 11.c.
[372] Id., Enclosure 3 ¶ 10.a.1.
[373] Id., Enclosure 3 ¶ 10.a.2.

This category of service members—with administrative, non-punitive discharges for general misconduct that did not involve court-martial charges—represent 3.8% of all service members, and over half of post-2001 the service members currently excluded from VA services. Allowing presumptive eligibility for these service members would reduce overall exclusion rates from 6.8% to 3%, much closer to the 1944 rate of 1.9% that Congress thought was too high when it enacted the current statute. The remaining 3% of service members include those with punitive discharges and those given administrative discharges in lieu of court-martial. This category of veteran would not be eligible for VA services unless a COD review finds that their service was other than dishonorable under the standards in 38 C.F.R. 3.12(d).

*Figure 3: Types of discharges leading to presumptive VA exclusion*[374]

### C.    Tentative eligibility for health care - 38 C.F.R. § 17.34.

We propose to expand tentative eligibility to include all service members who will probably be found eligible for health care and to include instructions for Enrollment and

---

[374] DOD FOIA request, 14-10057.   Staff of H. Comm. on Veterans' Affairs, <u>Eligibility for Veterans' Benefits Pursuant to Discharge Upgradings, Hearing Before the Committee on Veterans' Affairs on S. 1307 and Related Bills</u>, Rep. No. 97-887, at 600-01 (Comm. Print 1977).

Eligibility Staff on initiating the Character of Discharge Review process. The current regulations read, in whole:

> Subject to the provisions of §§ 17.36 through 17.38, when an application for hospital care or other medical services, except outpatient dental care, has been filed which requires an adjudication as to service connection or a determination as to any other eligibility prerequisite which cannot immediately be established, the service (including transportation) may be authorized without further delay if it is determined that eligibility for care probably will be established. Tentative eligibility determinations under this section, however, will only be made if:
>
> > (a) In emergencies. The applicant needs hospital care or other medical services in emergency circumstances, or
> >
> > (b) Based on discharge. The application is filed within 6 months after date of discharge under conditions other than dishonorably, and for a veteran who seeks eligibility based on a period of service that began after September 7, 1980, the veteran must meet the applicable minimum service requirements under 38 U.S.C. § 5303A.

We propose to replace this with the following:

> Subject to the provisions of §§ 17.36 through 17.38, when any person has filed, or expressed an intent to file, an application for hospital care or other medical services, except outpatient dental care, or has expressed an interest in hospital care or medical services or concerns that indicate the need for care or treatment and that person's application requires an adjudication as to service connection or a determination as to any other eligibility prerequisite which cannot immediately be established, the service (including transportation) may be authorized if it is determined that eligibility for care probably will be established.
>
> (a) Tentative eligibility determinations under this section, however, will only be made under the following circumstances:
>
> > (1)  In emergencies. When the applicant needs hospital care or other medical services in emergency circumstances, those services may be provided based on tentative eligibility;
> >
> > (2)  Based on discharge. When adjudication as to character of discharge is required, tentative eligibility will be provided to any applicant who has an Other Than Honorable characterization, who served more than four years, or who served more than one enlistment.  For an applicant who seeks eligibility based on a period of service that began after September 7, 1980, the applicant

must meet the applicable minimum service requirements under 38 U.S.C. § 5303A; or

(3)   Based on length of service. When any applicant does not meet applicable minimum service requirements under 38 U.S.C. § 5303A, tentative eligibility will be provided if the applicant was released for medical or health reasons, including medical discharge or retirement, condition not a disability, or other physical or mental health conditions.

Broadly, the expressed purpose of the current regulation is to allow the VA to provide medical care to all who are eligible or likely eligible without delay. It seeks to accomplish that goal by granting eligibility immediately if possible, and by granting "tentative eligibility" where eligibility "probably" will be established. The current proxies for probable eligibility are (a) emergencies and (b) discharge within the last six months where the discharge is "under conditions other than dishonorable" and any minimum service requirement is met.

Change is needed for three primary reasons. First, the current regulation is opaque and provides scant guidance to front-line staff. Whether a service member was discharged other-than-dishonorably and whether a service member meets any minimum service requirement is presently a complex adjudicatory process. Greater clarity and specificity would be helpful to describe whether a service member is probably eligible. Second, the proxies chosen do not adequately predict probable eligibility. As one example, they do not evaluate whether a service member completed a first or prior term of service on which eligibility can be based. Third, adoption of the proposals detailed above will increase access to the VA for service members with Other Than Honorable discharges, and their eligibility for VHA services is therefore probable. That has the added benefit of ensuring that other-than-honorably discharged service members with combat-related or Military Sexual Trauma-related health conditions are not wrongfully denied medical benefits for those service-connected injuries, to which they are entitled by law.

[375] Congress has recognized the "strong moral obligation of the Federal Government to provide treatment for service-connected disabilities."[376]

Accordingly, the proposed regulation implements two new proxies for probable eligibility. The first grants tentative eligibility to those service members with Other Than Honorable discharges, for the reasons explained above, and to service members where facts indicate that they completed at least one term of service. The second, which applies where the service member does not appear to meet minimum service requirements, grants tentative eligibility to those who appear to have service-connected injuries based on available facts.

It is possible that some who are granted tentative eligibility will later be found ineligible after a more careful review. However, the VA should take the policy of being over-inclusive, rather than underinclusive—a policy that Congress clearly supports.[377] The denial of prompt treatment to a service member in need has long-term consequences. It is better to give service members the benefit of the doubt and provide support for a period of time while adjudication is ongoing. If ultimately the service member is not eligible, then the VA can cease providing services.

Finally, we propose that any hospital or medical care provided during the tentative eligibility period is not charged to the applicant. The VA may, of course, bill other insurers. However, so as not to deter service members from seeking necessary care based on the specter of potential charges, the best policy is to waive costs during tentative eligibility.

We also propose to add the following subsections to the regulation, in order to describe necessary procedures for satisfying this regulation's goal.

> (b) When a person files an application for hospital care or other medical services, or has expressed an interest in hospital care or medical services, and an adjudication as to service connection or a determination as to any

---

[375] Pub. L. 113-146 (as amended by Pub. L. 113- 175, Pub. L. 113-235); see VHA Directive 2010-033, Military Sexual Trauma (MST) Programming (July 14, 2010); IB 10-448 Other Than Honorable Discharges: Impact on Eligibility for VA Health Care Benefits (Nov. 2014).

[376] S. Comm. on Veterans' Affairs, Eligibility for Veterans Benefits Pursuant to Vietnam Era Discharge Upgrading, report to accompany S. 1307, 95th Cong., 1st sess., at 18 (June 28, 1977).

[377] See, e.g., House Hearings on 1944 Act, supra note 28 at 415 ("[W]e are trying to give the veteran the benefit of the doubt, because we think he deserves it.").

other eligibility prerequisite is required, a request for an administrative decision regarding eligibility shall promptly be made to the appropriate VA Regional Office, or to the VA Health Eligibility Center.

(c) Applicants provided tentative eligibility shall promptly be notified in writing if they are found ineligible and furnished notice of rights of appeal.

The current regulation, written in the passive voice, fails to provide clear instructions to VHA staff and does not fully implement VA's broad mandate to provide rehabilitation and treatment services to those who have served. It passively refers to applications that have been filed, without here specifying how an applicant can obtain that application and submit it. Similarly, this regulation does not provide instructions to VHA staff about initiating a Character of Discharge Review for service members who seek health care for whom eligibility cannot immediately be established. Moreover, the regulation does not reflect the reality that when veterans go to VA health facilities they ask for treatment, not applications. That is, they say that they need counseling, medications, or housing, not an enrollment form.

To effectively implement this regulation, the proposed introductory paragraph triggers the tentative eligibility determination process not only when an application is filed, but also when a person expresses an intent to file an application, expresses interest in hospital or medical care, or expresses concern that indicates a need for care or treatment. This pragmatic, expansive language parallels the federal regulations for the Supplemental Nutrition Assistance Program (SNAP, commonly known as "food stamps"), which instruct staff to "encourage" to apply any person who "expresses interest in obtaining food stamp assistance or expresses concerns which indicate food insecurity."[378] The VA has a similar—indeed greater—obligation to ensure that all veterans get the care and treatment that they need and should adopt a similar stance of encouraging to apply all those who are interested.

Proposed subsection (b) then instructs VHA staff to request an administrative decision to the VA Regional Office or the VA Health Eligibility Center, and subsection (c) requires notice of any determinations and rights of appeal to service members. As discussed above, 90% of service members who require eligibility determinations never even obtain a review. Clearer instructions

---

[378] 7 C.F.R. § 273.2(c)(2).

may help remedy the widespread phenomena of less-than-honorably discharged veterans being denied by default and of being turned away without adjudication. Practical guidance on required procedures will help VA staff efficiently and correctly process applications.

### D.    Changes to health care enrollment procedures – 38 C.F.R. § 17.36(d).

We propose revising the regulations to offer clearer guidance to VA staff and to embrace a more veteran-friendly enrollment process. We propose inserting short additions to the existing regulations, as underlined below:

(d) Enrollment and disenrollment process—

(1)    Application for enrollment.  Any person may apply to be enrolled in the VA healthcare system at any time. Enrollment staff shall encourage any person who expresses an interest in obtaining hospital care, medical services, or other benefits or who expresses concerns that indicate an interest in benefits to file an application.  Upon request made in person or in writing by any person applying for or expressing an intent to apply for benefits under the laws administered by the Department of Veterans Affairs, the appropriate application form and instructions will be furnished. For enrollment in VA healthcare, the appropriate application form is the VA Form 10–10EZ.   Any person who wishes to be enrolled must apply by submitting a VA Form 10–10EZ to a VA medical facility or via         an         Online         submission         at https://www.1010ez.med.va.gov/sec/vha/1010ez/.

(2)    Action on application. Upon receipt of a completed VA Form 10–10EZ, a VA network or facility director, or the Deputy Under Secretary for Health for Operations and Management or Chief, Health Administration Service or equivalent official at a VA medical facility, or Director, Health Eligibility Center, will accept a veteran as an enrollee upon determining that the veteran is in a priority category eligible to be enrolled as set forth in § 17.36(c)(2). Upon determining that a veteran is not in a priority category eligible to be enrolled, the VA network or facility director, or the Deputy Under Secretary for Health for Operations and Management or Chief, Health Administration Service or equivalent official at a VA medical facility, or Director, Health Eligibility Center, will inform the applicant that the applicant is ineligible to be enrolled.  If eligibility is in question based on character of service, a request for an administrative decision regarding eligibility shall be made to the appropriate VA Regional Office, or the VA Health Eligibility Center, using a VA Form 7131.

The proposed regulations seek to implement a number of VA's goals, including clear guidance to applicants and staff and ease of access for service members. To those ends, the proposal includes more detailed instruction for VA staff. For example, it instructs staff to provide the appropriate application form, a 10-10EZ, to any person who expresses an interest in health care and detail where to request a Character of Discharge Review if needed. The requirements for process and adjudication currently exist in disparate provisions of law, regulations, and guidance, but a concise and direct provision here would be most useful. Moreover, in accordance with VA's mission of caring for all veterans, the proposal urges VA staff to encourage individuals to apply for health care if any interest in or need for treatment is expressed. The additional language will work to ensure that all those who are eligible receive the support and treatment that they deserve.

## VI.    Conclusion

We propose changes to the regulations implementing the VA's statutory requirement to exclude service members separated under "dishonorable conditions." We believe that the current regulations do not reflect public expectations, are inconsistent with the VA's official and external commitments, and violate the statute they implement. These problems are not the product of bad faith or systemic error on the part of VA adjudicators, but rather regulations that are outdated and inconsistent with Congressional intent. These improper standards have produced the highest rate of veteran exclusion for any era, denying access to 125,000 service members discharged since 2001, including about 30,000 who had deployed to contingency operations. The VA's regulations prevent it from successfully serving the veteran population, in particular those most at risk of suicide, homelessness and incarceration. We hope that the VA will recognize the opportunity it has to expand services to deserving veterans while correcting the legal infirmities of the present regulations.

**VII.** **PROPOSED AMENDMENTS**

### 38 C.F.R. § 3.12(d)

d. The VA may find that a separation was under dishonorable conditions only if the conduct leading to discharge would have justified a Dishonorable discharge characterization. This includes service members with Dishonorable discharges, and service members with other discharge characterizations whose conduct would have justified that characterization. An administrative discharge generally indicates that a Dishonorable characterization was not justified.

1. A discharge or release for any of the following types of misconduct was under dishonorable conditions unless circumstances exist that mitigate the misconduct:

   i. Acceptance of a discharge to avoid trial by general court-martial. Avoidance of a trial by general court-martial is shown by documentation that charges had been referred to a general court-martial by a general court-martial convening authority.

   ii. Mutiny or spying

   iii. An offense involving moral turpitude. Moral turpitude is conduct that involves fraud, depravity, or a violation of moral standards with an intent to harm another person. Offenses of moral turpitude are: Treason, Rape, Sabotage, Espionage, Murder, Arson, Burglary, Kidnapping, Assault with a Dangerous Weapon, and the attempt of any of these offenses.

   iv. Three or more separate incidents of serious misconduct that occurred within one year of each other. Misconduct is serious when it is punishable by at least one year of incarceration under the Uniform Code of Military Justice.

2. The severe punishment of a Dishonorable characterization is not justified where extenuating circumstances explain or mitigate the misconduct. The Secretary must consider any information that would justify a less severe punishment. The following circumstances may show that service was not dishonorable:

   i. The individual contributed substantial favorable service to the nation. A determination of favorable service to the nation will consider:

      1. The duration and quality of service prior to the misconduct that resulted in discharge, and

      2. Whether the person's service included hardship conditions, such as overseas deployment.

   ii. The person's state of mind at the time of misconduct was adversely affected by mental or physical disabilities or operational stress.

   iii. The person's actions were explained by extenuating circumstances, taking into consideration the person's age, maturity, and intellectual capacity.

### 38 C.F.R. § 3.12(a)

a. If the former service member did not die in service, pension, compensation, or dependency and indemnity compensation is not payable unless the period of service on which the claim is based was terminated by discharge or release under conditions other than dishonorable. (38 U.S.C. § 101(2)). An administrative discharge shall be a discharge under conditions other than dishonorable unless it is issued in lieu of court-martial. Discharges issued by court-martial or issued in lieu of court-martial must be reviewed under the criteria in paragraph (d) in order to determine whether the separation was under dishonorable conditions.

### 38 C.F.R. § 17.34

Subject to the provisions of §§ 17.36 through 17.38, when any person has filed, or expressed an intent to file, an application for hospital care or other medical services, except outpatient dental care, or has

expressed an interest in hospital care or medical services or concerns that indicate the need for care or treatment and that person's application requires an adjudication as to service connection or a determination as to any other eligibility prerequisite which cannot immediately be established, the service (including transportation) may be authorized if it is determined that eligibility for care probably will be established.

    a. Tentative eligibility determinations under this section, however, will only be made under the following circumstances:

        1. In emergencies. When the applicant needs hospital care or other medical services in emergency circumstances, those services may be provided based on tentative eligibility;

        2. Based on discharge. When adjudication as to character of discharge is required, tentative eligibility will be provided to any applicant who has an Other Than Honorable characterization, who served more than four years, or who served more than one enlistment. For an applicant who seeks eligibility based on a period of service that began after September 7, 1980, the applicant must meet the applicable minimum service requirements under 38 U.S.C. § 5303A; or

        3. Based on length of service. When any applicant does not meet applicable minimum service requirements under 38 U.S.C. § 5303A, tentative eligibility will be provided if the applicant was released for medical or health reasons, including medical discharge or retirement, condition not a disability, or other physical or mental health conditions.

    b. When a person files an application for hospital care or other medical services and an adjudication as to service connection or a determination as to any other eligibility prerequisite is required, a request for an administrative decision regarding eligibility shall promptly be made to the appropriate VA Regional Office, or to the VA Health Eligibility Center.

    c. Applicants provided tentative eligibility shall promptly be notified in writing if they are found ineligible and furnished notice of rights of appeal.

    d. Any hospital care or other medical services provided during the period of tentative eligibility shall be free of charge to the applicant.

## 38 C.F.R. § 17.36 Enrollment—provision of hospital and outpatient care to veterans

    a. Enrollment and disenrollment process—

        1. Application for enrollment. Any person may apply to be enrolled in the VA healthcare system at any time. Enrollment staff shall encourage any person who expresses an interest in obtaining hospital care, medical services, or other benefits or who expresses concerns that indicate an interest in benefits to file an application. Upon request made in person or in writing by any person applying for or expressing an intent to apply for benefits under the laws administered by the VA of Veterans Affairs, the appropriate application form and instructions will be furnished. For enrollment in VA healthcare, the appropriate application form is the VA Form 10–10EZ. Any person who wishes to be enrolled must apply by submitting a VA Form 10–10EZ to a VA medical facility or via an Online submission at https://www.1010ez.med.va.gov/sec/vha/1010ez/.

        2. Action on application. Upon receipt of a completed VA Form 10–10EZ, a VA network or facility director, or the Deputy Under Secretary for Health for Operations and Management or Chief, Health Administration Service or equivalent official at a VA medical facility, or Director, Health Eligibility Center, will accept a veteran as an enrollee upon determining that the veteran is in a priority category eligible to be enrolled as set forth in § 17.36(c)(2). Upon determining that a veteran is not in a priority category eligible to be enrolled, the VA network or facility director, or the Deputy Under Secretary for Health for Operations and Management or Chief, Health Administration Service or equivalent official at a VA medical facility, or Director, Health Eligibility Center, will

inform the applicant that the applicant is ineligible to be enrolled.  If eligibility is in question based on character of service, a request for an administrative decision regarding eligibility shall be made to the appropriate VA Regional Office, or the VA Health Eligibility Center, using a VA Form 7131.

## VIII. APPENDIXES

### A. Sample Regional Office Decision Letter

 **DEPARTMENT OF VETERANS AFFAIRS**

JUN **2 3** 2015            In Reply Refer To: 343/212/TH

█████████

1060 HOWARD ST
SAN FRANCISCO, CA 94103

Dear Mr. ██████:

We made a decision regarding your discharge from military service. Every effort was made to see that your claim received complete consideration.

This letter tells you what we decided, how we reached our decision and what evidence we used to reach our decision. We have also included information on what you can do if you don't agree with our decision, and who to contact if you have questions or need assistance

### What We Decided

We decided that your military service for the period December 15, 2003 through August 19, 2008 isn't honorable for VA purposes. You and your dependents aren't eligible for any VA benefits for this period of military service. Only veterans with honorable service are eligible for VA benefits.

You are not eligible for health care benefits under Chapter 17, Title 38 for any disabilities determined to be service connected.

### Evidence Used to Decide Your Claim

In making our decision, we used the following evidence:
- Facts and circumstances and DD214 as provided by the military service department
- VA Due Process Letter of 03-25-2011
- Responses to our due process letter and Buddy Statements received on 05-30-2012 and 01-17-2014
- VA Form 21-526EZ received on 1-12-2015

### What You Should Do If You Disagree With Our Decision

If you do not agree with our decision, please download and complete VA Form 21-0958, "Notice of Disagreement". You can download the form at http://www.va.gov/vaforms <http://www.va.gov/vaforms> or you can call us at 1-800-827-1000. You have one year from he date of this letter to appeal the decision. The enclosed VA Form 4107(C), "Your Rights to Appeal Our Decision," explains your right to appeal.



2

███████
███████

You can also ask the Service Department to change the character of discharge or you can apply for a correction of military records. To request a change, use the enclosed DD Form 293, Application for the Review of Discharge or Dismissal from the Armed Forces of the United States. To apply for correction, use the enclosed DD Form 149, Application for Correction of Military Record under the Provisions of Title 10, U.S. Code, Section 1552. Send the completed form to the proper address on the back of the form.

## If You Have Questions or Need Assistance

If you have any questions, you may contact us by telephone, e-mail, or letter.

| If you | Here is what to do. |
|---|---|
| Telephone | Call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the Federal number is 711. |
| Use the Internet | Send electronic inquiries through the Internet at https://iris.va.gov. |
| Write | VA now uses a centralized mail system. For all written communications, put your full name and VA file number on the letter. Please mail or fax all written correspondence to the appropriate address listed on the attached *Where to Send Your Written Correspondence*. |

In all cases, be sure to refer to your VA file number ███████

If you are looking for general information about benefits and eligibility, you should visit our website at https://www.va.gov, or search the Frequently Asked Questions (FAQs) at https://iris.va.gov.

We sent a copy of this letter to your representative, Swords to Plowshares, Veterans Rights Org, Inc., whom you can also contact if you have questions or need assistance.

Sincerely yours,

RO Director
VA Regional Office

Enclosure(s):  VA Form 4107
                DD Form 149
                DD Form 293
                Where to Send Your Written Correspondence

Cc: Swords to Plowshares

**B.      Presentation to Senate Veterans Affairs Committee, May 2014**



Impact of Military Discharges on Establishing Status as a Veteran for Title 38 Disability and/or Healthcare Benefits

VETERANS BENEFITS ADMINISTRATION     May 2014     U.S. Department of Veterans Affairs

---

### Impact of Military Discharges on Establishing Status as a Veteran for Title 38 VA Disability and/or Healthcare Benefits

- Does VHA work with VBA regarding an individual's eligibility for VA benefits, or does VHA explain to an individual that they have to contact VBA to resolve eligibility status?
  - VHA will complete VA Form 10-7131 with all available information before forwarding it to VBA for an eligibility status decision.
- What about for a Veteran who has not applied for service-connected disability yet, and doesn't plan to, but who would potentially qualify in a different enrollment category at VHA?
  - VBA currently makes all determinations regarding veteran status. Even if the Veteran is only applying for VA health care, the determination of Veteran status under 38 U.S.C. 101(2) is sent to VBA for adjudication before VHA can determine health care enrollment.

VETERANS BENEFITS ADMINISTRATION     4

---

### Impact of Military Discharges on Establishing Status as a Veteran for Title 38 VA Disability and/or Healthcare Benefits

- Veterans must be discharged under other than dishonorable conditions to be eligible for VA disability and health care benefits.
  - VA considers honorable and general (under honorable conditions) discharges to be issued "under conditions other than dishonorable," for purposes of establishing Veteran status under 38 U.S.C.§101(2)
  - An individual who does not receive an honorable or general discharge *may* still receive treatment at a VA medical facility, unless the individual is subject to one of the statutory bars to benefits listed in the statute in 38 U.S.C. 5303. In such cases, VA makes an administrative determination as to whether the Servicemember's service was "under conditions other than dishonorable." 38. C.F.R. §3.12
  - VA considers medical issues, such as PTSD and TBI, with military service records when making such determinations.

VETERANS BENEFITS ADMINISTRATION

---

### Impact of Military Discharges on Establishing Status as a Veteran for Title 38 VA Disability and/or Healthcare Benefits

- If a Veteran is temporarily enrolled, is there a time limit for VHA to provide health care?
  - The Veteran is given a tentative eligibility for health care until a final determination is made for those who apply within 6 months of discharge. Those who apply more than 6 months after discharge are provided emergency care only until the [veteran's eligibility status under 38 U.S.C. § 101(2)] is adjudicated.
- Do we give the Veteran a 6 month treatment period while the discharge is reviewed, 9 months, how long? Do we know how long the discharge review takes at VBA?
  - We will continue to provide health care until VBA adjudicates the Veteran's [eligibility status].

VETERANS BENEFITS ADMINISTRATION     6

---

### Impact of Military Discharges on Establishing Status as a Veteran for Title 38 VA Disability and/or Healthcare Benefits

- If an individual requests healthcare at a VHA facility, and the system shows a military discharge that is potentially disqualifying, what are the next steps?  What does VHA do?
  - When an individual presents or applies for VA health care benefits and has a potentially disqualifying military discharge, VHA takes the following steps:
    - VA eligibility staff may register the individual and place the health care benefits application in a Pending Verification Status.
  - Send a request for an administrative decision regarding the character of  service for VA health care purposes to the local VA Regional Office (VARO) using VA Form 7131.

VETERANS BENEFITS ADMINISTRATION     8

---

### Statutory Bar to Benefits

- A dishonorable discharge, or a discharge under the conditions listed below, is a statutory bar to VA benefits (38 U.S.C. § 5303):
  - As a conscientious objector who refused to perform military duty, wear the uniform, or comply with a lawful order
  - Discharge by reason of a general court-martial
  - Resignation by an officer for the good of the service
  - As a deserter
  - As an alien during a period of hostilities, where it is affirmatively shown that the former Servicemember requested his or her release
  - By reason of discharge under other-than-honorable (OTH) conditions; or issued as a result of an absence without official leave (AWOL) for a continuous period of at least 180 days

VETERANS BENEFITS ADMINISTRATION

## Non Statutory Bars to Benefits

- For Veterans with non statutory bars to benefits, including other-than-honorable, bad conduct, and certain uncharacterized discharges, VA must determine whether the Veteran is eligible for VA benefits (38 C.F.R. §3.12)
  - VA considers the available evidence, including the overall nature of the quality of service, and considers any mitigating factors when determining eligibility status.

VETERANS BENEFITS ADMINISTRATION

## Homeless Registry Review

- The review of the Homeless Registry from the names identified by VBA of Veterans who have applied for benefits and have negative discharges shows the following information.  Please note, the total numbers are for all years VA has collected data.
- VA has an internal discharge review process where approximately 160,000 have been reviewed to determine if a Veteran will be regarded as having an honorable discharge for VA health care and benefits. Of that total about 14,200 are also listed on the homeless registry.  Approximately, 1,700 of the homeless Veterans were granted Chapter 17 health care access in the VBA Character of Discharge process.

VETERANS BENEFITS ADMINISTRATION

## Veterans Status Eligibility Determination Process

- VAROs verify the Veteran's character of discharge with the service department review the facts, circumstances, and all other evidence of record to determine if the discharge is under conditions other than dishonorable.
- VA does not make character of discharge determinations and cannot change an existing DoD character of discharge determination.
- When determining Veteran status, VA provides due process as follows:
  - Provide a written notice of its intent to decide the status eligibility
  - Allow 60 days for the individual to respond to the notice and provide evidence or statements pertaining the decision.
  - Provide a hearing if requested
  - Allow the individual the right to representation
  - VA will assist individuals in obtaining third-party evidence to support their claim.

VETERANS BENEFITS ADMINISTRATION

## Physical Disability Board Review

- The *Wounded Warrior Act* was signed into law on January 28, 2008.  It established a process called Physical Disability Board of Review (PDBR) ,which provides Veterans who were medically separated between September 11, 2001 and December 31, 2009, the opportunity to request a review of their Department of Defense (DoD) adjudicated disability rating(s) to ensure accuracy and fairness.

- VA has an extensive local effort that is ongoing with Department of Defense to let homeless Veterans who are eligible for Physical Disability Board of Reviews (PDBR) know about their eligibility and assist with completing the DoD applications.

VETERANS BENEFITS ADMINISTRATION

## Administrative Decision and Notification to Veteran

- VA documents its findings in an administrative decision that is sent to the Veteran.
  - The administrative decision outlines the evidence used to make the determination, and notifies Veterans of their right to an appeal if the decision is unfavorable.
- VA will provide benefits if there is a distinctly separate period of service which qualifies the Veteran for benefits. In such cases, benefits can only be provided based on the period of service that was determined to have been under [conditions other than dishonorable.]

VETERANS BENEFITS ADMINISTRATION

## Physical Disability Board Review (Cont.)

- DoD recently provided the Department of Veterans Affairs (VA) with a list of approximately 73,000 Veterans who are eligible for PDBR consideration and who may or may not have previously accessed VA services.  The Veterans Health Administration (VHA) has cross-referenced with the National Homeless Veteran Registry to determine if there are Veterans on the list who have accessed VA health care.  The results indicate that VHA has assisted approximately 6,500 (almost 9 percent) of the PDBR Veterans through the local VA homeless programs.  VHA was able to determine that over 85 percent of these homeless and at-risk Veterans are assigned to a Patient Aligned Care Team.

VETERANS BENEFITS ADMINISTRATION

## Veterans Integrated Service Network

- On March 18, 2014, VHA issued guidance to all of the Veterans Integrated Service Network and VA medical center staff across the country to notify homeless and at-risk Veterans of their eligibility for PDBR and provide them with the appropriate letter and forms. In approximately 25 percent of the cases reviewed by the PDBR (as of December 2011), the applicant's Military Service Department has found the applicant eligible for a disability retirement and has awarded this to the applicant.  This means many of our homeless Veterans could have additional benefits and a financial source available to assist with securing stable housing and supporting their families, thus ultimately helping VA achieve the goal of ending homelessness among Veterans.

## C. Letter from VBA Undersecretary to Congresswoman Pelosi, July 31, 2015



THE UNDER SECRETARY OF VETERANS AFFAIRS FOR BENEFITS

WASHINGTON, D.C. 20420

July 31, 2015

The Honorable Nancy Pelosi
U.S. House of Representatives
Washington, DC 20515

Dear Congresswoman Pelosi:

Thank you for your July 6, 2015, letter regarding criteria the Department of Veterans Affairs (VA) uses to determine whether a former Servicemember is entitled to VA benefits or healthcare based upon character of discharge. I am responding on behalf of the Department.

Generally, to be eligible for VA disability, health care, and burial benefits, a Veteran must be discharged under "conditions other than dishonorable."[1] Please refer to 38 U.S.C. § 101(2). VA considers honorable and general discharges (both of which would be considered discharges under honorable conditions) as being issued under conditions other than dishonorable for VA benefit purposes. For all other discharges (such as "other than honorable" discharges), VA makes a factual determination as to whether the discharge is considered to be under conditions other than dishonorable for VA purposes.

Section 3.12 of title 38, C.F.R., outlines VA's character of discharge determination process. When a factual determination is needed, VA first reviews whether the reason for discharge is a statutory bar to benefits under 38 U.S.C. § 5303. Examples of statutory bars to benefits include:

- Resignation of an officer for the good of the service,
- Discharge due to conviction by a general court martial,
- Absence without official leave for 180 days or more, and
- A conscientious objector who refused to wear the uniform.

If a Servicemember's reason for discharge is one of the statutory bars to benefits, section 5303 requires VA to find the Servicemember's discharge disqualifying for VA purposes, unless he or she was considered insane at the time of the circumstances leading to the discharge. If a Servicemember's reason for separation is not a statutory bar to benefits, VA weighs the reason for separation against the overall nature of the quality of service and any mitigating factors, including those related to absence without leave for periods exceeding 180 days.

Typically, VA makes a character of discharge determination only after it receives a claim for benefits, which may be a request for medical treatment received at a VA medical facility, or a compensation or pension application received at a VA regional office. VA

---

[1] Educational benefits generally require an honorable discharge.

Page 2.

The Honorable Nancy Pelosi

regional office personnel are charged with the responsibility of making character of discharge determinations in claims for both health care and benefit programs. However, prior to this determination, a former Servicemember may be provided health care at a VA medical facility based on a tentative eligibility determination in emergency circumstances. With regard to compensation or pension applications, VA cannot make a final decision regarding entitlement to benefits until the character of discharge issue is resolved.

Before making any final determination on a former Servicemember's character of discharge, VA requests verification of the facts and circumstances surrounding the incident(s) resulting in an "other-than-honorable" discharge from the appropriate service department. VA then reviews all available evidence of record, including the reason for separation, precipitating circumstances, the quality and length of service, and other mitigating factors to determine whether the discharge is under conditions other than dishonorable for VA purposes. VA may consider behavioral health issues, specifically post-traumatic stress disorder (PTSD), when making a character-of-discharge determination. VA documents its determination in an administrative decision and sends it to the former Servicemember. Following this decision, even if VA determines that a Servicemember's character of discharge does not qualify him or her for other types of VA benefits, the Servicemember may still be entitled to treatment at a VA medical facility for any disabilities determined to be service connected, unless the Servicemember is subject to one of the statutory bars to benefits specified in section 5303. Please also refer to 38 C.F.R. § 3.360.

Administrative character-of-discharge decisions are subject to random quality assurance review at the local regional office level by experienced VA claim processors and nationally by quality assurance personnel. For the 12-month period ending May 31, 2015, VA's national claim-based accuracy rate for benefit entitlement decisions (which includes character of discharge decisions) was 91.6 percent. The accuracy of decisions completed by California's three regional offices was 91.2 percent for the same period.

Beyond VA's character of discharge determination process, former Servicemembers may also seek to have a Department of Defense (DoD) Discharge Review Board upgrade their less-than-honorable discharge or to have a DoD Board for Correction of Military or Naval Records revise their service records to change the service department's characterization of service. Changes to a former Servicemember's characterization of service, made by these Boards, are typically binding on VA. Such Boards are subject to 2014 guidance from former Secretary of Defense Charles Hagel, directing a "very liberal" standard for considering character of discharge upgrades when PTSD is a factor. During transition assistance briefings, DoD explains character of discharges to Servicemembers who are completing their military service. Information

Page 3.

The Honorable Nancy Pelosi

about DoD's discharge-upgrade process is available on VA's website located at: *www.benefits.va.gov/benefits/character_of_discharge.asp,* as well as through VA's national call centers and regional office public contact activities.

VA is deeply committed to ensuring every eligible Veteran receives the maximum amount of benefits and care to which he or she is entitled. Should a Veteran requiring assistance come to your attention, particularly when entitlement is uncertain based upon character of service, we will readily assist in any way possible. Should you have further questions, please have your staff contact Ms. Mandy Hartman, Congressional Relations Officer, at (202) 461-6416, or by email at Mandy.Hartman@va.gov.

Thank you for your continued support of our mission.

Sincerely,

Allison A. Hickey

# EXHIBIT C



**THE DEPUTY SECRETARY OF VETERANS AFFAIRS**
**WASHINGTON**

May 27, 2016

Mr. Daniel Nagin
Clinical Professor of Law
Director, Veterans Legal Clinic
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA  02130

Dear Mr. Nagin:

Thank you for your December 19, 2015, cosigned petition for rulemaking regarding the Department of Veteran Affairs' (VA) processes and procedures for character of discharge determinations.  Thank you for the effort that went into this petition, researching your positions and formulating your arguments.

Your petition specifically requested that VA amend several regulations, namely, 38 Code of Federal Regulations (CFR) § 3.12(a), regarding the character of discharge of a Veteran; § 3.12(d), concerning regulatory bars to VA benefits; § 17.34, concerning tentative eligibility determinations for VA health care; and § 17.36, concerning enrollment in VA health care.

VA regularly reviews its adjudication regulations to ensure that they implement current policy consistent with VA's statutory authority.  The Veterans Benefits Administration (VBA) agrees that rulemaking is necessary concerning the definitions of "moral turpitude" and "willful and persistent misconduct."  Further, VBA agrees that there is a need to re-examine the language in 38 CFR § 3.12(d)(5).  VBA also believes that it would be helpful to provide additional guidance in VA's regulations on factors that relate to Veteran status, such as mitigating circumstances.  VA will initiate rulemaking proceedings to update and clarify policies in these areas and, as part of that process, consider all other concerns raised in your petition.

In addition, you requested that VA revise its regulations at 38 CFR § 17.34 to expand tentative eligibility for VA health care.  The Veterans Health Administration (VHA) agrees that § 17.34 could be improved, if revised, to authorize tentative eligibility for certain additional former Servicemembers who are probably eligible for VA health care but whose eligibility cannot be immediately established.  VHA also agrees the regulations could be clarified to better explain procedures relating to tentative eligibility determinations.  Accordingly, VA will initiate rulemaking proceedings to clarify and expand the regulations governing tentative eligibility.

Page 2.

Mr. Daniel Nagin

You also propose that VA amend its regulations at 38 CFR § 17.36(d)(1) governing enrollment.  VHA agrees the health care enrollment process should be clear and Veteran friendly; to that end, VHA is currently engaged in a re-design of enrollment processes to improve Veterans' enrollment experience.  For example, VHA recently amended § 17.36 so that Veterans can apply for health care enrollment over the phone.  Because VHA is still determining the contours of these new processes, we are unable to state whether VHA supports all of the specific recommendations in the petition.  However, we agree to pursue rulemaking to clarify how requests for administrative determinations are made.  Further, as VHA works to improve enrollment processes, we will continue to assess whether regulatory changes are needed to more clearly and accurately explain the application process.

Thank you for your attention to this matter and your advocacy on behalf of our Nation's Servicemembers and Veterans.  We have sent a similar letter to each of the cosigners of your petition.

Sincerely,

Sloan D. Gibson

# EXHIBIT D

**From:**        Karren, Cleveland, VBAVACO
**Sent:**        Mon, 11 Jul 2016 16:06:29 -0400
**To:**          (b)(6)
**Subject:**     RE: Character of Discharge and Tentative Health Care Eligibility Reg Change
Status Update and Planning Meeting

It is crazy that we just sit on these. I had CS pull a VOR list last month and at that time  we had
7,805. I have attached the VOR Pull

**From:** (b)(6)
**Sent:** Monday, July 11, 2016 3:55 PM
**To:** Karren, Cleveland, VBAVACO
**Subject:** RE: Character of Discharge and Tentative Health Care Eligibility Reg Change Status Update and
Planning Meeting

<< File: Intake Assessment Checklist  Letter VAIQ # 7716822 (b)(6)                    pdf >>
(b)(5)

(b)(6)

**From:** Karren, Cleveland, VBAVACO
**Sent:** Monday, July 11, 2016 8:55 AM
**To:** (b)(6)
**Subject:** RE: Character of Discharge and Tentative Health Care Eligibility Reg Change Status Update and
Planning Meeting

I will be tomorrow, I'm at work today

**From:** (b)(6)
**Sent:** Monday, July 11, 2016 8:54 AM
**To:** Karren, Cleveland, VBAVACO
**Subject:** RE: Character of Discharge and Tentative Health Care Eligibility Reg Change Status Update and
Planning Meeting

I was off Friday afternoon.  Are  you in or are you on AT?

# EXHIBIT E

(b)(5)

During a July 2015 briefing the Secretary about a letter from Swords expressing similar concerns as appear in the petition, the Secretary directed VBA to provide him with data on the validity of Swords' assertions.  It appears that VBA now has that data.  Does VBA have plan for presenting it to the Secretary?

(b)(6)

-----Original Message-----
From: (b)(6)    (b)(6)    VBAVACO
Sent: Friday, February 19, 2016 12:47 PM
To: (b)(6)    (b)(6)
Cc: (b)(6)    (b)(6)    (b) VBAVACO
Subject: RE: Updated Rough Draft

(b)(5)

I would like for my leadership to weigh in....sending to (b)(6) (b)(6) now.

(b)(5)

(b)(6)

-----Original Message-----
From: (b)(6)    (b)(6)
Sent: Friday, February 19, 2016 9:00 AM
To: (b)(6)    (b)(6)    VBAVACO
Cc: (b)(6)    (b)(6)    (b) VBAVACO
Subject: RE: Updated Rough Draft

The correct processing time as provided to me during Wednesday's meeting by (b)(6)    (b)(6)    is approximately 800 days. (b)(5)    I'm pending significant input from VHA on their response. (b)(5)
(b)(5)

-----Original Message-----
From: (b)(6)    (b)(6)    VBAVACO
Sent: Friday, February 19, 2016 8:54 AM
To: (b)(6)    (b)(6)
Subject: RE: Updated Rough Draft

Can we verify that average processing time....that is over 3 years.

(b)(5)

-----Original Message-----
From: (b)(6)    (b)(6)
Sent: Friday, February 19, 2016 8:48 AM
To: (b)(6)    (b)(6)    VBAVACO
Subject: RE: Updated Rough Draft

We could do that it but the petition already contains the assertion that " "Regional Offices place eligibility  evaluations in the Administrative Decision lane where compared to other claims, adjudication takes twice as long to complete.  The average processing time is 1,200 days." Petition at 78. (b)(5)
(b)(5)

# EXHIBIT F

Claudia O'Brien
202.637.2181
claudia.o'brien@lw.com

**LATHAM&WATKINS**LLP

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200 Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

December 12, 2019

**VIA CERTIFIED MAIL**

William A. Hudson, Jr.
Acting General Counsel
U.S. Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

    Re:    **Status of December 19, 2015 Petition for Rulemaking**

Dear Mr. Hudson,

    I write concerning the status of a December 19, 2015, petition for rulemaking ("Petition") submitted by the undersigned organizations, which the Department of Veteran Affairs (the "Department") purported to grant on May 27, 2016. The Petition requested changes to Department regulations regarding eligibility for veterans benefits for former servicemembers. A copy is attached as Exhibit A. Before that petition, counsel for these groups met with representatives from the Department in late May 2015 raising similar arguments, which the Department agreed to construe as a petition for rulemaking. No draft rule has yet issued.

    It has now been 4½ years since the May 2015 meeting that was construed as a petition for rulemaking and 3½ years since the Department formally granted the Petition.[1] Although we certainly appreciate that draft rules take substantial time to prepare, we believe the delay has long since become unreasonable. That delay is even more unreasonable given that one of the issues raised in the Petition for Rulemaking—the illegality of defining discharges for homosexual, but not heterosexual, sexual misconduct as under "dishonorable conductions," *see* Ex. A at 82–83, 92–93—is an issue the Department itself identified in 2004.[2] But the Department has yet to remedy the legal defect that it identified itself more than 15 years ago.

---

[1] A copy of the July 14, 2015, letter construing the May 2015 meeting (and June 2015 follow-up email) as a petition for rulemaking is attached as Exhibit C. A copy of the May 27, 2016, letter signed by Deputy Secretary Sloan D. Gibson granting the Petition is attached as Exhibit C.

[2] In that year, the Department issued a proposed rule that would have replaced the word "homosexual" with "sexual" and thus made all aggravated sexual misconduct disqualifying. *See* Service Requirements for Veterans, 69 Fed. Reg. 4820, 4827–28 (proposed Jan. 30, 2004). In

The Department has not given any clear indication as to when a draft rule will be promulgated. If such action is imminent, we have no concerns and will await its publication with eagerness. But if not, we will unfortunately need to explore potential remedies through litigation. At this point, the Department's inaction has rendered its "grant" of the Petition tantamount to a constructive denial.

We view potential litigation as deeply regrettable—and hopefully preventable. We therefore are providing notice that, absent issuance of a proposed rule or clear indication that issuance of such a rule is imminent, we are inclined to file suit in the U.S. Court of Appeals for the Federal Circuit after 60 days. We would strongly prefer to work with the Department constructively instead of resorting to litigation. But the delay has now become extreme and, absent expeditious action by the Department, intolerable. This protracted delay—now spanning 15 years for one of the arguments raised in the Petition for Rulemaking—is manifestly agency action "unreasonably delayed" under 5 U.S.C. § 706(1).

We certainly hope litigation can be prevented, and would greatly prefer working with the Department as constructive partners. To that end, we have tried to be extraordinarily patient given the difficulties involved. That patience is now near its breaking point. In the 42 months since the Petition for Rulemaking was purportedly granted, the Department has denied, in whole or in part, eligibility for veterans benefits to more than 12,500 former servicemembers under standards that are unlawfully strict. The effect of denying benefits can be severe: such veterans are substantially more likely to die by suicide, become homeless, or be imprisoned, often due to physical or mental health conditions related to their service. *See generally* Ex. A. Given that the effect of continued inaction may be that more veterans could lose their housing, their freedom, or even their lives while this rule is pending, we cannot countenance further delay.

We would be happy to discuss the schedule for the proposed rule or any of our concerns with you. Please feel free to contact any of us. We would greatly prefer to resolve our concerns constructively and without involving federal courts.

Respectfully submitted,

Dana Montalto
Attorney & Clinical Instructor
Veterans Legal Clinic
Legal Services Center of Harvard Law School

Claudia O'Brien
Latham & Watkins LLP

---

the proposed rule, the Department rightly explained that "all of the sexual offenses listed in this paragraph are egregious no matter who commits them." *Id.*

# EXHIBIT G

 **VA** | U.S. Department of
Veterans Affairs

**Office of the General Counsel**
Washington DC 20420

In Reply Refer To:
**022-62785**

FEB 0 5 2020

Ms. Claudia O'Brien
Lathan & Watkins LLP
555 Eleventh St., N.W.
Suite 1000
Washington, D.C. 20004

Dear Ms. O'Brien,

This responds to your December 12, 2019, request concerning the status of your December 2015 petition for rulemaking regarding 38 CFR 3.12, *Character of discharge*, that the Department of Veterans Affairs (VA) granted in May 2016.

VA still intends to issue a rule on the matters raised in your petition. The delay in VA's rulemaking is unfortunate but does not reflect any intent to deny your petition, nor mere inattention to this important matter. The Veterans Benefits Administration (VBA) drafted a proposed rule in late 2016 and obtained concurrence of the rule in 2017. However, VA was unable to move forward with that proposed rule, as its projected cost (in the tens of billions over 5 years) necessitated further exploration of alternatives and the cost-effectiveness of available approaches. *See generally* Exec. Order No. 12866, §§ 1(b)(5)-(6), 4(c)(1)(B), 6(a)(3)(C); Exec. Order No. 13893, §§ 1, 2, 5; OMB Memorandum M-05-13 (2005).

In 2018, VBA drafted an alternative proposed rule and began discussions on the cost estimate with VBA's Office of Financial Management (OFM). Complexities related to this rule and the various types of military separations at issue resulted in successive discussions about the best approach to estimate the population impacted by this alternative. VBA currently is finalizing a revised and updated costing. VBA has pledged to prioritize completion of the costing and issuance of this rule.

2.

Ms. Claudia O'Brien

     We understand your inclination to file suit in the U.S. Court of Appeals for the Federal Circuit under the theory that VA has constructively denied your December 2015 petition.  But VA fully intends to publish a rule on this issue.  We hope that providing you this information can avert the need for litigation at this point.  If you would like an additional update in 60 days, please let me know.

Sincerely yours,

William A. Hudson, Jr.
Acting General Counsel

# EXHIBIT H

RIN 2900–AQ95

**Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge**

COMMENTS OF
**THE NATIONAL VETERANS SERVICES PROGRAM AND
SWORDS TO PLOWSHARES**




Dana Montalto
Daniel Nagin
Veterans Legal Clinic
LEGAL SERVICES CENTER OF HARVARD LAW
SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Claudia O'Brien
Patrick Nevins
Alexander Stout
Zachary Williams
Brittany Bruns
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

Bart Stichman
NATIONAL VETERANS LEGAL SERVICES
PROGRAM
P. O. Box 65762
Washington, DC 20035

Maureen Siedor
Amy Rose
SWORDS TO PLOWSHARES
401 Van Ness Avenue, Suite 313
San Francisco, CA 94102

September 8, 2020

## TABLE OF CONTENTS

**Page**

I.   Executive Summary ....................................................................................1

II.  Background ................................................................................................3

     A.   Hundreds of Thousands of Veterans Are Denied Access to the Benefits
          They Need and Deserve Because of Unlawful Exclusionary Policies ...................3

     B.   Petitioners' Petition For Rulemaking..................................................................6

     C.   The Proposed Rule ...............................................................................................8

          1.   VA Did Not Propose Changes to 38 C.F.R. § 3.12(a)................................8

          2.   VA Proposed Changes to 38 C.F.R. § 3.12(d).........................................8

          3.   VA Did Not Propose Changes to 38 C.F.R. §§ 17.34 and 17.36...............9

III. Significant Aspects of the Proposed Rule Are Unlawful, Arbitrary, and Contrary
     to VA's Mission .......................................................................................10

     A.   The Legal & Historical Background of the 1944 G.I. Bill ...............................10

     B.   38 C.F.R. § 3.12(a): Presumption of Ineligibility ..................................14

          1.   Section 3.12(a) Violates Congress's Intent................................................15

          2.   Section 3.12(a) Draws an Arbitrary Line That Treats Similarly
               Situated Service Members Differently and Violates Equal
               Protection ...............................................................................................17

          3.   Section 3.12(a) Is Bad and Outdated Policy ...............................................21

          4.   VA Must Extend § 3.12(a) Presumptive Eligibility to All
               Administratively Discharged Veterans, Except Those Discharged
               in Lieu of Court-Martial.......................................................................26

     C.   38 C.F.R. § 3.12(d): Regulatory Bars & Compelling Circumstances...................27

          1.   38 C.F.R. § 3.12(d): Preamble .................................................................29

          2.   38 C.F.R. § 3.12(d)(1): Discharge in Lieu of Court-Martial ...................31

          3.   38 C.F.R. § 3.12(d)(3): Moral Turpitude ...................................................32

          4.   38 C.F.R. § 3.12(d)(4): Willful and Persistent Misconduct.....................36

          5.   38 C.F.R. § 3.12(d)(5): Aggravated Sexual Acts......................................41

6.    38 C.F.R. § 3.12(e): Compelling Circumstances & Mitigating Factors..............................................................44

D.    38 CFR 17.34/36: Health Care Enrollment.........................52

IV.  Conclusion .........................................................................55

V.   About the Petitioners.........................................................56

## I.    EXECUTIVE SUMMARY

Swords to Plowshares and the National Veterans Legal Service Program ("Petitioners") submit these comments in response to the proposed rule issued by the Department of Veterans Affairs' ("VA") on July 10, 2020 ("Proposed Rule").[1]

VA's current regulations unlawfully prevent former service members who received less-than-honorable discharges from obtaining critical VA benefits for which they are qualified, such as health care, housing, education, disability compensation, and employment training.[2]    To challenge their character of discharge and gain eligibility, these veterans have to endure lengthy, complicated adjudications, all while they are denied access to supportive services and left—often literally—out in the cold.

Petitioners are grateful that VA has taken action that is intended to address this unacceptable reality.    However, VA's Proposed Rule falls short, and, in many respects, violates congressional directives and statutory mandates.    The legislative history of the Servicemen's Readjustment Act of 1944 ("1944 G.I. Bill") demonstrates Congress's expansive and generous attitude toward veterans, including those with less-than-honorable discharges.    Congress enacted the "other than dishonorable" eligibility standard drafted by Harry Colmery, former National Commander of the American Legion, who explained the purpose of that phrase as follows:

> I was going to comment on the language "under conditions other than dishonorable."    Frankly, we use it because we are seeking to protect the veteran against injustice . . . .    We do not like the words "under honorable conditions"

---

[1] AQ95-Proposed Rule - Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471 (proposed Jul. 10, 2020).

[2] Throughout this Comment, Petitioners use the terms "former service member," "former member," "service member," and "veteran" interchangeably to refer to all individuals who served in the armed forces, regardless of discharge status. Petitioners do not use the term "veteran" to mean only those individuals who have been able to successfully establish status as a "veteran" under 38 U.S.C. § 101(2), but rather in an expansive way that acknowledges the value of all former service members' contributions to our country and in accord with Congress's intent in enacting the Servicemen's Readjustment Act of 1944 (the "1944 G.I. Bill").

1

because we are trying to give the veteran the benefit of the doubt, because we think he is entitled to it.[3]

Under the plain language of the relevant statutes and their legislative intent, veterans should be excluded only if they received or should have received a Dishonorable discharge.[4] Three current United States Senators said as much in comments in the instant proceeding: "Congress only authorized exclusion of those servicemembers who received or should have received dishonorable discharges by military standards. Congress did not intend for VA to create a new standard that would be more exclusionary that the military standard and did not give VA any authority to do so."[5] However, under the Proposed Rule, service members can be excluded from VA for minor infractions that, by themselves, would never warrant a Dishonorable discharge. The Proposed Rule contains vague and ill-defined legal terms that will result in inconsistent, arbitrary, delayed, and unlawful Character of Discharge ("COD") determinations.

Therefore, VA should amend its Proposed Rule and adopt a final version of Section 3.12 that is consistent with the following standards:

- Presume eligibility of all administratively discharged veterans, except those discharged in lieu of court-martial;

- Remove regulatory bars in excess of VA's statutory authority that operate to exclude veterans based on misconduct that never could have or would have led to a Dishonorable discharge; and

- Require holistic consideration of compelling circumstances in all cases.

---

[3] *Hearings on H.R. 3917 and S. 1767 to Provide Federal Government Aid for the Readjustment in Civilian Life of Returning World War II Veterans Before the H. Comm. on World War Veterans' Legislation*, 78th Cong. 415 (1944)), (statement of Harry W. Colmery, past National Commander, American Legion).

[4] *See, e.g.*, S. Rep. No. 78-755, at 15 (1944) ("Many persons who have served faithfully and even with distinction are released from the service for relatively minor offenses. . . . It is the opinion of the committee that such discharge should not bar entitlement to benefits otherwise bestowed unless the offense was such, as for example those mentioned in section 300 of the bill, as to constitute dishonorable conditions.").

[5] Comments on RIN 2900-AQ95, Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge from Richard Blumenthal, Jon Tester & Sherrod Brown, U.S. Sen., U.S. Senate (Sep. 3, 2020) (on file with Regulations.gov (beta)) at 3 ("Comments of Blumenthal, Tester, and Brown").

A proposed draft regulation that incorporates these recommendations is included at the end of this Comment.

## II.    BACKGROUND

In their decades working in the veterans community, Petitioners have seen firsthand the harms and injustices suffered by veterans with less-than-honorable discharges and the failures of the current systems that were created to serve them. Petitioners' years of experience representing veterans, including in VA COD adjudications and Department of Defense ("DOD") discharge upgrades, compelled Petitioners to seek reforms of the flawed COD regulations.

### A.    Hundreds of Thousands of Veterans Are Denied Access to the Benefits They Need and Deserve Because of Unlawful Exclusionary Policies

Hundreds of thousands of former service members are not considered "veterans" because of VA's current COD regulations at 38 C.F.R. § 3.12. Many of these former service members deployed to combat, experienced hardships, suffered trauma, and risked their lives. Many have physical and mental wounds that persist to this day. All who served did so when most of the fellow Americans did not. Yet, they are unable to access health care, disability compensation, homelessness prevention services, and other benefits offered by VA—solely because of their discharge status.

In many cases, former service members received less-than-honorable discharges because of trauma, hardship, or discrimination. Studies have found a strong correlation between having a mental health condition in service, whether because of combat or Military Sexual Trauma ("MST"), and being less-than-honorably discharged. For example, Operation Iraqi Freedom Marine Corps combat veterans with Post Traumatic Stress Disorder ("PTSD") are eleven times more likely to be discharged for misconduct and eight times more likely to be discharged for

substance abuse than similar veterans without PTSD.[6]    Systemic and institutionalized discrimination, such as against LGBTQ service members and service members of color, has also led to higher rates of less-than-honorable discharges in those communities.  A recent study by Protect Our Defenders found that Black service members in all branches are "substantially more likely than White service members to face military justice or disciplinary action."[7]  Black service members are between 1.29 times and 2.61 times more likely to have disciplinary action taken against them than White service members in an average year.[8]  The accumulation of disciplinary infractions leads directly to less-than-honorable discharges.

Those in-service experiences often continue to affect a service member after discharge, especially when compounded by the shame, stigma, and exclusion imposed by a less-than-honorable discharge characterization.  Thus, veterans with less-than-honorable discharges have higher rates of homelessness, mental health conditions, incarceration, and unemployment.[9]  They are three times more likely to experience suicidal ideation.[10]  But because of their discharge characterization, the service members who need VA's services the most usually cannot access them.

---

[6] Robyn M. Highfill-McRoy, Gerald E. Larson, Stephanie Booth-Kewley & Cedric F. Garland, *Psychiatric Diagnoses and Punishment for Misconduct: the Effects of PTSD in Combat-Deployed Marines*, BMC Psychiatry, Oct. 25, 2010, at 5.

[7] Don Christenson & Yelena Tsilker, *Racial Disparities in Military Justice: Findings of Substantial and Persistent Racial Disparities Within the United States Military Justice System, at* i-ii (2017), protectourdefenders.com/disparity.

[8] *Id.*

[9] Adi V. Fundlapalli et al., *Military Misconduct and Homelessness Among US Veterans Separated from Active Duty, 2001-2012,* 314 J. Am. Med. Ass'n 832 (2015); Claire A. Hoffmire et al., *Administrative Military Discharge and Suicidal Ideation Among Post-9/11 Veterans*, 56 Am. J. Prev. Med. 727 (2019); Sara Kintzle et al., *Exploring the Economic and Employment Challenges Facing U.S. Veterans: A Qualitative Study of Volunteers of America Service Providers and Veteran Clients* (May 2015).

[10] Hoffmire, *supra* note 9 at 730.

Service members who received less-than-honorable discharges are presumed ineligible for VA benefits. They can challenge that presumption through the COD review process. However, the COD process is significantly flawed. The review process is opaque and many service members do not understand how to request an eligibility review. The COD process is burdensome on both VA adjudicators and the veteran, and often takes a year or more to complete. While the review is pending, veterans are excluded from many or all VA benefits even though they may, in fact, be eligible. However, under the current regulations, VA annually deems about 80 to 90 percent of veterans who received other than honorable discharges to have served "dishonorably" despite the fact that they were not separated with a Dishonorable discharge—and thus VA bars them from accessing VA benefits. Both at the Regional Office level and at the Board of Veterans' Appeals, there are vast disparities in rate and reasons for benefits denials. For example, in Fiscal Year ("FY") 2018, the Oakland Regional Office granted 39.7 percent of COD determinations, while the Milwaukee Regional Office granted just 5.9 percent.[11]

Decisions denying CODs are overwhelmingly based on VA's overbroad regulatory bars rather than Congress's statutory bars. Because of VA's regulations governing COD adjudications, these denials usually fail to take into account mitigating factors, such as mental health and combat service. From 1992 to 2015, the Board of Veterans' Appeals denied the COD appeals of three out of four veterans with PTSD or Traumatic Brain Injury ("TBI"), and denied 85 percent of the COD appeals of Vietnam combat veterans.[12]

While this COD review process is tragically flawed, it is more than most veterans with less-than-honorable discharges get. The vast majority of veterans with less-than-honorable

---

[11] FOIA data on file with Petitioners.

[12] Attached as Exhibit 1, Underserved: How the VA Wrongfully Excludes Veterans with Bad Paper Discharges, at 14-15 [hereinafter Ex. 1, *Underserved*].

discharges have never even received a COD review from VA. Only about ten percent of less-than-honorably discharged veterans have undergone COD review. The remaining 90 percent are excluded by default, because VA has chosen to presumptively exclude all veterans who were not honorably discharged.

The failure to timely provide supportive services to veterans with less-than-honorable discharges compounds issues with their health and well-being and reduces their chances for successfully reintegrating into civilian society. Because VA denies or delays assistance, these veterans must turn to other, less resourced sources for help: local non-profits, shelters, state and municipal programs, other federal programs, and their friends and family members.

VA is tasked with upholding our nation's obligation to care for those who served in uniform. VA has publicly committed to reducing veteran suicide, ending veteran homelessness, and supporting veterans with mental health conditions, including those who served in combat and experienced MST. The current COD regulations prevent VA from accomplishing those goals. They pose an unnecessary burden on the VA's adjudicatory systems while tying the hands of the thousands of VA health care professionals, social workers, case managers, peer specialists, outreach staff, and others who want to serve the veterans most in need of their help, regardless of discharge status.

As a matter of law and policy, VA must update its COD regulations.

### B.    Petitioners' Petition For Rulemaking

To address the failures of the COD adjudicatory system, on June 5, 2015, Petitioners submitted a brief petition for proposed rulemaking, which VA acknowledged by letter dated July 14, 2015. On December 19, 2015, Petitioners submitted their full and expanded petition for

proposed rulemaking ("Petition").[13]   In the Petition, Petitioners requested that VA make the following four changes:

- **38 C.F.R. § 3.12(a): Reduce Administrative Burdens & Delay Through Updating the Presumption of Eligibility.**  Petitioners proposed reducing the number of service members who are presumptively ineligible by requiring prior COD review only for those with punitive discharges or discharges in lieu of court-martial.  This would reduce the costly administrative burden associated with the current regulations, as well as accord with Congress's intent to exclude only those discharged under "dishonorable conditions" and to give all former members the "benefit of the doubt."

- **38 C.F.R. § 3.12(d): Align Regulatory Bars with Statutory Text and Congressional Intent by Correctly Defining Disqualifying Misconduct and Considering Mitigating Factors.**  Petitioners proposed adopting a definition for "dishonorable conditions" that excludes former service members based only on severe misconduct (i.e., conduct that could and would have actually led to a Dishonorable discharge under the practice of military law) and that includes express consideration of mitigating factors, such as behavioral health and extenuating circumstances, and favorable service, such as combat and hardship deployments. Considering compelling circumstances is required to accord with congressional intent and will help eliminate the disparities across how different service branches use non-punitive, administrative discharges for misconduct.

- **38 C.F.R. § 17.34: Grant Tentative Health Care Eligibility.**  Petitioners proposed providing tentative eligibility for health care to all service members who were administratively discharged, who probably have a service-connected injury, or who probably honorably completed an earlier term of service pending a COD eligibility review.

- **38 C.F.R. § 17.36: Improve Health Care Enrollment Processes.**  Petitioners proposed creating a more veteran-friendly healthcare enrollment process by adding more detailed instructions for VA staff and requiring that VA staff encourage individuals to apply for healthcare.

---

[13] Attached as Exhibit 2, Dec. 19, 2015 Petition to Amend Regulations Restricting Eligibility for VA Benefits Based on Conduct in Service.

The Petition was supported by numerous veterans service organizations and advocacy organizations.[14]  Members of Congress have also called on VA to take "immediate action" to comply with the law and take action on the Petition.[15]

### C.    The Proposed Rule

On May 27, 2016, VA granted the Petition and initiated rulemaking.  And on July 10, 2020, more than five years after Petitioners submitted their initial petition for rulemaking, VA issued its Proposed Rule.

#### 1.    *VA Did Not Propose Changes to 38 C.F.R. § 3.12(a)*

The Proposed Rule does not include changes to Section 3.12(a), which governs which former service members must undergo an individual COD eligibility review and are presumptively excluded from VA access until the successful completion of that review.

#### 2.    *VA Proposed Changes to 38 C.F.R. § 3.12(d)*

VA's Proposed Rule suggests amending Section 3.12(d) in five main ways.

*First*, under the current regulations, acceptance of an undesirable discharge to escape trial by general court-martial renders a discharge under "dishonorable conditions."  VA's Proposed Rule replaces the term "undesirable discharge" with "discharge under other than honorable conditions or its equivalent" and replaces "to escape trial" with "in lieu of a trial" to, according to the Notice, "conform to the te[r]minology that service departments currently use and to avoid ascribing motivation or stigma to a former service member's decision to accept a discharge rather than to proceed to trial by a general court-martial."

---

[14] *See* Exhibits 3-9.

[15] *See* Exhibit 10, Mar. 5, 2020 Letter from Senate to VA.

*Second*, the bar for "homosexual acts involving aggravating circumstances" would be revised to remove the express reference to sexual orientation and instead apply to all sexual acts involving aggravating circumstances, regardless of the sexual orientation or gender identity of the victim or perpetrator.

*Third*, "moral turpitude" would be defined as "a willful act that gravely violates accepted moral standards and would be expected to cause harm or loss to person or property."

*Fourth*, VA's Proposed Rule provides additional detail in the regulatory bar for "willful and persistent misconduct." VA proposes to define "persistent misconduct" as "instances of minor misconduct occurring within two years of each other, an instance of minor misconduct occurring within two years of more serious misconduct, and instances of more serious misconduct occurring within five years of each other" and to define "minor" misconduct as "misconduct for which the maximum sentence imposable" under the Manual for Courts-Martial "would not include a dishonorable discharge or confinement for longer than one year if tried by a general court-martial." The Proposed Rule also offers additional guidance on how absences without leave ("AWOL") of various lengths will be considered under the willful and persistent misconduct bar.

*And fifth*, VA's Proposed Rule creates an enumerated list of "compelling circumstances" that must be considered as potentially mitigating the misconduct. VA proposes to extend consideration of "compelling circumstances" to the regulatory bars of sexual misconduct involving aggravating circumstances, offenses involving moral turpitude, and willful and persistent misconduct, but not to the regulatory bar for discharges in lieu of general court-martial.

3.    VA Did Not Propose Changes to 38 C.F.R. §§ 17.34 and 17.36

The Proposed Rule does not include changes to Sections 17.34 and 17.36, with the indication that a proposal would be forthcoming at a later date.

III.    **SIGNIFICANT ASPECTS OF THE PROPOSED RULE ARE UNLAWFUL, ARBITRARY, AND CONTRARY TO VA'S MISSION**

The Proposed Rule overall fails to comport with the statutory text and congressional intent. As set forth more fully below, the proposal misconstrues the meaning of "dishonorable" to deem far too many veterans disqualified based on misconduct that never would have led to a Dishonorable discharge. The proposal also contravenes Congress's intent to expand eligibility and give veterans the "benefit of the doubt" through VA's presumption that all other-than-honorably discharged veterans are ineligible—until they are subjected to a lengthy COD review process and prove their worth. The Proposed Rule creates a burdensome, complex system that will be difficult for VA adjudicators to administer in a fair and consistent manner and that will operate to exclude far too many veterans from receiving the care and support that they need.

On behalf of the thousands of veterans with less-than-honorable discharges that they have helped, Petitioners call on VA to adopt a final rule that is consistent with law and congressional intent; that can be fairly, equitably, and compassionately applied to allow those who have served our country to access the benefits they need; and that allows VA to fulfill its mission of caring for those who have borne the battle.

A.    **The Legal & Historical Background of the 1944 G.I. Bill**

Before addressing specific recommendations for certain subsections of the Proposed Rule, it is important first to understand the overall conceptual framework that Congress created through the 1944 G.I. Bill that must be properly implemented by VA in its final regulation. The 1944 G.I. Bill simultaneously created the "conditions other than dishonorable" eligibility standard and the statutory bars (later codified at 38 U.S.C. §§ 101(2) and 5303(a), respectively). These sections have not materially changed since the enactment of the 1944 G.I. Bill, with the exception of Congress enacting an additional statutory bar for extended unauthorized absences in the post-

10

Vietnam War era.[16]  Therefore, VA must understand and comply with the legislative intent behind the 1944 G.I. Bill and any regulation governing the availability of benefits must comport with Congress's mandates.

Prior to 1944, Congress had legislated a number of different standards for veterans benefits eligibility depending on the benefit at issue and the era or war in which the veteran served.  Some benefits required fully Honorable discharges; some excluded only those with Bad Conduct or Dishonorable discharges.  Some laws specifically excluded veterans who had been discharged under certain circumstances.  The 1917 War Risk Insurance Act, for example, excluded former service members who had been discharged for:

> mutiny, treason, spying, or any offense involving moral turpitude, or willful and persistent misconduct, of which he was found guilty by court-martial, or that he was an alien, conscientious objector who refused to perform military duty or to wear the uniform, or a deserter.[17]

In the years before World War II, the most recent eligibility standard Congress enacted was a law granting the VA Administrator discretion to choose the standard; with that authority, the Administrator limited benefits only to former members with Honorable discharges.[18]

Congress clearly rejected those previous standards in enacting the 1944 G.I. Bill. In considering and enacting the 1944 G.I. Bill and its "other than dishonorable" eligibility standard, Congress was seeking to accomplish a number of goals, as expressed in the text of the final statute and as discussed extensively in congressional hearings and the contemporaneous legislative record.  Congress expressly chose an eligibility standard that was different than the standard used

---

[16] *See Garvey v. Wilkie*, No. 2020-1128, 2020 WL 5048433 at *6 (Fed. Cir. Aug. 27, 2020).

[17] *See, e.g.*, Act of June 25, 1918, ch. 104, 40 Stat. 609, *amended by* World War Veterans' Act, ch. 320, 43 Stat. 607 (1924).

[18] Bradford Adams & Dana Montalto, *With Malice Toward None: Revisiting the Historical and Legal Basis for Excluding Veterans from Veteran Services*, 122 Penn. St. L. Rev. 69, 82-83 (2017).

in prior legislation. It did not grant unlimited discretion to VA, and it did not limit access to those with only Honorable discharges. Congress created specific statutory bars that would bar eligibility (to bar veterans who had committed severe misconduct), but otherwise Congress wanted to give veterans with less-than-honorable discharges the "benefit of the doubt" and offer them the support and care they needed. While many urged Congress to require an Honorable discharge, Congress explicitly—and strongly—rejected that proposal.[19] Notably, in 1944, at the time that Congress expanded the eligibility criteria, just 1.7 percent of service members were discharged with a less-than-honorable characterization.[20] Legislators therefore intended to enact a rule under which less than 1.7 percent of veterans would be unable to access VA's benefits and services.[21]

The standard Congress chose for "other than dishonorable" mandated that former service members would be excluded only on the basis of severe misconduct that could have and would have led to a Dishonorable discharge.[22] Congress envisioned a limited role for VA in this process: to exclude service members who should have been dishonorably discharged but were not because of a procedural or technical error.[23] The statutory bars that Congress wrote into law were a guide for the level of severe misconduct that should be disqualifying.[24] In making the eligibility determination, Congress also wanted mitigating factors, such as combat service or war wounds, to

---

[19] *Id.* at 85.

[20] Ex. 1, *Underserved*, at 11.

[21] *Id.*

[22] Adams & Montalto, *supra* note 18, at 88.

[23] *Id.*

[24] S. Rep. No. 78-755, at 16 (1944) ("It is the opinion of the Committee that such discharge [less-than-honorable] should not bar entitlement to benefits otherwise bestowed unless such offense was such, as for example those mentioned in section 300 of the bill [listing the statutory bars], as to constitute dishonorable conditions.").

be taken into consideration.[25]   Congress thought that VA should not be strictly bound by the military's characterization, which it thought might be overly harsh or unjust.[26]   Rather, Congress saw VA as having a very different mission than the military: to help veterans recover from war and reintegrate into civilian society so that they could lead healthy and productive lives after their service.[27]   In reality, VA has created a less forgiving standard that denies benefits *more often* than if the military's characterization were left alone.

As the 1944 G.I. Bill is the authorizing statute under which VA's regulations are promulgated, any final regulation must be formulated in harmony with this statutory background. The specific comments below are informed by this history: they propose changes to the current regulation and Proposed Rule that create a standard of exclusion only where the service member committed severe misconduct that could have led to a Dishonorable discharge, that account for mitigating circumstances and positive service, and that give service members the "benefit of the doubt." Put another way, a final rule that excludes veterans based on minor misconduct, that fails to account for mitigating or positive factors, and that presumptively excludes so many who have served our country in uniform would be unlawful, in violation of statute, arbitrary, and capricious.

Both the current regulation and the Proposed Rule go well beyond the exclusions contemplated by the statutory text and the legislative history and improperly revive and expand prior existing bars which Congress rejected in the 1944 G.I. Bill. Nothing in the text of the statute or the legislative history requires that VA use the existing regulatory bars as a framework for Section 3.12—nor indeed does the law require that VA create any regulatory bars at all. Much of

---

[25] Adams & Montalto, *supra* note 18, at 105.

[26] *Id.* at 89-90.

[27] *Id.* at 112.

the legislative history, in fact, calls into question or expressly rejects the exclusionary criteria that VA has long imposed. In particular, it appears contrary to basic principles of administrative law that after Congress created a wholly new eligibility standard that broke from prior standards, VA reinstated into regulation the earlier exclusionary standards that Congress rejected. That is, Congress used some of the standards from the 1917 War Risk Insurance Act (desertion, conscientious objector, and alien, under certain conditions) as statutory bars in the 1944 G.I. Bill, but *did not* enact the bars for moral turpitude or willful and persistent misconduct of which the member had been convicted by court-martial. For VA to impose those statutorily discarded standards in even broader form (i.e., without the requirement of a court-martial conviction) violates the law and means that they must be removed from the final rule.[28]

We call on VA to uphold the legacy of the World War II Era Congress and the responsibility that those representatives bestowed on VA to ensure that all who served in uniform succeed in their post-service lives. The 1944 G.I. Bill mandates nothing less. VA's current rule—which excludes post-9/11 veterans at four times the rate that the pre-1944 law excluded World War II veterans—is failing to do that. But in issuing this final rule, VA can correct the errors of the past and give all veterans the care and support that they deserve.

### B.    38 C.F.R. § 3.12(a): Presumption of Ineligibility

Although VA's Proposed Rule makes some stylistic changes to the current Section 3.12(a), the proposal does not substantively change the subsection. Both the current regulations and the Proposed Rule presume the eligibility of service members with Honorable and General (collectively, "under honorable conditions") discharge characterizations and presume the

---

[28] *See Scofield v. Lewis*, 251 F.2d 128, 132 (5th Cir. 1958) ("The Regulations must, by their terms and in their application, be in harmony with the statute. A Regulation which is in conflict with or restrictive of the statute is, to the extent of the conflict or restriction, invalid.").

ineligibility of service members with Other Than Honorable, Bad Conduct, or Dishonorable discharge characterizations. These latter service members are required to undergo a burdensome COD review through which VA decides whether it considers their discharge "other than dishonorable" and therefore will allow them to access benefits. As discussed later in this Comment, the majority of veterans do not undergo COD determinations for numerous reasons, and those that do are overwhelmingly unsuccessful in establishing eligibility. Those few veterans who are eventually successful in proving eligibility are denied critical benefits while their COD determination is pending.

Section 3.12(a)'s presumption of ineligibility goes against congressional intent, is arbitrary and capricious, violates the Equal Protection Clause of the U.S. Constitution, and represents a bad, outdated policy. VA can and should presume eligibility for all administrative discharges, except those in lieu of court-martial.

1. *Section 3.12(a) Violates Congress's Intent*

As discussed above, the legislative history of the 1944 G.I. Bill reveals that Congress intended to provide benefits to almost all veterans, not just those honorably discharged. Congress made only "dishonorable" conduct disqualifying. By using the military legal term of art "dishonorable," Congress understood "dishonorable conduct" to refer to only very severe misconduct.[29] By presuming that former service members without honorable discharges are ineligible for benefits, VA departs from Congress's intent by denying and delaying the benefits of eligible veterans. To return to Congress's original intent, VA should amend Section 3.12(a) to presume the eligibility of the majority of administratively discharged service members.

---

[29] Adams & Montalto, *supra* note 18, at 111.

Congress intended to provide benefits to veterans without honorable discharges. During hearings over the Act that became the 1944 G.I. Bill, the bill's drafter Harry Colmery stated that the language "other than dishonorable" in the Act was selected because "we are trying to give the veteran the benefit of the doubt, for we think he is entitled to it."[30] Mr. Colmery also noted that deserving service members may receive unfavorable discharges and that these service members are "just as needy of the help and benefits provided under this act."[31]

Legislators understood "dishonorable conduct" that would disqualify a service member from receiving benefits to refer to very serious misconduct. In the House Report accompanying the bill, the House Committee on World War Veterans' Legislation stated that "[e]xcept upon dishonorable discharge, it is the view of the committee that recognition should be given of meritorious, honest, and faithful service."[32] The Senate Report accompanying the bill flagged the language "other than dishonorable" as correcting "hardships under existing laws requiring honorable discharge as a prerequisite to entitlement."[33] The Senate Report noted that many "persons who have served faithfully . . . are released from the service for relatively minor offenses, receiving . . . a discharge without honor . . . ."[34] The committee thought that "such discharge should not bar entitlement to benefits otherwise bestowed unless the offense was such . . . as to constitute dishonorable conditions."[35] Carl Brown, the Chief of Claims at the American Legion,

---

[30] *Hearings on H.R. 3917 and S. 1767 to Provide Federal Government Aid for the Readjustment in Civilian Life of Returning World War II Veterans Before the H. Comm. on World War Veterans' Legislation*, 78th Cong. 415 (1944), (statement of Harry W. Colmery, past National Commander, American Legion).

[31] *Id*. at 416.

[32] H.R. Rep. No. 78-1418, at 17 (1944).

[33] S. Rep. No. 78-755, *supra* note 4, at 15.

[34] *Id*.

[35] *Id*.

testified during hearings over the bill that if the service member "did not do something that warranted court-martial and dishonorable discharge, I would certainly not see him deprived of his benefits."[36]  A recent Federal Circuit opinion confirms the understanding that the statute was meant to deny benefits only to those former service members guilty of severe misconduct.[37]

The current and proposed regulations stand in direct contravention to this intent.

2.    *Section 3.12(a) Draws an Arbitrary Line That Treats Similarly Situated Service Members Differently and Violates Equal Protection*

In addition to conflicting with Congress's intent, Section 3.12(a) draws an arbitrary line between veterans who served in different branches of the military or in different eras of war. Similarly situated veterans are treated differently by VA, raising concerns about the lawfulness of VA's determinations as to benefits eligibility.[38]  This proposal is both arbitrary and capricious in violation of the standards set forth in the Administrative Procedure Act[39] and presents concerns under the Equal Protection Clause of the United States Constitution.

Different branches assign the types of discharge characterizations at different rates, leading to a disparate impact on similarly situated service members who served in different branches.  For example, a service member in the Navy may receive an Other Than Honorable discharge for misconduct, but had he served in the Army and committed the same misconduct, he would have

---

[36] *Hearings on H.R. 3917 and S. 1767 to Provide Federal Government Aid for the Readjustment in Civilian Life of Returning World War II Veterans Before the H. Comm. on World War Veterans' Legislation*, 78th Cong. 419 (1944) (statement of Carl C. Brown, Chief of Claims, National Rehabilitation Committee, The American Legion).

[37] *Garvey v. Wilkie*, *supra* note 16, at *6.

[38] *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014) (alteration in original) (citing *BNSF Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005)) ("As a general matter, an agency cannot treat similar situated entities differently unless it 'support[s] th[e] disparate treatment with a reasoned explanation and substantial evidence in the record."); *Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983) ("The Board cannot, despite its considerable discretion, treat similar situations dissimilarly and, indeed, can be said to be at its most arbitrary when it does so.").

[39] 5 U.S.C. § 706(2)(A).

received an Honorable discharge.  Under this example, the service member in the Army would be presumed eligible for VA benefits, whereas the Navy service member would not, despite the fact that the same misconduct was at issue.  Of all Other Than Honorable, Bad Conduct, and Dishonorable discharges since 1980, almost half—45 percent—were issued by the Navy.[40]  The Marine Corps accounts for 24 percent of the presumptively ineligible discharges over that same period, even though the Marine Corps is the smallest of the service branches.[41]  To look at it another way, taking Fiscal Year 2011 as an example, the Air Force assigned Other Than Honorable discharges to just 0.5 percent of enlisted airmen separated that year, while the Marine Corps assigned Other Than Honorable discharges to 10 percent of enlisted Marines—a twenty-fold difference.[42]

### Enlisted Service Members Discharged as Percent of Characterized Discharges, FY11

|  | Honorable | General | Other Than Honorable | Bad Conduct | Dishonorable |
|---|---|---|---|---|---|
| Army | 81% | 15% | 3% | 0.6% | 0.1% |
| Navy | 85% | 8% | 7% | 0.3% | 0.0% |
| Marine Corps | 86% | 3% | 10% | 1% | 0.1% |
| Air Force | 89% | 10% | 0.5% | 0.5% | 0.0% |
| Total | 84% | 10% | 5% | 1% | 0.1% |

---

[40] Attached as Exhibit 11, Turned Away: How VA Unlawfully Denies Health Care to Veterans with Bad Paper Discharges, at 22 [hereinafter Ex. 11, *Turned Away*].

[41] *Id.* (In contrast the Army, which has the most personnel, accounts for 27 percent of presumptively ineligible service members. The Air Force accounts for less than 5 percent.).

[42] Ex. 1, *Underserved*, at 12.

These service branch disparities have persisted over time, and they are not due to any difference between those who enlist in the Air Force versus the Marine Corps or any other branch. A 1980 Government Accountability Office report found that the differences could not be explained by individual merit or misconduct, but rather were caused by each branch's distinct disciplinary policies and culture.[43] For example, there are significant differences in how the service branches address single instances of drug use. In the Marine Corps, administrative separation with an Other Than Honorable discharge is practically mandatory; in the Army or Air Force, the service member would likely be discharged with a General characterization, or may not be separated at all. VA's Proposed Rule fails to account for these differences whatsoever, and data even show that VA adjudications often exacerbate the disparities.[44] By presuming that these service members are ineligible for benefits, VA disparately excludes service members from some branches, treating them unequally without a rational reason to do so.

Just as there are different discharge characterization rates across branches, there are also disparities over time. The percentage of veterans presumed ineligible by VA depends on the era in which the service member served. Since World War II, and despite some increased procedural protections for service members being discharged, all the branches have increased their use of less-than-honorable discharges. For example, whereas the military overall discharged 1.7 percent of World War II veterans with less-than-honorable discharges, that rate increased to 2.8 percent by the Vietnam Era and 6.5 percent in the Post-9/11 Era.[45] Because VA presumes ineligibility for all

---

[43] Comptroller General, Report to the Congress of the U.S.: Military Discharge Policies and Practices Result in Wide Disparities: Congressional Review Is Needed, U.S. GAO FPCD-80-13 (Jan. 15, 1980), https://www.gao.gov/products/FPCD-80-13.

[44] Ex. 1, *Underserved*, at 2-3.

[45] *Id.* at 2.

less-than-honorably discharged veterans under Section 3.12(a), these changes in military practice have significantly increased the percentage of veterans who are presumptively excluded by VA's rule and who require a COD evaluation.  Indeed, because VA never conducts a COD review for the vast majority of less-than-honorably discharged veterans, VA currently excludes 2.8 percent of Vietnam Era veterans and 6.5 percent of Post 9-11 veterans.[46]  These rates of exclusion are multiples higher than the rate of excluded World War II veterans when Congress expressly chose to expand eligibility—a clear signal that VA's rule is miscalibrated.

While the point should be obvious, it is worth noting that service members in today's military, despite the higher rates of less-than-honorable discharges, are not inherently "less honorable" than those who served in prior eras.  As evidence of that, service members from all eras have similar rates of punitive (Bad Conduct and Dishonorable) discharges—0.7 percent of World War II veterans and 1.0 percent of Post-9/11 veterans—suggesting that the rate of severe, felony-level misconduct has remained steady.  It is just the rate of administrative Other Than Honorable discharges, where service members have significantly fewer rights, that has increased. Like the disparities across service branches, the disparities across eras of service raise significant equal protection issues.  Veterans alike in all but the years they wore the uniform are being treated differently by VA.  By presuming that all Other Than Honorably discharged service members are ineligible for benefits, VA disparately impacts service members who have served recently.

By treating similarly situated veterans differently and denying similarly situated veterans who served in different eras or branches access to benefits at different rates, VA fails to consider

---

[46] *Id.*.

the relevant factor of the rate of less-than-honorable discharges meted out in different eras and by different branches. In so doing, VA acts arbitrarily and capriciously and in violation of the APA.[47]

### 3.    *Section 3.12(a) Is Bad and Outdated Policy*

Both the current and proposed versions of Section 3.12(a) are bad policy. Presuming ineligibility of veterans with less-than-honorable administrative discharges unnecessarily burdens both veterans and VA. The current and proposed versions of Section 3.12(a) are unmoored from the actual practice of military separation law, which has changed to increase drastically the number of veterans with Other Than Honorable administrative discharges. Presuming ineligibility of these service members also prevents VA from helping veterans at heightened risk of suicide, homelessness, and incarceration.

The presumption of ineligibility also unnecessarily burdens both the former service members and VA adjudicators. These burdens would be alleviated by a regulation that required CODs only for those veterans most likely to have engaged in conduct that may be deemed "dishonorable," that is, those discharged because of or in lieu of court-martial. This would allow eligible veterans to access their benefits without undue delay and would reduce the burdens on VA.

### a.    *Unreasonable Burden on Veterans*

Currently, service members seeking benefits who are presumed ineligible must seek a COD determination before they can access most services. These veterans are unduly burdened by presumed ineligibility during the lengthy COD process and delayed access to benefits. The COD

---

[47] *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

process often takes years to complete.[48]  During this time, veterans who are presumed ineligible for benefits languish without access to benefits to which they may be entitled.  Many veterans have not gone through the burdensome COD process, leaving many potentially eligible veterans without access to benefits.[49]  As one example, the Veterans Legal Clinic at the Legal Services Center of Harvard Law School represented an Operation Enduring Freedom Marine Corps combat veteran who received an Other Than Honorable discharge for a single instance of using "hasheesh" after he deployed to Afghanistan.  With pro bono help from the Clinic, the veteran was able to apply for VA health care, and VA eventually approved his application based on the finding that no statutory or regulatory bar applied (and later granted him service-connected disability compensation for deployment-related mental health conditions).  But VA took nearly *two years* to render that initial determination, during which time the veteran was unable to access any health care at VA.  By simple application of the existing regulations, it was clear to the veteran's advocates that he should be eligible—and VA eventually agreed—but the presumption of ineligibility barred the veteran until he proved his eligibility to VA.  There was no way that VA could retroactively award the veteran the health care and support it denied him during those difficult years when he was dealing with unstable employment, a service-connected mental health condition, suicidal ideations, and the death of a parent.

Besides the thousands of veterans excluded from VA until they prove their eligibility, the much larger majority of presumptively ineligible service members never undergo a VA COD review at all.  These veterans thus may never gain access to benefits to which they may be entitled.  Veterans who seek benefits and are denied are often not told about the process for applying for a

---

[48] Ex. 1, *Underserved*, at 12.

[49] *Id.*

COD determination.[50]  They may be erroneously told that they are categorically ineligible for services.[51]  These veterans are unable to access benefits and do not seek COD review, and they are not counted in statistics of veterans seeking CODs or denied benefits.

### b.    *Unnecessary Burden on VA Adjudicators*

Presuming ineligibility of veterans who do not have honorable discharges also unnecessarily burdens VA adjudicators.  To conduct a proper COD review, VA adjudicators must conduct a complex, legally technical, and records-heavy process that involves numerous steps, and they are given a unique level of discretion compared with other adjudicatory functions.  After screening the veteran's file and identifying COD as an issue, the VA adjudicator must send a notice to the former service member about the review and elicit information and records in support of eligibility.  The adjudicator must also offer the former service member the opportunity for an in-person hearing and hold such hearing if requested.

Meanwhile, VA must gather numerous records and must decipher complex documents and regulations.  Adjudicators are required to consider all available records, including service treatment records, personnel records, and records of proceedings pertaining to the veteran's discharge.  But records are frequently missing from service members' personnel files and service treatment records, and key separation documents are often hard to read, inaccurate, or imprecise, hampering the adjudicator's ability to correctly identify the misconduct that led to discharge and any contributing factors.  The adjudicator will have to screen whether there is a mental health condition that might rise to the level of "insanity" and, if so, prepare a referral for a medical examination.  The adjudicator must then make and document a formal determination before

---

[50] Ex. 11, *Turned Away*, at 2.

[51] *Id.*

referring the determination to the Veterans Service Center Manager or designee for approval. Depending on the outcome of that review, further medical examinations may be needed, if the adjudicator finds the member eligible for Chapter 17 health care only. Finally, after all those steps, the adjudicator must send the former service member a decision notice communicating the outcome of the administrative decision. Then VA must determine how to further process the administrative decision.

Unsurprisingly, this process can—and often does—take years. For the four Regional Offices in which COD determinations are currently centralized, the average days to complete COD claims in FY 2018 were all over one year: 484 days in Little Rock, 517 days in Muskogee, 371 days in Nashville, and 486 days in Winston-Salem.[52]

Moreover, the initial COD determination may not be the end of the road for the claim. Because Regional Office adjudicators fully or partially deny the vast majority of veterans' COD claims—79 percent were denied in FY 2018—there could be years of supplemental claims and appeals before the matter is finally resolved.[53]

### c. *VA's Ineligibility Presumption Harms the Most Vulnerable Veterans*

By presuming the ineligibility of hundreds of thousands of veterans, the current and proposed Section 3.12(a) prevents VA from offering prompt help to veterans who are at significant risk of suicide, homelessness, and incarceration. Service members discharged other-than-honorably are three times more likely to experience suicidal ideation than those with Honorable or General discharges.[54] That increased risk can be entirely eliminated if the veteran has access to

---

[52] FOIA data on file with Petitioners.

[53] *Id.*

[54] Hoffmire, *supra* note 9, at 727-80.

VA health care. Yet, VA's current presumption of ineligibility prevents or dangerously delays most of these veterans from getting that life-saving help.

Section 3.12(a) also impedes VA's mission of helping veterans recover from homelessness or preventing them from becoming homeless in the first place.[55] Veterans with Other Than Honorable discharges are presumed ineligible for the HUD-VASH program, a highly successful homelessness reduction partnership that combines the value of a Section 8 housing voucher with the wrap-around support of VA social work and health care services. That program uses VA's health care eligibility standard and funnels eligibility determinations through VHA. For service members with Other Than Honorable discharges, who may be health care-eligible based on a service-connected disability or pursuant to a COD Review, there is no clear path to apply for HUD-VASH, undergo an eligibility determination, and gain access to the program. As a result of VA's restrictive policies regarding eligibility and applications, national efforts to end veteran homelessness are hampered.

Section 3.12(a) likewise prevents VA from helping veterans avoid incarceration or have a successful reentry into the community. According to the Bureau of Justice Statistics, 23.2 percent of service members in prison, and 33.2 percent of service members in jail, have less-than-honorable discharge characterizations.[56] These increased rates are likely due to the higher rates of mental health conditions and homelessness among the less-than-honorably discharged veterans population. Yet, VA's Veteran Justice Outreach workers, who provide services to incarcerated veterans and support diversionary Veterans Treatment Courts across the country, are only able to

---

[55] Emily Brignone et al., *Non-Routine Discharge from Military Service: Mental Illness, Substance Use Disorders, and Suicidality,* 52 Am J. Prev. Med. 557, 558 (2017).

[56] *See* Dep't of Justice Bureau of Justice Statistics, Veterans in Prison and Jail, 2011-12 (Dec. 2015), https://www.bjs.gov/content/pub/pdf/vpj1112.pdf; *see also* Ex. 1, *Underserved*, at 23.

work with VA-eligible veterans—and Section 3.12(a) presumptively excludes all less-than-honorably discharged veterans.  As a result, states often entirely exclude less-than-honorably discharged veterans from participating in Veterans Treatment Court[57]—which are built around the supportive services VA provides—denying those veterans access to the supportive resources of those courts and instead subjecting them to more punitive, harsh carceral policies and conditions.

4.    *VA Must Extend § 3.12(a) Presumptive Eligibility to All Administratively Discharged Veterans, Except Those Discharged in Lieu of Court-Martial*

Congress created the "other than dishonorable" eligibility standard that intentionally does not refer to specific DOD discharge characterizations but rather to general standards of conduct. Yet, VA presumes eligibility for thousands of veterans who may, in fact, have been discharged under circumstances that meet a statutory or regulatory bar for benefits—so long as the military characterized their service as Honorable or General.  Through Section 3.12(a), VA made the judgment that, as a matter of policy and administrative efficiency, it would not require former service members with Honorable or General discharges to go through the burdensome COD review process prior to accessing VA benefits and health care, because only the minority of such members likely committed "dishonorable" conduct in service.

VA must extend this presumption of eligibility to other administratively discharged veterans who are unlikely to have committed dishonorable conduct: those with Other Than Honorable discharges that were not in lieu of court-martial.  A military commander has already decided that these former service members did not commit misconduct serious enough to warrant a court-martial referral, whether because of the lack of severity of the misconduct, the presence of mitigating circumstances, or both.  Under a properly constructed set of regulatory bars, which

---

[57] Ex. 1, *Underserved*, at 21-22.

excludes only for serious misconduct and takes into account mitigating factors, most or all of these veterans should be found eligible, and thus the burden of the COD review on VA and the veteran is needless.

If VA is concerned that a veteran deemed presumptively eligible should be excluded, VA has the option to conduct a COD review and propose to terminate benefits.  VA already applies this procedure to honorably discharged veterans deemed presumptively eligible, such as those who were separated as conscientious objectors.[58]  The advantage of a policy of presuming eligibility is that it reduces the burden on VA, is easily administered on the face of the DD 214 (by looking at the character of service and narrative reason boxes), and allows veterans who are entitled to benefits to start accessing them more quickly, rather than waiting months and years during which time their health conditions likely worsen and their lives become more unstable.

## C.    38 C.F.R. § 3.12(d): Regulatory Bars & Compelling Circumstances

VA must establish regulatory bars that properly interpret the text of the governing statute, accord with the statutory scheme, and honor Congress's intent.  A faithful regulatory interpretation would result in bars that exclude only those former service members who committed severe, unmitigated misconduct that should have led—but for a technical or procedural reason did not lead—to a Dishonorable discharge.  The Proposed Rule does not currently do that, and therefore further changes are needed.

Moreover, it is important to recognize as a starting point that no act or statement of Congress requires that VA impose any regulatory bars at all.  VA chose to create the existing regulatory bars based on its own general rulemaking authority under 38 U.S.C. § 501(a).

---

[58] *See, e.g.*, *Title Redacted by Agency*, No. 12-41864, 2012 WL 7014448, at *3 (Bd. Vet. App. Dec. 7, 2012) (ordering a remand for a conscientious objector with an Honorable discharge characterization to determine whether the servicemember is barred from VA services by the statutory bars at 38 U.S.C. § 5303(a) and 38 C.F.R. § 3.12(c)(1)).

27

Curiously, the bars that it chose are based on statutes and regulations that pre-existed the 1944 G.I. Bill and that Congress expressly rejected and overwrote therein.  As such, those bars are contrary to law.[59]  Thus, there is nothing that requires VA to use the current or proposed regulatory language—or indeed that prevents VA from removing the regulatory bars altogether.

Decades of experience with the existing regulatory bars clearly show that the COD rule is fundamentally flawed and that major revision is needed to bring it into line with statute, enable a workable administrative system, and get help to veterans who desperately need it.

Despite centralizing COD adjudications in four Regional Offices, vast disparities in COD outcomes remain.  In FY 2018, one of those four offices, the Little Rock RO, issued full grants in 33.3 percent of CODs, whereas another office, the Muskogee RO, issued full grants in just 14.8 percent—a two-fold difference.[60]  Moreover, despite centralization, the other 54 Regional Offices still are responsible for a significant portion of COD decisions, and similar disparities exist across those ROs.[61]  Disparities in treatment of similarly situated veterans based purely on which RO determines their eligibility is a quintessentially arbitrary and capricious result.[62]

The current regulatory bars have vastly more exclusionary effect than the statutory bars. More than 50 percent of veterans denied full access to VA benefits in FY 2018 were excluded based on the regulatory bars alone.[63]  The proposed regulatory bars—because of their similarity to

---

[59] *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1383 (D.C. Cir. 1985) ("[W]hen an agency does not reasonably accommodate the policies of a statute or reaches a decision that is 'not one that Congress would have sanctioned,' . . . a reviewing court must intervene to enforce the policy decisions made by Congress.") (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

[60] FOIA data on file with Petitioners.

[61] *Id.*

[62] *See, e.g., Fed. Election Comm'n v. Rose*, 806 F.2d 1081, 1089 (D.C. Cir. 1986) ("[A]n agency's unjustifiably disparate treatment of two similarly situated parties works a violation of the arbitrary-and-capricious standard.").

[63] FOIA data on file with Petitioners.

the existing bars or even greater breadth—are likely to continue that trend.  The outsized impact of the regulatory bars on preventing former service members from accessing basic benefits shows that these bars are clearly contrary to law.  Two fundamental principles of administrative law and statutory interpretation are that an agency's regulation must be within the scope of the authority granted by Congress and cannot render the statutory text meaningless.[64]  For example, under the proposed regulations service members could be disqualified for willful and persistent conduct for being AWOL for less than 180 days despite Congress requiring at least 180 days to disqualify a service member under a statutory bar.  More examples of the Proposed Rules conflicting with and exceeding the statute are given below.  By overreaching and swallowing up the statute, VA's current and proposed regulations are unlawful.

We urge VA to reconsider in a more holistic fashion which former service members it is truly seeking to exclude from basic veteran benefits and to remove the existing and proposed regulatory bars.  However, to the extent that VA decides to continue to use the existing framework of regulatory bars, we ask that VA make the following changes:

      1.    *38 C.F.R. § 3.12(d): Preamble*

The Proposed Rule reframes the prefatory language of the regulatory bars to state that "[b]enefits are not payable where the former service member was discharged or released under one of the following conditions."

---

[64] *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *U.S. v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982) ("The challenged Regulation is not a reasonable statutory interpretation unless it harmonizes with the statute's 'origin and purpose.'"); *Chrysler Corp. v. Brown*, 441 U.S. 281, 308 (1979) ("What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued."); *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) (An agency's "'interpretation' of the statute cannot supersede the language chosen by Congress."); *Doe, 1 v. Fed. Election Comm'n*, 920 F.3d 866, 874 (D.C. Cir. 2019), cert. denied, 140 S. Ct. 2506 (2020) ("It is hornbook law that an agency cannot grant itself power via regulation that conflicts with plain statutory text.").

Under current practice and Court of Appeals for Veterans Claim precedent, the relevant misconduct to be considered in a COD determination is the specific misconduct that led to discharge.[65]  An adjudicator may not consider any misconduct that did not lead to discharge, and should not be combing through a veteran's service records to find other misconduct on which basis the veteran could be excluded.  This accords with the text of the statute, which directs attention to the conditions under which the service member was "discharged or released."  This also conforms to principles of due process, because a service member should be aware of the likely consequences of a disciplinary action; if the misconduct was not noticed in the discharge paperwork then the member did not have a full opportunity to know that it could bar access to benefits and to then challenge that action.  Limiting consideration to the misconduct that was noticed on the separation or court-martial paperwork and that actually led to discharge is also efficient for VA adjudicators: the adjudicator can focus on the separation paperwork rather than digging through the whole file to find some other, perhaps nonexistent, misconduct allegations.

The Proposed Rule is seemingly ambiguous on which misconduct the COD review should focus, though the law makes clear that it should be solely the misconduct that led to discharge. For clarity and consistency of application and to bring its regulations into compliance with the statute, VA should revise the prefatory language in the final rule to state that a former service member may be deemed ineligible only on the basis of misconduct that was listed on the administrative separation notice or court-martial conviction and that actually formed the basis of the discharge.

---

[65] *See Gardner v. Shinseki*, 22 Vet. App. 415, 420-21 (2009); *Frazier v. Shinseki*, No. 09-3765, 2011 WL 1930395, at *3 (Vet. App. May 20, 2011) (nonprecedential).

2.     *38 C.F.R. § 3.12(d)(1): Discharge in Lieu of Court-Martial*

Under the current version of Section 3.12(d)(1), service members who are discharged for accepting an "undesirable discharge to escape trial by a general court-martial" are deemed discharged under dishonorable conditions.  VA proposes replacing the term "undesirable discharge" with "discharge under other than honorable conditions or its equivalent" and the term "to escape trial" with "in lieu of a trial."

VA's proposed regulation is unlawfully vague in two respects.  First, it is not clear what is "equivalent" to a "discharge under other than honorable conditions."  Some readers, including VA adjudicators, may think that a General discharge is equivalent, when that is not what VA appears to intend.  And while no veteran receives an "Undesirable" discharge anymore, there remain hundreds of thousands of veterans who served in the Vietnam War era or earlier who have such characterization, and the rule must account for them, too.  The final rule should use more specific language such as "undesirable discharge or discharge under other than honorable conditions in lieu of general court-martial."

Second, the Proposed Rule fails to fully clarify who is not covered by this regulatory bar: namely, service members who were discharged in lieu of *special* court-martial.  A common error in COD determinations is the wrongful exclusion of service members discharged because of or in lieu of special court-martial, though the statutory and regulatory bar expressly state that only *general* court-martial is disqualifying.  The Legal Services Center of Harvard Law School represented a veteran initially denied on exactly these erroneous grounds.  The veteran served two Honorable enlistments in the Army, which included deploying to Afghanistan, before receiving an Other Than Honorable discharge in lieu of special court-martial for helping a fellow Soldier buy drugs.  After the Regional Office wrongfully denied him, it took three years for a Decision Review Officer to issue a new COD determination that granted his eligibility—during which time the

31

veteran was denied thousands of dollars of compensation benefits.  To better prevent such clear errors, VA should expressly state in its final rule that those discharged in lieu of special court-martial are not barred under this provision.

Furthermore, for reasons described more below, we strongly object to the exclusion of veterans discharged in lieu of general court-martial from "compelling circumstances" consideration as arbitrary, discriminatory, and harmful.

3.    *38 C.F.R. § 3.12(d)(3): Moral Turpitude*

Under the current version of Section 3.12(d)(3), veterans can be deemed "dishonorable" for committing a single offense involving moral turpitude, a term for which the current regulation provides no definition, though it states that "generally" felonies involve moral turpitude.  VA's Proposed Rule defines "moral turpitude" as "a willful act committed without justification or legal excuse which gravely violates accepted moral standards and . . . would be expected to cause harm or loss to person or property," a standard set forth in a 1987 VA Office of General Counsel precedential opinion.  This proposal is impermissibly broad and untethered from any military legal principles, in violation of the statute and VA's authority.  In addition, the phrase "moral turpitude" is inherently vague and will lead to inconsistent and arbitrary decision making.

As explained above, VA must remove the moral turpitude bar because it violates administrative law.  Congress chose not to include moral turpitude as a statutory bar in the 1944 G.I. Bill, though such a bar had existed in prior statute and other bars from that statute were carried forward.  This demonstrates Congress's rejection of moral turpitude as a bar to benefits.  However, VA not only improperly reinstated the moral turpitude bar, it broadened it.[66]  In the 1946 COD regulation, VA excluded veterans for not just offenses of moral turpitude that resulted in court-

---

[66] *See Nat. Res. Def. Council*, 768 F.2d at 1383.

martial conviction (the prior statutory standard) but to all morally turpitudinous offenses of which convicted by military or civilian court.  VA later broadened the bar even more to its current state, where no court-martial or other court conviction is required at all.  This directly contravenes the statute and Congress's intent, and thus the moral turpitude bar exceeds the authority that Congress delegated to VA.

Substantively, VA's proposed definition of "moral turpitude" encompasses behavior that does not meet the high standard of "dishonorable."  "Moral turpitude" is a concept that does not exist in military law; there is no armed forces case law or practice to draw on in formulating a reasonable and appropriate standard.  This alone calls into question VA's use of the term in its regulatory bars.

In VA law, "moral turpitude" is not defined by statute or regulation.  However, relying on legal dictionaries, the Board of Veterans' Appeals has defined moral turpitude as "conduct that is contrary to justice, honesty, or morality"[67] and "[b]aseness, vileness, or depravity in the private and social duties which a man owes to his fellowmen or to society in general."[68]  The Office of General Counsel issued a precedential opinion in 1987 that held that an offense involves "moral turpitude" "if it is willful, gravely violates accepted moral standards, is committed without justification or legal excuse, and, by reasonable calculation, would be expected to cause harm or loss to person or property."[69]

---

[67] *Title Redacted by Agency*, Bd. Vet. App. 20016688 (Mar. 5, 2020), https://www.va.gov/vetapp20/files3/20016688.txt.

[68] *Title Redacted by Agency*, Bd. Vet. App. 20011599 (Feb. 11, 2020), https://www.va.gov/vetapp20/files2/20011599.txt.

[69] General Counsel's Opinion, Veterans Administration, Op. G.C. 6-87 (July 27, 1987).

Other areas of federal law, such as immigration, do have a developed definition and concept of "moral turpitude."  But in two main respects, VA's proposed definition sweeps far more broadly than those doctrines and impermissibly expands the legally accepted and commonsense definition of "moral turpitude" to behavior that must not warrant a Dishonorable discharge.  First, VA's proposed definition of moral turpitude encompasses unintentional behavior.  It is axiomatic that acts of moral turpitude—"[b]aseness, vileness, or depravity"—include an element of intent.  Yet, VA's proposed version of Section 3.12(d)(3) states that the misconduct "would be *expected to* cause harm or loss to person or property" (emphasis added).  This would permit VA to assess the offense using an objective standard that does not take into account the former service member's actual intent or state of mind.  As a result, VA's definition of moral turpitude impermissibly encompasses accidental and reckless acts.

Second, VA's definition of moral turpitude includes "harm or loss to . . . property" without the requirement of fraud that "moral turpitude" definitions typically require.  Without fraud, mere willful property damage might be considered "dishonorable" and therefore presumptively disqualifying.

A proper definition of moral turpitude that accords with existing legal doctrines would encompass: "conduct that involves fraud, or conduct that gravely violates moral standards and involves the intent to harm another person."  Such a definition of moral turpitude is properly limited to truly egregious and intentional behavior—and behavior that may actually warrant a Dishonorable discharge.

In any event, the term "moral turpitude" is inherently vague and subject to personal opinions based on an individual's own moral viewpoint.  Although VA proposes to explain "moral turpitude" in more words, the proffered definition is so broad as to remain open to varying

34

interpretations. This failing was pointed out in the 1973 Nader Report on Vietnam Veterans with the following description: "[a]n older VA employee in Montgomery, Alabama, may consider smoking marijuana an offense involving moral turpitude, while his younger counterpart in San Francisco would merely be amused."[70] The likelihood of such disparities has not disappeared in the passing years. Just this year, Petitioner Swords to Plowshares received a decision from the Muskogee Regional Office denying a client's COD determination on "moral turpitude" grounds because he had tested positive one time for drugs that he has used to self-medicate his service-related mental health condition, whereas the Legal Services Center represented a veteran who was discharged for one-time drug use and neither this bar, nor any other bar, was found to apply. VA has expressed a goal of providing clear guidance and comprehensible standards to its adjudicators so that they can render consistent decisions on a national scale. The use of the phrase "moral turpitude" undermines that goal.

To better accord with statute and create an easily applied rule, Petitioners propose removing the phrase "moral turpitude" and replacing it with a list of offenses that VA considers morally turpitudinous as that term is properly defined. That is, the bar would exclude former service members who committed the offenses of treason, mutiny, spying, rape, sabotage, murder, arson, burglary, kidnapping, or the attempt of any of these offenses, and offenses that have a maximum punishment of life imprisonment under the Uniform Code of Military Justice.

---

[70] John W. Brooker, Evan R. Seamone & Leslie C. Rogall, *Beyond T.B.D.: Understanding VA's Evaluation of a Former Service Member's Benefit Eligibility following Involuntary or Punitive Discharge from the Armed Forces*, 214 Mil. L. Rev. 1, 172 (2012).

4.    *38 C.F.R. § 3.12(d)(4): Willful and Persistent Misconduct*

Under the current and proposed version of Section 3.12(d)(4), service members who are discharged for committing "willful and persistent misconduct" are considered discharged under dishonorable conditions.  These terms are currently interpreted and applied far too broadly.  By going well beyond the limits contemplated by the drafters of the 1944 G.I. Bill, VA has acted unlawfully in enacting and enforcing this regulatory bar.[71]  VA relies on its general definition of "willful misconduct" to mean any intentional conduct—minor or otherwise— that violates any rule, or any reckless action that has a probability of doing so.  VA now proposes to create a definition of "persistent" to mean two or more incidents of misconduct or misconduct that lasts more than one day.  VA's definition places few limits on what is willful or persistent; any sequence of misconduct citations, regardless of whether they are related, of similar character, or occurred close in time, qualifies as "persistent."   Under VA's Proposed Rule, service members commit "willful and persistent misconduct" if they commit

- multiple instances of "minor misconduct occurring within two years of each other";

- a single instance of "minor misconduct occurring within two years of more serious misconduct"; or

- multiple instances of "serious misconduct occurring within five years of each other"

These imprecise and expansive standards permit almost any disciplinary problems to be considered "willful and persistent misconduct."  Unsurprisingly, the vast majority of CODs are denied on the basis of "willful and persistent misconduct"—and this bar will likely remain the primary basis for

---

[71] *See Nat. Res. Def. Council*, 768 F.2d at 1383.

excluding veterans from VA if the Proposed Rule is promulgated in its current form.[72]  VA must avoid that unlawful and unwanted outcome for the reasons explained below.

As an initial matter, the willful and persistent misconduct bar should be eliminated entirely because it exceeds Congress's grant of authority to VA.[73]  The willful and persistent misconduct bar conflicts with the governing statute by assigning a "dishonorable" label to minor misconduct for which service members never would have been—and indeed were not—discharged Dishonorably.[74]  Indeed, the rule can exclude a service member for misconduct that quite literally never could have led to a Dishonorable discharge because such punishment is not permitted for those offenses.  For example, two unauthorized absences of less than one day would be considered "dishonorable" under VA's proposed willful and persistent misconduct bar—but a Dishonorable discharge is not authorized under such circumstances.  VA's Proposed Rule thus violates the plain text of the statute.

What is more, as with the moral turpitude bar, Congress expressly chose not to include "willful and persistent misconduct" of which convicted by court-martial as a statutory bar in the 1944 G.I. Bill, though such a bar had existed in prior law.  Yet VA not only created such a bar, it removed the requirement of a court-martial conviction—vastly expanding the number of veterans

---

[72] Ex. 1, *Underserved*, at 23.

[73] While *Garvey v. Wilkie* did uphold the willful and persistent misconduct bar as valid exercise of VA's discretion, that decision misunderstood the nature of Congress's Vietnam Era legislation and the standard of "dishonorable" conduct in military law. *See Garvey v. Wilkie*, No. 2020-1128, 2020 WL 5048433 (Fed. Cir. Aug. 27, 2020). Further, the *Garvey* decision specified that the willful and persistent misconduct bar should apply only to serious misconduct. The Proposed Rule does not so limit the application of persistent misconduct, but rather explicitly includes minor misconduct.

[74] Minor misconduct itself is ill defined. *See* Comments of Blumenthal, Tester, and Brown (noting that the definition of "minor misconduct" is "too expansive and vague, and thus risks excluding veterans whom Congress intended to be eligible for benefits").

37

excluded under its ambit. The willful and persistent misconduct thus violates the statute and exceeds the authority Congress delegated to VA.

However, if VA chooses to employ the "willful and persistent misconduct" phrasing—which it should not—then the language should account for the following changes. Revisions are needed to correct the fundamental misunderstanding of military law reflected in the Proposed Rule and to avoid the arbitrary and unwanted results that will necessarily ensue.

*First*, VA's proposed two-year timeframe for minor misconduct is meaningless under the actual practice of military law. As explained in the Notice, VA based its two-year timeline on the statute of limitations for non-judicial punishment. That limitations period has little valence in military law, and there are other principles and standards of military law that place limits on how long after an offense non-judicial punishment can be imposed. It would therefore be arbitrary to use two years as a bright-line rule for disqualifying misconduct. A more reasonable line would be one year.

*Second*, VA's Proposed Rule does not account for multiple instances of misconduct arising out of the same act. If a commander is motivated to discharge a particular service member, the commander could easily—and frequently may—charge multiple minor offenses arising out of a single act of wrongdoing. VA's proposal fails to recognize this reality and thus operates to exclude service members who were targeted for separation or who, in a moment of crisis, may have rapidly deteriorated. Instead, VA should require that incidents of misconduct be separate and distinct to court as willful and persistent.

*Third*, VA's proposed definition of "persistent" is flawed. Citing the Tenth Edition of Merriam-Webster's Collegiate Dictionary, VA defines persistent conduct as conduct "that is ongoing over a period of time" or "that recurs on more than one occasion." However, the cited

dictionary does not include "more than one time" anywhere in its definition of "persistent." Rather, the full definition from the tenth edition of Merriam-Webster's Collegiate Dictionary is:

**per·sis·tent** \-tənt\ *adj* [L *persistent-, persistens,* prp. of *persistere*] (1826)  **1 : existing for a long or longer than usual time or continuously: as a : retained beyond the usual period** ⟨a ~ leaf⟩ **b : continuing without change in function or structure** ⟨~ gills⟩ **c : effective in the open for an appreciable time usu. through slow volatilizing** ⟨mustard gas is ~⟩ **d : degraded only slowly by the environment** ⟨~ pesticides⟩ **e : remaining infective for a relatively long time in a vector after an initial period of incubation** ⟨~ viruses⟩ **2 a : continuing or inclined to persist in a course  b : continuing to exist in spite of interference or treatment** ⟨a ~ cough⟩ **— per·sis·tent·ly** *adv* [75]

According to several other dictionaries and commonsense, two wrongful acts over a two-year period do not constitute ***persistent*** misconduct.[76] And to the extent VA was reinstating the willful and persistent misconduct bar (of which convicted by court-martial) that existed in pre-1944 veterans benefits law, it is worth noting that the definition of "persistent" in the second edition of Webster's Collegiate Dictionary, published in 1910, was: "1. Inclined to persist; tenacious of position or purpose.  2. (Biol.) Remaining beyond the period when parts of the same kind

---

[75] Merriam-Webster's Collegiate Dictionary, at 867 (10th ed. 1993) (1: existing for a long or longer than usual time or continuously: as a: retained beyond the usual period . . . b: continuing without change in function or structure . . . c: effective in the open for an appreciable time usu. through slow volatilizing . . . d: degraded only slowly by the environment . . . e: remaining infective for a relatively long time in a vector after an initial period of incubation . . . 2 a: continuing or inclined to persist in a course b: continuing to exist in spite of interference or treatment.")

[76] *Persistent*, Merriam-Webster's Unabridged Dictionary(last visited September 1, 2020), https://www.merriam-webster.com/dictionary/persistent (defining persistent as "existing for a long or longer than usual time or continuously"); *Persistent*, Lexico (last visited September 1, 2020), https://www.lexico.com/en/definition/persistent (defining persistent as "[c]ontinuing to exist or endure over a prolonged period"); *Persistent*, Oxford English Dictionary (last visited September 1, 2020), https://www.oed.com/view/Entry/141468?redirectedFrom=persistent#eid (defining persistent as "[o]f an action or event: continual, recurrent; repeated, esp. constantly"); *Offender*, Black's Law Dictionary (11th ed. 2019) (defining "persistent felony offender" as "[s]omeone who has at least thrice been convicted of felonies usu. of a specified level of seriousness and often within a specified period . . .").

sometimes fall off or are absorbed; ***permanent***."[77]  Thus, at the very least, misconduct must consist of at least three separate incidents of serious misconduct within one year of each other, where the service member has been counseled and had the opportunity to correct the behavior.  Such a definition is more accurate and faithful to the statute.

*Fourth*, VA's Proposed Rule does not prevent service members being disqualified for willful and persistent conduct for being AWOL for less than 180 days despite Congress's clear guidance to the contrary.  In the statutory bars, Congress provided a specific standard for how much AWOL must be to qualify as sufficiently severe to forfeit eligibility: at least 180 days. And such absence can be excused by compelling circumstances.  However, AWOL for shorter periods under VA's Proposed Rule can warrant a dishonorable designation on the basis of willful and persistent behavior.  For example, the Court of Appeals for Veterans Claims has interpreted the "willful and persistent" regulatory standard to be satisfied with periods of AWOL of only thirty days despite the statutory 180-day standard.  A fundamental principle of statutory interpretation is that an agency cannot interpret a law so as to render another part of that law superfluous—but that is exactly the consequence of a regulatory bar that excludes former members who were AWOL for less than 180 days consecutively.  That is impermissible and is in direct conflict with Congress's statutory bar.[78]

The willful and persistent misconduct bar has been used thousands of times to exclude veterans whom Congress expressly said should be granted access to benefits and whom VA says it wants to help.  Among them are many of the veterans Petitioners and the Legal Services Center have represented: an Operation Enduring Freedom Marine Corps combat veteran who used "spice"

---

[77] Webster's Collegiate Dictionary (2d ed. 1910) (emphasis added). Similarly, that edition defined "persist" as "To stand firm; to be fixed and unmoved; to continue steadfastly; to persevere." *Id*.

[78] *See Nat. Res. Def. Council*, 768 F.2d at 1383.

to self-medicate his undiagnosed PTSD and was other-than-honorably discharged for drug abuse; a Vietnam War Army combat veteran who went AWOL—for fewer than 180 days—after redeploying because of an argument triggered by his undiagnosed PTSD and received an Undesirable discharge; a Black Korean War Era veteran who suffered racial discrimination and was given an Undesirable discharge for minor misconduct when his superiors thought that his seeking medical treatment was "malingering"; a veteran who was repeatedly raped and sexually harassed by a Non-Commissioner Officer and then given an Undesirable discharge in lieu of court-martial when he "showed disrespect" to his superiors.

The willful and persistent misconduct bar, both facially and as applied, is probably the most egregious violation of the statutory text and congressional intent. By its plain language, it operates to exclude veterans for conduct that never could have led to a Dishonorable discharge, as well as many more veterans for which realistically they never would have been dishonorably discharged. The bar is also the easiest path for front-line VA adjudicators to deny eligibility to a veteran; all they need to do is find two instances of misconduct in an enlistment period, even if they were not the basis of the discharge. VA must keep in mind the reality of mass claims adjudication and burdens placed on Veterans Service Representatives in their daily work. VA should not make it so easy to cut a person who served our country off from benefits. We therefore strongly urge VA to remove the willful and persistent misconduct bar in its entirety.

### 5.    *38 C.F.R. § 3.12(d)(5): Aggravated Sexual Acts*

Under the current version of Section 3.12(d)(5), service members are considered dishonorable if discharged for committing "homosexual acts involving aggravating circumstances." VA's Proposed Rule replaces the word "homosexual" with "sexual," meaning that Section 3.12(d)(5) would apply to all such sexual acts, not just "homosexual acts."

We fully agree that VA and the military should strongly oppose those who have committed sex crimes against others and find ways to support and assist MST survivors. However, there are ways to do so that do not promote discrimination against LGBTQ veterans, who themselves have often suffered MST.

While VA's proposed amendment appears to be a step in the right direction, Section 3.12(d)(5) should be eliminated, not amended.  It must not be forgotten that the origin of this provision was even more expressly discriminatory: the 1959 version of this regulation read that "homosexual acts or tendencies generally will be considered a discharge under dishonorable conditions"[79] and the 1963 version of the regulation created a bar for "generally, homosexual acts."[80]  The legacy of this overt discrimination remains in the current text.

Given the military's and VA's long history of discriminating against LGBTQ service members, the seemingly neutral language in the proposed version of Section 3.12(d)(5) would likely be enforced more often against LGBTQ servicemembers.[81]  Indeed, between the end of WWII and the repeal of the Don't Ask, Don't Tell ("DADT") policy in 2011, about 114,000 servicemembers were involuntarily separated based on sexual orientation.[82]  And sexual

---

[79] 38 C.F.R. § 3.12(c) (1959).

[80] 38 C.F.R. § 3.12(d)(5) (1963).

[81] *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015) (noting that "[g]ays and lesbians were . . . barred from military service"); *see also* Comments on RIN 2900-AQ95: Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge from Beth Goldman, Pres., N.Y. Legal Assistance Group (Sep. 4, 2020) (on file with Regulations.gov (beta)) at 10-12 (noting that the Proposed Rule will have a continued "disparate impact" on LGBTQ servicemembers).

[82] Matthew M. Burke, *Bill Would Upgrade Records of Those Discharged Under DADT*, Stars and Stripes (June 21, 2013), https://www.stripes.com/news/us/bill-would-upgrade-records-of-those-discharged-under-dadt-1.226901.

orientation discrimination against service members is still prevalent in the military today.[83] Consensual sodomy was a crime under the Uniform Code of Military Justice until 2003 and largely used to prosecute LGBTQ service members.[84]  Allegations of other "sex" crimes, both in the past and today, are often disparately charged against LGBTQ service members by individuals who was to express their personal moral objection to LGBTQ individuals.  For example, Swords to Plowshares represents a male Navy veteran who was discharged with an OTH due to a sex offense with aggravating factors after he was caught kissing another man in public.  Under the Proposed Rule, a VA adjudicator may still find this meets the definition of a sex crime sufficient to bar this veteran from benefits.

Removing this bar would not suddenly allow those who had intentionally committed severe sex offenses to access VA benefits.  Under the Uniform Code of Military Justice, rape and sexual assault have a mandatory Dishonorable discharge.[85]  Furthermore, rape and aggravated sexual assault could be listed under Section 3.12(d)(3) as a "morally turpitudinous" offense.[86]  Removing Section 3.12(d)(5) entirely is necessary to fully end its historical discrimination against LGBTQ veterans, and the harm VA seeks to prevent by including this subsection can be better accomplished by other means.

---

[83] Carla Groves, *Military Sexual Assault: An Ongoing and Prevalent Problem*, 23 J. Hum. Behav. Soc. Ent. 747 ("Considering the traditionally anti-LGBT military environment, LGBT service members are likely at higher risk of experiencing MST when compared to non-LGBT service members." and "sexual orientation discrimination frequently occurs" in the military).

[84] *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 578 (2003); Act of Aug. 10, 1956, 70A Stat. 74 (1956) (codified at 10 U.S.C. § 925, repealed 2003).

[85] 10 U.S.C. § 920.

[86] *See, e.g.*, *(Title Redacted by Agency)*, Bd. Vet. App. 20016688 (Mar. 5, 2020), https://www.va.gov/vetapp20/files3/20016688.txt ("[T]he appellant's conduct, specifically the unconsented sexual touching of a civilian in the confines of his car, as well as the admission of biting and struggling with her after she rejected his advances, constitutes an offense of moral turpitude" and "is certainly contrary to justice, honesty, and morality").

6.    *38 C.F.R. § 3.12(e): Compelling Circumstances & Mitigating Factors*

Under the current version of Section 3.12(d), there is no provision permitting or requiring consideration of extenuating or mitigating factors.  VA's Proposed Rule adds such a provision through a "compelling circumstances" "exception" for the regulatory bars of "moral turpitude," "willful and persistent misconduct," and "sexual acts involving aggravating circumstances or other factors affecting the performance of duty," but not "discharge in lieu of a trial" or "mutiny or espionage."  VA proposes the following list of mitigating factors:

- a clinical diagnosis of, or evidence that could later be medically determined to demonstrate existence of, posttraumatic stress disorder, depression, bipolar disorder, schizophrenia, substance use disorder, attention deficit hyperactivity disorder, impulsive behavior, cognitive disabilities, and co-morbid conditions (i.e., substance use disorder and other mental disorders);

- combat related or overseas-related hardship;

- sexual abuse/assault;

- duress, coercion, or desperation;

- family obligations or comparable obligations to third parties; and

- age, education, cultural background, and judgmental maturity.

We strongly support the creation of a "compelling circumstances" consideration in the rule and appreciate the breadth of factors that VA proposes to include.  Indeed, we believe the consideration of positive and mitigating factors to be required by statute because it is inherent in the concept of "dishonorable"—a term of art in military law.  In Petitioners' experience practicing veterans law, they too often had veteran clients denied eligibility on the basis of misconduct for which there were clearly evident explanations, or where the veterans had simply messed up after years of dedicated service.  A requirement that VA adjudicators listen to and consider the broader context of a veteran's service accords with statute and affords veterans the opportunity to access needed benefits.

44

The proposed compelling circumstances capture very important factors that should be considered in VA eligibility determinations, and we overall agree with the factors VA proposes to include. We do, however, wish to point out specific ways in which VA's Proposed Rule is flawed, too narrow, or otherwise will therefore fail to live up to its intended purpose.

### a. Compelling Circumstances Must Include Holistic Review of the Veteran's Service

Framing the mitigating factors as an "exception" infers that service members can access benefits only if they have an excuse for their behavior. That misconstrues the statutory text and congressional intent. As noted above, the drafter of the 1944 G.I. Bill used the language "other than dishonorable" to give veterans the "benefit of the doubt" and to create a presumption of eligibility. A framework such as VA proposes, which excludes veterans unless certain conditions are met, flips the intended presumption. VA should instead use the language proposed in the Petition to require adjudicators to balance the alleged negative conduct against compelling circumstances. And, as discussed above, VA should presume eligibility under Section 3.12(a).

Also, the list of "compelling circumstances" should be framed as a non-exhaustive list so that the totality of the circumstances is weighed when rendering eligibility determinations. Veterans should be allowed to present mitigating and extenuating circumstances not explicitly included on this list, and VA should have to consider them.

### b. Denying Compelling Circumstances Consideration to Veterans Discharged In Lieu of General Court-Martial is Arbitrary, Unreasonable, and Harmful

VA proposes to exclude service members discharged after accepting an Other Than Honorable discharge in lieu of trial by general court-martial from "compelling circumstances" consideration. This is unjust and irrational. In justifying this proposal in the Notice, VA claims that such service members need not have access to the mitigating factors because they can consult

legal counsel and receive mental health examinations before being other-than-honorably discharged in lieu of trial by general court-martial.  But the right to counsel is not unique to service members who are discharged in lieu of court-martial; all service members facing Other Than Honorable or punitive discharge have the right to consult with legal counsel, whether they are being discharged in lieu of court-martial or for serious misconduct, a pattern of misconduct, drug abuse, or other basis.[87]

Similarly, the right to a pre-separation mental health examination is not unique to service members discharged in lieu of court-martial; such examinations are currently afforded to service members being administratively separated for misconduct of any sort.[88]  However, the requirement of a pre-separation mental health screening is a relatively recent development and applies only to certain subsets of service members.  Congress mandated such screenings for service members who had deployed to combat within the past 24 months only in 2009; it then expanded the protection to members who reported MST in 2018.[89]  Thus, the vast majority of veterans—including all veterans who served in Vietnam, the First Gulf War, and the early years of the wars in Iraq and Afghanistan did not have the benefit of this law.  What is more, many service members were denied the protection even after it was created.  A 2017 GAO Report found that the military routinely failed to provide screenings or conducted inadequate screenings, and that 62 percent of service members discharged for misconduct from 2011 to 2015 had been diagnosed with a mental

---

[87] Department of Defense Instruction No. 1332.14 (Jan. 27, 2014); *see also* U.S. Marine Corps Order 1900.16 (Nov. 26, 2013); Dep't of Army Reg. No. 635-200 (Dec. 19, 2016); Navy Personnel Command Manual §§ 1910-406, 1910-504 (Jul. 18, 2008); Air Force Instruction No. 36-3208 (Jul. 1, 2020).

[88] 10 U.S.C. § 1177.

[89] National Defense Authorization Act for Fiscal Year 2018, Pub. L. 115–91, 131 Stat. 1379 (2017) (codified as amended at 10 U.S.C. § 1552)

health condition in service, yet separated anyway.[90]  This same report even found that the Marine Corps and Army were systematically denying mental health screenings to members being discharged in lieu of court-martial in particular.[91]  Denying veterans discharged in lieu of general court-martial consideration of "compelling circumstances" is therefore discriminatory and arbitrary—and it would operate to exclude many veterans whom Congress intended to provide benefits.

Also, failing to extend the compelling circumstances consideration to service members discharged in lieu of trial by general court-martial irrationally discriminates against former Soldiers because the Army uses such "Chapter 10" discharges much more than other branches.[92]  Thus, service members who committed the same misconduct—for example, self-medicating drug use or AWOL to escape a sexually abusive superior officer—could be addressed under different administrative separation procedures based on the branch and VA could then reinforce that disparity, despite the underlying circumstances being identical.  That disparate result for similarly situated veterans is arbitrary and capricious.[93]

Similarly, it appears irrational—and contrary to statute and congressional intent—to allow compelling circumstances consideration for veterans discharged for rape or sexual assault but not for veterans discharged in lieu of general court-martial.  A veteran can be discharged in lieu of

---

[90] *DOD Health: Actions Needed to Ensure Post Traumatic Stress Disorder and Traumatic Brain Injury Are Considered in Misconduct Separations*, U.S. GAO GAO-17-260, 2-3 (May 16, 2017) https://www.gao.gov/assets/690/684608.pdf.

[91] *Id.* at 19.

[92] FOIA data (on file with Legal Services Center of Harvard Law School).

[93] *See, e.g., Steger v. Def. Investigative Serv.*, *supra* note 38 at 1406 ("The Board cannot, despite its considerable discretion, treat similar situations dissimilarly and, indeed, can be said to be at its most arbitrary when it does so.").

general court-martial for much less serious offenses, including technical violations of military regulations and self-medicating drug use.

The harshness of this proposal is perhaps best illustrated through the true experiences of our veteran clients. As just two examples, the Veterans Legal Clinic at the Legal Services Center of Harvard Law School has represented an Operation Enduring Freedom Army combat veteran who had served in the Special Forces and completed multiple enlistments before being discharged under Other Than Honorable conditions in lieu of court-martial merely for violating a travel order—while on leave, he visited his fiancée outside the permitted travel radius. Despite having a PTSD diagnosis related to his deployment, this veteran did not receive a pre-separation mental health screening because his combat deployment was more than two years prior to separation. The Clinic also represented a Post-9/11 Army veteran and MST survivor who went AWOL to escape her violently abusive husband and was discharged under Other Than Honorable conditions in lieu of court-martial. VA's Proposed Rule would look only at the manner in which these veterans were discharged, refusing to consider the context in which it happened, and exclude them from benefits. That would be unjust. VA should avoid these unwanted outcomes by extending "compelling circumstances" consideration to all regulatory bars.

### c. *Positive Factors Must Account for the Inherent Value of Military Service*

While we appreciate and support VA's proposal to consider not just mitigating factors but also the positive and favorable service of veterans, the language used to convey that concept is unconstitutionally vague. The Proposed Rule requires consideration of the veteran's service besides the misconduct and whether such service was "honest, faithful and meritorious and of benefit to the Nation." Whether a veteran's service was "of benefit to the Nation" is entirely indeterminate and will lead to inconsistent outcomes based on who reviews the claim. The phrase

"meritorious" has a special meaning in military law to signify acts of individual achievement, which sets a higher standard that some service members—who volunteered to serve, who were willing to deploy but not called on to do so, who fulfilled all their duties until something went wrong—may not meet if a commander did not choose to bestow an award or medal. Yet such members should also be given credit for the time that they serve our country in uniform. VA should create a standard that honors the service and sacrifices inherent in all military service, especially now when so few Americans perform such service.

### d. Clarification of and Additions to the Mitigating Factors Are Needed

We are highly supportive of a compelling circumstances factor for mental health conditions that existed in service. The importance of having a general consideration of mental health conditions cannot be understated given the significant research showing how in-service mental health conditions directly lead to less-than-honorable discharges. There are significant flaws with the way that mental health is considered under the current regulatory scheme, including the difficulty—both legal and personal—that veterans face in claiming "insanity," which is currently the sole path for veterans' in-service mental health to be factored into the COD decision.[94]

However, VA's proposed list of mitigating mental health conditions should be broadened and reframed so as not to be used in an exclusionary manner. Lawyers and others who are expert in interpreting regulations can see that this mental health mitigating factor provision is a non-exhaustive list that provides examples of conditions but could include any other mental health condition. In practice, Petitioners frequently see how non-exhaustive lists in the hands of an inexperienced or uninterested adjudicator are used as a checklist—and if the veteran's condition

---

[94] 38 C.F.R. §§ 3.12, 3.354.

is not on that list, then it does not qualify. Moreover, many studies have established that service members are often misdiagnosed or undiagnosed in service.[95] For example, one Legal Services Center client—an OEF Army combat veteran with an Other Than Honorable discharge—was misdiagnosed with "Intermittent Explosive Disorder" in service, but later found by VA to be 100 percent service-connected for PTSD and TBI. Moreover, all Vietnam era veterans served before PTSD was even a recognized condition by the psychiatric profession.

Under the current proposal, many qualified service members will not receive benefits to which they are entitled simply because they do not meet the rigid set of conditions in VA's Proposed Rule. We recommend that VA issue a final rule that refers broadly to mental health conditions that existed at the time of the conduct leading to discharge, including evidence of a mental health condition even if such condition was not diagnosed until after the member's discharge.

We also strongly support the consideration of "sexual assault and abuse" as a mitigating factor. Petitioners have represented countless MST survivors who were less-than-honorably discharged when they tried to escape the MST, in retaliation for reporting the MST, or because of a related mental health condition.[96] However, the proposal is narrower than VA's definition of MST: it fails to accord members who experienced sexual harassment consideration.[97] VA should broaden this subsection to include sexual harassment as well.

---

[95] *Booted: Lack of Recourse for Wrongfully Discharged US Military Rape Survivors*, Human Rights Watch (May 19, 2016), https://www.hrw.org/report/2016/05/19/booted-lack-recourse-wrongfully-discharged-us-military-rape-survivors. (From 2001 to 2010, "potentially thousands of [service members] were misdiagnosed and wrongfully administratively discharged" because "proper procedures were not followed.").

[96] *Id.*

[97] 38 U.S.C. § 1720D

Similarly, VA should also include Intimate Partner Violence ("IPV") as a mitigating factor. Each year, thousands of service members report experiencing IPV at the hands of military or civilian partners.[98]  Like service members who experience MST, those experiencing IPV are at heightened risk of developing PTSD or another mental health condition, face barriers to accessing support and treatment, may have limited routes to reporting the violence, and may respond in a way that could be misinterpreted as "misconduct" and lead to less-than-honorable discharge. Because of the similarities between MST and IPV survivors, VA should expressly consider IPV as a "compelling circumstance."

Furthermore, we support the extension of the right of veterans to raise in COD review that a valid legal defense would have precluded court-martial conviction for the alleged misconduct, currently Section 3.12(e)(3) of the Proposed Rule.  However, such consideration is too narrow. The rule states that the defense "must go directly to the substantive issue of absence or misconduct rather than to procedures, technicalities, or formalities."  Due process is not a "technicality" or "formality"—it is a fundamental principle of American law.  The Proposed Rule seems to deny veterans the right to present issues of constitutional and statutory due process rights as a defense, though such defenses could have been brought in the court-martial itself.  To accord with law, including military legal practice, the consideration of a valid legal defense must extend to all defenses, substantive and procedural.

Finally, VA should include as a mitigating factor whether the service member experienced discrimination in service or was discharged for pre-textual reasons, whether that discrimination was on the basis of race, sexual orientation, gender or gender identity, national origin, or otherwise.

---

[98] *See, e.g., Report on Child Abuse and Neglect and Domestic Abuse in the Military for Fiscal Year 2018*, DOD (Mar. 12, 2019), https://download.militaryonesource.mil/12038/MOS/Reports/fap-fy18-dod-report.pdf; *Evaluation of Military Services' Law Enforcement Responses to Domestic Violence Incidents*, DOD (Apr. 19, 2019), https://media.defense.gov/2019/Apr/25/2002120678/-1/-1/1/DODIG-2019-075.PDF.

A recent report from Protect Our Defenders found that Black service members are significantly more likely to receive non-judicial punishment or court-martial compared with White service members.[99] And a 1972 Department of Defense report thoroughly documented the extensive racial discrimination throughout the military justice system, in courts-martial, non-judicial punishment, and discharge—as well as in duty assignments and other aspects of military life.[100] As discussed above, for many decades, LGBTQ veterans were subject to institutionalized discrimination that led to disparate punishment and discharge, and they were frequently targeted for punishment by bigoted commanders. VA should allow veterans to present discrimination as a reason that mitigates or explains allegations of in-service misconduct by expressly including "discrimination" as a compelling circumstance.

### D.     38 CFR 17.34/36: Health Care Enrollment

VA did not propose any changes to 38 C.F.R. §§ 17.34 and 17.36, but the Notice states that VA "is still considering appropriate changes" in light of the 2018 enactment of 38 U.S.C. § 1720I, which grants mental health evaluation and treatment to certain veterans discharged under Other Than Honorable conditions. Petitioners proposed changing Section 17.34 so that tentative eligibility for health care is provided to all service members who were administratively discharged, who probably have a service-connected injury, or who probably honorably completed an earlier term of service pending eligibility review. Petitioners further proposed amending Section 17.36 to create a more veteran-friendly healthcare enrollment process by adding more detailed instructions for VA staff and urging VA staff to encourage individuals to apply for health care.

---

[99] Christenson, *supra* note 7 at i-ii.

[100] *Report of the Task Force on the Administration of Military Justice in the Armed Forces*, DOD (Nov. 30, 1972), https://ctveteranslegal.org/wp-content/uploads/2013/03/DoD-Task-Force-on-the-Administration-of-Military-Justice-in-the-Armed-Forces-v1.pdf.

Petitioners reaffirm that these changes should be made for the reasons stated in the Petition. Given that Petitioners submitted this request in 2015 and VA granted the Petition as to these provisions in 2016, any further delay in issuing a proposed rule would be unreasonable. We therefore urge VA to issue changes in line with our proposal forthwith.

### E.    Petitioners' Proposed Rule

To summarize our recommendations, below is proposed language for VA's final rule:

38 C.F.R. § 3.12. *Benefit eligibility based on character of discharge.*

(a) *Presumption of eligibility.* If the former service member did not die in service, then pension, compensation, or dependency and indemnity compensation is payable for claims based on periods of service that were terminated by discharge or release under conditions other than dishonorable. (38 U.S.C. 101(2)). Unless issued in lieu of court-martial, an administrative discharge is a discharge under conditions other than dishonorable. Discharges issued by court-martial or issued in lieu of court-martial must be reviewed under paragraphs (c) and (d) in order to determine whether the discharge was under other than dishonorable conditions.

. . .

(d) *Regulatory standards for dishonorable conduct.* A discharge is under dishonorable conditions only if the specific conduct for which the former service member was discharged should have led to a Dishonorable discharge by general court-martial, as defined in subsection (1) below, and is not outweighed by compelling circumstances in the service member's record.

> (1) A discharge for only the following types of misconduct may be under dishonorable conditions, unless compelling circumstances exist:
>
>> i. A discharge in lieu of trial by general court-martial. Such discharge must be shown by documentation establishing that charges were referred to a general court-martial by a general court-martial convening authority. This provision does not include a discharge in lieu of special court-martial or a discharge in lieu of court-martial approved prior to the referral of charges.
>>
>> ii. A serious offense of which convicted by court-martial. Only the following offenses are serious under this section: Murder, Rape, Sexual Assault, Arson, Kidnapping, Mutiny, Spying, Treason, and the attempt of any of these offenses, and any offenses that under the Uniform Code of Military Justice are punishable by confinement for life.
>
> (2) A discharge is not under dishonorable conditions where compelling circumstances demonstrate favorable service or mitigate the misconduct. Evidence that exists outside the member's service records, including evidence of behavioral changes or that was not

documented during service, may establish a compelling circumstance condition or event. Compelling circumstances may be found based on the totality of the circumstances of the former service member's service, to include consideration of such factors as:

i. Mental and physical health. This includes whether the former service member may have been experiencing a mental or physical health condition at the time of the misconduct that led to discharge. This also includes consideration of military sexual trauma, intimate partner violence, operational stress, or other such circumstances or hardship.

ii. Personal and family circumstances. This includes the former service member's age, maturity, and intellectual capacity, and any family obligations or comparable obligations to third parties.

iii. Conditions of service. This includes discrimination, command climate, disparate or arbitrary action, era of service, and service branch.

iv. Favorable service to the nation. A determination of favorable service to the nation will consider factors including:

a. The overall duration and quality of service.

b. Combat, overseas, or hardship service.

c. Medals, awards, decorations, and other achievements or acts of merit.

v. Legal error in discharge. This includes whether a valid legal defense would have precluded a conviction for misconduct under the Uniform Code of Military Justice, to include consideration of substantive and procedural rights.

## IV.     CONCLUSION

Petitioners appreciate VA's efforts to clarify the regulatory bars to benefits based on COD, but further reform is needed. VA's Proposed Rule is arbitrary and capricious and contrary to Congressional intent, and the Rule would leave countless veterans unserved as a result of bad policy decisions. VA should revise its Proposed Rule as described herein to ensure that all who served in uniform receive the benefits they rightfully earned.

Respectfully submitted,

Dana Montalto
Daniel Nagin
Veterans Legal Clinic
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Claudia O'Brien
Patrick Nevins
Alexander Stout
Zachary Williams
Brittany Bruns
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

Bart Stichman
NATIONAL VETERANS LEGAL SERVICE PROGRAM
P. O. Box 65762
Washington, DC 20035

Maureen Siedor
Amy Rose
SWORDS TO PLOWSHARES
401 Van Ness Avenue, Suite 313
San Francisco, CA 94102

September 8, 2020

## V.    ABOUT THE PETITIONERS

**The National Veterans Legal Services Program ("NVLSP"):** NVLSP is an independent, nonprofit veterans service organization that has served active duty military personnel and veterans since 1981.  NVLSP strives to ensure that our nation honors its commitment to its 22 million veterans and active duty personnel by ensuring they have the benefits they have earned through their service to our country.  NVLSP has represented veterans in lawsuits that compelled enforcement of the law where the VA or other military services denied benefits to veterans in violation of the law.  NVLSP's success in these lawsuits has resulted in more than $5.2 billion dollars being awarded in disability, death and medical benefits to hundreds of thousands of veterans and their survivors.  NVLSP offers training for attorneys and other advocates; connects veterans and active duty personnel with pro bono legal help when seeking disability benefits; publishes the nation's definitive guide on veteran benefits; and represents and litigates for veterans and their families before the VA, military discharge review agencies and federal courts.  For more information, go to www.nvlsp.org.

**Swords to Plowshares:** Founded in 1974 by veterans, Swords to Plowshares is a community-based not-for-profit 501(c)(3) organization that provides needs assessment and case management, employment and training, housing, and legal assistance to approximately 3,000 veterans in the San Francisco Bay Area each year.  Swords to Plowshares promotes and protects the rights of veterans through advocacy, public education, and partnerships with local, state, and national entities.  For more information, go to www.swords-to-plowshares.org.

**The Veterans Legal Clinic at the Legal Services Center of Harvard Law School:** The Veterans Legal Clinic at the Legal Services Center of Harvard Law School provides pro bono representation to veterans and their family members in a range of veterans and military law matters, as well as pursues initiatives to reform the systems that serve the veterans community.  Located at

the crossroads of Jamaica Plain and Roxbury, the Legal Services Center is composed of six clinics—the Veterans Legal Clinic, Consumer Law Clinic, Housing Law Clinic, Family Law Clinic, Federal Tax Clinic, and LGBTQ+ Advocacy Clinic—and is Harvard Law School's largest clinical placement site.  The Center's longstanding mission is to educate law students for practice and professional service while simultaneously meeting the critical legal needs of the community.

In addition to providing individual pro bono representation to veterans with less-than-honorable discharges before VA and the DOD military review boards, the Veterans Legal Clinic collaborates with other veterans organizations on initiatives to update and improve government policies that prevent veterans from accessing needed care and supportive services and to train more pro bono advocates about how to represent veterans with bad paper.  Among these initiatives are the Underserved report and associated Petition for Rulemaking on behalf of Swords to Plowshares and the National Veterans Legal Services Program, which asked VA to amend its COD regulations that govern eligibility for basic VA services for veterans with less-than-honorable discharges; the Turned Away report, which documented the nationwide practice of VHA unlawfully denying veterans with less-than-honorable discharges the right to apply for health care; and the Discharge Upgrade Practice Manual, a forthcoming treatise co-authored with Connecticut Veterans Legal Center on how to effectively advocate for veterans seeking to correct an unlawful or unjust discharge status or to gain access to VA benefits and care.

# EXHIBIT I

**RIN 2900–AQ95**

**Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge**

### RESPONSE OF
### THE NATIONAL VETERANS LEGAL SERVICES PROGRAM AND
### SWORDS TO PLOWSHARES
### TO THE
### SEPTEMBER 9, 2021 REQUEST FOR INFORMATION




Dana Montalto
Daniel Nagin
Veterans Legal Clinic
LEGAL SERVICES CENTER OF HARVARD LAW
SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Gavin Masuda
Alexander Stout
Mohini P.B. Rarrick
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

Bart Stichman
Renée Burbank
NATIONAL VETERANS LEGAL SERVICES
PROGRAM
P. O. Box 65762
Washington, DC 20035

Maureen Siedor
Amy Rose
SWORDS TO PLOWSHARES
401 Van Ness Avenue, Suite 313
San Francisco, CA 94102

October 12, 2021

**TABLE OF CONTENTS**

**Page**

I.    Executive Summary ....................................................................................................1

II.   Response to the Request for Information...........................................................5

    A.    Compelling Circumstances ................................................................5

    B.    Willful and Persistent Misconduct........................................................13

    C.    Moral Turpitude .......................................................................................18

    D.    Benefit Eligibility..............................................................................21

III.  Conclusion ..........................................................................................................31

IV.   About the Petitioners.........................................................................................32

    Exhibit 1: Petitioners' Proposed Rule...............................................................34

    Exhibit 2: Listening Session Comments of Renée Burbank, National Veterans
        Legal Services Program .....................................................................37

    Exhibit 3: Listening Session Comments of Maureen Siedor, Swords to Plowshares........42

    Exhibit 4: Listening Session Comments of Dana Montalto, Veterans Legal Clinic,
        Legal Services Center of Harvard Law School.......................................47

i

I.    **EXECUTIVE SUMMARY**

The Department of Veterans Affairs ("VA") has a historic opportunity to correct decades of statutory misinterpretation that have excluded far too many veterans from receiving the benefits that they need and deserve.  The current regulatory bars at 38 C.F.R. § 3.12 have contributed to the higher rates of homelessness, suicide, unemployment, and untreated mental health conditions among the less-than-honorably discharged veterans population, with a disproportionate impact on veterans of color, LGBTQ+ veterans, Post-9/11 era veterans, and veterans who experienced combat or Military Sexual Trauma.  VA's Proposed Rule, though improved in some ways, would unfortunately continue this pattern of improper and inequitable exclusion.  We call on VA to issue a final rule that removes the unlawful regulatory bars and upholds its sacred mission to care for those who have been wounded in service to our country.

Swords to Plowshares and the National Veterans Legal Service Program ("NVLSP", and together, the "Petitioners") submit these comments in response to the Request for Information issued by the Department of Veterans Affairs on September 9, 2021 (the "Request for Information").[1]  These comments supplement the comments submitted by Petitioners on September 8, 2020[2] in response to the Proposed Rule issued on July 10, 2020 ("Proposed Rule").[3]  In addition, Petitioners Renée Burbank of NVLSP and Maureen Siedor of Swords to Plowshares, and counsel for Petitioners Dana Montalto of the Veterans Legal Clinic at the Legal Services Center of Harvard Law School, each spoke during VA's listening sessions regarding the Proposed

---

[1] Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, Request for Information, 86 Fed. Reg. 50513 (Sept. 9, 2021).

[2] Comments of Petitioners, AQ95-Proposed Rule (filed Sept. 8, 2020), https://www.regulations.gov/comment/VA-2020-VBA-0018-0061 ("Petitioners' Comments").

[3] Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471 (proposed Jul. 10, 2020).

Rule and the Request for Information held on October 5 and 6, 2021 (the "Listening Sessions"). The oral comments presented during the Listening Sessions are attached as Exhibits 2, 3, and 4, respectively.

VA's current regulations unlawfully prevent former service members who received less-than-honorable discharges from obtaining critical VA benefits—everything from health care to education, disability compensation, and employment training—for which they are otherwise qualified.[4]  The result of this denial is that veterans must challenge their character of discharge to gain eligibility, enduring an often lengthy and complicated adjudication and having no access to benefits during this process.  The process is so opaque and arduous that some veterans are excluded from VA benefits entirely as they cannot navigate the character of discharge procedures.

To address the failures of the Character of Discharge ("COD") adjudicatory system, on June 5, 2015, Petitioners submitted a brief petition for proposed rulemaking, which VA acknowledged by letter dated July 14, 2015.  On December 19, 2015, Petitioners submitted their full and expanded petition for proposed rulemaking ("Petition").  On May 27, 2016, VA granted the Petition and initiated rulemaking.  On July 10, 2020, more than five years after Petitioners submitted their initial petition for rulemaking, VA issued its Proposed Rule.  And now, after yet another year has passed, VA published the Request for Information, seeking answers to questions that were addressed in a fulsome manner in the opening round of comments by numerous organizations, including Petitioners.

---

[4] Throughout this Comment, Petitioners use the terms "former service member," "former member," "service member," and "veteran" interchangeably to refer to all individuals who served in the armed forces, regardless of discharge status. Petitioners do not use the term "veteran" to mean only those individuals who have been able to successfully establish status as a "veteran" under 38 U.S.C. § 101(2), but rather in an expansive way that acknowledges the value of all former service members' contributions to our country and in accord with Congress's intent in enacting the Servicemen's Readjustment Act of 1944 (the "1944 G.I. Bill").

As those opening comments make clear, VA's Proposed Rule falls short and, in many respects, violates congressional directives and statutory mandates. The Proposed Rule fails to recognize that Congress requires VA to exclude from benefits only those veterans who received, or should have received, a Dishonorable discharge.[5] Moreover, the Proposed Rule contains vague and ill-defined terms and legal standards that will result in inconsistent, arbitrary, delayed, and unlawful COD determinations. The opening comments overwhelmingly support Petitioners' view that VA should amend its Proposed Rule and adopt a final version of Section 3.12 that is both consistent with Congressional mandates and far more practicable to administer, implementing the following standards:

- Presume eligibility of all administratively discharged veterans, except those discharged in lieu of court-martial;[6]

- Remove regulatory bars in excess of VA's statutory authority that operate to exclude veterans based on misconduct that never could have or would have led to a Dishonorable discharge;[7] and

---

[5] *See, e.g.*, S. Rep. No. 78-755, at 15 (1944) ("Many persons who have served faithfully and even with distinction are released from the service for relatively minor offenses. . . It is the opinion of the committee that such discharge should not bar entitlement to benefits otherwise bestowed unless the offense was such, as for example those mentioned in section 300 of the bill, as to constitute dishonorable conditions.").

[6] Comments of Veterans Healthcare Policy Institute, AQ95—Proposed Rule (filed Sept. 8, 2020) at 6, https://www.regulations.gov/comment/VA-2020-VBA-0018-0055 ("VHPI Comments") ("[t]he VA should finalize regulations that presume administrative separations are honorable for VA purposes unless they were in lieu of Court Martial. Only those with punitive discharges, or were to receive punitive discharges, should be subjected to an eligibility review, as Congress intended."); Comments of the Homeless Advocacy Project, AQ95—Proposed Rule (filed Sept. 8, 2020) at 1-2, https://www.regulations.gov/comment/VA-2020-VBA-0018-0071 ("HAP Comments") (arguing that VA's continuation of the presumption of ineligibility for "bad paper" discharges is "contradictory to Congress' intent" and harms those veterans "most in need of the VA's support."); Comments of New York Legal Assistance Group, AQ95—Proposed Rule (filed Sept. 4, 2020) at 1-2, https://www.regulations.gov/comment/VA-2020-VBA-0018-0029 ("NYLAG Comments") ("Congress intended that VA exclude only *dishonorably* discharged servicemembers," and that a presumption of ineligibility for OTH discharges "needlessly overburdens VA adjudicators." They request VA presume that benefits are payable to veterans discharged "under conditions other than dishonorable," except in the cases of "punitive discharge," a discharge in lieu of general court-martial, or a "bar to benefits as enumerated by 38 U.S.C. § 5303.").

[7] *See* Comments of Sens. Richard Blumenthal, Jon Tester, and Sherrod Brown, AQ95—Proposed Rule (filed Sept. 3, 2020) at 3, https://www.regulations.gov/comment/VA-2020-VBA-0018-0028 ("Sen. Blumenthal, et al. Comments") ("Congress only authorized exclusion of those servicemembers who received or should have received dishonorable discharges by military standards. Congress did not intend for VA to create a new standard that would be more exclusionary that the military standard and did not give VA any authority to do so"); Comments of National Veterans

- Require holistic consideration of compelling circumstances in all cases.[8]

Despite the clarity in the existing record, Petitioners welcome the opportunity to speak further on the questions raised by VA in the Request for Information.  Petitioners address each question and sub-question as posed on the four topics of compelling circumstances, willful and persistent misconduct, moral turpitude, and benefit eligibility.  Petitioners refer VA to our prior comment in this proceeding and the attached proposed draft regulation, the latter of which incorporates Petitioners' positions in this comment.

What must be stated up front is that VA cannot both tinker with the definition of moral turpitude or create a simple equation for persistent misconduct (questions A and B) and also establish a fair and just character of discharge adjudicatory system (question D.3).  The only way to ensure that the COD review system does not reinforce systemic discrimination against marginalized veterans is to enact systemic changes to this regulatory scheme.  Placing the burden on veterans to prove that they suffered discrimination based on race, sex, gender identity, sexual orientation, mental health condition, disability, or other characteristic or experience such that they

---

Council for Legal Redress & Connecticut Veterans Legal Center, AQ95—Proposed Rule (filed Sept. 8, 2020) at 2-4, https://www.regulations.gov/comment/VA-2020-VBA-0018-0057 ("NVCLR & CVLC Comments") ("[Congress'] 'other than dishonorable' standard was deliberately less restrictive than the standards of prior laws, and Congress expressly designed it to include veterans who received less-than-honorable discharges" and "Congress intended that VA's authority extend only to correcting the rare circumstance where a servicemember should have, but did not, receive a Dishonorable discharge" and "Congress both rejected and overwrote that pre-existing law in enacting the 1944 G.I. Bill and its 'other than dishonorable' eligibility standard.  VA's reinstatement of those standards in regulation exceeds its authority and violates fundamental principles of administrative law").

[8] Comments of Vietnam Veterans of America, AQ95—Proposed Rule (filed Sept. 8, 2020) at 3, https://www.regulations.gov/comment/VA-2020-VBA-0018-0066 ("VVA Comments") (recommending that the VA "amend the proposed rules to unequivocally indicate that the listed impairments [under 'compelling circumstances'] is not an exclusive list and that other impairments raised will and should be considered."); Comments of Inner City Law Center, AQ95—Proposed Rule (filed Sept. 8, 2020) at 1-2, https://www.regulations.gov/comment/VA-2020-VBA-0018-0063 ("ICLC Comments") (with respect to Section 3.12(e)(2)(i), which enumerates several mental conditions that would mitigate a period of prolonged AWOL or other misconduct, the VA should "explicitly declare that it is leaving room for uncommon or heretofore unknown mental health conditions by stating that the enumerated list [in § 3.12(e)(2)(i)] is non-exhaustive.").

4

should have access to VA benefits will necessarily leave many of these veterans out in the cold—unable to access the supportive services to which they are entitled by law.  VA can and must do better.

## II.     RESPONSE TO THE REQUEST FOR INFORMATION

### A.     Compelling Circumstances

#### 1.     What conditions, symptoms, or circumstances if any, should VA consider when determining the impact of mental impairment at the time of the prolonged AWOL or misconduct?

Service members diagnosed with mental health conditions are at significantly heightened risk for a less-than-honorable discharge.  For example, one study of Marine Corps Iraq combat veterans found that those diagnosed with Post-Traumatic Stress Disorder ("PTSD") were 11 times more likely to be discharged for misconduct and 8 times more likely to be discharged for substance use.[9]  It is of utmost import that VA create a fair and broad rule for considering mental health as a mitigating factor.  Specifically, VA should issue a final rule that refers broadly to mental health conditions that existed at the time of the conduct leading to discharge, including any condition that was not diagnosed until after the member's discharge.[10]  VA's proposed list of mitigating mental health conditions should be broadened and reframed to be more inclusive.[11]

---

[9] Robyn M. Highfill-McRoy, Gerald E. Larson, Stephanie Booth-Kewley & Cedric F. Garland, *Psychiatric Diagnoses and Punishment for Misconduct: the Effects of PTSD in Combat-Deployed Marines*, BMC Psychiatry, Oct. 25, 2010, at 5.

[10] Memorandum from A.M. Kurta, the Under Sec'y of Defense for Personnel and Readiness, Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment ¶¶ 4-6 (Aug. 25, 2017), https://dod.defense.gov/Portals/1/Documents/pubs/Clarifying-Guidance-to-Military-Discharge-Review-Boards.pdf ("Evidence may come from sources other than a veteran's service record . . . Evidence may also include changes in behavior; requests for transfer to another military duty assignment; deterioration in work performance; inability of the individual to conform their behavior to the expectations of a military environment; substance abuse . . . Evidence of misconduct, including any misconduct underlying a veteran's discharge, may be evidence of a mental health condition, including PTSD; TBI; or of behavior consistent with experiencing sexual assault or sexual harassment.").

[11] *See* Petitioners' Comments at Section III(C)(6)(d).

As discussed in our prior comment, Petitioners frequently have witnessed COD adjudicators disqualify veterans if the veteran's condition is not on an enumerated list.[12] Among other advocacy groups, the National Veterans Council for Legal Redress and Connecticut Veterans Legal Center share the Petitioners' concern, particularly regarding the additional administrative burden and cost that making difficult COD determinations would pose on adjudicators who are not experts in mental health conditions.[13] Moreover, many studies have established that service members are often misdiagnosed or undiagnosed in service, meaning an exhaustive list of conditions could be unduly exclusionary.[14] As we made clear previously, under the current proposal, many qualified service members will be excluded from benefits to which they are entitled simply because they do not meet the rigid set of conditions in VA's Proposed Rule.[15]

More broadly, VA should consider any and all applicable compelling circumstances, including, but not limited to, mental impairment at the time of the conduct leading to discharge, in all VA eligibility determinations. As discussed in our prior comment, a holistic view of all circumstances is required in COD determinations, rather than strict standards that exclude

---

[12] *Id.*

[13] NVCLR & CVLC Comments at 6 ("[T]he proposed modifications to the regulatory bars in § 3.12(d) would create a complicated and highly technical standard that will increase the administrative burden on [the] VA" and will "likely to lead to disparate outcomes for veterans across different Regional Offices and Board of Veterans' Appeals Board Members." Specifically, "[t]he Proposed Rule will require a level of expertise in military law that most Veterans Service Representatives, Board Members, and other VA staff do not possess, which will lead to erroneous and incorrect decisions." Hence, the VA "should remove all regulatory bars and rely on the statutory bars expressly set forth by Congress."); *see also* Sen. Blumenthal, et al. Comments at 3 ("VA staff will still bear a huge administrative burden of sifting through every veteran with an OTH discharge's Official Military Personnel Files (OPMF) to see if these regulations are met. The funds used for this process would be better spent on providing care and benefits to more veterans").

[14] *See* Petitioners' Comments at section III(C)(6)(d) (citing *Booted: Lack of Recourse for Wrongfully Discharged US Military Rape Survivors*, Human Rights Watch (May 19, 2016), https://www.hrw.org/report/2016/05/19/booted/lack-recourse-wrongfully-discharged-us-military-rape-survivors. (From 2001 to 2010, "potentially thousands of [service members] were misdiagnosed and wrongfully administratively discharged" because "proper procedures were not followed.")).

[15] *Id.*

information to service members' detriment.[16]  Presentations during the Listening Sessions support this notion, with one leading veterans' advocate pointing out that medical and circumstantial evidence is often not available in a COD determination, particularly years after the fact and that other markers of a mental health condition, such as alleged misbehavior, must still be evaluated.[17] Such practice would accord with the approach of the Department of Defense military review boards, which look to unauthorized absences, alcohol and substance use, and unexplained behavioral changes, among other factors, as markers of a mental health condition.[18]

Overall, the compelling circumstances listed in the Proposed Rule do capture important factors that should always be considered and Petitioners broadly agree with the factors VA proposes to include, but the Proposed Rule remains underinclusive.

Petitioners continue to strongly support the creation of a "compelling circumstances" consideration in the rule and appreciate the breadth of factors that VA proposes to include.[19] Indeed, we believe the consideration of positive and mitigating factors to be required by statute because it is inherent in the concept of "dishonorable"—a term of art in military law.   In Petitioners' experience representing veterans in COD reviews, we have far too often represented veteran clients denied eligibility on the basis of misconduct for which there were clearly evident explanations.  Numerous advocacy groups for veterans have found that bars to eligibility may be

---

[16] *See generally*, Petitioners' Comments.

[17] *See*, *e.g.*, Coco Culhane, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021).  All references to, and quotes from, oral presentations during the Listening Sessions are drawn from summaries or transcriptions prepared by Petitioners.  An official transcript of the Listening Sessions has not been released as of the date of this submission.

[18] Memorandum from A.M. Kurta, the Under Sec'y of Defense for Personnel and Readiness, Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment ¶¶ 4-6 (Aug. 25, 2017), https://dod.defense.gov/Portals/1/Documents/pubs/Clarifying-Guidance-to-Military-Discharge-Review-Boards.pdf.

[19] Petitioners' Comments at section III(C).

the result of sexual assault and harassment, discrimination, mental health conditions, or other

mitigating circumstances that do not fall neatly into the VA's enumerated categories.[20] VA should

require its adjudicators to listen to and consider the broader context of a veteran's service record

and afford veterans the opportunity to access needed benefits. Among others, the New York State

Division of Veterans' Services also support this broader approach to review of a service member's

circumstances.[21] Furthermore, the Ohio Veterans' Task Force, among others, agrees with

Petitioners that limiting compelling circumstances to certain misconduct is too narrow and that

such language should be deleted.[22]

Critically, not only the list of "mental impairments" but also the entire category of

"compelling circumstances" should be framed as a non-exhaustive list so that the totality of the

---

[20] *See* Comments of the Minority Veterans of America, AQ95—Proposed Rule (filed Sept. 4, 2020) https://www.regulations.gov/comment/VA-2020-VBA-0018-0031 ("MVA Comments") ("For too long, veterans have been denied their rightfully earned benefits due to irregularities and ambiguities in terminology definitions and applications, as related to regulatory and statutory bars. This impact and subsequent categorical denial of VA benefits has disproportionately fallen on combat veterans and veterans that were subjected to sexual assault and identity-based discrimination and attacks during their service, many of whom experience post-traumatic stress as a result of their lived experiences."); NVCLR & CVLC Comments at 11 (arguing that "the majority of veterans receive less-than-honorable discharges for conduct that does not rise to the level of dishonorable conduct, and in many cases, there are mitigating and extenuating circumstances that explain the misconduct, such as a mental health condition related to combat service or Military Sexual Trauma."); ICLC Comments at 1-2 (with respect to Section 3.12(e)(2)(i), which enumerates several mental conditions that would mitigate a period of prolonged AWOL or other misconduct and stating that the enumerated list [in § 3.12(e)(2)(i)] is non-exhaustive." In addition, regarding Section 3.12(e)(2)(iv), "[s]exual harassment must be included, in addition to abuse and assault" because "[t]he current construction burdens the veteran with the unenviable task of attempting to argue that harassment they experienced in service constitutes abuse or assault.").

[21] Comments of the New York State Division of Veterans' Services, AQ95—Proposed Rule (filed Aug. 25, 2020) at 4, https://www.regulations.gov/comment/VA-2020-VBA-0018-0026 ("NYS DVS Comments") ("there must be some mechanism in place to ensure adjudicators provide thorough reviews of the veteran's full military and medical records to ensure that veterans are not penalized and stigmatized for actions or outcomes that were not their fault").

[22] Comments of the Ohio Veterans' Law Task Force, AQ95—Proposed Rule (filed Sept. 8, 2020) at 8-9, https://www.regulations.gov/comment/VA-2020-VBA-0018-0070 ("Ohio Veterans' Law Task Force Comments") (arguing that under "compelling circumstances," the VA should "delet[e] language that only refers to AWOLs, and add several categories of 'compelling circumstances' that a VA adjudicator must consider," including "discrimination/harassment; personal trauma; military sexual trauma; mental health conditions; self-medication with drugs; coercive/aggressive recruiting that permitted an unqualified member to enlist; and interpersonal violence."); Comments of Charlotte Center for Legal Advocacy, AQ95—Proposed Rule (filed Sept. 8, 2020) at 4, https://www.regulations.gov/comment/VA-2020-VBA-0018-0074 ("Charlotte Center For Legal Advocacy Comments") (same).

circumstances is weighed when rendering eligibility determinations.  This is supported by Vietnam Veterans of America in addition to others.[23]  Veterans should always be allowed to present mitigating and extenuating circumstances not explicitly included on the "compelling circumstances" list, and VA should be required to consider them.[24]  As set out in our prior comment, this includes service members discharged in lieu of general court-martial, as denying them compelling circumstances consideration is arbitrary, unreasonable, and harmful.[25]  Other commenters agree, finding VA's "bright line" denial of such consideration in these circumstances to be damaging to service members and unjust.[26]

As discussed by the National Organization of Veterans' Advocates and others, service members also experience significant disparities in the COD determinations.[27]  The Proposed Rule does little to prevent these disparities from persisting and in many cases may exacerbate them.  For example, if the compelling circumstances consideration is not extended to service members

---

[23] VVA Comments at 3 (recommending that VA "amend the proposed rules to unequivocally indicate that the listed impairments [under 'compelling circumstances'] is not an exclusive list and that other impairments raised will and should be considered."); Comments of Public Counsel's Center for Veterans' Advancement, AQ95—Proposed Rule (filed Sept. 7, 2020) at 9-10, https://www.regulations.gov/comment/VA-2020-VBA-0018-0050 ("Public Counsel's CVA Comments") (same); ICLC Comments , at 1-2 (same).

[24] Public Counsel's CVA Comments at 9-10 (warning that the definition of "mental impairment" in the "compelling circumstances" exception "may unintentionally exclude veterans with other mitigating clinical impairments."); Comments of the Veteran Advocacy Project, AQ95—Proposed Rule (filed Sept. 8, 2020) at 3, https://www.regulations.gov/comment/VA-2020-VBA-0018-0075 ("VAP Comments") (believing that the current expansion of the "compelling circumstances" exception creates a "strong possibility" that VA adjudicators will only approve COD changes for "those factors made explicit.").

[25] Petitioners' Comments at Section III(C)(6)(b).

[26] See NYS DVS Comments at 5 ("numerous documented circumstances exist where service members have been forced into signing off on an other-than-honorable discharge because they were not properly informed of their rights or because they were facing retaliation"); Charlotte Center For Legal Advocacy Comments at 4 (requesting VA to extend the "compelling circumstances" exception to all COD determinations, including those discharges in lieu of general court-martial. They argue that VA's current "bright-line exclusion" is inconsistent with VA's own stated reason for the "compelling circumstances" exception and "ignores the veteran's totality of service.").

[27] See Comments of the National Organization of Veterans' Advocates, Inc., AQ95—Proposed Rule (filed Sept. 8, 2020) at 1-2, https://www.regulations.gov/comment/VA-2020-VBA-0018-0056 ("NOVA Comments") (arguing that there are "broad disparities in treatment of veterans between the various VA Regional Offices across the country, where employees interpret and apply the current, overly-broad regulations with disparate outcomes").

discharged in lieu of trial by general court-martial, this will adversely and arbitrarily affect former Soldiers because the Army uses such "Chapter 10" discharges much more than other branches.[28] Thus, service members who committed the same misconduct could be addressed under different administrative separation procedures based on the branch and VA could then reinforce that disparity for similarly situated veterans, which is arbitrary and capricious.[29] Simplifying the COD determination process and reframing Section 3.12(a) to presume eligibility for veterans, rather than ineligibility, could help alleviate some of the disparate outcomes.

> **2.** **VA proposed to consider, as a factor in a "compelling circumstances" analysis, "Sexual abuse/assault." Should VA employ a different or additional term for this category, such as ''Military Sexual Trauma (MST)''? Also, should VA include language reminding adjudicators to look beyond service records to corroborate the account of an in-service personal assault, as provided in 38 CFR 3.304(f)(5)?**

Sadly, every year thousands of service members experience sexual assault and harassment, and many of them are discharged because of retaliation or a related mental health condition. In addition, thousands of service members have experienced other forms of harassment, attacks, or discrimination. It is important, therefore, that VA take full account of veterans' lived experiences. Military Sexual Trauma ("MST") is the appropriate term to adopt rather than sexual abuse/assault, which is too narrow. The term "sexual abuse/assault" fails to accord due consideration to members who experienced sexual harassment, which the term "MST" would capture, as well as excludes others who experienced injurious harassment and attacks.[30]

---

[28] FOIA data (on file with Legal Services Center of Harvard Law School).

[29] Petitioners' Comments at n. 38.

[30] *Id.*; *see also* 38 U.S.C.§ 1166(c)(2) for definition of MST.

As stated in our prior comment, we fully agree that VA and the military should find ways to support and assist MST survivors and hold individuals who perpetrate sex crimes responsible.[31] One of the primary ways to do so will be to include MST in the analysis of compelling circumstances. The National Organization of Veterans' Advocates, among others, agrees with the Petitioners' analysis and advocates that MST should be the operative term, in addition to a host of other factors that are relevant to any determination of "compelling circumstances." [32]

However, the term "MST" is itself too narrow and fails to address the many forms of gender-based violence or physical, emotional, and sexual abuse that many service members experience. During the Listening Sessions, others reiterated the importance of considering MST as broadly as possible, stressing that survivors suffer both physical and emotional injuries, are often dissuaded from discussing MST within their command, and the recurrence of MST as a significant factor in survivors going AWOL to escape abuse.[33]

As discussed in Petitioners' prior comment, in addition to revising the "compelling circumstance" term to MST, VA should also include Intimate Partner Violence ("IPV") as a mitigating factor.[34] Each year, thousands of service members report experiencing IPV at the hands

---

[31] *Id*. at Section III(C)(5).

[32] *See* NOVA Comments at 3 (arguing that the VA should "broaden 'sexual abuse and assault' under subsection (e)(2)(iv) to specifically include all military sexual trauma (MST), including sexual harassment and intimate partner violence," and "add a separate item under subsection (e)(2) to allow for consideration of discrimination, to include on the bases of race, color, national origin, religion, sex, gender identi[t]y (including gender expression), sexual orientation, disability or perceived disability, age, marital status, family/parental status, political beliefs, or reprisal or retaliation for involvement in prior reporting activity").

[33] *See*, *e.g.*, Kathleen Silvia, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021); Coco Culhane, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021); Juliet Taylor, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021); Mikayla Pentecost, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021).

[34] Petitioners' Comments at Section III(C)(5).

of their military or civilian partners.[35]  Given the prevalence of IPV and the potential harms such

as a heightened risk of developing PTSD or another mental health condition, barriers to accessing

support and treatment, and limited routes to reporting the violence, other veterans' advocacy

groups agree that IPV should be included in any "compelling circumstances analysis."[36]  There are

significant similarities between MST and IPV survivors, as both may respond in a way that could

be misinterpreted as "misconduct" and lead to less-than-honorable discharge and therefore VA

should expressly consider IPV as a "compelling circumstance."

Furthermore, VA should include as a mitigating factor whether the service member

experienced discrimination in service or was discharged for pre-textual reasons, whether that

discrimination was on the basis of race, sexual orientation, gender or gender identity, national

origin, or otherwise.[37]  Several other organizations agree, citing numerous instances of

discrimination within the military that led to bad paper discharges and explaining that VA should

allow veterans to present discrimination as a reason that mitigates or explains allegations of in-

service misconduct.[38]

---

[35] *See, e.g., Report on Child Abuse and Neglect and Domestic Abuse in the Military for Fiscal Year 2018*, DOD (Mar. 12, 2019), https://download militaryonesource.mil/12038/MOS/Reports/fap-fy18-dod-report.pdf; *Evaluation of Military Services' Law Enforcement Responses to Domestic Violence Incidents*, DOD (Apr. 19, 2019), https://media.defense.gov/2019/Apr/25/2002120678/-1/-1/1/DODIG-2019-075.PDF.

[36] NYLAG Comments at 5 (arguing that IPV should be considered a "compelling circumstance" in addition to sexual harassment); NOVA Comments at 3 (same).

[37] Petitioners' Comments at Section III(C)(4)-(5).

[38] NYS DVS Comments at 3 ("VA should recognize that incidents historically deemed 'willful and persistent misconduct' may actually be the products of discrimination, coercion, mistreatment, misdiagnosis, or other intentional or unintentional injustice to the discharged veteran"); Ohio Veterans' Law Task Force Comments at 1, 8-9 ("[s]ince the Vietnam War, researchers have found that Veterans of color disproportionately receive bad discharges."  And arguing that under "compelling circumstances," the VA should "delet[e] language that only refers to AWOLs, and add several categories of 'compelling circumstances' that a VA adjudicator must consider," including "discrimination/harassment; personal trauma; military sexual trauma; mental health conditions; self-medication with drugs; coercive/aggressive recruiting that permitted an unqualified member to enlist; and interpersonal violence Charlotte Center For Legal Advocacy Comments at 4 (same); MVA Comments ("For too long, veterans have been denied their rightfully earned benefits due to irregularities and ambiguities in terminology definitions and applications, as related to regulatory and statutory bars.  This impact and subsequent categorical denial of VA benefits has

12

To the second part of VA's question, the Petitioners urge VA to enable adjudicators to look beyond service records to corroborate any account of assault, harassment, or discrimination—not just accounts of personal assault narrowly addressed by 38 C.F.R. § 3.304(f)(5). Service records are generally created and maintained by a member's command and may exclude pertinent information, including about an in-service personal assault, MST, or other adverse personal experience. The Veterans Healthcare Policy Institute supports this proposition, noting that service members often lack vital documentation within their record of harm suffered during their service.[39] Looking outside of the service record would also provide an independent check against superiors who choose to exclude information regarding an assault from a service record to escape liability.

Altogether, MST, IPV, and discrimination should be broadly considered alongside any other "compelling circumstances," including relevant information outside of a service record, in order to capture the breadth of harm that may impact members' conduct in service.

## B.    Willful and Persistent Misconduct

1.    **Should VA proceed with a distinction between "minor misconduct" and "more serious misconduct" when evaluating whether misconduct is persistent? Should VA define what is considered "serious misconduct?" Should VA only consider an action to be "misconduct" if it actually caused harm to a person or property or should VA consider all misconduct, regardless of severity, in its determination?**

---

disproportionately fallen on combat veterans and veterans that were subjected to sexual assault and identity-based discrimination and attacks during their service, many of whom experience post-traumatic stress as a result of their lived experiences."); NOVA Comments at 3 (arguing that the VA should "broaden 'sexual abuse and assault' under subsection (e)(2)(iv) to specifically include all military sexual trauma (MST), including sexual harassment and intimate partner violence," and "add a separate item under subsection (e)(2) to allow for consideration of discrimination, to include on the bases of race, color, national origin, religion, sex, gender identi[t]y (including gender expression), sexual orientation, disability or perceived disability, age, marital status, family/parental status, political beliefs, or reprisal or retaliation for involvement in prior reporting activity").

[39] VHPI Comments at 3 ("[m]ilitary culture in all branches holds that those who seek mental health care are weak and unreliable," many OTH veterans "get into trouble with the military and are given bad paper without ever having the benefit of the medical care they need while in uniform." As a result, many OTH veterans lack proper documentation of any physical or mental issues they faced while serving and thus cannot present any mitigating evidence to a VA adjudicator.); Matt Handley, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (explaining that VSRs need to review thousands of documents to assess a full service record).

**Should VA consider extenuating circumstances that may have led to or impacted the ''misconduct'' at issue?**

The willful and persistent misconduct bar should be eliminated entirely because it exceeds Congress's grant of authority to VA.[40]    Furthermore, it is arbitrary and capricious and discriminatory.

As an initial matter, for all regulatory bars, it is essential that the "misconduct" being evaluated is solely the misconduct that actually led to discharge.  VA adjudicators cannot consider any instances of misconduct not cited as the basis for separation, for reasons laid out in our initial comment.[41]  This is both legally required—because the statutory text refers to the conditions for which the member was "discharged or released" and because of principles of due process—and practical—because it reduces the burden on adjudicators who need only locate the separation packet, rather than comb through an entire service record.[42]  In its final rule, VA should clarify the regulatory language such that solely the misconduct that led to discharge is weighed in barring veterans from benefits.

As to the willful and persistent misconduct bar itself, others agree with Petitioners that "minor misconduct" is ill-defined and the definition can lead to a willful and persistent bar for which service members never would have been—and indeed were not—discharged

---

[40] Petitioners' Comments at Section III(C)(4), n.73 (citing *Garvey v. Wilkie*, No. 2020-1128, 2020 WL 5048433 (Fed. Cir. Aug. 27, 2020)); HAP Comments at 3-4 (calls for the provision regarding "willful and persistent misconduct" to be "eliminated in its entirety" or limited only to those veterans discharged "for repeated acts of severe misconduct." They believe that the "reliance on minor misconduct as a basis for barring benefits . . . is inequitable" and, if the VA continues to consider minor misconduct, the VA should "remove and replace" its "less accurate and more restrictive definition of 'persistent'").

[41] Petitioners' Comments at Section III(C)(1).

[42] Matt Handley, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (stating that VA is trying to create bright-line rules to help adjudicators, but such bright-line rules may create an easy out for a VSR to deny benefits).

Dishonorably.[43]  Indeed, as we and others have explained, the rule operates to exclude a service member for misconduct that never could have led to a Dishonorable discharge because such punishment is not permitted for those offenses.[44]  For example, a Dishonorable discharge is not authorized for two unauthorized absences of less than one day, but such conduct would be deemed "dishonorable" under VA's current and proposed willful and persistent misconduct bar.

As recently recognized by the Federal Circuit, Congress made explicit in enacting the G.I. Bill of Rights that only serious misconduct should be a bar to receiving benefits; withholding benefits only to former service members whose misconduct was "not less serious than those giving occasion to dishonorable discharge by court-martial," even if their discharge was not Dishonorable.[45]  The Proposed Rule would continue VA's practice of penalizing minor misconduct, running contrary to this clear Congressional instruction.  For example, while the statutory bar to benefits requires an AWOL period of at least 180 days before a claimant is deemed to have separated under dishonorable conditions, VA's Proposed Rule would exclude a claimant for an AWOL period of fewer than 180 days in direct contradiction to the statutory scheme.

---

[43] *See*, Sen. Blumenthal, et al. Comments at 2 (noting that the definition of "minor misconduct" is "too expansive and vague, and thus risks excluding veterans whom Congress intended to be eligible for benefits"). *See* NYLAG Comments at 5 (opposing VA's "bright-line definitions" of "willful and persistent conduct;" specifically, they believe that two instances of minor misconduct is not "willful and persistent."); William L. Boudreau, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) ("As a junior officer in the Marine Corps, the understanding of the 'willful and persistent' standard is so low that it essentially has no effect on conduct within the military.  Removing them would not get rid of any deterrent effect."); Caleb R. Stone, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) ("'Willful and persistent' cannot be consistently applied").

[44] *See* Petitioners' Comments at Section III(C)(4); NYS DVS Comments at 3 ("VA should recognize that incidents historically deemed 'willful and persistent misconduct' may actually be the products of discrimination, coercion, mistreatment, misdiagnosis, or other intentional or unintentional injustice to the discharged veteran"); *see* Sen. Blumenthal, et al. Comments at 2-3 (arguing that the willful and persistent standard can encompass almost any disciplinary problem); VAP Comments at 2 (arguing that the VA's definition of "persistent" is "too severe").

[45] *Garvey v. Wilkie*, 972 F. 3d 1333, 1339 (Fed. Cir. 2020) (citing S. Rep. No. 78-755, at 15S. Rep. No. 78-755, at 15).

If VA decides to retain the "willful and persistent" standard, the language would continue to be interpreted and applied far too broadly and require further clarification of what constitutes such misconduct.  As discussed in our previous comment, VA's definition of these terms places few limits on what is willful or persistent and any sequence of misconduct citations, regardless of whether they are related, of similar character, or occurred close in time, qualifies as "persistent," which will likely lead to arbitrary and unjust decision-making.[46]  U.S. Senators and many advocacy groups have argued the same, that VA's Proposed Rule offers imprecise and expansive standards that permit almost any disciplinary problems to be considered "willful and persistent misconduct."[47]  As Petitioners have discussed previously, the vast majority of CODs are denied on the basis of "willful and persistent misconduct"—and this bar will likely remain the primary basis for excluding veterans from VA if the Proposed Rule remains in its current form.[48]

As Petitioners stated previously, if VA chooses to employ the "willful and persistent misconduct" phrasing—which it should not—then the language should be severely constructed. Petitioners propose a time frame of one year and requiring multiple instances of similar and related misconduct.[49]  Revisions are needed to correct the fundamental misunderstanding of military law reflected in the Proposed Rule and to avoid the arbitrary and unwanted results that will necessarily

---

[46] Petitioners' Comments at Section III(C)(4); *see, e.g. Reape v. McDonough*, No. 19-4684, 2021 U.S. App. Vet. Claims LEXIS 1709 (U.S. Ct. App. Vet. Cl., Sept. 27, 2021) (the court found that a Marine should not have been denied benefits despite meeting VA's "willful and persistent" threshold for dishonorable conduct given the minor infractions the veteran received while in service and the high level of quality of his service).

[47] Sen. Blumenthal, et al. Comments at 2-3 (arguing that the willful and persistent standard can encompass almost any disciplinary problem); VAP Comments at 2 (same); Ohio Veterans' Law Task Force Comments at 5-7 (same).

[48] Petitioners' Comments at Section III(C)(4) & n.72 (citing Ex. 1, *Underserved*, at 23);  Matt Handley, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (stating that VA is trying to create bright-line rules to help adjudicators, but such bright-line rules may create an easy out for a VSR to deny benefits).

[49] *Id*. at Section III(C)(4).

ensue. By its plain language, the willful and persistent misconduct bar excludes veterans for conduct that could not, and in fact did not, result in a Dishonorable discharge.

To the final sub-question, as made clear during the Listening Sessions, VA should consider the totality of circumstances for willful and persistent conduct, and create simpler guidelines to ensure greater fairness.[50] Broad consideration of any and all mitigating or positive factors is required by statute and congressional intent.

We therefore strongly urge VA to remove the willful and persistent misconduct bar in its entirety, and, if not, to implement the changes outlined herein and in our previous comment regarding duration, separate acts, and volume of conduct.

> **2.** **Some commenters requested that VA clarify the number of incidents required to constitute willful and persistent misconduct. How many instances over what period of time should be considered persistent? Should the totality of the circumstances be considered in addition to the number of incidents when determining misconduct to be willful and persistent?**

VA's proposed definition of "persistent" as conduct "that is ongoing over a period of time" or "that recurs on more than one occasion" is flawed and, as discussed in our prior comment, contrary to both commonsense and dictionary definitions of the word "persistent."[51] As we have said, misconduct must consist of at least three separate incidents of serious misconduct within one year of each other, where the service member has been counseled and had the opportunity to correct the behavior to be meaningfully "persistent."[52] Several other advocacy groups agree with Petitioners and have commented that such conduct should include at least three instances and

---

[50] *See, e.g.*, Coco Culhane, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021); Alden Pinkham, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021).

[51] Petitioners' Comments at Section III(C)(4).

[52] *Id.*

criticizing the term "persistent" as VA has constructed it.[53]  Such amended definition is more accurate to the word and faithful to VA's statutory mandate.

Again, the totality of circumstances should always be considered in evaluating willful and persistent misconduct.  Similar to how "compelling circumstances" should be considered in all cases of alleged misconduct, Petitioners advocate for a holistic approach in all manner related to character of discharge.  The willful and persistent misconduct standard is only meaningful if the misconduct is contextualized within the service member's experience, including traumatic experiences such as MST or discrimination that may have contributed to the conduct that is being punished.

### C.    Moral Turpitude

**1.    VA regulation currently does not define moral turpitude, but states in 38 CFR 3.12(d)(3) that it includes "generally, conviction of a felony." VA's proposed rule would define moral turpitude as a "'willful act that gravely violates accepted moral standards and would be expected to cause harm or loss to person or property."  Should VA revise this proposed definition, and if so, how?**

VA's Proposed Rule on moral turpitude is overbroad and untethered from any military legal principles, in violation of the statute and VA's authority.  In addition, as we stated in our

---

[53] *See* NOVA Comments at 2 (arguing that if the "willful and persistent misconduct" bar cannot be removed entirely, the regulation should at the very least "require three or more separate incidents within one year that are severe and could have led to a Dishonorable discharge"); Ohio Veterans' Law Task Force Comments at 5-7 ("VA's definition of "persistent" misconduct is vague and should therefore be removed."  Arguing that both the legal and plain definitions of the term "persistent" or phrases involving the term "persistent" suggest at least three instances of misconduct, contrary to the present regulations.  And the regulations' focus on AWOL, combined with the definition of "persistent," could lead to the absurd result that one servicemember with a single AWOL would be granted benefits, while another servicemember with two AWOLs of fewer total days would be denied benefits.  In short, "[t]he VA's proposed definition of 'persistent' will gravely impact vulnerable veterans who committed relatively minor misconduct or were unfairly targeted by their command Public Counsel's CVA Comments at 5 (recommending that the definition of "willful and persistent conduct" only include "severe and repeated misconduct" and calls considering two minor instances of misconduct "willful and persistent" "a harmful overreach"); VVA Comments at 3 (suggesting deleting the "willful and persistent" misconduct section as being inconsistent with Congressional intent, but should that section remain, advocating for limiting "willful and persistent" misconduct to "serious misconduct that is frequent (three or more separate incidents within a year)").

previous comment, the phrase "moral turpitude" is inherently vague and will lead to inconsistent and arbitrary decision making and thus, should be removed entirely.[54] Furthermore, here—as with all regulatory and statutory bars—VA can only exclude a veteran based on misconduct that actually led to discharge as noticed in the separation packet or court-martial conviction.[55]

Many organizations and advocacy groups agree with Petitioners, including the New York State Division of Veterans' Services, which states that "VA should clarify which offenses could be considered serious or morally turpitudinous due to ambiguity."[56] Several former service members and veterans' advocates also demonstrated during the Listening Sessions that the "moral turpitude" standard is inherently flawed, even with the Proposed Rule's amendments.[57]

---

[54] Petitioners' Comments at Section III(C)(3) ("VA must remove the moral turpitude bar because it violates administrative law. Congress chose not to include moral turpitude as a statutory bar in the 1944 G.I. Bill, though such a bar had existed in prior statute and other bars from that statute were carried forward. This demonstrates Congress's rejection of moral turpitude as a bar to benefits. However, VA not only improperly reinstated the moral turpitude bar, it broadened it. In the 1946 COD regulation, VA excluded veterans for not just offenses of moral turpitude that resulted in court-martial conviction (the prior statutory standard) but to all morally turpitudinous offenses of which convicted by military or civilian court. VA later broadened the bar even more to its current state, where no court-martial or other court conviction is required at all. This directly contravenes the statute and Congress's intent, and thus the moral turpitude bar exceeds the authority that Congress delegated to VA.").

[55] *Supra*, section B(1).

[56] *See*, NYS DVS Comments at 4 (arguing that VA should clarify which offenses could be considered serious or morally turpitudinous due to ambiguity); *see* Sen. Blumenthal, et al. Comments at 2-3 ("the changes regarding the definition of moral turpitude are still unacceptably vague" because "[t]here will likely be significant confusion and differing judgements as to what constitutes moral turpitude, especially since it may include conduct that does not result in prosecution or conviction"); Ohio Veterans' Law Task Force Comments at 4-5 ("The VA should… eliminate th[e] [moral turpitude] standard or at least "restrict this section to acts of violence, a uniform moral wrong." Specifically, the VA could define acts of "moral turpitude" as "conduct that causes serious bodily harm to another person."); Public Counsel's CVA Comments at 7 (requesting that the definition of "moral turpitude" be "further defined to avoid ongoing ambiguity" and include "range of descriptive conduct."); *see* HAP Comments at 5-7 (requesting the VA to eliminate the "entirely unworkable" provision regarding "moral turpitude" because its "vague definition" will lead to "unintended results." Arguing that the omission of "without justification or legal excuse" in the definition of moral turpitude "improperly broadens" the definition. And, recommending that the VA "propose specific offenses for which a veteran could be barred from receiving benefits, thereby "eliminate[ing] the subjective and discretionary nature of the review process."); NYLAG Comments at 12 (Arguing that the proposed rule "must be clear as to what misconduct is to be considered 'serious.'" Therefore, they call on VA to remove the "amorphous" "moral turpitude" regulatory bar or "explicitly define" such offenses "as those with an element of 'intentional violence.'").

[57] *See*, *e.g.*, Alden Pinkham, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (arguing that the proposed definition of moral turpitude is "just as vague" as the existing definition); Bruce Carruthers, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (arguing that moral turpitude is a "moving target" in our diverse and changing society and that what is acceptable as moral to

While Petitioners maintain that the "moral turpitude" bar should be removed entirely due to inherent ambiguity, if it must remain then the proposed definition from VA's Proposed Rule is still flawed.  Substantively, VA's proposed definition of "moral turpitude" as a ''willful act that gravely violates accepted moral standards and would be expected to cause harm or loss to person or property" encompasses behavior that does not meet the high standard of "dishonorable."  As discussed in our previous comment, "moral turpitude" does not exist as a concept in military law and so there is no armed forces case law or practice to draw on in formulating a reasonable and appropriate standard, suggesting its use by VA here is inappropriate.[58]

VA's proposed definition sweeps far more broadly than doctrines from other bodies of U.S. law and impermissibly expands the legally accepted and commonsense definition of "moral turpitude" to behavior that must not warrant a Dishonorable discharge.[59]  VA's proposed definition of moral turpitude encompasses accidental and reckless acts and permits VA to assess an offense using an objective standard that does not take into account the former service member's actual intent or state of mind.[60]  Others agree with the Petitioners that VA's definition of moral turpitude should remove "harm or loss to . . . property" and that a more useful standard would be to enumerate certain violent offenses, rather than present a subjective standard.[61]

---

one may be moral turpitude to another); Greg Gagne, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) ("A lot of the types of misconduct that get people to that result are not crimes of moral turpitude.  They're usually people [having trouble adjusting] to a very extreme situation").

[58] Petitioners' Comments at Section III(C)(3).

[59] *Id*.

[60] *Id*.

[61] VVA Comments at 2 (advocating that "the definition of 'moral turpitude' include an 'intent' requirement and should not include a loss to property" and suggesting that VA "specifically list the acts that it would deem to qualify as an offense involving moral turpitude to decrease ambiguity and inconsistent application of this section."); Ohio Veterans' Law Task Force Comments at 4-5 (same); Public Counsel's CVA Comments at 7 (same); NOVA Comments at 2 (same); Charlotte Center For Legal Advocacy Comments at 3 (same).

If VA chooses to retain a moral turpitude bar—which it should not—Petitioners advocate that a proper definition of moral turpitude in accord with existing legal doctrines would encompass only "conduct that involves fraud, or conduct that gravely violates moral standards and involves the intent to harm another person."  Such a definition of moral turpitude is correctly limited to truly egregious and intentional behavior—and behavior that may actually warrant a Dishonorable discharge.  Furthermore, Petitioners and others noted that rape and aggravated sexual assault could be listed under Section 3.12(d)(3) as a "morally turpidinous" offense.[62]

If VA decides not to remove this bar as it should, then, rather than providing a "moral turpitude" definition, VA should replace the phrase "moral turpitude" with a list of offenses that constitute "moral turpitude" as that term is properly defined.[63]  Then the bar would exclude former service members who were convicted of treason, mutiny, spying, rape, sabotage, murder, arson, burglary, kidnapping, or the attempt of any of these offenses, and offenses that have a maximum punishment of life imprisonment under the Uniform Code of Military Justice.  This would be more just and preferable to the current proposals regarding "moral turpitude."

### D.     Benefit Eligibility

    **1.**    **Some commenters recommended that VA only apply statutory bars to benefits (those enumerated in 38 U.S.C. 5303(a)); others expressed concerns about how such an approach would affect military order and discipline.  How (if at all) would removing the regulatory bars affect military order and discipline?**

---

[62] *See* Petitioners' Comments at Section III(C)(3); *Title Redacted by Agency*, Bd. Vet. App. 20016688 (Mar. 5, 2020), https://www.va.gov/vetapp20/files3/20016688.txt ("[T]he appellant's conduct, specifically the unconsented sexual touching of a civilian in the confines of his car, as well as the admission of biting and struggling with her after she rejected his advances, constitutes an offense of moral turpitude" and "is certainly contrary to justice, honesty, and morality"); NOVA Comments at 2 (arguing that the VA should "specifically define actions that are considered an offense involving moral turpitude" and limit those actions to the following: rape, sexual assault, murder, arson, burglary, kidnapping, assault with a dangerous weapon, treason, sabotage, and the attempt of any of these offenses").

[63] Petitioners' Comments at Section III(C)(3); Charlotte Center For Legal Advocacy Comments at 3 (requesting that VA's definition of "moral turpitude" to amended to be "more precise," including an "exhaustive list of crimes" that would meet the definition); *see infra* n. 56.

Congress expressly tasked VA with caring for former service members in their post-service lives, not with imposing discipline, which is the purview of the service branches themselves.  In crafting its new regulation, VA should focus on its own mission to "care for those who have borne the battle."  A final rule that removed all regulatory bars would best allow VA to fulfill that mission.

In adopting the "other than dishonorable" eligibility standard, Congress had at the front of its mind VA's sacred duty to support those wounded in uniform.  Harry Colmery, former American Legion National Commander and drafter of the 1944 G.I. Bill of Rights, testified to Congress that a service member who gets an unfavorable discharge "may have been just as dislocated as anyone else" and "just as needy of the help and the benefits that are provided under [the G.I. Bill]."[64]  He further explained that:

> [T]his is no reflection upon the services, but frankly we do not care to have the Army and the Navy be the arbiter and primarily pass directly in judgment on whether or not the men who serve the colors derive the benefits granted by the Congress.  We prefer to have that done by the Veterans' Administration acting under the supervision of the Congress . . .[65]

By giving VA an eligibility standard distinct from the characters of service assigned by the military, Congress sought to decouple the separate missions of the military and VA:  the military could use less-than-honorable discharges to impose discipline, while VA would provide rehabilitation, treatment, and care to support less-than-honorably discharged veterans in their post-service lives.  It is therefore contrary to Congressional intent for VA to exclude veterans from benefits as a means of imposing military discipline.

---

[64] *World War Veterans' Legislation: Hearings on H.R. 3917 and S. 1767 Before the H. Comm. on World War Veterans' Legislation*, 78th Cong. 418, 420 (1944) at 416.

[65] *Id.*

In any event, removing the regulatory bars would have no effect on military order and discipline.  In general, it is well-recognized that vague future punishments have little or no deterrent effect on behavior.[66]  In this instance, the deterrent effect of potentially losing access to VA benefits is even more attenuated, as service members typically have no knowledge of non-military sanctions for their behavior.  As illustrated in the Listening Sessions, the former service members who spoke, unanimously agreed with Petitioners that military order and discipline would not be affected based on their experience in the military.[67]  The COD process and VA benefit eligibility rules are unknown to most service members; service members are largely unaware of the impact that their in-service conduct or discharge status will affect their post-service benefits.[68]  A vague, uncertain potential that in-service misconduct could lead to benefits exclusion cannot have any conceivable deterrent effect.

---

[66] *See, e.g.*, Aaron Chalfin and Justin McCrary, *Criminal Deterrence: A Review of the Literature*, 55(1) J. OF ECON. LIT. 5, 38 (Mar. 2017) (concluding that, in an assessment of existing empirical research on criminal deterrence, "individuals respond to the incentives that are the most immediate and salient"); Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence*, 100(3) J. CRIM. L. & CRIMINOLOGY 765, 821 (Summer 2010) (arguing that, under rational choice theory, "[c]riminal deterrence may have its limits precisely because the legal costs are far removed in time and people find it difficult to feel the pain of the longer-term consequences of their actions").

[67] *See, e.g.*, John Brooker, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (former service member and JAG, "Never once have I seen a commander lever the regulatory bars explicitly or implicitly as [an issue of military discipline]."); Stephen Kennedy, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (former service member, "Having served as a lower enlisted soldier, I can tell you, I had no idea what the regulatory or statutory bars to VA benefits were.  What I cared about was those to my right and my left.  That was a far greater incentive."); Greg Gagne, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (former service member and military defense counsel, "I've done hundreds of cases.  I can tell you very confidently that when people are in the positions that they find themselves in when receiving an OTH, the last thing on their minds is VA benefits.  Frankly, dishonorable discharge or punitive discharge is not even on their minds."); Dr. Erin McBurney, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (former service member, "Most active duty [service members] have little or no knowledge of VA regulations and practice."); Sean Pentecost, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (former service member, "I strongly believe that removing the regulatory bars will have no effect on good order and discipline. . . Changes to the COD process will be largely unknown to the active duty community.").

[68] Sen. Blumenthal, et al. Comments at 1 (arguing that often service members agree to discharge in lieu of court-martial without knowing the effect it has on their VA eligibility and criticizing this process as not have "strong due process protections for veterans").

Additionally, and as stated repeatedly in Petitioners' initial comment and the comments of others cited herein, experiences such as MST, IPV, discrimination, in-service mental health conditions, and other factors are a significant contributor to what is deemed military misconduct. Good order and discipline thus are undermined by punishing veterans who are themselves the victims of abuse and misconduct or whose conduct is adversely impacted by impaired judgment or constrained circumstances.

Limiting benefits exclusion to the statutory bars would allow for a greater number of service members to receive critical, life-saving benefits, while continuing to bar those who committed serious, unmitigated misconduct. This upholds Congress's intent and, as explained below, would best create a fair, just, and equitable rule for accessing VA benefits.

> **2.  Some commenters suggested that granting benefits to those with less than honorable discharges denigrates others' honorable service. How (if at all) would extending VA benefits eligibility denigrate others' honorable service?**

VA's role is to provide support to veterans in their post-service lives, not to sit in moral judgment of their character and worth as an individual. Thus, as answered in the prior question, VA should focus on its mission of care. It is critical to understand what a character of discharge determination does and does not do: it does not change the character of service on a veteran's discharge paperwork to "Honorable," which is the sole purview of the Department of Defense. It does assess eligibility for benefits based on a standard that Congress wrote to expressly include many less-than-honorably discharged veterans. This leads to two points. First, that VA's rules and processes do nothing to confer or remove "honor" from any veteran's service. Only the action of military commanders and Department of Defense military review boards can do so. Second, that Congress decided in 1944 to grant eligibility for basic benefits to veterans with less-than-honorable discharges, and those veterans should have access now. Anyone who perceives VA's

rulemaking today as changing the status quo misunderstands what the law is and the fact that some veterans with less-than-honorable discharges already receive benefits.

In any event, as so many veterans described during the Listening Sessions, granting benefits to those with less-than-honorable discharges does not denigrate anyone else's honorable service.[69]  Indeed, veterans who spoke during the Listening Sessions felt profoundly the opposite, making clear that denying healthcare, supportive services, and disability benefits to other veterans "cheapened" and "dishonored" their honorable service and violated their oaths to "never leave a fallen comrade."[70]  VA benefits are an important way that service members are cared for after serving their country; they are not intended as a measure of the value of a service member's life.

---

[69] *See generally,* John Brooker, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (former service member and JAG, arguing that providing a former service member with veteran status and with benefits such as healthcare does not denigrate his honorable service.); Bradford Adams, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (same); Matt Handley, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (same); Greg Gagne, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (same); Richard Gudis, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (same); Juliet Taylor, *VA Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (same); William L. Boudreau, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (same); Kristopher Goldsmith, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (same); Dr. Erin McBurney, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (same); Karl Behrendt, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (same).
[70] *See, e.g.,* John Brooker, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (former service member and JAG, arguing it is "patently inhumane" to say that providing another veteran with basic needs such as healthcare denigrates one's own service.  "The idea that denying any veteran the ability to eat or access healthcare denigrates my service is patently false."); Bradford Adams, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (former service member, "My honorable service is denigrated by seeing VA deny recognition to anyone who served.  I'm not honored by homelessness, denial of medical care, by poverty.  This does not honor my service.  It does not return to me anything I have lost."); Matt Handley, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (former service member, "As a former noncommissioned officer, I find that sentiment to be extremely disconcerting and misguided.  What *would* truly denigrate my honorable service would be to leave those comrades behind to suffer from poverty, homelessness, and lack of access to healthcare while I enjoy the benefits of my discharge."); Greg Gagne, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (In response to this question regarding denigration of honorable service, "I can understand that argument, but when you have the exposure to the system at this level, you realize that it is not that cut-and-dry"); Kristopher Goldsmith, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) ("Every branch beats into you that you never leave a fallen comrade.  I understand that there are some veterans who have left comments in the administrative record indicating that providing healthcare to another vet denigrates their service; those folks, respectfully, have forgotten their oath and what it means to serve."); Dr. Erin McBurney, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) ("Veterans benefits are not a reward - they are services designed to save lives and enable the transition from military service to healthy and productive civilian lives."); Juliet Taylor, *VA*

First, VA should act with humility, remembering that it is the American people who have "grant[ed]" benefits to our veterans, and VA's job is merely to distribute those benefits in keeping with its statutory obligations. Congress set the standard for granting benefits to our veterans and VA has no role in assessing the virtue of that standard.

And second, even if VA were to take it upon itself to determine whether "extending VA benefits eligibility denigrate others' honorable service," it is plain that distributing benefits to one deserving veteran has no effect on the honor imparted to other veterans. Plainly spoken, feeding someone who is hungry has no effect on the hunger of another who has already eaten. Congress did not ask VA to ration benefits, giving access only to the most selfless or the most decorated. The lifesaving and life-changing benefits that VA delivers are not a medal to be awarded. Rather, VA benefits are a commitment from the American people to those who served when others did not. Imparting VA benefits, as instructed by Congress, brings neither honor nor dishonor to our veterans. It brings only hope, care, and the thanks of a grateful nation.

3.     **VA is committed to ensuring that its character of discharge regulations reflect the principles of fairness, inclusion, and justice that our Service members and our Nation deserves. What specific changes can be made to the proposed rule for fairly adjudicating the benefits eligibility of historically disadvantaged and vulnerable populations?**

To ensure that VA's character of discharge regulations reflect the principles of fairness, inclusion, and justice, VA must implement substantial changes to its character of discharge regulations and processes. The current and proposed regulations disproportionately exclude

---

*Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (As an honorably discharged veteran who went through the process of COD, I believe that caring for all of our veterans, including OTH veterans, is the right thing to do." "It does greater honor to all who have served than the VA's current system." "This does not impact my service. I am a veteran, woman veteran, an immigrant, and I was deployed, and based on my work in the community, I think the system is unfair and should be revised to be compassionate. You should go back to the drawing board."); *see also*, U.S. Army, "Soldier's Creed", https://www.army mil/values/soldiers html (last visited Oct. 7, 2021) ("I am a warrior and a member of a team…I will never leave a fallen comrade.").

26

veterans of color, LGBTQ+ veterans, post-9/11 veterans, veterans with mental health conditions, and veterans who experienced combat or Military Sexual Trauma.[71]  These are all populations who are at heightened need for VA's supportive services.  They have already suffered marginalization and should not be further excluded from the rights and benefits to which they are entitled.

VA should begin creating a more just and equitable system by presuming eligibility for benefits—rather than presuming ineligibility—for all administratively discharged veterans, who need help and are at significant risk of suicide, homelessness, and incarceration.  There is broad support for granting an assumption of eligibility rather than the reverse, which has led to significant denial of benefits and other harmful outcomes for former service members.[72]  Through the 1944 G.I. Bill, Congress granted veterans—including those less-than-honorably discharged—the "benefit of the doubt."  A presumption of eligibility upholds that purpose.[73]  VA's current and

---

[71] *See generally* LEGAL SERVICES CORPORATION, 2021 REPORT OF THE VETERANS TASK FORCE 24–28 (2021); VETERANS LEGAL SERVICES, TURNED AWAY: HOW VA UNLAWFULLY DENIES HEALTH CARE TO VETERANS WITH BAD PAPER DISCHARGES 4–7 (2020) ("A 2017 study by Protect our Defenders showed that from 2006 to 2015, black soldiers were 61% more likely to face a general or special court-martial than white soldiers."); VETERANS LEGAL CLINIC AT THE LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL, DO ASK, DO TELL, DO JUSTICE: PURSUING JUSTICE FOR LGBTQ MILITARY VETERANS 2 (Apr. 19-20, 2018) ("To this day, thousands of LGBTQ veterans are still denied access to essential veterans services—with dire consequences for their mental and physical health, financial wellbeing, and peace of mind."); SWORDS TO PLOWSHARES, NATIONAL VETERANS LEGAL SERVICES PROGRAM, AND VETERANS LEGAL CLINIC AT THE LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL, UNDERSERVED: HOW THE VA WRONGFULLY EXCLUDES VETERANS WITH BAD PAPER 2 (Mar. 2016) ("The VA excludes 6.5% of veterans who served since 2001, compared to 2.8% of Vietnam era veterans and 1.7% of World War II era veterans."); HUMAN RIGHTS WATCH, BOOTED: LACK OF RECOURSE FOR WRONGFULLY DISCHARGED US MILITARY RAPE SURVIVORS (May 19, 2016).

[72] Comments of the National Coalition for Homeless Veterans, AQ95—Proposed Rule (filed Sept. 4, 2020) https://www.regulations.gov/comment/VA-2020-VBA-0018-0030 ("NCHV Comments") (arguing that "[v]eterans should be presumed eligible for VA health care unless proven otherwise" including those who are waiting for a character of discharge decision); Comments of Veterans Legal Services, AQ95—Proposed Rule (file Sept. 7, 2020) at 3, https://www.regulations.gov/comment/VA-2020-VBA-0018-0069 (requesting that VA "reframe" its regulations to "assume eligibility" and to "find exceptions whenever possible."); VVA Comments at 2 (strongly supporting Petitioners' proposals, including ending a requirement of a COD review for veterans with OTH discharges and instead presume those veterans eligible for benefits).

[73] Petitioners' Comments at Section III(A).

proposed framework flips the presumption that Congress intended, in violation of the statute.[74]

VA should now adopt a presumption of eligibility under Section 3.12(a).[75]  As discussed at length

in Petitioners' previous comment, comments from other parties, and oral presentations during the

Listening Sessions, giving veterans the benefit of the doubt and presuming eligibility would foster

far greater justice and inclusion than would occur under the Proposed Rule.[76]

Among the many reasons to create a presumption of eligibility for administratively

discharged veterans, service members discharged other-than-honorably are three times more likely

to experience suicidal ideation than those with Honorable or General discharges.[77]  Several other

commenters have presented evidence that veterans who are denied benefits, or at risk of losing

---

[74] *Id.* at Section III(A)–(B); *see also* Sen. Blumenthal, et al. Comments at 3 (same); NVCLR & CVLC Comments at 2-4 (same).

[75] *See* Sen. Blumenthal, et al. Comments at 4 ("[v]eterans should be presumed eligible for VA health care unless proven otherwise"); NVCLR & CVLC Comments at 1 (recommending "presum[ing] eligibility for all veterans with administrative discharges—including those with Other Than Honorable discharge characterizations—and exclude only those former servicemembers who should have received or actually did receive a Dishonorable discharge").

[76] *See* Petitioners' Comments; Sen. Blumenthal, et al. Comments at 4 ("[v]eterans should be presumed eligible for VA health care unless proven otherwise"); NVCLR & CVLC Comments at 1 (recommending "presum[ing] eligibility for all veterans with administrative discharges—including those with Other Than Honorable discharge characterizations—and exclude only those former servicemembers who should have received or actually did receive a Dishonorable discharge"); Juliet Taylor, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) ("We know that disparities in military justice cause veterans of color, those with mental disabilities, LGBTQ, etc., to be treated inequitably by the military justice system, and they are more likely to get OTH discharges"); Garry Monk, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) ("I have seen many veterans with OTH discharges because their commander did not like them or discriminated against them because of their color or otherwise, but who served right alongside someone who received an honorable discharge."); Matt Handley, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) ("I would urge the VA to consider the recommendation made by many of the commentators on the proposed rule to abandon the regulatory bars entirely and deny benefits only to those who are precluded by the statutory bars."); Alden Pinkham, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 5, 2021) (arguing that removing the regulatory bars will help provide equity for vulnerable and historically marginalized veterans); Stephen Kennedy, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) (arguing that a systematic review of discharges shows no qualitative or quantitative differences between veterans with honorable and OTH discharges); Michael Taub, *VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule* (Oct. 6, 2021) ("The short but honest answer to this question is that the only way to ensure fairness in the COD process is eliminating the [willful and persistent] regulatory bar.").

[77] Claire A. Hoffmire et al., *Administrative Military Discharge and Suicidal Ideation Among Post-9/11 Veterans*, 56 AM. J. PREV. MED. 727, 727-80 (2019).

their benefits, are at greater risk of suicidal ideation.[78]  These increased risks can be eliminated if

such veterans have access to VA health care.  As the Veterans Healthcare Policy Institute pointed

out, "[r]econfiguring an eligibility scheme that only potentially excludes those with punitive

discharges, or those who could have received punitive discharges, will create a more just system,"

and, moreover, for veterans with Other Than Honorable discharges, "access to VA is particularly

critical . . . …[because] …veterans with bad paper who have recently accessed VA mental health

services are no more likely than other veterans to experience suicidal ideation."[79]  Yet, VA's

current presumption of ineligibility prevents or dangerously delays most of these veterans from

getting the life-saving help they so desperately need.

Justice would also demand that VA properly fulfill its mission of helping veterans recover

from homelessness or preventing them from becoming homeless in the first place.[80]  The current

presumption of ineligibility also prevents VA from helping veterans avoid incarceration or have a

successful reentry into the community, with this population also suffering from increased rates of

homelessness and mental health conditions.[81]

Several suggestions throughout this comment, our previous comment, and the Petition have

suggestions for how VA can broaden eligibility and limit bars to benefits only to cases where

circumstances would warrant a Dishonorable discharge.  Such changes, even more than the

---

[78] NCHV Comments ("Bad paper status veterans are seven times more likely to become homeless and are two times more likely to commit suicide."); Public Counsel's CVA Comments at 2-3 (stating the "consequences of an unfavorable discharge" are "higher rates of suicidality, homelessness, under-employment or non-employment," among other things, and arguing that VA's COD process should be "on the forefront of veteran inclusion."); VAP Comments at 1 (arguing that veterans are particularly vulnerable to homelessness, suicide, and crime); VHPI Comments at 5 ("Studies have shown that veterans with bad paper are three times more likely to experience suicidal ideation.").

[79] VHPI Comments at 4-5.

[80] Emily Brignone et al., *Non-Routine Discharge from Military Service: Mental Illness, Substance Use Disorders, and Suicidality,* 52 Am. J. Prev. Med. 557, 558 (2017).

[81] *Id.*

suggested adjustments to certain adjudicatory schemes, definitions, and language of the character of discharge regulations, would have a profound impact on the application of justice and fairness for our former service members.

Furthermore, expanding the "compelling circumstances" considerations to include a broad range of positive and mitigating factors furthers the goal of a just and inclusive system. For reasons explained above and in our initial comment, VA should expand its list of "compelling circumstances" to also include experiences of sexual harassment, intimate partner violence, and discrimination and to be non-exhaustive so that veterans can have their own individual circumstances fully weighed.[82]

Relatedly, no veteran should be prevented from presenting a "compelling circumstance," as the Proposed Rule does by excluding veterans discharged in lieu of general court-martial from such consideration. Doing so draws an arbitrary and irrational line that will disproportionately impact Army veterans, who are more likely to be discharged under such a "Chapter 10" plea bargain. As explained in our initial comment,[83] veterans with similar in-service experiences and conduct will be treated differently in VA's proposed scheme. This will lead to unjust outcomes and unlawful exclusion.

Finally, as stated at the start of this comment, the only path to a systemically just character of discharge review process is through systemic reform that fundamentally changes the rules and procedures. Mere edits to the text of the regulatory bars at Section 3.12(d) will allow injustice to persist and leave veterans unlawfully excluded from benefits they need and deserve.

---

[82] Petitioners' Comments at Section III(C)(6)(a), (d).

[83] *Id*. at Section III(C)(6)(b).

## III.    CONCLUSION

Petitioners appreciate VA's efforts to clarify the regulatory bars to benefits based on COD, but further reform is needed.  As set forth above and in Petitioners' opening comments, VA's Proposed Rule is arbitrary and capricious and contrary to Congressional intent, and the Proposed Rule would leave countless veterans unserved as a result of bad policy decisions.  VA should revise its Proposed Rule as described herein to ensure that all who served in uniform receive the benefits they rightfully earned.

Respectfully submitted,

Dana Montalto
Daniel Nagin
Veterans Legal Clinic
LEGAL SERVICES CENTER OF HARVARD LAW
SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Gavin Masuda
Alexander Stout
Mohini P.B. Rarrick
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

Bart Stichman
Renée Burbank
NATIONAL VETERANS LEGAL SERVICE
PROGRAM
P. O. Box 65762
Washington, DC 20035

Maureen Siedor
Amy Rose
SWORDS TO PLOWSHARES
401 Van Ness Avenue, Suite 313
San Francisco, CA 94102

October 12, 2021

## IV.    ABOUT THE PETITIONERS

**The National Veterans Legal Services Program ("NVLSP"):** NVLSP is an independent, nonprofit veterans service organization that has served active duty military personnel and veterans since 1981.  NVLSP strives to ensure that our nation honors its commitment to its 22 million veterans and active duty personnel by ensuring they have the benefits they have earned through their service to our country.  NVLSP has represented veterans in lawsuits that compelled enforcement of the law where the VA or other military services denied benefits to veterans in violation of the law.  NVLSP's success in these lawsuits has resulted in more than $5.2 billion dollars being awarded in disability, death and medical benefits to hundreds of thousands of veterans and their survivors.  NVLSP offers training for attorneys and other advocates; connects veterans and active duty personnel with pro bono legal help when seeking disability benefits; publishes the nation's definitive guide on veteran benefits; and represents and litigates for veterans and their families before the VA, military discharge review agencies and federal courts.  For more information, go to www.nvlsp.org.

**Swords to Plowshares:** Founded in 1974 by veterans, Swords to Plowshares is a community-based not-for-profit 501(c)(3) organization that provides needs assessment and case management, employment and training, housing, and legal assistance to approximately 3,000 veterans in the San Francisco Bay Area each year.  Swords to Plowshares promotes and protects the rights of veterans through advocacy, public education, and partnerships with local, state, and national entities.  For more information, go to www.swords-to-plowshares.org.

**The Veterans Legal Clinic at the Legal Services Center of Harvard Law School:** The Veterans Legal Clinic at the Legal Services Center of Harvard Law School provides pro bono representation to veterans and their family members in a range of veterans and military law matters, as well as pursues initiatives to reform the systems that serve the veterans community.  Located at

the crossroads of Jamaica Plain and Roxbury, the Legal Services Center is composed of six clinics—the Veterans Legal Clinic, Consumer Law Clinic, Housing Law Clinic, Family Law Clinic, Federal Tax Clinic, and LGBTQ+ Advocacy Clinic—and is Harvard Law School's largest clinical placement site.  The Center's longstanding mission is to educate law students for practice and professional service while simultaneously meeting the critical legal needs of the community.

In addition to providing individual pro bono representation to veterans with less-than-honorable discharges before VA and the DOD military review boards, the Veterans Legal Clinic collaborates with other veterans organizations on initiatives to update and improve government policies that prevent veterans from accessing needed care and supportive services and to train more pro bono advocates about how to represent veterans with bad paper.  Among these initiatives are the Underserved report and associated Petition for Rulemaking on behalf of Swords to Plowshares and the National Veterans Legal Services Program, which asked VA to amend its COD regulations that govern eligibility for basic VA services for veterans with less-than-honorable discharges; the Turned Away report, which documented the nationwide practice of VHA unlawfully denying veterans with less-than-honorable discharges the right to apply for health care; and the Military Discharge Upgrade Legal Practice Manual, a recently published treatise co-authored with Connecticut Veterans Legal Center on how to effectively advocate for veterans seeking to correct an unlawful or unjust discharge status or to gain access to VA benefits and care.

**Exhibit 1: Petitioners' Proposed Rule**

To summarize our recommendations, below is proposed language for VA's final rule:

38 C.F.R. § 3.12. *Benefit eligibility based on character of discharge.*

(a) *Presumption of eligibility.*  If the former service member did not die in service, then pension, compensation, or dependency and indemnity compensation is payable for claims based on periods of service that were terminated by discharge or release under conditions other than dishonorable. (38 U.S.C. 101(2)).  Unless issued in lieu of court-martial, an administrative discharge is a discharge under conditions other than dishonorable.  Discharges issued by court-martial or issued in lieu of court-martial must be reviewed under paragraphs (c) and (d) in order to determine whether the discharge was under other than dishonorable conditions.

. . .

(d) *Regulatory standards for dishonorable conduct.*  A discharge is under dishonorable conditions only if the specific conduct for which the former service member was discharged should have led to a Dishonorable discharge by general court-martial, as defined in subsection (1) below, and is not outweighed by compelling circumstances in the service member's record.

> (1) A discharge for only the following types of misconduct may be under dishonorable conditions, unless compelling circumstances exist:

>> i. A discharge in lieu of trial by general court-martial.  Such discharge must be shown by documentation establishing that charges were referred to a general court-martial by a general court-martial convening authority.  This provision does not include a discharge in lieu of special court-martial or a discharge in lieu of court-martial approved prior to the referral of charges.

>> ii. A serious offense of which convicted by court-martial.  Only the following offenses are serious under this section: Murder, Rape, Sexual Assault, Arson, Kidnapping, Mutiny, Spying, Treason, and the attempt of any of these offenses, and any offenses that under the Uniform Code of Military Justice are punishable by confinement for life.

> (2) A discharge is not under dishonorable conditions where compelling circumstances demonstrate favorable service or mitigate the misconduct.  Evidence that exists outside the member's service records, including evidence of behavioral changes or that was not documented during service, may establish a compelling circumstance condition or event. Compelling circumstances may be found based on the totality of the circumstances of the former service member's service, to include consideration of such factors as:

>> i. Mental and physical health.  This includes whether the former service member may have been experiencing a mental or physical health condition at the time of the misconduct that led to discharge.  This also includes consideration of military sexual trauma, intimate partner violence, operational stress, or other such circumstances or hardship.

35

ii. Personal and family circumstances.  This includes the former service member's age, maturity, and intellectual capacity, and any family obligations or comparable obligations to third parties.

iii. Conditions of service.   This includes discrimination, command climate, disparate or arbitrary action, era of service, and service branch.

iv. Favorable service to the nation.  A determination of favorable service to the nation will consider factors including:

       a. The overall duration and quality of service.

       b. Combat, overseas, or hardship service.

       c. Medals, awards, decorations, and other achievements or acts of merit.

v. Legal error in discharge.  This includes whether a valid legal defense would have precluded a conviction for misconduct under the Uniform Code of Military Justice, to include consideration of substantive and procedural rights.

**Exhibit 2: Listening Session Comments of Renée Burbank, National Veterans Legal Services Program**



**Oral Comments on VA's Regulatory Bars to Benefits**

**Based on Character of Discharge**

**Presented by:**

**Renee Burbank,**

**Director of Litigation**
**National Veterans Legal Services Program (NVLSP)**

**Oct. 5, 2021**

**Introduction**

Good morning my name is Renee Burbank, and I am the Director of Litigation at the National Veterans Legal Services Program, or NVLSP.  For 40 years, NVLSP has worked to ensure our nation fulfills its moral duty to care for our veterans.  Each year, NVLSP assists thousands of veterans and active-duty personnel to obtain the benefits to which they are entitled.

First, thank you.  NVLSP sincerely appreciates that VA is taking this rulemaking with the seriousness it deserves. The Department of Veterans Affairs has a historic opportunity to correct a rule that has kept far too many veterans from receiving the benefits that they need and deserve. The current regulatory bars at 38 C.F.R. § 3.12 contribute to the higher rates of homelessness, suicide, unemployment, and untreated mental health conditions among less-than-honorably discharged veterans. Improving the character of discharge rule is not simply legally the right thing to do; it will save lives.

Nevertheless, VA's Proposed Rule, though improved, does not do enough.  When Congress enacted the "other than dishonorable" eligibility standard in the G.I. Bill of 1944, it had at the front of its mind VA's duty to support those wounded in uniform, and expressly tasked VA with caring for former service members in their post-service lives, not imposing discipline.  The proposed Rule should conform to that Congressional intent and purpose.

NVLSP, along with its partner Swords to Plowshares, intends to submit additional written comments in response to VA's September 9th Federal Register Notice.  I therefore will focus my oral comments today on just two points:  First, I urge VA to expand how veterans can establish compelling circumstances.  Second, VA should remove its willful and persistent bar entirely because it is unlawful as well as arbitrary, capricious, and discriminatory.

A. **Compelling Circumstances**

NVLSP strongly supports VA creating a compelling circumstances consideration in its character of discharge determinations, but we are concerned that, by creating a dispositive list of factors to consider, VA's proposed rule is still too narrow.

To take just one example, in its topic A.2 in the Sept 9 Federal Register notice, VA asks whether it should expand its proposed "sexual abuse / assault" category  to "military sexual trauma" or another term. MST is broader than abuse / assault, and therefore a better choice, but

MST does not include all types of assault and harassment that VA should consider. Other types of sexual violence or personal trauma and harassment should be explicitly included, including intimate partner violence and assault, harassment, or hazing based on race, religion, color, sexual orientation or gender identity, or disability as well as sex.

NVLSP also agrees that adjudicators should and must look beyond service records to corroborate accounts of compelling circumstances, but the language of 3.304(f)(5), by its terms, applies only to veterans claiming PTSD based on a personal assault.

Section 3.12 should not be so limited. Several of the proposed "compelling circumstances" categories would regularly require evidence not apparent in a member's service records. For example, the "duress, coercion, or desperation" factor and "family obligations or obligations to a third party" factor would presumably require looking outside service records in most cases. Therefore, the expansive evidentiary rule in section 3.304(f)(5) should apply to all determinations evaluating compelling circumstances, but the specific list of possible evidentiary sources in 3.304(f)(5) is not broad enough. The Proposed Rule should direct adjudicators that all factors in the proposed 3.12I(2) can be corroborated through evidence from sources other than the veteran's service records, and that *any* credible information from *any* source must be considered.

## B. <u>Willful and Persistent Misconduct</u>

Next, VA also seeks comments on its proposed changes to the "willful and persistent misconduct" bar. That bar is the most common way VA excludes former service members from VA benefits. As VA works to improve the Rule, therefore, fixing the willful and persistent misconduct bar is critical.

Title 38 defines a veteran for VA purposes as a service member "who was discharged or released therefrom under conditions other than dishonorable." Therefore, any regulatory bar based on that definition must relate to the reason a service member was discharged. The statute therefore requires that VA's "willful and persistent" misconduct standard be restricted so that VA considers only serious misconduct, for which the veteran was actually discharged, that should have but did not lead to a dishonorable discharge.

Take, for example, a fact pattern that matches the experience of too many less-than-honorably discharged service members. A service member serves well and capably enough for a number of years. Then, after failing a single drug test, they are discharged with an other-than-

40

honorable characterization.  Rather than simply assessing whether that drug use should bar the service member from VA benefits, VA's proposed rule would have the adjudicator root through their entire service record to find and judge misconduct that the Department of Defense did not see fit to discharge the veteran for. If the record reflects a variety of non-judicial punishments over a span of a couple years for incidents like being late to their post of duty or being disorderly – incidents that their chain of command specifically did not believe warranted discharge of any kind and which could not result in a dishonorable discharge in any event – the veteran now risks a negative character of discharge determination.

VA adjudicators are not trained in the Uniform Code of Military Justice. Their job is to fulfill VA's mission to care for veterans, not to judge and decide appropriate punishment.  The willful and persistent misconduct standard is unworkable, unfair, and unlawful. VA should remove it entirely.

## Conclusion

In conclusion, NVLSP urges VA to conform its proposed rule to Congress's original intent and purpose to care for as many of our veterans as possible and to exclude service members only when they were discharged the most serious misconduct and no mitigating circumstances exist.

I thank you for your time.

###

**Exhibit 3: Listening Session Comments of Maureen Siedor, Swords to Plowshares**



## Intro

Thank you. My name is Mo Siedor, and I'm the Legal Director at Swords to Plowshares. We are a community-based non-profit dedicated to serving the homeless, low-income and at-risk veterans in the San Francisco Bay Area. Each year, our team of attorneys at Swords assists over 500 veterans and nearly half of them have a less than honorable discharge. As such, we have helped a large volume of clients navigate the Character of Discharge process.

Seeing the VA regularly issue incorrect and unjust decisions in these cases was our impetus to petition the VA, along with The National Veterans Legal Services Program, for rulemaking regarding its COD regulations. Our petition was the culmination of **an extensive** amount of data collection, deep historical legal research, numerous conversations with advocates across the country, and our considerable experience directly representing clients in COD cases.

Given my time limit today, I want to focus my comments on the requests for information pertaining to Moral Turpitude and Benefit Eligibility.

## Moral Turpitude

To begin, the **proposed** definition of moral turpitude is overboard and vague, and will likely lead to inconsistent and arbitrary decision making. This bar should be removed entirely.

I want to provide some examples to illuminate how in practice this proposed definition might be applied –

- Take the relatively common reason our clients are kicked out of the military – testing positive for marijuana use. Under the proposed language, an adjudicator in locations where recreational marijuana has been legal for many years – such as Denver or LA – this behavior would likely not rise to the level of a "grave violation" of moral standards and wouldn't be **seen** as harmful, while in a more conservative jurisdiction where marijuana use is still a crime – such as Little Rock or Wichita -- an adjudicator could reasonably conclude the opposite. In fact, at Swords, we had a client whose only misconduct was a single positive drug test, and the Muskogee RO denied his COD on moral turpitude grounds.

- This vague definition also gives room for an adjudicator - with a strong belief that taking one's own life is immoral - to deny a veteran access to benefits because of a suicide attempt in service.

- We had a client at Swords who lost friends in an IED explosion in Iraq and while still on that deployment, he shot himself in the chest and was discharged with an Other than Honorable. Two months ago, the VA denied his COD. It is inconceivable that Congress intended the VA to turn someone away from treatment and help for being suicidal, but both the current and proposed regulations would allow for that outcome.

One could argue that training the adjudicators on what constitutes moral turpitude would remedy these issues, but – as documented in our petition and comment -- a review of vast inconsistency in

these decisions based on Regional Office or which BVA judge is assigned makes it hard to feel confident that training would solve the problem.

When devising a federal benefits system, the language employed must ensure a consistent outcome regardless of the office adjudicating the claim or the individual assigned to make the decision. However, these vague definitions, all but guarantee inconsistent outcomes for claimants.
And it's important to remember that the decisions VA is making can mean life or death for many of our clients. They are determining whether someone will receive mental health care, prescription medications, social worker support and case management, and disability income to help pay their basic needs.

VA adjudicators are a diverse group, living in a very diverse nation. The proposed definition does not adequately account for these differences.

**Benefits Eligibility:**
Next, regarding part D - benefits eligibility - the VA asks how removing the regulatory bars would impact military order and discipline. I have been representing clients in CODs since 2014, and I have personally met with hundreds of veterans wanting legal help related to a less than honorable discharge. Of those conversations, I can remember only one time– it was at a legal clinic at the Menlo Park VA – when a client came to me asking for help with a COD. It was memorable because I was so surprised that he knew about the process at all.

Clients come to us regularly requesting help with a discharge upgrade because they think that's the only avenue to getting help from VA. In my experience, former servicemembers – and even many employees within VA -- generally do not know about this process, let alone what the regulatory bars say or don't say.

Given this, I can't imagine how removing them would have any impact on military order and discipline. The DOD has an entire system – including their own judiciary and legal code - to handle disciplinary issues, and they do a fine job of maintaining military order. VA should focus on its own mission to "care for those who have borne the battle."

**Question D2:**
To the second question of whether extending benefits to those with less than honorable discharges will denigrate the service of others: Many veterans have already answered this question in the listening session, so I will limit my response to this one point – the COD process already exists. Any analysis as to whether this negatively impacts those with honorable discharges is ultimately irrelevant. There are currently veterans with less than honorable discharges who already get VA benefits because of Congressional mandate. Again, the focus needs to stay on how to improve the existing COD process so that it is more equitable and consistent with Congressional intent.

**Conclusion:**
Lastly – I want to conclude with some brief thoughts on the VA's general inquiry with this Request for Information. One of the main challenges we face as advocates is a lack of understanding by VA adjudicators of the COD regulations. In interactions at hearings, on calls with Higher Level

Review Officers, and in the language of the decision letters – it is commonplace that the regulations governing this process are misstated, misunderstood, and misapplied.

I want to share some examples from **just the last few months** from our work at Swords-

- I had a client who was diagnosed with mouth cancer on active duty. Part of his check had to be removed. He tested positive one time for marijuana use and received an OTH discharge. The VA's decision letter cited only that single non-judicial punishment yet denied his COD under the "willful & persistent misconduct" bar.

- We had another client who received an NJP early on in service for underaged drinking right before is combat deployment to Iraq. Two years later - after he was back stateside – he tested positive once for marijuana, and -- in the 14 pages of discharge paperwork -- the only misconduct cited was that positive drug test. At the COD hearing, the adjudicator conceded on the record that the regulation states that the VA is only allowed to consider the misconduct for which our client was quote "discharged or released because", per 3.12(d). Nevertheless, the adjudicator told us that he was still going to count earlier NJP in the willful & persistent misconduct analysis because that's how they "were trained to do it."

- Lastly, an adjudicator recently called an attorney on my team to tell her that the COD hearing she'd requested for her client wasn't going to make a difference in his case, that we were wasting her time and ours, and the only way he would ever get anything from VA was with a discharge upgrade. We looped in the Under Secretary for Benefits' Office, got the adjudicator removed from his claim, and within weeks we had a new hearing in which the client prevailed in his COD and is now receiving 70% service-connection for combat-related PTSD.

The proposed regulations do not address **these problems.**

The VA is asking for us to help figure out how many incidents over how many months or years, what types of sexual abuse should or shouldn't be considered mitigation, what symptoms should and shouldn't be considered when assessing mental impairment during an AWOL?

With all due respect, the VA is missing the forest for the trees --

- Adding more categories of minor versus serious misconduct based on the UCMJ will lead to confusion;
- Leaving it up to adjudicators to parse out what is a "grave" vs "not grave" moral violation will not help;
- Allowing compelling circumstances to be applied – but only some compelling circumstances – and only to some bars and not others - VA is all but guaranteeing we will continue to see inconsistent, unfair, and unlawful outcomes.

It is an impossible ask of these adjudicators to apply these convoluted rules after a just brief review of someone's military file and make a moral judgment on the character of their military service.

The beauty of the statutory bars is that, for the most part, they are simple yes or no questions, and they provide simple guidance to adjudicators.

If the VA is going to continue to have regulatory bars - the overarching goal must be to make the rules as simple as possible, as clear as possible, to limit the discretion of adjudicators, and to comport them with Congressional intent.  We implore VA to keep this in mind.

The veterans in need of CODs are some of the most vulnerable and most in need of VA help as you have heard today and yesterday. Congress intended VA to give those who served the benefit of the doubt and wrote the statutory bars to reflect that intention. The VA has gone awry of that intent with these proposed regulations that will exclude many veterans who very much deserve and have earned the VA's help.

Thank you.

**Exhibit 4: Listening Session Comments of Dana Montalto, Veterans Legal Clinic, Legal Services Center of Harvard Law School**



Dana Montalto
Clinical Instructor & Lecturer-on-Law
Veterans Legal Clinic

Listening Session Testimony
Wednesday, October 6, 2021

Good morning. My name is Dana Montalto. I am a Clinical Instructor at the Veterans Legal Clinic at the Legal Services Center of Harvard Law School, where I provide pro bono representation to veterans in state and federal veterans and military law matters and teach law school students through the actual practice of law.

In this role, I have helped many veterans who received less-than-honorable discharges navigate the character of discharge review process. I have also had the privilege of working on behalf of Swords to Plowshares and the National Veterans Legal Services Program to seek to reform the regulations at 38 C.F.R. 3.12.

This work on behalf of both individuals and veterans organizations led me to dig into the history of VA's other than dishonorable standard that Congress enshrined in law as part of the 1944 GI Bill of Rights. I will share a bit of that history now, which bears directly on question A regarding compelling circumstances; questions B & C regarding the phrasing of certain regulatory bars; and question D1 about VA's mission.

After World War I, our government failed to properly care for returning servicemembers. There was no centralized, comprehensive benefits and health care program to assist World War I veterans in their transition, and as a result, they suffered untreated wounds and mass unemployment. This ultimately led a Bonus Army of tens of thousands of veterans to walk across the country and march on Washington to demand fair and adequate treatment.

While the government eventually agreed to provide some assistance, for many, it was too little, too late. Importantly, many veterans—including those who did not have Honorable discharges—were excluded.

The World War II Era Congress knew of that recent history when, in 1944, it began making a plan for the 16 million returning servicemembers and chose to make an extensive set of benefits—

48

health care, disability compensation, education, home loans—available to them to help them reintegrate into and succeed in their civilian lives.

Congress thought carefully about whether veterans who did not have fully Honorable discharges (such as those with Other Than Honorable discharges) should be eligible for these benefits and considered a range of options.

In the end, Congress adopted the position proposed by Harry Colmery, former national commander of the American Legion, who originally drafted the 1944 G.I. Bill: that standard was eligibility for all former servicemembers who were discharged under "other than dishonorable" conditions—which expressly can include veterans who received less-than-honorable discharges.

When Congress settled on this standard, it knew about servicemembers who experienced "combat stress" or "shell shock", or who started drinking to deal with war wounds, and who then were kicked out less-than-honorably because of related misconduct. And Congress thought that while it may be appropriate for them not to be in the military anymore, that the government still should care for these veterans.

As Harry Colmery explained: "we use [the language 'under conditions other than dishonorable'] because we are seeking to protect the veteran against injustice . . . we are trying to give the veteran the benefit of the doubt, because we think he is entitled to it."

Some argued against this standard and sought instead to reserve VA benefits only to those with Honorable discharges. But Congress deliberately chose otherwise.

It is important to remember that nearly half of members of Congress at that time had served in uniform. So they made this decision not because they did not understand military life, but instead because they understood it better than most.

This history and the plain text of the "other than dishonorable" standard must inform VA's character of discharge regulations. But the current regulations and proposed rule fail to heed that history and text.

First, on Question A regarding mental impairment, it is notable that in hearings and testimony on the G.I. Bill, Congress did not use the technical language of the psychiatric profession. Rather, they discussed "combat stress" and "shell shock". They referred to behaviors symptomatic of a mental health condition like alcohol and substance use and absences from duty. This broad understanding of mental health and how it manifests in service should be reflected in VA's final rule.

Second, on Questions B & C, before the 1944 G.I. Bill was enacted, certain statutes and regulations barred VA benefits to former servicemembers who were discharged for "any offense involving moral turpitude" or "willful and persistent misconduct, of which he was found guilty by court-martial". With full knowledge of those existing bars, Congress explicitly chose not to include them in the 1944 G.I. Bill; instead, Congress chose a totally new standard—the "other than dishonorable" conditions standard, which was intended as a liberalizing reform that would expand

49

access. For VA to then reinstate even broader versions of those "moral turpitude" and "willful and persistent misconduct" bars in regulation and used them to exclude veterans for the past decades violates fundamental principles of administrative law and directly contradicts Congress's wishes. Those bars must be removed.

Relatedly, Congress nowhere expressed a desire to limit the consideration of mitigating circumstances to only certain veterans. Indeed, by utilizing the military term of art "dishonorable"—which invokes the balancing of aggravating and mitigating factors inherent in military sentencing determinations—Congress incorporated a requirement that compelling circumstances be factored into all eligibility determinations. Thus, where Question B asks whether a "totality of the circumstances" should be considered, the answer is yes.

Third, and finally, on Question D1, in its debates about the "other than dishonorable" eligibility standard, Congress explained why it thought that VA should make the eligibility determination, not the service branches. Congress saw the military and VA as having different missions: the military had to defend the nation, maintaining good order and discipline; VA must support veterans in their post-service lives. Congress thought that the person deciding whether a veteran should be able to get treatment for the wounds of war should be someone far removed from the heat of battle. Congress deliberately decoupled the military-assigned character of discharge from VA's eligibility determinations because the military is responsible for discipline, whereas VA is responsible for care.

And indeed, I have heard from so many VA staff—including those responsible for health care enrollment, outreach, homelessness prevention, and benefits adjudication—that they truly want to provide care to all who served our country, regardless of discharge status, but feel trapped by the overly restrictive character of discharge regulations currently in place.

And I have seen firsthand the life-changing impact that breaking through these eligibility rules and gaining access to VA's robust, holistic supportive services can have on an individual veteran's life.

You have a unique opportunity to change the lives of so many veterans by reforming these regulations. I ask you to do so to uphold the original intent of the World War II Era Congress who never again wanted to leave a generation of veterans behind.

Thank you to everyone at VA for taking the time now to review and update these regulations and for listening to my testimony today.

# EXHIBIT J

**Alexander L. Stout**
Direct Dial: +1.202.637.2158
alexander.stout@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

**LATHAM & WATKINS LLP**

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

July 8, 2022

**VIA EMAIL**

Catherine C. Mitrano
Acting General Counsel
U.S. Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

Re:  <u>Rulemaking Regarding Regulatory Bars to Benefits (RIN 2900-AQ95)</u>

Dear Ms. Mitrano,

We write on behalf of our clients, the National Veterans Legal Service Program and Swords to Plowshares (together, the "Petitioners"), to remind the Department of Veterans Affairs ("VA") of the urgent need for action in the above-referenced rulemaking proceeding. More than seven years have passed since Petitioners asked VA to open a proceeding to address how its regulations were indiscriminately restricting eligibility for VA benefits at an unprecedented scale.[1] While our clients appreciate VA's issuance of a proposed rule,[2] after two years and three opportunities for public comment, the time has come for VA to issue a final rule in this proceeding—and as discussed below, the path is clear from a procedural standpoint.

When it does issue a final rule, it is clear that VA can and should remove completely the "regulatory bars" to benefits, which exclude far more former service members from benefits than the congressionally mandated "statutory bars."[3] In response to the NPRM, VA received numerous comments addressing the need to remove the regulatory bars to benefits to achieve greater consistency for similarly situated former service members in the character of discharge ("COD") process. As Petitioners noted in their comments, the NPRM illustrated that VA needed to "reconsider in a more holistic fashion which former service members it is truly seeking to exclude

---

[1] National Veterans Legal Service Program and Swords to Plowshares, "Petition for Rulemaking to Amend 38 C.F.R. §§ 3.12(a), 3.12(d), 17.34, 17.36(d) Regulations Interpreting 38 U.S.C. § 101(2) Requirement for Service 'Under Conditions Other than Honorable,'" (Dec. 19, 2015) (hereinafter, the "Petition").

[2] *See* Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471 (proposed July 10, 2020) (hereinafter, the "NPRM"); Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, Request for Information, 86 Fed. Reg. 50513 (Sept. 9, 2021) (hereinafter, the "RFI"); VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule (Oct. 5-6, 2021) (hereinafter, the "Listening Sessions").

[3] *See* Petition, Sec. IV and V.

**LATHAM&WATKINS**LLP

from basic veteran benefits and to remove the existing and proposed regulatory bars."[4]  Other commenters agreed and called on VA to eliminate the regulatory bars.[5]  After reviewing these comments, VA issued the RFI and held two days of listening sessions asking expressly about the potential effects of removing the regulatory bars.[6]  In response, VA received written[7] and oral[8] comments demonstrating overwhelming public support for eliminating the regulatory bars.  For example, Petitioners commented that removing the regulatory bars—which many noted are confusing and frequently misapplied—would have no effect on military order and discipline, in part because removing access to VA benefits has "little or no deterrent effect" on behavior.[9]  Additionally, removing the regulatory bars allows for a greater number of service members to receive critical benefits while barring only those individuals who fall within the statutory

---

[4] Comments of Swords to Plowshares and the National Veterans Legal Service Program, AQ95-Proposed Rule (filed Sept. 8, 2020), https://www.regulations.gov/comment/VA-2020-VBA-0018-0061.

[5] *See, e.g.,* Comments of Sens. Richard Blumenthal, Jon Tester, and Sherrod Brown, AQ95—Proposed Rule (filed Sept. 3, 2020) at 3, https://www.regulations.gov/comment/VA-2020-VBA-0018-0028 ("Congress only authorized exclusion of those servicemembers who received or should have received dishonorable discharges by military standards. Congress did not intend for VA to create a new standard that would be more exclusionary that the military standard and did not give VA any authority to do so").

[6] *See* RFI, Question D(1) ("Some commenters recommended that VA only apply statutory bars to VA benefits (those enumerated in 38 U.S.C. 5303(a)); others expressed concerns about how such an approach would affect military order and discipline.  How (if at all) would removing the regulatory bars affect military order and discipline?").

[7] *See* Comments of Sens. Richard Blumenthal and Bernard Sanders, AQ95—Proposed Rule (filed Oct. 12, 2021) at 3, https://www.regulations.gov/comment/VA-2020-VBA-0018-0107 ("VA should remove the regulatory bars as overbroad, vague and harmful to VA's mission of caring for those wounded in service."); Comments of Michael Brooks, AQ95—Proposed Rule (filed Sept. 22, 2021 ) at 2, https://www.regulations.gov/comment/VA-2020-VBA-0018-0086 ("Removing regulatory bars would have minimal if any effect on military order and discipline as there are other remedies readily available to the chain of command to encourage military order and discipline."); Comments of Coco Culhane and Brent Filbert, AQ95—Proposed Rule (filed Oct. 12, 2021) at 7, https://www.regulations.gov/comment/VA-2020-VBA-0018-0121 ("Removing the regulatory bars would have absolutely no impact on good order and discipline in the military. . . . The number of servicemembers who are actually aware of character of discharge rules is infinitesimally small."); Comments of National Veterans Council for Legal Redress and the Connecticut Veterans Legal Center, AQ95—Proposed Rule (filed Oct. 12, 2021) at 4 , https://www.regulations.gov/comment/VA-2020-VBA-0018-0101 ( "There is no evidence to support the proposition that VA's regulatory scheme has any impact on the ability of military leadership to maintain order and discipline, nor any evidence to suggest that making VA more inclusive would have any detrimental impact on the military at all."); Comments of University of San Diego Veterans Law Clinic, AQ95—Proposed Rule (filed Oct. 12, 2021) at 4, https://www.regulations.gov/comment/VA-2020-VBA-0018-0110 ("Removing the regulatory bars would not affect military order and discipline." "Military commanders would likely be surprised to learn the VA believes it should play any role in ensuring good order and discipline within the troops under their command.").

[8] *See* John Brooker, VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule (Oct. 5, 2021) (former service member and JAG, "I simply cannot fathom a way that regulatory bars impact military order and discipline."); Alden Pinkham, VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule (Oct. 5, 2021) ("The regulatory bars prevent veterans in most need of care from accessing the VA." "The answer to that is to remove the regulatory bars because they result in … [exclusion of veterans]."); Eleanor Morales, VA Character of Discharge Listening Session on RIN 2900-AQ95 Proposed Rule (Oct. 5, 2021) ("I have never met a military commander who thinks it's VA's job to enforce good order and discipline - - the VA should focus instead on its mission of caring for those who have borne the battle." "These regulatory bars are not understood in the military because they are too complex.").  Note that all quotations from the Listening Sessions are based on Petitioners' best efforts.  No transcripts have been made available from the Listening Sessions.

[9] Response of Petitioners, AQ95 Request for Information (filed Oct. 12, 2021), https://www.regulations.gov/comment/VA-2020-VBA-0018-0106.

LATHAM&WATKINS LLP

exclusions.[10]   In sum, the record evidence makes clear that when VA issues its final rule in this proceeding it must eliminate the regulatory bars once and for all.

## VA HAS PROVIDED ADEQUATE NOTICE THAT IT MAY REMOVE THE REGULATORY BARS

VA should not allow procedural concerns to delay the issuance of a final rule, such as removing the regulatory bars to benefits; as a legal matter, it is clear that VA has provided adequate notice and opportunity to comment on a final rule that would do exactly that.  Through three rounds of public comment—in response to the NPRM, the RFI, and the Listening Sessions—VA has satisfied all requirements under Section 553 of the Administrative Procedures Act (the "APA") by providing interested parties with a fair opportunity to comment on the future of the regulatory bars. Even if a court were to doubt the directness of VA's notice, eliminating the regulatory bars is, at a minimum, a logical outgrowth of VA's multiple requests for public comments.  At worst, a claimed lack of directness would likely constitute only a harmless procedural error, with no foreseeable party establishing standing to challenge the adequacy of VA's notice and comment on this rulemaking.

### A.    The NPRM and RFI made clear that removing the regulatory bars was under consideration

VA has satisfied the APA's requirement that it "fairly apprise interested parties of the issues involved" when proposing to amend the existing regulation.[11]  Agencies satisfy the APA's requirements by (1) issuing a notice of proposed rulemaking in the Federal Register[12]; (2) giving the public a meaningful opportunity to comment on the proposed rule[13]; and (3) when the rule is final rule is promulgated, issuing a "concise general statement" of its purpose.[14]  The APA notably does not "require that every alteration in a proposed rule be reissued for notice and comment"; otherwise "an agency could 'learn from the comments on its proposals only at the peril of' subjecting itself to rulemaking without end."[15]  Indeed, final rules are expected to be "somewhat different and improved" from initially proposed rules.[16]  Moreover, notice can come in a variety of forms; the APA does not require formal labels for notices (e.g., "General Notice of Proposed

---

[10] *Id.*

[11] *Nuvio Corp. v. FCC*, 473 F.3d 302, 310 (D.C. Cir. 2006) (quoting *Action for Children's Television v. FCC*, 564 F.2d 458, 470 (D.C. Cir. 1977)); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 95 (D.C. Cir. 2010) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005)) (stating that adequate notice "is crucial to 'ensure that agency regulations are tested via exposure to diverse public comment, ... to ensure fairness to affected parties, and ... to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'").

[12] 5 U.S.C. § 553(b).

[13] *Id.* § 553(c).

[14] *Id.*

[15] *First Am. Disc. Corp. v. Commodity Trading Futures Ass'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (internal citation omitted).

[16] *Trans–Pac. Freight Conference of Japan/Korea v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1249 (D.C. Cir. 1980).

**LATHAM&WATKINS**LLP

Rulemaking"), and notice is adequate if it describes the relevant issues with sufficient detail for interested parties to understand.[17]

In 2016, VA acknowledged Petitioners' petition for rulemaking "concerning regulatory bars," stating it would be "helpful to provide additional guidance in VA's regulations" and would "consider all other concerns raised" in the Petition, which included a request to remove the regulatory bars.[18]  VA's NPRM provided interested parties with notice of potential updates and clarifications to the COD rulemaking and considered broad changes to extend "compelling circumstances" to expand the application of benefits and address systematic denial of benefits due to mental illness or service-related disability.[19]  VA acknowledged in the NPRM that it has a desire for greater consistency of treatment across former service members and has recognized flaws inherent to the existing regulatory bars that require contemplation of "compelling circumstances."[20]

In response to the comments received from the NPRM, VA sought a second round of comments nearly one year later in the Federal Register through the RFI,[21] addressing directly the potential consequences of complete removal of regulatory bars.  VA also solicited live feedback from the public via the Listening Sessions, contemplating the same complete removal as in the RFI.  These forms of additional notice are plainly sufficient under the precedent cited above.  Indeed, in the RFI, the scope of VA's questions to the public clearly contemplate removing the regulatory bars entirely.  VA provided a broad set of questions that did not limit its proposed rulemaking to what was initially published.  In particular, VA invited commenters to advocate for or to argue against the complete removal of the regulatory bars by asking about the potential impact such removal would have on military order and discipline.[22]

Taken together, the NPRM, RFI, and Listening Sessions demonstrate that VA met its obligation to provide interested parties with "fair notice" that the agency was pursuing multiple options for reforming the regulatory bars, up to and including their complete removal.[23]  If VA issues a final rule removing the regulatory bars, it will have fulfilled its duty under the APA, learning from comments and issuing a final rule that is an improvement on the initial proposal.  A court reviewing the adequacy of VA's notice would likely find that VA had satisfied Section 553 of the APA because VA published both the NPRM and RFI in the Federal Register, and gave the public three meaningful opportunities to comment, including by asking direct questions about removing the regulatory bars altogether.  VA also gave the public more than one method of

---

[17] *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020).
[18] Department of Veteran Affairs, Letter on Petition for Rulemaking to Update and Clarify Regulatory Bars to Benefits (May 27, 2016); Petition, Sec. IV and V.
[19] Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471 (proposed July 10, 2020).
[20] *Id.*
[21] *See* RFI, Question D(1).
[22] *Id.*
[23] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174, (2007) ("The object [of notice and comment], in short, is one of fair notice.").

**LATHAM&WATKINS**LLP

submitting comments, appealing to a wide variety of commenters who might prefer written or oral communication.

VA has satisfied the APA's requirements by providing notice that the regulatory bars might be removed, so VA should now proceed—without further delay—to promulgate a final rule removing those bars.

### B.    Even if the NPRM and RFI were not clear, removing the regulatory bars is a "logical outgrowth" of VA's proposal

Although VA's notice for revoking the regulatory bars is clear on the face of the notice and opportunities to comment, a court *also* could find that the final rule is a "logical outgrowth" of VA's NPRM and RFI and thus that VA had satisfied its notice-and-comment obligations under the APA. A final rule, including a rule rescission, is considered a logical outgrowth when "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."[24] Courts also ask whether, if given a new opportunity to comment, "commenters would not have their first occasion to offer new and different criticisms which the Agency might find convincing."[25]

Here, interested parties certainly have had fair opportunities to comment through oral and written means, and have taken advantage of such opportunities. Indeed, VA acknowledges in its RFI that it "received numerous public comments" and that "[d]ue to the various and differing comments received, VA is seeking additional information." A court analyzing VA's notice under the logical outgrowth test would likely ask "whether the notice was 'sufficient to advise interested parties that comments directed to the' controverted aspect of the final rule should have been made."[26] Any new opportunity to comment from VA would not provide commenters with any reason to provide new or different comments than those that have been filed previously. Indeed, because VA's notices are adequate as is, any additional opportunities would do little to build upon what has already been said. For example, in *Veterans Justice Group, LLC v. Secretary of Veterans Affairs*, veterans' advocacy groups challenged a different VA rule.[27] There, advocacy groups argued that the rule's intent-to-file provision did not constitute a logical outgrowth of the proposed rule.[28] VA's proposed rule sought to standardize an informal claims process in part by creating an "incomplete claim" concept.[29] However, VA dropped the "incomplete claim" concept and instead adopted an "intent to file" process which VA did not include in the proposal.[30] VA argued that

---

[24] *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94–95 (D.C. Cir. 2010) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005)); *see also First Am. Discount*, 222 F.3d at 1015 ("The test for a 'logical outgrowth,' variously phrased, is whether a reasonable commenter 'should have anticipated that such a requirement' would be promulgated, or whether the notice was 'sufficient to advise interested parties that comments directed to the' controverted aspect of the final rule should have been made." (internal citation omitted)).

[25] *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 642 (1st Cir. 1979).

[26] *First Am. Disc. Corp.*, 222 F.3d at 1015.

[27] 818 F.3d 1336, 1344 (Fed. Cir. 2016).

[28] *Id.*

[29] *Id.*

[30] *Id.*

**LATHAM&WATKINS**LLP

even though the final rule used a different structure than the proposed rule, it achieved the policy goal of standardizing inputs articulated in the notice.[31]  The Federal Circuit agreed with VA and held that interested parties "should have anticipated" the change in the final rule was possible given the notice in the initial proposal concerning the standardization of the claim initiation process.[32]  Here, as there, VA's notices provide ample evidence that interested parties "should have anticipated" that VA was considering removing regulatory bars in its final rule.  Like in *Veterans Justice Group*, if VA removes the regulatory bars it will effectuate a policy that provides greater consistency in the COD process, as discussed in its NPRM.

Nor is this a case where the agency could be accused of "bootstrap[ping] notice from a comment."[33]  Rather, while the NPRM gave notice of multiple options for reforming the regulatory bars, VA clarified its proposed approach in response to initial comments and issued the RFI accordingly.  The RFI explicitly stated, "[s]ome commenters recommended that VA only apply statutory bars to benefits," and requested feedback on that proposal.[34]  Thus, the RFI (and accompanying Listening Sessions) constituted additional notice directly from VA—not from comments alone—that VA considered removal of regulatory bars because VA directly solicited further public input in response to initial comments.  A potential plaintiff would be unable to show that removing the regulatory bars was unforeseeable from the NPRM and RFI given the scale of the proposed reforms in the NPRM and the explicit discussion of removal in the RFI.[35]  Moreover, the wealth of comments (both supporting and opposing removal of the regulatory bars) in response to both the NPRM and RFI in fact serve to highlight that commenters knew that VA's consideration of removing of the regulatory bars was either contained within the NPRM and RFI or a logical outgrowth thereof.

In sum, if VA were to issue a final rule, including to remove the regulatory bars, VA's publication of the NPRM and RFI provided sufficient evidence to establish that the public should have anticipated that a potential consequence of the proposed rulemaking was to remove the regulatory bars to benefits and, further, interested parties had ample opportunity to participate in public commenting on this potential outcome.

### C.    Any procedural error is harmless and no party would have standing to bring suit

Moreover, the chances of a successful procedural challenge to a final rule that removed or reformed the regulatory bars so as to grant broader access are even more remote given that no party would have standing to bring such a challenge.  A party would have standing only if a claimed procedural error caused a substantive injury to that party.[36]  In analyzing whether the procedural

---

[31] *Id.*

[32] *Id.* at 1345.

[33] *Cf. Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A.*, 705 F.2d 506, 549 (D.C. Cir. 1983) ("As a general rule, EPA must itself provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment . . . notice necessarily must come—if at all—from the agency.").

[34] *See* RFI, Question D(1).

[35] *Id*

[36] *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (stating that parties challenging agency action based on their inability to comment must show they suffered a "personal and particularized injury" as a result).

LATHAM&WATKINSLLP

error was harmless, courts ask whether the procedural error is a "technical" or "complete" failure.[37] A technical failure occurs when an agency provides some notice and comment but the process constitutes a violation of statutory standards.[38]  A complete failure occurs when there is a total lack of compliance with the APA's notice and comment requirements, which leaves reviewing courts uncertain as to the effect of the non-compliance.[39]

In the unlikely event that a court were to find that VA committed a procedural error, it would be expected to conclude that the error constituted a technical failure and was therefore harmless.  For example, in *Aeronautical Repair Station Association Incorporated v. Federal Aviation Administration*, aircraft maintenance employers challenged the FAA's final rule mandating drug and alcohol testing for contract employees who perform aircraft safety maintenance because FAA mischaracterized its proposed rule as simply a "clarification."[40] There, FAA issued a notice of proposed rulemaking seeking to revise its drug and alcohol testing regulations to clarify that performance by contract meant performance under any tier of contract.[41] In response to critical comments, FAA published a supplemental notice of proposed rulemaking addressing directly the comments it received on whether subcontractors qualified for testing under the rule, which FAA included in its final rule.[42]  The court acknowledged that there was substance to petitioners' claim that including subcontractors in the final rule was more than "simply a clarification," but that it did not warrant overturning the final rule because FAA "went out of its way to ensure that interested parties had the opportunity to participate and comment."[43]

Here, too, VA went out of its way and provided multiple opportunities to comment.  The substance of the RFI—and the subsequent comment round and Listening Sessions—gave interested parties additional, specific notice that VA was considering removing the regulatory bars and a fair opportunity to comment on that outcome.  There would be no basis for a court to conclude that VA's actions constituted a "total lack of compliance" with the APA and represented a "complete" procedural failure.

By the same token, there is no party that could plausibly allege *any* concrete harm for any claimed lack of notice.  When notice is challenged, persons may invoke judicial review under the APA if they are harmed by a final agency action within the meaning of the statute at issue.[44]  Parties challenging agency action based on their inability to comment must show they suffered a "personal and particularized injury" as a result.[45]  The "mere violation of a procedural requirement thus does not permit any and all persons to sue to enforce the requirement."[46]  Thus, to establish standing

---

[37] *United States v. Reynolds*, 710 F.3d 498, 516–19 (3d Cir. 2013).

[38] *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1384 (Fed. Cir. 2017).

[39] *Mid Continent Nail Corp.,* 846 F.3d at 1384.

[40] 494 F.3d 161, 170 (D.C. Cir. 2007).

[41] *Id.* at 165.

[42] *Id.*

[43] *Id.* at 171.

[44] 5 U.S.C. §§ 702, 704.

[45] *Fla. Audubon Soc'y*, 94 F.3d at 664 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n.7(1992)).

[46] *Id.*

**LATHAM&WATKINS** LLP

based on procedural violations, a party must show that (1) the agency omitted a required procedure, and (2) the procedural error caused a substantive injury to the plaintiff or petitioner.[47]

Here, even if a court somehow were to find a procedural gap, a party would have standing only if that procedural error caused it a substantive injury.  If VA did remove the regulatory bars, the primary effect would be that a subset of current or former service members would benefit; the removal of the regulatory bars would not withhold or deny any other existing benefits or entitlements.  In the RFI, VA did ask whether military order or discipline may be harmed by removing the regulatory bars, but it is not obvious who would be in a position to suffer an injury-in-fact even if there were a discernable harm to order or discipline.  Without a plausible party that may have been harmed by the removal of the regulatory bars, it is unlikely that a court would ever be asked to consider the adequacy of notice in the first place.

As discussed at length in the written and oral comments provided to VA, many individuals stand to gain life-saving healthcare and other benefits from removing the regulatory bars to benefits, but such action injures no one.  Without any party to assert an injury on the basis of inadequate notice, no party would have standing to challenge VA's adoption of this rule.

\*     \*     \*     \*     \*

Petitioners call on VA to promptly issue a final rule that removes the regulatory bars to benefits for former service members.  Issuing such a final rule does not require any further notice and comment, nor are any other delays warranted.  Indeed, every day of additional delay is a day that VA is failing to fulfill its statutory duty and wrongfully denying benefits to former service members without a dishonorable discharge.  Further unreasonable delay adversely affects tens of thousands of former service members, and prompt action is required to cure this ongoing harm.

Petitioners would appreciate the opportunity to meet with you and your team to discuss the contents herein and address any of VA's questions.  Please contact the undersigned if such a conversation could contribute to VA promptly issuing a final rule.

Respectfully,

*/s/ Alexander L. Stout*

Alexander L. Stout
of LATHAM & WATKINS LLP

cc:     Dana Montalto (dmontalto@law.harvard.edu)
        Dan Nagin (dnagin@law.harvard.edu)

---

[47] *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 205 (D.D.C.), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015).

**LATHAM&WATKINS** LLP

David Barrans (David.Barrans@va.gov)
Tanya Bradsher (Tanya.Bradsher@va.gov)
Laurine Carson (Laurine.Carson@va.gov)
Brian Griffin (Brian.Griffin2@va.gov)
Richard J. Hipolit (Richard.Hipolit@va.gov)
Jonathan Krisch (Jonathan.Krisch@va.gov)

# EXHIBIT K

 

February 10, 2021

*Via Email and FedEx*

The Honorable Denis R. McDonough
Secretary of Veterans Affairs
810 Vermont Ave, NW
Washington, DC 20420

Secretary McDonough,

Congratulations on your recent confirmation as Secretary of Veterans Affairs (VA). The undersigned attorneys, law professors, and advocates who serve homeless and low-income veterans are invested in your success as the VA's new leader and look forward to the progress you plan to make within the Department.

As you may know, in 2016 under the Obama-Biden Administration, the VA committed to revise its Character of Discharge (COD) regulations, which govern when veterans with less-than-honorable discharges are eligible for basic VA benefits like health care and disability support. VA agreed to do so based on a petition for rulemaking by Swords to Plowshares and the National Veterans Legal Services Program (NVLSP), represented by the Legal Services Center of Harvard Law School and Latham & Watkins, concerning these unjust, unlawful, and outdated regulations that disproportionately exclude veterans of color, veterans with mental health conditions, veterans at risk of suicide, and LGBTQ+ veterans.[1] Four years later, the VA finally issued proposed regulations that, if finalized, will continue to unlawfully bar veterans from the benefits that they have earned and deserve.[2]

We write to express our serious concern with the regulations proposed under the previous administration. Within your first 100 days as VA Secretary, we ask that revised final regulations be issued that better accord with VA's governing law and VA's purpose of serving our nation's veterans. Swords to Plowshares and NVSLP additionally request a meeting with your office to discuss how the VA can better serve veterans with less-than-honorable discharges. Many of the undersigned have already submitted detailed comments to the VA about the problematic nature of the proposed regulations and to suggest alternative language.[3] The proposed regulations are contrary

---

[1] Petition for Rulemaking to Amend 38 C.F.R. §§ 3.12(a), 3.12(d), 17.34, 17.36(d) Regulations Interpreting 38 U.S.C. § 101(2) Requirement for Service "Under Conditions Other Than Dishonorable", https://uploads-ssl.webflow.com/5ddda3d7ad8b1151b5d16cff/5efed0ac6dc9fc718786414b_Petition%20to%20amend%20regulations%20implementing%2038%20USC%20101(2).pdf.

[2] AQ95-Proposed Rule - Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471 (proposed Jul. 10, 2020), https://www.federalregister.gov/documents/2020/07/10/2020-14559/update-and-clarify-regulatory-bars-to-benefits-based-on-character-of-discharge.

[3] Swords to Plowshares and NVSLP's omnibus public comment is enclosed for ease of reference.

to the plain statutory language and legislative intent, harm the most vulnerable veterans, and serve only to further an arbitrary and confusing regulatory system.

(1) VA Regulations are Contrary to Statutory and Legislative Intent

VA benefits, including health care, are only accessible to "Veterans," which federal statute defines as "a person who served in the active military, naval, or air service, *and who was discharged or released therefrom under conditions other than dishonorable*."[4] Under the current and proposed regulations, however, hundreds of thousands of veterans are, and will continue to be, left out of the VA's system of care due to minor misconduct that is often consequent to Post-Traumatic Stress Disorder (PTSD) or Traumatic Brain Injury (TBI) symptoms they were experiencing when they separated from the military. This is because whenever a former service member with a discharge status of *Other than Honorable*, *Bad Conduct*, *Dishonorable*, or *Uncharacterized* applies for VA services, the VA does not automatically recognize them as a veteran. Instead, the VA will first conduct an individualized COD review to decide whether the claimant meets the  definition of a veteran. In this process, the VA reviews the claimant's benefits application materials and their military records to determine if any statutory or regulatory bar exists.[5]

In contrast to the VA's regulatory system, the plain language of the relevant statutes and the legislative history establish that veterans should be excluded from VA only if they received (or should have received) a Dishonorable Discharge.[6]  The legislative history of the Servicemen's Readjustment Act of 1944—the statute that created the "*other than dishonorable*" standard— demonstrates  Congress's expansive and generous attitude toward veterans, including those with less-than-honorable discharges. Congress knowingly enacted that expanded eligibility standard, which was drafted by Harry Colmery, former National Commander of the American Legion. Mr. Colmery explained the purpose of that phrase as follows:

> I was going to comment on the language "under conditions other than dishonorable." Frankly, we use it because we are seeking to protect the veteran against injustice . . . We do not like the words "under honorable conditions" because we are trying to give the veteran the benefit of the doubt, because we think he is entitled to it.

Three current United States Senators, in their public comment in response to the VA's proposed rule, concurred with this interpretation:

> Congress only authorized exclusion of those servicemembers who received or should have received dishonorable discharges by military standards. Congress did not intend for VA to create a new standard that would be more exclusionary that the military standard and did not give VA any authority to do so.[7]

---

[4] 38 USC § 101(2)(emphasis added)

[5] 38 CFR § 3.12(c), (d)

[6] 38 USC § 101(2); *see, e.g.*, S. Rep. No. 78-755, at 15 (1944) ("Many persons who have served faithfully and even with distinction are released from the service for relatively minor offenses. . . . It is the opinion of the committee that such discharge should not bar entitlement to benefits otherwise bestowed unless the offense was such, as for example those mentioned in section 300 of the bill, as to constitute dishonorable conditions.").

[7] Comments on RIN 2900-AQ95, Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge from Richard Blumenthal, Jon Tester & Sherrod Brown, U.S. Sen., U.S. Senate (Sep. 3, 2020) (on file with

However, should the current proposed rule be finalized, former service members will continue to be barred from VA benefits for minor infractions. For example, the VA is proposing to exclude former service members who have two incidents of minor misconduct within a 24-month period. That is, under the proposed regulations, the VA could deny eligibility to a claimant whose only misconduct was two days of absence without leave (AWOL) in the last two years of a 6-year enlistment. Such misconduct could never warrant a Dishonorable Discharge under the Uniform Code of Military Justice. In fact, Congress authorizes VA to deny eligibility to veterans who have gone AWOL, but requires the AWOL be "for a continuous period of at least 180 days" – considerably longer than the two days permitted under the VA's proposed regulations.[8]

     (2) Proposed Rule Harms the Most Vulnerable Veterans

In many cases, former service members received less-than-honorable discharges because of trauma, hardship, or discrimination. Studies have found a strong correlation between having a mental health condition in service, whether because of combat or Military Sexual Trauma, and being less-than-honorably discharged. For example, Operation Iraqi Freedom Marine Corps combat veterans with PTSD are eleven times more likely to be discharged for misconduct and eight times more likely to be discharged for substance abuse than veterans without PTSD.[9] A GAO Report from 2017 found that the military routinely failed to provide mandatory mental health screenings, or conducted inadequate screenings, and that 62 percent of service members discharged for misconduct from 2011 to 2015 had been diagnosed with a mental health condition in service, yet separated anyway.[10] Systemic and institutionalized discrimination, such as against LGBTQ+ service members and service members of color, also has led to higher rates of less-than-honorable discharges in those communities. A recent study by Protect Our Defenders found that Black service members are between 1.29 times and 2.61 times more likely to have disciplinary action taken against them than white service members in an average year.[11] The accumulation of disciplinary infractions leads directly to less-than-honorable discharges.

Those in-service experiences often continue to affect a service member after discharge, especially when compounded by the shame, stigma, and exclusion imposed by a less-than-honorable discharge characterization. Thus, veterans with less-than-honorable discharges have higher rates of homelessness, mental health conditions, incarceration, and unemployment.[12] They are three times

---

Regulations.gov (beta)) at 3.

[8] 38 USC § 5303(a)

[9] Robyn M. Highfill-McRoy, Gerald E. Larson, Stephanie Booth-Kewley & Cedric F. Garland, *Psychiatric Diagnoses and Punishment for Misconduct: the Effects of PTSD in Combat-Deployed Marines*, BMC Psychiatry, Oct. 25, 2010, at 5.

[10] DOD Health: Actions Needed to Ensure Post Traumatic Stress Disorder and Traumatic Brain Injury Are Considered in Misconduct Separations, U.S. GAO GAO-17-260, 2-3 (May 16, 2017), https://www.gao.gov/assets/690/684608.pdf.

[11] Don Christenson & Yelena Tsilker, *Racial Disparities in Military Justice: Findings of Substantial and Persistent Racial Disparities Within the United States Military Justice System, at* i-ii (2017), protectourdefenders.com/disparity.

[12] Adi V. Fundlapalli et al., *Military Misconduct and Homelessness Among US Veterans Separated from Active Duty, 2001-2012,* 314 J. Am. Med. Ass'n 832 (2015); Claire A. Hoffmire et al., *Administrative Military Discharge and Suicidal Ideation Among Post-9/11 Veterans*, 56 Am. J. Prev. Med. 727 (2019); Sara Kintzle et al., *Exploring the Economic and Employment Challenges Facing U.S. Veterans: A Qualitative Study of Volunteers of America Service Providers and Veteran Clients* (May 2015).

more likely to experience suicidal ideation.[13] But because of the VA's exclusionary COD regulations, the former service members who need VA's services the most usually cannot access them.

(3) COD Process is Arbitrary and Overly Burdensome

The current and proposed COD process, which presumes service members with less-than-honorable discharges to be ineligible, is overly burdensome on both VA adjudicators and veterans. The process is opaque and the regulations are vague, leading to inconsistent results. For example, in Fiscal Year 2018, the Oakland Regional Office granted 39.7 percent of COD determinations, while the Milwaukee Regional Office granted just 5.9 percent.[14] NVLSP and Swords to Plowshares' comment details how the current proposed regulations continue to be vague and include language that we expect will results in varying outcomes from VA adjudicators.

Additionally, many VA employees and service members do not understand how to request an eligibility review. Only about 10 percent of less-than-honorably discharged veterans have undergone COD review. The remaining 90 percent are excluded by default, because VA has chosen to presumptively exclude all veterans who were not honorably discharged.[15] The VA's proposed regulation does nothing to help this issue; in fact, even though the new rules are supposed to correct errors of the past created by excluding veterans for minor misconduct and not taking into account mitigating factors, the VA is expecting to grant eligibility at the same rate as it does under the current regulations.[16]

Our clients regularly suffer the consequences of this failed system and of being denied life-sustaining care and benefits that the VA was created to provide. And, when the system does work, we see how life-altering it is for a veteran to go from homeless and being unable to work due to severe PTSD to having exceptional mental healthcare, monthly disability compensation, and housing assistance from the VA. Perhaps as important, they also achieve the dignity of having the VA recognize them as a Veteran.

We respectfully request that the VA abandon its current proposed language. The VA has a moral and legal obligation to help these veterans, and to that end, we ask that finalized regulations be issued that include the following standards:

- Presume eligibility of all administratively discharged veterans, except those discharged in lieu of court-martial;
- Remove regulatory bars in excess of VA's statutory authority that operate to exclude veterans based on misconduct that never could have or would have led to a Dishonorable Discharge; and
- Require holistic consideration of compelling circumstances, such as mental health and hardship, in all cases.

---

[13] Hoffmire, *supra* note 12 at 730.
[14] FOIA results on file with the authors.
[15] Turned Away: How VA Unlawfully Denies Health Care to Veterans with Bad Paper Discharges, https://legalservicescenter.org/wp-content/uploads/Turn-Away-Report.pdf.
[16] FOIA results on file with the authors.

Thank you for your careful review of this matter, as well as for your review of the omnibus public comment submitted by Swords to Plowshares and NVLSP, and the numerous other public comments in support of creating a more just and inclusive VA eligibility process. Should the VA undertake to re-write new proposed regulatory language, Swords and NVLSP are readily available to your office to provide our input, guidance, and support.

Sincerely,

Dana Montalto
Daniel Nagin
VETERANS LEGAL CLINIC
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Claudia O'Brien
Patrick Nevins
Alexander L. Stout
Zachary Williams
Brittany Bruns
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

Bart Stichman
NATIONAL VETERANS LEGAL SERVICES PROGRAM
1600 K Street, NW, Suite 500
Washington, DC 20006

Maureen Siedor
Amy Rose
SWORDS TO PLOWSHARES
401 Van Ness Avenue, Suite 313
San Francisco, CA 94102

Katherine B. McGuire, *Chief Advocacy Officer*
Sophie Friedl, *Director of Congressional and Federal Affairs, Military and Veterans Health Policy*
AMERICAN PSYCHOLOGICAL ASSOCIATION
750 First St NE
Washington, DC 20002

Emon Northe, *Project Manager*
Janon Holmes, *Attorney*
VETERANS LEGAL SERVICES PROJECT
CHARLOTTE CENTER FOR LEGAL ADVOCACY
1431 Elizabeth Avenue
Charlotte, NC 28204

Colonel Don Christensen, USAF (ret.), *President*
PROTECT OUR DEFENDERS
950 N. Washington Street
Alexandria, VA 22314

Paula Clamurro, *Senior Staff Attorney*
Amanda Pertusati, *Supervising Staff Attorney*
CENTER FOR VETERANS' ADVANCEMENT
PUBLIC COUNSEL
610 S. Ardmore Ave.
Los Angeles, CA 90005

Liam Brennan, *Executive Director*
Cinthia Johnson*, Deputy Director*
Millie VandenBroek*, Staff Attorney for Discharge Upgrades and Policy Counsel*
Chelsea Donaldson*, Singer Fellow Staff Attorney*
CONNECTICUT VETERANS LEGAL CENTER
114 Boston Post Rd., Ground Floor
West Haven, CT 06516

Michael Taub, *Veterans Project Director*
Alexandra Muolo, *Staff Attorney and Duffy Fellow*
Joel Sobel, *Staff Attorney and Duffy Fellow*
HOMELESS ADVOCACY PROJECT
1429 Walnut Street, 15th Floor
Philadelphia, PA 19102

Jonathan Killoran, *Supervising Attorney*
HOMELESS VETERANS PROJECT
INNER CITY LAW CENTER
1309 E. 7th Street
Los Angeles, CA 90021

Peter Perkowski, *Legal & Policy Director*
MODERN MILITARY ASSOCIATION OF AMERICA
1725 I Street NW, Suite 300
Washington, DC 20006

Kathryn Monet, *Chief Executive Officer*
NATIONAL COALITION FOR HOMELESS VETERANS
1730 M Street NW, Suite 705
Washington, DC 20036

Diane Boyd Rauber, *Executive Director*
NATIONAL ORGANIZATION OF VETERANS' ADVOCATES, INC.
1775 Eye Street, NW
Washington, DC 20006

Beth Goldman, *President/Attorney in Charge*
NEW YORK LEGAL ASSISTANCE GROUP
100 Pearl Street, 19th Floor
New York, NY 10004

Stacey-Rae Simcox, *Professor of Law Director,* VETERANS LAW INSTITUTE & *Director,* VETERANS ADVOCACY CLINIC
STETSON UNIVERSITY COLLEGE OF LAW
1401 61st St S
Gulfport, FL 33707

Chantal Wentworth-Mullin, *Managing Director*
BETTY AND MICHAEL D. WOHL VETERANS LEGAL CLINIC
SYRACUSE UNIVERSITY COLLEGE OF LAW
Dineen Hall
950 Irving Avenue
Syracuse, NY 13244

Robert F. Muth, *Professor of Law Managing Attorney,* VETERANS LEGAL CLINIC
UNIVERSITY OF SAN DIEGO SCHOOL OF LAW
5998 Alcala Park, BA 303
San Diego, CA 92110

Donald F. Hayes, *Director*
VETERANS LEGAL ASSISTANCE PROJECT OF VERMONT
SOUTH ROYALTON LEGAL CLINIC
VERMONT LAW SCHOOL
190 Chelsea Street, P.O. Box 117
South Royalton, VT 05068

Coco Culhane, *Executive Director*
VETERAN ADVOCACY PROJECT
1 Liberty Plaza, Floor 23
New York, NY 10006

Anthony Hardie, *National Chair & Director*
VETERANS FOR COMMON SENSE
1140 3rd St. NE, Space 2138
Washington, DC 20002-6274

Paul Cox, *President*
VETERANS HEALTHCARE POLICY INSTITUTE
4081 Norton Ave.
Oakland, CA 94602

Michele R. Vollmer, *Director, Veterans and Servicemembers Legal Clinic*
*Clinical Professor of Law*
PENN STATE LAW
329 Innovation Boulevard, Suite 118
University Park, PA 16802

John W. Brooker*
Lieutenant Colonel, U.S. Army (Retired)
110 Portsmith Place
Chapel Hill, NC 27516

Angela Drake*, *Director*
VETERANS CLINIC
UNIVERSITY OF MISSOURI SCHOOL OF LAW
119-120 Hulston Hall
Columbia, MO 65211

Jeanne Nishimoto*
*Associate Director*, Veterans Legal Clinic
UCLA SCHOOL OF LAW
385 Charles E Young Dr E
Los Angeles, CA 90095

Jed Nolan, *Director*
VETERANS ADVOCACY CLINIC
WEST VIRGINIA UNIVERSITY COLLEGE OF LAW
101 Law School Drive
Morgantown, WV 26506

Yelena Duterte*, *Director*
Jillian Berner*, *Senior Staff Attorney*
Samantha Stiltner*, *Staff Attorney*
Veterans Legal Support Center and Clinic
UIC JOHN MARSHALL LAW SCHOOL
THE UNIVERSITY OF ILLINOIS AT CHICAGO
300 S. State Street
Chicago, IL 60604

Eleanor Morales*, *Assistant Clinical Professor*
*Director*, VETERANS LEGAL CLINIC
WAKE FOREST UNIVERSITY SCHOOL OF LAW
P.O. Box 7206
Winston-Salem, NC 27109

Michael J. Wishnie*, *William O. Douglas*
*Clinical Professor of Law and Director,*
*Veterans Legal Services Clinic*
VETERANS LEGAL SERVICES CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511

*Signatory is joining in their individual capacity. Institutional affiliation is listed for identification only.

Enclosure:    Comments on RIN 2900-AQ95, Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge from the National Veterans Legal Services Program and Swords to Plowshares

# EXHIBIT L

No. _____

# United States Court of Appeals
# for the Federal Circuit

_____

IN RE SWORDS TO PLOWSHARES AND THE NATIONAL
VETERANS LEGAL SERVICES PROGRAM, PETITIONERS

---

## PETITION FOR WRIT OF MANDAMUS
## TO THE DEPARTMENT OF VETERANS AFFAIRS

---

Daniel L. Nagin
Dana Montalto
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130

Alexander L. Stout
ZWILLGEN PLLC
1900 M Street NW
Suite 250
Washington, DC 20036

October 24, 2023

Matthew T. Murchison
Ryan T. Giannetti
James A. Darlson
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Petitioners
Swords to Plowshares and
the National Veterans Legal
Services Program*

# CERTIFICATE OF INTEREST

**Case Number**          23-

**Short Case Caption**      *In re Swords to Plowshares*

**Filing Party/Entity**    Swords to Plowshares; The National
                           Veterans Legal Services Program

I certify the following information is accurate and complete to the best
of my knowledge.

Date: October 24, 2023        Signature: */s/ Matthew T. Murchison*

                              Name:     Matthew T. Murchison

1. **Represented Entities.**  Provide the full names of all entities
   represented by undersigned counsel in this case.

   Swords to Plowshares

   The National Veterans Legal Services Program

2. **Real Part in Interest.**  Provide the full names of all real parties
   in interest for the entities.  Do not list the real parties if they are
   the same as the entities.

   None.

3. **Parent Corporations and Stockholders.**  Provide the full
   names of all parent corporations for the entities and all publicly
   held companies that own 10% of more stock in the entities.

   The entities are both non-profit 501(c)(3) organizations not owned
   by any parent corporation, stockholder, or other entity.

4. **Legal Representatives.**  List all law firms, partners, and
   associates that (a) appeared for the entities in the originating court
   or agency or (b) are expected to appear in this court for the entities.

Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

**Latham & Watkins LLP**: Matthew T. Murchison, Ryan T. Giannetti, James A. Darlson

**Legal Services Center of Harvard Law School, Veterans Legal Clinic**: Dana Montalto, Daniel Nagin

**ZwillGen PLLC**: Alexander Stout

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

JURISDICTION ............................................................................ 4

RELIEF SOUGHT ........................................................................ 5

ISSUE PRESENTED .................................................................... 6

FACTUAL BACKGROUND .......................................................... 6

    A.    The 2015 Rulemaking Petition ............................................. 6

    B.    VA's 2016 Grant of the Rulemaking Petition ...................... 15

    C.    Years and Years of Continued Delay by VA ......................... 16

ARGUMENT ............................................................................... 20

I.    VA VIOLATED ITS CLEAR AND UNDISPUTABLE LEGAL
    DUTY TO CONCLUDE THE RULEMAKING
    PROCEEDING. .................................................................... 21

II.    PETITIONERS HAVE NO OTHER MEANS OF
    ADEQUATE RELIEF ........................................................... 24

III.    VA'S YEARS-LONG DELAY IS EGREGIOUS AND MERITS
    MANDAMUS. ...................................................................... 25

    A.    The First, Third, Fourth, and Fifth *TRAC* Factors
    Strongly Support Mandamus .............................................. 27

    B.    The Remaining *TRAC* Factors Are Neutral, And None
    Undercuts Mandamus ......................................................... 33

CONCLUSION ............................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re A Cmty. Voice,*
   878 F.3d 779 (9th Cir. 2017) ...................................................... *passim*

*Allied Chem. Corp. v. Daiflon, Inc.,*
   449 U.S. 33 (1980) ........................................................................... 21

*In re Am. Rivers & Idaho Rivers United,*
   372 F.3d 413 (D.C. Cir. 2004) ...................................................... *passim*

*Cheney v. U.S. Dist. Ct. for D.C.,*
   542 U.S. 367 (2004) ......................................................................... 20

*In re Core Commc'ns, Inc.,*
   531 F.3d 849 (D.C. Cir. 2008) ................................................ 26, 27, 34

*In re Ctr. for Bio. Diversity,*
   53 F.4th 665 (D.C. Cir. 2022) .............................................. 5, 20, 26, 34

*Earth Island Institute v. Regan,*
   553 F. Supp. 3d 737 (N.D. Cal. 2021) .................................... 22, 23, 28

*Env't Def. Fund, Inc. v. Ruckelshaus,*
   439 F.2d 584 (D.C. Cir. 1971) ............................................................. 4

*FCC v. Dean Foods Co.,*
   384 U.S. 597 (1966) ........................................................................... 5

*Martin v. O'Rourke,*
   891 F.3d 1338 (Fed. Cir. 2018) ................................................. *passim*

*Midwest Gas Users Ass'n v. FERC,*
   833 F.2d 341 (D.C. Cir. 1987) ........................................................... 27

*Mote v. Wilkie,*
   976 F.3d 1337 (Fed. Cir. 2020) ................................................... 20, 25

*In re Nat. Res. Def. Council, Inc.,*
   956 F.3d 1134 (9th Cir. 2020)........................................... 27, 28, 29, 33

*In re Paralyzed Veterans of Am.,*
   392 F. App'x 858 (Fed. Cir. 2010) ....................................... 4, 5, 21, 25

*Pub. Citizen Health Rsch. Grp. v. Comm'r, Food & Drug*
   *Admin.,*
   724 F. Supp. 1013 (D.D.C. 1989) ....................................................... 23

*Telecomms. Rsch. & Action Ctr. v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) ...................................................... *passim*

## STATUTES

5 U.S.C.
   § 555(b)........................................................................................ *passim*
   § 706(1).................................................................................... 3, 4, 21

38 U.S.C.
   § 101(2)................................................................................................ 7
   § 502 .................................................................................................. 4
   § 5303 ................................................................................................ 7
   § 5303(a)....................................................................................... 8, 15

## REGULATIONS

38 C.F.R.
   § 3.12 ......................................................................................... 15, 16
   § 3.12(a).......................................................................................... 2, 10
   § 3.12(d).................................................................................... 2, 10, 13
   § 3.12(d)(5) ....................................................................................... 16
   § 17.34 .................................................................................... 10, 15, 16
   § 17.34(b)............................................................................................ 2
   § 17.36 ....................................................................................... 11, 16

Pensions, Bonuses, & Veterans' Relief, 11 Fed. Reg. 8729
   (Aug. 13, 1946) (codified at 38 C.F.R. § 2.1064(d) (1946)) ................. 16

Service Requirements for Veterans, 69 Fed. Reg. 4820
   (proposed Jan. 30, 2004) ................................................................. 16

Update and Clarify Regulatory Bars to Benefits Based on
    Character of Discharge, 85 Fed. Reg. 41471 (July 10,
    2020) (to be codified at 38 C.F.R. pt. 3) ............................... 3, 16, 17, 23

Update and Clarify Regulatory Bars to Benefits Based on
    Character of Discharge, 86 Fed. Reg. 50513 (proposed
    Sept. 9, 2021) (to be codified at 38 C.F.R. pt. 3) ............................ 3, 18

## OTHER AUTHORITIES

Bradford Adams & Dana Montalto, *With Malice Toward
    None: Revisiting the Historical and Legal Basis for
    Excluding Veterans from Veteran Services*, 122 PENN. ST.
    L. REV. 69 (2017) ........................................................................ 2, 8, 30

H.R. REP. NO. 79-1510 (1946) .................................................................. 2

## STATEMENT OF RELATED CASES

No appeal in or from the same civil action or proceeding in the lower court has previously been before the Federal Circuit or any other appellate court.

## INTRODUCTION

This Petition seeks a writ of mandamus to address egregious delay by the U.S. Department of Veterans Affairs ("the Department" or "VA") in resolving a petition for rulemaking filed in 2015, ostensibly granted in 2016, and yet sitting in limbo now for the better part of a decade.

The rulemaking implicates VA's core mission of providing health care, disability compensation, and other benefits to eligible service members and their families. VA's current regulations wrongfully withhold these critical benefits from tens of thousands of former service members who received less-than-honorable discharges—most commonly, administrative "other than honorable" ("OTH") discharges for minor or moderate infractions often connected to service-related mental health conditions.[1] Congress had intended to confer benefits broadly, including

_____

[1] As background, discharges can be broadly divided into administrative or punitive. Punitive discharges include bad conduct discharges and dishonorable discharges, and require conviction by a court martial. Administrative discharges include honorable, general (under honorable conditions), and other than honorable. Administrative discharges may be voluntary or involuntary, and an administrative character of service is typically assigned by military commanders or handed down by military administrative boards without direct recourse to judicial process. With narrow exceptions, dishonorably discharged service members are statutorily barred from receiving VA benefits, and the Petitioners' rulemaking petition does not include any request to change regulations

on service members with a history of less-serious misconduct.[2]  Yet VA's unwise regulations undermine Congress's intent to ensure broad access to VA benefits for those who have served our country.

With the hope of correcting this injustice, Petitioners met in May 2015 with VA officials to present their policy and legal arguments for amending the regulations.  In a letter dated July 14, 2015, VA interpreted this meeting as a "request that VA make revisions to 38 C.F.R. § 3.12(d), 38 C.F.R. § 3.12(a) and 38 C.F.R. § 17.34(b)."  Ex. A (July 14, 2015 Letter).  Then, on December 19, 2015, Petitioners submitted a formal petition for rulemaking asking VA to revise and update its regulations (the "Rulemaking Petition").  Ex. B (Rulemaking Petition).  The Department granted the Rulemaking Petition on May 27, 2016, through a letter

---

governing eligibility for this category of former servicemembers.  The rulemaking petition predominately relates to how VA assesses eligibility for former service members with OTH characterizations who did not commit serious misconduct and for whom mitigating and extenuating circumstances may exist.

[2] *See, e.g.*, Bradford Adams & Dana Montalto, *With Malice Toward None: Revisiting the Historical and Legal Basis for Excluding Veterans from Veteran Services*, 122 PENN. ST. L. REV. 69, 132 (2017) ("Congress was generously providing the benefits on as broad a base as possible and intended that all persons not actually given a [D]ishonorable discharge should profit by this generosity.") (quoting H.R. REP. NO. 79-1510, at 13–14 (1946)) (alteration in original).

stating that "VA will initiate rulemaking proceedings" in response to the Rulemaking Petition.  Ex. C (May 27, 2016 Letter).  After more than four years of initial delay, VA published a proposed rule in the Federal Register—one that did little to improve the regulations.  *See* Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471 (July 10, 2020) (to be codified at 38 C.F.R. pt. 3).  Then, after over a year of additional delay, VA issued a "request for information" and held a series of "listening sessions."  Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 86 Fed. Reg. 50513 (proposed Sept. 9, 2021) (to be codified at 38 C.F.R. pt. 3) (announcing listening sessions to be held Oct. 5, 2021, and Oct. 6, 2021, and inviting additional comments due Oct. 12, 2021).  Another two years have elapsed since that second round of public input closed.

Now, nearly **eight years** after Petitioners submitted the Rulemaking Petition, and over **seven years** after it was granted, VA still has not issued a final rule.  This eight-year delay is unreasonable and unlawful.  *See* 5 U.S.C. §§ 555(b), 706(1).  Petitioners accordingly ask the Court to issue a writ of mandamus compelling VA to take final, judicially reviewable agency action resolving this proceeding.  Too many service

members have been denied the benefits they earned and the help they need for far too long.

## JURISDICTION

This Court has exclusive jurisdiction over challenges to VA rulemaking actions. 38 U.S.C. § 502. Moreover, "[b]ecause the Secretary's alleged unlawful withholding of the final rule interferes with [this Court's] jurisdiction pursuant to 38 U.S.C. § 502, [this Court] ha[s] authority under the All Writs Act, 28 U.S.C. § 1651, to address the Secretary's action in failing to issue the final rule." *In re Paralyzed Veterans of Am.* ("*Paralyzed Veterans*"), 392 F. App'x 858, 859–60 (Fed. Cir. 2010); *see also* 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed"); *id.* § 555(b) (requiring resolution of "a matter presented to" an agency "within a reasonable time"); *Telecomms. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 76 (D.C. Cir. 1984) ("Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction.") (citing *Env't Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 593 (D.C. Cir.

1971); *FCC v. Dean Foods Co.*, 384 U.S. 597, 603 (1966)). Under well-settled precedent in this Circuit, "[m]andamus is . . . an appropriate procedural vehicle to address claims of unreasonable delay" by an agency. *Martin v. O'Rourke*, 891 F.3d 1338, 1343 (Fed. Cir. 2018).

## RELIEF SOUGHT

Petitioners seek an order granting this Petition and directing VA to take final, judicially reviewable agency action in response to the Rulemaking Petition within 30 days of this Court's decision. *See, e.g.*, *Paralyzed Veterans*, 392 F. App'x at 861 (directing "the Secretary to issue the final regulation within 30 days of the date of filing of this order"). Petitioners also request that the Court retain jurisdiction over this matter for the purpose of ensuring VA's compliance with the order. *See, e.g.*, *In re Ctr. for Bio. Diversity*, 53 F.4th 665, 673 (D.C. Cir. 2022) ("retain[ing] jurisdiction" to ensure EPA's compliance with court order granting mandamus petition). To be clear, Petitioners are not asking this Court to compel a particular *substantive* outcome with respect to the Rulemaking Petition—but rather request an order directing VA to take *any* final, judicially reviewable action in accordance with its procedural obligations under the Administrative Procedure Act ("APA").

## ISSUE PRESENTED

Whether this Court should issue a writ of mandamus directing VA to take final, reviewable agency action in response to the Rulemaking Petition, which VA has a statutory duty to resolve "within a reasonable time," yet which remains unresolved nearly **eight years** after its submission and over **seven years** after it was ostensibly granted.

## FACTUAL BACKGROUND

### A.    The 2015 Rulemaking Petition

Nearly eight years ago, on December 15, 2015, Petitioners formally asked VA to initiate a rulemaking to correct regulations that cause extreme harm to tens of thousands of this country's most vulnerable former service members.[3]  VA's failure to resolve this Rulemaking Petition in the intervening years, and the ongoing harms to our Nation's former service members stemming from this unlawful delay, necessitated the submission of this Petition seeking a writ of mandamus requiring VA to take judicially reviewable action.

---

[3] As noted above, VA understood that Petitioners were seeking a rulemaking regarding these regulations as early as May 2015, well before the submission of the Rulemaking Petition.  *See supra* at 2.

As explained in the Rulemaking Petition, VA's failure to provide benefits to many service members with less-than-honorable discharges is based on regulations that do not reflect public expectations, harm former service members, and are inconsistent with VA's official and external commitments, stated policy goals, and—most critically—Congress's intent for the statute the regulations purport to implement. *See* Ex. B (Rulemaking Petition). VA's delay in amending the regulatory bars to benefits has left tens of thousands of former service members without the benefits and services that they need and which they have earned through their service and sacrifice.

Only "veterans" qualify for VA benefits. *See* 38 U.S.C. § 101(2). Congress defines "veterans" as former service members "discharged . . . under conditions other than dishonorable," *id*., and specifically excludes former service members who engaged in certain serious misconduct that is enumerated at 38 U.S.C. § 5303. Although no statute defines "dishonorable conditions," the statutory text, statutory framework, and legislative history show that Congress intentionally chose to echo the military's term of art, "Dishonorable discharge," and to invoke the severe

misconduct implied by that term.[4]   In so doing, Congress intended the dishonorable conditions requirement to exclude from benefits only those whose serious criminal behavior merited a punitive dismissal "by reason of the sentence of a general court-martial," 38 U.S.C. § 5303(a), and very few others.[5]   In other words, with few exceptions, Congress authorized VA to exclude from benefits only former service members who received, or could have received, the formal due process of a general court-martial and were discharged with a dishonorable or bad conduct characterization of service.   VA is bound by law to provide benefits to all former service members who neither received nor deserved a dishonorable discharge.

But VA is failing to fulfill its statutory duty and is instead operating under regulations that wrongfully deny benefits to former service members who did not have a punitive discharge and could not have been convicted by a general court martial, given the minor nature of their

---

[4] *See, e.g.*, Adams & Montalto, *supra* note 1, at 88 ("Congress ultimately found that only severe misconduct—behaviors that did or should have led to a Dishonorable discharge—should be disqualifying.").

[5] The limited exceptions include conscientious objectors who refused to perform military duty, wear the uniform, or otherwise comply with lawful orders of competent military authority, prolonged deserters, officers who resign for the good of the service, and individuals who are discharged during a period of hostilities as an alien.   38 U.S.C. § 5303(a).

misconduct. Specifically, VA regulations exclude a much broader group of former service members whose separations were administrative "other than honorable" discharges, most of whom were never afforded judicial due process. *See* Ex. B (Rulemaking Petition). Studies show that some of the most vulnerable groups of service members, including those who experience post-traumatic stress disorder, have incurred traumatic brain injuries, have suffered military sexual trauma, or have experienced discrimination due to race or LGBT status, are among the most likely to receive an administrative OTH discharge, and suffer the additional stigma that such a discharge carries. *See id.* at 2 ("One study showed that Marine Corps combat veterans with PTSD diagnoses were **eleven times** more likely to get misconduct discharges, because their behavior changes made them unable to maintain military discipline."); *id.* at 27 n.111; *id.* at 64–65.

Petitioners are veterans' service organizations that, among other things, work to help former service members gain access to the benefits they have earned. Petitioner Swords to Plowshares, for example, spends nearly $25 million per year to provide supportive housing, health and social services, employment and training, and client support services to

9

veterans. But both Petitioners also expend substantial sums of money and provide extensive pro bono representation to veterans seeking discharge upgrades, as well as "Character of Discharge" determinations and benefits eligibility rulings before VA and the courts—that is time and money that could be better spent providing direct services to veterans, if only VA regulations did not default to excluding former service members with OTH discharges.

Petitioners sought to remedy this problem by formally petitioning VA to fix its broken regulations. To align VA's regulations with Congress' directive to provide former service members with essential and life-saving services, the Rulemaking Petition asks the Department to amend the regulations below as follows:

- 38 C.F.R. § 3.12(a): Reduce the number of service members that are presumptively ineligible by only requiring prior review for those with punitive discharges or discharges in lieu of court-martial.

- 38 C.F.R. § 3.12(d): Adopt standards for "dishonorable conditions" that excludes service members based only on severe misconduct and that considers mitigating circumstances such as behavioral health, hardship service, overall service, and extenuating circumstances.

- 38 C.F.R. § 17.34: Provide tentative eligibility for health care to all who were administratively discharged, who probably have a service-connected injury, or who probably honorably completed an earlier term of service pending eligibility review.

- 38 C.F.R. § 17.36: Ensure that service members seeking health care receive an eligibility review.

Ex. B at 86 (Rulemaking Petition).

The Rulemaking Petition explains the necessity of these changes and how VA's current regulations have created an unacceptable situation for former service members. The regulations are vague, overbroad and leave far too much discretion in the hands of adjudicators. Further, the Congress that passed the G.I. Bill intended for former service members to enjoy the benefit of the doubt, and more recent Congresses have established numerous presumptions favoring veterans (*e.g.*, presumptions favoring service connections for exposure to burn pits, water contamination at Camp Lejeune, and exposure to Agent Orange). Yet the current VA regulations take the exact opposite approach and force former service members with an OTH separation to overcome a presumption that they are *not* entitled to benefits. The combination of an unfair adverse presumption and vague regulations has had disastrous results for former service members, including:

- VA excludes current-era veterans at a higher rate than at any prior era: three times more than Vietnam-era veterans, and four times more than World War II-era veterans. Almost seven percent of post-2001 service members—including at least 30,000 who deployed to a contingency operation—are considered "non-veterans" under VA's existing regulations.

- VA Regional Offices decide that former service members' less-than-honorable—but not dishonorable—discharges are "dishonorable" for VA purposes (and therefore disqualifying) in 90% of cases they review.  Many years, some Regional Offices denied 100% of the cases they reviewed.

- Board of Veterans' Appeals decisions deny eligibility to 81% of veterans reporting post-traumatic stress disorder; 83% of veterans with hardship deployments, including during Operation Enduring Freedom (Afghanistan), Operation Iraqi Freedom, and Vietnam; and 77% of veterans with combat service.

- Veterans who are awarded their due benefits following a review must wait, on average, over three years for the review to be completed *before* they receive any benefits.

- Former enlisted Marines are ten times more likely to be excluded from VA services than former Airmen, even when they have equivalent performance and discipline histories.

- Over 120,000 post-2001 veterans have not received an eligibility review and are therefore ineligible by default.

- Veterans who are presumptively excluded under VA's current regulations because of a less-than-honorable discharge are twice as likely to die by suicide, twice as likely to be homeless, and three times as likely to be involved in the criminal justice system than other veterans.

- Internal emails acquired though Freedom of Information Act requests confirm that even VA employees recognize that the system for adjudicating eligibility applications is broken.  Upon discovering that there were over 7,805 pending applications, one VA employee commented, "It is crazy that we just sit on these."[6]  Another employee, reacting to Petitioners' written comments, claimed

---

[6] *See* Ex. D.

defensively that veterans in immediate need of services are only forced to wait, on average, about ***800 days*** for an adjudication.[7]

The record before the VA indicates that the bar to benefits for "willful and persistent misconduct" in 38 C.F.R. § 3.12(d) is especially harmful. The vague terminology invites VA adjudicators to deny benefits even in the cases of very minor misconduct. Worse, the bar is often treated as disjunctive, with adjudicators regularly blocking access to benefits if they find conduct to have been willful *or* persistent, in effect requiring an "honorable" or "general under honorable conditions separation," thereby transforming the regulatory bars into the very standard that Congress expressly rejected. During the VA's on-the-record listening sessions held in October 2021, Maureen Siedor, legal director for Petitioner Swords to Plowshares, shared a story highlighting this problem:

> I have a client who was diagnosed with mouth cancer on active duty. Part of his cheek had to be removed. He tested positive one time for marijuana use and received an OTH discharge.
>
> The VA's decision letter cited only that single non-judicial punishment, yet denied his COD under the willful and persistent misconduct bar.

---

[7] *See* Ex. E ("The correct processing time as provided to me during Wednesday's meeting by [redacted] is approximately 800 days.").

Veterans Benefits Admin., Bars to Benefits Based on Character of Discharge, Public Listening Session Tr. at 70:8-15 (Oct. 6, 2021).

Another commenter, Mikayla Pentecost of the Veterans Legal Assistance Program at Legal Aid of Sonoma County, shared the story of a client whom she called simply "John" to protect his privacy. John was sexually assaulted by two other service members shortly after arriving at his first duty station. When he tried to report the assaults, he was advised "to never mention the incident again." John sought mental health counseling for symptoms resulting from this trauma, but struggled to cope with what had happened. In one moment of frustration, he ripped a sheet of paper in half in front of a superior. Later, while experiencing suicidal ideation, John left without authorization to seek emergency support. When he voluntarily returned shortly thereafter, he was charged with insubordination and destruction of property for the paper-tearing incident months earlier, as well as multiple charges related to the AWOL offense. He was separated with an OTH discharge. "Cut off from the VA services and benefits he so desperately needed to begin to heal from his trauma, John has experienced poverty and homelessness for the last two decades." *Id.* at 100–104. Although he was

charged for only two incidents (the paper-tearing incident and an AWOL incident that, at two weeks, fell 166 days shy of the statutory 180-day AWOL bar to benefits Congress established at 38 U.S.C. § 5303(a)), John was repeatedly denied VA benefits because adjudicators decided that the number of misconduct specifications with which he had been charged for those two incidents amounted to willful and persistent misconduct.

### B.    VA's 2016 Grant of the Rulemaking Petition

In its May 27, 2016 letter, VA agreed to reexamine these regulations and granted the Rulemaking Petition. Ex. C (May 27, 2016 Letter). The letter expressly acknowledged that the Rulemaking Petition raised a number of issues requiring corrective action by VA. For instance, the letter confirmed that VA's Veterans Benefits Administration "agrees that rulemaking is necessary" to amend certain key limitations on benefits in 38 C.F.R. § 3.12, and pledged that VA "will initiate rulemaking proceedings to update and clarify policies in these areas." *Id.* at 1. The letter also stated that VA's Veterans Health Administration "agrees that [38 C.F.R.] § 17.34 could be improved" to expand tentative eligibility for benefits, and similarly committed that "VA will initiate rulemaking proceedings to clarify and expand the regulations governing

tentative eligibility." *Id.* VA also "agree[d] to pursue rulemaking to clarify how requests for administrative determinations are made" under 38 C.F.R. § 17.36. *Id.* at 2.[8] Years later, in its notice of proposed rulemaking, VA acknowledged that the need to update its outdated regulations was particularly glaring, since "paragraph (d) [of 38 C.F.R. § 3.12] has not been updated since 1980." Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. at 41473.

## C. Years and Years of Continued Delay by VA

More than seven years after VA's letter granting the Rulemaking Petition, acknowledging that changes to its regulations are "necessary," and committing to pursue reforms, VA ***still*** has not taken any final agency action in this proceeding—whether that be a final rule amending

---

[8] The Department has been aware of the need for formal rulemaking to address some of the issues raised in the Rulemaking Petition for *nearly two decades*. For example, as Petitioners noted in their December 19, 2019 letter, the Department issued a proposed rule in 2004 that, had it been adopted, would have partially addressed the deficiencies of 38 C.F.R. § 3.12(d)(5). *See* Ex. F (Dec. 12, 2019 Letter) (citing Service Requirements for Veterans, 69 Fed. Reg. 4820, 4827–28 (proposed Jan. 30, 2004)). This regulation—which unconstitutionally targets "homosexual acts involving aggravating circumstances"—is a relic of a rule drafted in 1946 targeting *all* "homosexual acts or tendencies." *Compare* Pensions, Bonuses, & Veterans' Relief, 11 Fed. Reg. 8729, 8731 (Aug. 13, 1946) (codified at 38 C.F.R. § 2.1064(d) (1946)), *with* 38 C.F.R. § 3.12(d)(5) (2019).

its regulations or any other judicially reviewable action. All the while, the former service members described in the Rulemaking Petition continue to face significant harm under VA's current regulations.

Indeed, it took years for VA even to ***propose*** amendments to its regulations, and it did so only after prodding by Petitioners. In a December 12, 2019 letter, Petitioners reiterated the importance of addressing these issues promptly and requested that VA either publish a proposed rule or indicate that a proposed rule was imminent. Ex. F (Dec. 12, 2019 Letter). In its February 5, 2020 response, VA stated it "fully intends to publish a rule," and would provide Petitioners an update regarding the Rulemaking Petition's status in sixty days. Ex. G (Feb. 5, 2020 Response Letter). VA finally published a proposed rule on July 10, 2020, albeit one that did little to ameliorate the harm VA's regulations caused to former service members and fell far short of aligning VA regulations with statutory law. *See* Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471.

Comments responding to the proposed rule confirmed to the VA the proposed rule's numerous and substantial shortcomings. Precisely one year and one day after the comment period closed on the proposed rule,

VA announced a request for information and a series of listening sessions to further inform development of a final rule "[d]ue to the various and differing comments received."  Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 86 Fed. Reg. 50513.  The listening sessions were held on October 5 and 6, 2021, and written comments were due by October 12, 2021.  The listening sessions revealed overwhelming support for removing VA's regulatory bars to benefits and aligning VA policy with the law as Congress had intended.  Nevertheless, two years after this second round of public input, VA has taken no final, reviewable action.  Both comment periods, combined, resulted in fewer than 120 comments for VA to review.

Throughout the process, Petitioners have worked in good faith to help VA with its rulemaking.  Petitioners met with VA personnel in May 2015 to present their Rulemaking Petition, then again on March 12, 2020, to discuss the status of the rulemaking.  On August 21, 2023, Petitioners requested a meeting with VA Secretary McDonough to further discuss the importance of this rulemaking and what might be done to reach final resolution of the Rulemaking Petition.  The Secretary declined the request on September 19, 2023.

Petitioners have also provided extensive written commentary and advice to assist VA's effort, including the original petition, which was accompanied by a presentation and report detailing the urgency of the issue, comments on the regulatory docket submitted on September 8, 2020, and October 12, 2021, and letters to VA sent on December 12, 2019, February 10, 2021, and July 8, 2022. Exs. B, G–K.  Through these and other efforts, Petitioners have worked to support VA's effort by providing substantive policy analysis, firsthand accounts of the impact VA's ill-conceived regulations have had on former service members, legal research to support issuance of a final rule, and any other information that VA has indicated could be helpful or that Petitioners have believed could be beneficial.  Unfortunately, VA has continued to drag its feet; nearly eight years after the formal Rulemaking Petition was filed and more than seven years after it was granted, VA has still not promulgated a final rule.

Meanwhile, VA continues to exclude tens of thousands of former service members with less-than-honorable discharges from the life-saving benefits to which they should be entitled.  These former service members "are substantially more likely to die by suicide, become

homeless, or be imprisoned." Ex. F (Dec. 12, 2019 Letter). Despite recognizing this suffering, publicly committing to reducing veteran homelessness and suicide, and granting the Rulemaking Petition, VA still has nothing to offer these former service members but indefinite delay. *Pledging* action is not *taking* action, and final agency action from VA is long overdue. Far too many who served our country have been denied life-saving benefits while VA spent the better part of a decade dithering; untold numbers have died waiting for VA to act, denied the benefits they earned and even their treasured status as "veterans."

## ARGUMENT

Mandamus is appropriate where (1) "the party's right to the writ [is] 'clear and indisputable," (2) there are "'no other adequate means' to obtain the desired relief," and (3) the court is "'satisfied that the writ is appropriate under the circumstances."" *Mote v. Wilkie*, 976 F.3d 1337, 1342 (Fed. Cir. 2020) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004)); *see also In re Ctr. for Bio. Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022). The third prong, often described as an inquiry into whether egregious delay constitutes compelling equitable grounds for mandamus, is evaluated in the Federal Circuit based on the six-part

"*TRAC*" test. *Martin*, 891 F.3d at 1344–45, 1348 (citing *TRAC*, 750 F.2d at 79–80). Each of these elements is satisfied here.

## I. VA VIOLATED ITS CLEAR AND UNDISPUTABLE LEGAL DUTY TO CONCLUDE THE RULEMAKING PROCEEDING.

Petitioners' "right to the relief sought is 'clear and undisputable.'" *Paralyzed Veterans*, 392 F. App'x at 860 (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980)). Under the APA, "each agency shall proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b); *see also id.* § 706(1) (empowering courts to "compel agency action unlawfully withheld or unreasonably delayed"). "This has been interpreted to mean that an agency has a duty to fully respond to matters that are presented to it under its internal processes." *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (citing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)). A "petition [for rulemaking] is such a matter." *Id.* at 785. And to "'conclude [the] matter'" as the APA requires, VA "must enter a final decision subject to judicial review" within that reasonable time. *Id.* (citing 5 U.S.C. § 555(b)); *see also id.* ("The agency does not comply with that duty merely by beginning an appropriate proceeding." (citation omitted)).

This crystal-clear legal duty to take final, reviewable agency action in response to a rulemaking petition within a reasonable time arises even absent any formal acknowledgment of the petition by the agency. For example, the D.C. Circuit concluded that the Federal Energy Regulatory Commission ("FERC") was required to act on a petition that it had otherwise ignored. *See In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 418 ("FERC's insistence that it is not obligated to address a petition filed under one of its own regulations allowing requests for discretionary action . . . is without merit. Under the APA a federal agency is obligated to 'conclude a matter' presented to it 'within a reasonable time'[.]" (citing 5 U.S.C. § 555(b))).

Similarly, the Northern District of California found a clear duty to act in *Earth Island Institute v. Regan*, where the EPA neither granted nor denied a petition for rulemaking but *did* indicate that it intended to take action along the lines proposed and even issued a proposed rule. 553 F. Supp. 3d 737, 748–49 (N.D. Cal. 2021). The court concluded that, "having chosen to consider and issue the Proposed Rule to amend Subpart J of the NCP, the EPA came under duty to take final action on the Proposed Rule within a reasonable time." *Id*. at 749 (citing 5 U.S.C.

§ 555(b)).  "Once an agency decides to take a particular action, a duty to do so within a reasonable time is created."  *Id*. (quoting *Pub. Citizen Health Rsch. Grp. v. Comm'r, Food & Drug Admin.*, 724 F. Supp. 1013, 1020 (D.D.C. 1989)).

The duty to act within a reasonable timeframe is even more obvious where, as here, the agency has explicitly granted the rulemaking petition and committed to resolving it.  *See, e.g.*, *In re A Cmty. Voice*, 878 F.3d at 785 ("EPA granted this petition for a rulemaking, though not promising a specific timeline or to specifically adopt the outcome offered by the Petitioners.  Under these circumstances, EPA is under a clear duty to act.").   In this case, VA expressly granted Petitioners' Rulemaking Petition in 2016 and pledged to pursue regulatory reforms it conceded were "necessary," Ex. B, and then published a proposed rule (however substantively problematic it may have been) in 2020, *see* Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, 85 Fed. Reg. 41471.   VA thus has a clear legal duty to conclude the rulemaking and take final, reviewable action within a reasonable time— a duty that VA has plainly failed to meet.

## II. PETITIONERS HAVE NO OTHER MEANS OF ADEQUATE RELIEF.

This request for mandamus is Petitioners' only adequate means of obtaining relief.   As an initial matter, the problems raised in the Rulemaking Petition stem solely from VA's unwise regulations, and only VA, through the formal administrative rulemaking process, can amend or withdraw those regulations.   *See supra* at 8–15; *see also* Ex. B (Rulemaking Petition).   The governing statute certainly does not strip former service members of their VA benefits eligibility based on an administrative OTH discharge; to the contrary, Congress intended VA to serve nearly all such former service members.   Final, reviewable agency action addressing the regulatory issues raised in the Rulemaking Petition can come only from VA.

Moreover, Petitioners' repeated efforts to spur VA into action without resorting to mandamus relief have been unsuccessful.   As noted above, Petitioners have made several submissions over the years aimed at providing VA with substantive input to conclude this proceeding, and have reached out to VA regarding the status of this proceeding on numerous occasions.   *See supra* at 18–19.  When Petitioners inquired in August 2023 about scheduling a meeting with the Secretary about

24

resolving this proceeding, VA declined the request.  *See supra* at 19.  In the face of VA's egregious delay in resolving the Rulemaking Petition, Petitioners have no choice but to seek a judicial order directing VA to conclude this proceeding through final, reviewable action.

The Federal Circuit has acknowledged that, where a Petitioner seeks to end the unlawful withholding of final agency action in a rulemaking proceeding, there is no adequate alternative but to seek mandamus.  For example, when the petitioners in *Paralyzed Veterans* sought to compel final agency action in a rulemaking proceeding regarding exposure to herbicides in Vietnam, this Court held that the requirement that there be "no alternative means of obtaining the relief desired" was "clearly satisfied."  392 F. App'x at 859–60.  Just as in this case, the petitioners there sought to "compel the Secretary to cease what they allege is an unlawful agency action," specifically, unlawfully withholding a final rule.  *Id*. at 860.  "Mandamus is clearly the only avenue for the petitioners to obtain such relief."  *Id*.

## III.  VA'S YEARS-LONG DELAY IS EGREGIOUS AND MERITS MANDAMUS.

The final factor in the mandamus inquiry is whether "the writ is appropriate under the circumstances," *Mote*, 976 F.3d at 1342 (citation

omitted), an inquiry that examines "whether the agency's delay is so egregious as to warrant mandamus," *In re Ctr. for Bio. Diversity*, 53 F.4th at 670 (quoting *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)). This inquiry, in turn, is "guided by the standard announced in *TRAC*." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 418. The six factors outlined in *TRAC*, 750 F.2d at 79–80, and adopted by this Court in *Martin*, 891 F.3d at 1344–45, are as follows:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";

> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

> (6) the court need not find "any impropriety lurking behind agency lassitude" in order to hold that agency action is unreasonably delayed.

*Id.* (quoting *TRAC*, 750 F.2d at 79–80). Four of the *TRAC* factors strongly support judicial intervention, two factors are neutral or inapplicable, and none supports inaction.

### A. The First, Third, Fourth, and Fifth *TRAC* Factors Strongly Support Mandamus.

The first *TRAC* factor weighs heavily in favor of mandamus, as the VA's years-long delay goes far beyond any meaningful "rule of reason." The length of the agency's delay "is considered to be the most important factor in some circuits." *Martin*, 891 F.3d at 1345 (citing *In re A Cmty. Voice*, 878 F.3d at 786); *see also In re Core Commc'ns, Inc.*, 531 F.3d at 855 ("The first and most important factor is that 'the time agencies take to make decisions must be governed by a "rule of reason."'" (quoting *TRAC*, 750 F.2d at 80)); *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) ("The most important *TRAC* factor is the first factor, the rule of reason." (internal citations and quotation marks omitted)). Courts considering this factor widely agree that "a reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419 (quoting *Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir. 1987)); *see also, e.g., In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1139 (collecting cases). Here,

VA has failed to issue a final rule for the better part of a decade—nearly **eight years** since Petitioners submitted their formal Rulemaking Petition, and over **seven years** since VA granted the request for a rulemaking.

Courts nationwide routinely find comparable or even shorter delays to be "egregious." *See, e.g.*, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419 ("FERC's six-year-plus delay is nothing less than egregious."); *id.* at 419 n.12 (collecting cases in the D.C. Circuit finding delays of three, four, and five years to be unreasonable); *In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1139 ("On this issue, the more developed law of the District of Columbia Circuit has held that a six-year-plus delay is nothing less than egregious. Our own case law is no different.") (internal quotations and citations omitted) (collecting cases); *In re A Cmty. Voice*, 878 F.3d at 787 (delay "into its eighth year" is egregious); *Earth Island Inst.*, 553 F. Supp. 3d at 741, 752 (delay is egregious and violates 5 U.S.C. § 555(b) where the agency "failed to conclude the rulemaking process . . . more than five (now six) years since it accepted [plaintiff's] supplemental petition for rulemaking, and more than seven (now eight) years since [plaintiff's] initial petition for rulemaking").

Nor is it any excuse to say that VA published a proposed rule or has otherwise made halting efforts on this issue. Courts that have considered similar delays have "found egregious delay even though the '[agency] appears to have done some work.'" *In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1140 (quoting *In re A Cmty. Voice*, 878 F.3d at 783). This is not a particularly complex rulemaking; there have been fewer than 120 comments submitted across two comment periods, and the best answer— ensuring that all of the former service members Congress intended to cover have access to VA benefits—is clear. There is no excuse for VA's ongoing delay.

The third *TRAC* factor likewise militates strongly for judicial intervention, as VA's unreasonable delay in resolving this rulemaking on benefits eligibility directly impacts "human health and welfare." *See Martin*, 891 F.3d at 1346 ("Veterans' disability claims always involve human health and welfare." (citing *TRAC*, 750 F.2d at 80)). And this rulemaking is not just about one disability claim; the VA regulations at issue prevent **tens of thousands** of former service members who apply for vital health benefits from obtaining them, jeopardizing the health and

welfare of men and women who wore the uniform of our country.[9]  These

benefits include health care, supportive housing, disability

compensation, etc., for some of our most vulnerable former service

members—disproportionately, individuals with significant mental

health challenges like PTSD or TBI incurred during their service.  These

former service members "are twice as likely to die by suicide, twice as

likely to be homeless, and three times as likely to be involved in the

criminal justice system" than other veterans.  Ex. B at 2 (Rulemaking

Petition).  While VA has delayed, former service members have suffered

and died for lack of healthcare, shelter, counseling, and other services

that VA is duty bound to provide.  Further delay only adds to the ranks

of the fallen.

---

[9] The number of former service members with OTH discharges who do not even pursue benefits in light of VA's regulatory bars is far higher. Over 100,000 post-9/11 former service members who received less-than-honorable discharges are denied the status of "veteran," and the benefits that come with that status, by default. *See* Adams & Montalto, *supra* note 1, at 130.  "There are real consequences to a denial of 'veteran' status—to the individual servicemember who cannot get healthcare or disability support, to the servicemember's family who must pick up the slack, and to our society which is losing promising young men and women to unemployment, homelessness, and suicide." *Id.* at 139.

The fourth *TRAC* factor, the effect of expediting delayed action on other priorities, also supports mandamus. There is no reason to believe that competing priorities would suffer. As noted above, this is a simple rulemaking that has required VA to review fewer than 120 comments; these comments overwhelmingly supported Petitioner's position on reform. VA has had eight years to contemplate Petitioners' proposals, has had three years to contemplate its own proposed rule, and has a number of options for agency action available, including Petitioners' proposal, VA's own proposed rule, and the various alternatives and suggested revisions to the proposed rule that have been on file as comments for years.

VA is well aware that the current rules unreasonably deny crucial benefits, including health care and disability compensation, to former service members; after all, VA granted the Rulemaking Petition over seven years ago. Petitioners reminded VA in their December 12, 2019 letter that "the effect of continued inaction may be that more veterans could lose their housing, their freedom, or even their lives while this rule is pending." Ex. F at 2 (Dec. 12, 2019 Letter). Impacted former service members continue to suffer the effects of being denied benefits, ranging

31

from experiencing substantially higher suicide rates than either veterans generally or the American population at large, to enduring the indignity of not being considered "veterans" by the VA despite their service. There is simply no rational justification to delay any further such a simple, yet important rulemaking—especially when it supports VA's core mission of serving veterans and could align VA's regulations with statutory law—in favor of competing priorities when this rulemaking has stagnated for eight years.

The fifth *TRAC* factor, the nature of the interests prejudiced by delay, strongly supports mandamus for many of the same reasons that the third *TRAC* prong does. The interests prejudiced by VA's inaction are of the utmost importance: the health and safety of tens of thousands who served this country, ensuring our former service members receive the benefits and status that they've earned, VA's compliance with its statutory duty to provide services and benefits to former service members, and aligning VA's regulations with the governing statutes and Congress's intent. Further delay will only exacerbate the harms to these critical interests.

## B.    The Remaining *TRAC* Factors Are Neutral, And None Undercuts Mandamus.

The second and sixth *TRAC* factors are inapplicable and certainly do not cut against granting mandamus in this case.  On the second factor, courts have made clear that where, as here, there is no specific statutory deadline for agency action beyond the APA's requirement that it be concluded "within a reasonable time," 5 U.S.C. § 555(b), courts will apply the APA's requirement and grant mandamus where the agency's delay is unreasonable.  *See, e.g.*, *In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1140 (finding that the absence of a "specific timetable" set out by statute means only that the APA's "reasonable time" standard applies) (citing 5 U.S.C. § 555(b)).

Finally, the sixth *TRAC* factor is of no effect, since a "writ may be appropriate under the *TRAC* analysis even where there is no evidence of bad faith." *Martin*, 891 F.3d at 1348 (citing *In re A Cmty. Voice*, 878 F.3d at 787); *see also In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1140–41 ("The . . . sixth factor[ ] merit[s] little discussion . . . because there is no dispute that 'the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.'") (quoting *TRAC*, 750 F.2d at 79–80).

33

\*          \*          \*

In sum, the first (and most important) *TRAC* factor, along with the third, fourth, and fifth all strongly support a finding that VA's delay is egregious and mandamus is appropriate.  The second and sixth *TRAC* factors are neutral.  No factor weighs against mandamus.  Thus, applying the *TRAC* analysis, "the agency's delay is so egregious as to warrant mandamus."  *See In re Ctr. for Bio. Diversity*, 53 F.4th at 670 (quoting *In re Core Commc'ns, Inc.*, 531 F.3d at 855).

## CONCLUSION

Because VA has violated its clear legal duty to conclude its rulemaking within a reasonable time, Petitioners have no other adequate means to obtain relief, and VA's delay is so egregious as to merit mandamus, the Court should grant the requested writ of mandamus and compel VA to take final, judicially reviewable action in response to the Rulemaking Petition within 30 days of this Court's decision.

Dated:  October 24, 2023

Of Counsel:

Ryan T. Giannetti
James A. Darlson
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
Ryan.Giannetti@lw.com
J.D.Darlson@lw.com

Daniel L. Nagin
Dana Montalto
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 390-2560
dnagin@law.harvard.edu
dmontalto@law.harvard.edu

Alexander L. Stout
ZWILLGEN PLLC
1900 M Street NW
Suite 250
Washington, DC 20036
(202) 296-3585
Alex.Stout@awillgen.com

Respectfully submitted,

 */s/* Matthew T. Murchison
Matthew T. Murchison
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
Matthew.Murchison@lw.com

*Counsel for Petitioner*

# EXHIBIT M

NOTE:  This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**In Re SWORDS TO PLOWSHARES, NATIONAL VETERANS LEGAL SERVICES PROGRAM,**
*Petitioners*

———————————

2024-104

———————————

On Petition for Writ of Mandamus to the Department of Veterans Affairs.

———————————

**ON PETITION**

———————————

Before LOURIE, PROST, and STOLL, *Circuit Judges*.

PER CURIAM.

# O R D E R

Petitioners, Swords to Plowshares and the National Veterans Legal Services Program, seek a writ of mandamus directing the Department of Veterans Affairs ("DVA") to take final agency action in its ongoing rulemaking proceedings to update and clarify existing regulations regarding eligibility for benefits based on character of discharge. The Secretary of Veterans Affairs opposes.

Because the Secretary's alleged failure to timely issue a final rule interferes with our jurisdiction to review the rule pursuant to 38 U.S.C. § 502, we have authority to

review petitioners' allegations of unreasonable delay under the All Writs Act, 28 U.S.C. § 1651. *See* 5 U.S.C. § 706(1); *In re A Cmty. Voice*, 878 F.3d 779, 783 (9th Cir. 2017); *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984); *In re Paralyzed Veterans of Am.*, 392 F. App'x 858, 860 (Fed. Cir. 2010). However, mandamus is "reserved for extraordinary situations," *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988), where, *inter alia*, the right to issuance of the writ is clear and indisputable and issuance of the writ is appropriate under the circumstances. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004).

We are certainly troubled by the amount of time it has taken the DVA to conduct these rulemaking proceedings.[*] Nevertheless, the DVA has now submitted final amended rules to the Office of Information and Regulatory Affairs for review, and the Secretary represents to this court in his response that 150 days would be sufficient to finalize the rulemaking process. *See* Resp. at 24. We conclude that it is proper under these circumstances to deny the petition without prejudice to petitioners again seeking mandamus relief if the DVA should fail to take final action by April 15, 2024, by which time we fully expect final action to be completed.

Accordingly,

---

[*]     The DVA initiated these rulemaking proceedings in 2016. It published a proposed rule in 2020. Based on more than 70 comments received, the DVA issued a request for information in 2021. And since that time, the DVA states that it has gathered information, held listening sessions, drafted multiple versions of the rule, conducted inter-agency meetings, received and evaluated feedback, and recommended its course of action to the Secretary.

IN RE: SWORDS TO PLOWSHARES                            3

IT IS ORDERED THAT:

The petition is denied.

FOR THE COURT

February 5, 2024
Date

Jarrett B. Perlow
Clerk of Court

# EXHIBIT N

2024-104

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

IN RE SWORDS TO PLOWSHARES AND THE NATIONAL VETERANS
LEGAL SERVICES PROGRAM,
Petitioners.

PETITION FOR WRIT OF MANDAMUS
TO THE DEPARTMENT OF VETERANS AFFAIRS

RESPONSE BRIEF OF THE SECRETARY OF VETERANS AFFAIRS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ERIC P. BRUSKIN
Assistant Director

OF COUNSEL:

BRIAN D. GRIFFIN
Deputy Chief Counsel

JONATHAN KRISCH
Attorney
Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC  20420

MEREDYTH COHEN HAVASY
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC  20044
Telephone: (202) 305-2951

November 8, 2023

*Attorneys for the
Secretary of Veterans Affairs*

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................ i

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF THE CASE...................................................................... 1

    I.    Background ........................................................................... 1

ARGUMENT ............................................................................................ 10

    I.    Jurisdiction And Standard Of Review.................................... 10

    II.    Petitioners Fail To Demonstrate A Clear And Indisputable Right To The Writ................................................................................ 12

    III.    The *TRAC* Factors Analysis Weighs Against The Writ Being Appropriate Under The Circumstances.............................. 15

        A.    The First *TRAC* Factor Weighs Against Mandamus ............... 15

        B.    The Second *TRAC* Factor Weighs Against Mandamus........... 19

        C.    The Third and Fifth *TRAC* Factors Weigh Against Mandamus ................................................................................ 19

        D.    The Fourth *TRAC* Factor Weighs Against Mandamus............ 21

        E.    The Sixth *TRAC* Factor Is Neutral As To Mandamus ............. 22

    IV.    Issuance Of The Writ Is Not Warranted Under The Circumstances . 23

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Air Line Pilots Ass'n, Intern. v. Civil Aeronautics Bd.*,
    750 F.2d 81 (D.C. Cir. 1984) ........................................ 18, 25

*Cheney v. United States Dist. Ct. for Dist. of Columbia*,
    542 U.S. 367 (2004) ............................................................11

*Garvey v. Wilkie*,
    972 F.3d 1333 (Fed. Cir. 2020) ............................... 4, 13, 14

*In re A Cmty. Voice*,
    878 F.3d 779 (9th Cir. 2017) ...................................... 12, 13

*In re Am. Rivers and Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) ................................... passim

*In re Int'l Chemical Workers Union*,
    958 F.2d 144 (D.C. Cir. 1992) .................................... 18, 25

*In re Nat. Res. Def. Council, Inc.*,
    956 F.3d 1134 (Ninth Cir. 2020) .......................................19

*In re Paralyzed Veterans Of Am.*,
    392 F. App'x 858 (Fed. Cir. 2010) ...................................10

*In re Stingray IP Sols., LLC*,
    56 F.4th 1379 (Fed. Cir. 2023) .........................................11

*Kerr v. United States Dist. Court for Northern Dist. of California*,
    426 U.S. 394 (1976) ............................................................10

*Kimmel v. Sec'y of Veterans Affairs*,
    No. 22-1754, 2022 WL 14319044 (Fed. Cir. Oct. 25, 2022) .............................25

*Martin v. O'Rourke*,
    891 F.3d 1338 (Fed. Cir. 2017) ................................. passim

*Norton v. S. Utah Wilderness,*
   *All.*, 542 U.S. 55 (2004) ............................................................ 12, 13

*Public Citizen Health Research Group v. Brock*,
   823 F.2d 626 (D.C. Cir. 1987) .............................................. 17, 18, 25

*Telecommunications Research and Action Center v. Federal Communications Commission*,
   750 F.2d 70 (D.C. Cir 1984) ...................................................... passim

### STATUTES

5 U.S.C. § 555(b) ...............................................................................11

5 U.S.C. § 706(1) ......................................................................... 11, 12

28 U.S.C. § 1651(a) ...........................................................................10

38 U.S.C. § 101(2) .............................................................................14

38 U.S.C. § 502 ..................................................................................10

38 U.S.C. § 1720D .............................................................................21

38 U.S.C. § 1720I ............................................................................4, 20

38 U.S.C. § 1720J ..............................................................................20

38 U.S.C. § 5303 ....................................................................... 4, 13, 14

38 U.S.C. § 5303(a) .............................................................................4

Sergeant First Class Heath Robinson Honoring our Promise to Address
   Comprehensive Toxics Act of 2022, Pub. L. 117-168 (PACT Act) ...................8

# REGULATIONS

38 C.F.R. pt. 3 .......................................................................................3, 5

38 C.F.R. § 3.12 ............................................................................ passim

38 C.F.R. § 3.12(a) ......................................................................................1

38 C.F.R. § 3.12(c) ......................................................................................4

38 C.F.R. § 3.12(d) ....................................................................... passim

38 C.F.R. § 3.360 .....................................................................................20

38 C.F.R. § 3.400 .....................................................................................18

38 C.F.R. § 17.34 ...................................................................................1, 4

38 C.F.R. § 17.34(b) ...................................................................................1

38 C.F.R. § 17.34(d) ...................................................................................1

38 C.F.R. § 17.36 ........................................................................................4

Update and Clarify Regulatory Bars to Benefits Based on Character Of
Discharge
   85 Fed. Reg. 41471 (July 10, 2020) ........................................................3

Update and Clarify Regulatory Bars to Benefits Based on Character Of
Discharge
   86 Fed. Reg. 50513 (Sept. 9, 2021) ........................................................5

# EXECUTIVE ORDERS

Exec. Order No. 12866
   58 Fed. Reg. 51,735 (Sept. 30, 1993) ....................................... 2, 23, 24

Exec. Order No. 13893 ...............................................................................2

iv

# OTHER AUTHORITIES

OMB Memorandum M-05-13 (2005) ........................................................................2

https://www.regulations.gov/document/VA-2020-VBA-0018-0001/comment

....................................................................................................................5

https://www.regulations.gov/document/VA-2020-VBA-0018-0010/comment

....................................................................................................................5

https://www.regulations.gov/document/VA-2020-VBA-0018-0067/comment

....................................................................................................................5

https://www.regulations.gov/document/VA-2020-VBA-0018-0076/comment

....................................................................................................................6

https://news.va.gov/press-room/more-than-1-million-benefits-claims-under-the-
pact-act/ ...........................................................................................................
....................................................................................................................21

VA Notice 22-15 (Sept. 15, 2022) (available at
https://www.va.gov/vapubs/viewPublication.asp?
Pub_ID=1396&FType=2) ................................................................................7, 8

Pursuant to this Court's October 25, 2023 order (ECF 4), the Secretary of

Veterans Affairs (Secretary), respectfully submits this response to petitioners'

petition for a writ of mandamus.

## STATEMENT OF THE CASE

On October 25, 2023, petitioners filed a petition for a writ of mandamus

requesting that this Court order the Department of Veterans Affairs (VA) to take

final agency action regarding proposed revisions to its Character of Discharge

regulations within 30 days.  Petitioners' Petition for Writ of Mandamus (Pet.) at 2,

5.  Petitioners allege "egregious delay" by the VA in resolving a rulemaking

petition that was filed in 2015.  Pet. at 1.  As established below, petitioners have

not met the stringent requirements for issuance of the writ.

I.    Background

In June 2015, petitioner Swords to Plowshares (STP) contacted the VA to

suggest proposed revisions to eligibility criteria for servicemembers discharged for

misconduct.  Pet. Ex. A.  The following month, VA responded that it would

evaluate STP's proposals and respond following evaluation.  *Id.*

In December 2015, STP filed a formal petition asking VA to amend its

regulations at 38 C.F.R. §§ 3.12(a), 3.12(d), 17.34, and 17.36(d) regarding

eligibility for benefits based on character of discharge (COD).  Pet. Ex. B.  STP

argued that VA's regulations precluded too many former servicemembers with

1

"other than honorable" (OTH) discharges from receiving VA services.  *Id.*  STP further asserted that the regulations contravened Congress' intent to exclude only those former servicemembers who were dishonorably discharged or whose conduct would merit a dishonorable discharge.  *Id.*

On May 27, 2016, VA responded in a letter to STP stating that it would initiate rulemaking proceedings to update and clarify its COD policies.  VA particularly agreed that rulemaking was necessary concerning the definitions of "moral turpitude" and "willful and persistent misconduct," (38 C.F.R. § 3.12(d)(3)-(4)) and that it would re-examine the language of 38 C.F.R. § 3.12(d)(5).  Pet. Ex. C.  VA also agreed to initiate rulemaking proceedings to "clarify and expand the regulations governing tentative eligibility" and the health care enrollment process. *Id.*

The Veterans Benefits Administration (VBA) drafted a proposed rule in late 2016 and obtained certain internal concurrences in 2017, but VA was unable to move forward with the rule because "its projected cost (in the tens of billions over 5 years) necessitate[d] further exploration of alternatives and the cost-effectiveness of available approaches."  Pet. Ex. G (citing Exec. Order No. 12866, §§ 1(b)(5)-(6), 4(c)(1)(B), 6(a)(3)(C); Exec. Order No. 13893, §§ 1,2, 5; OMB Memorandum M-05-13 (2005)).

Between 2018 and 2020, VBA drafted an alternative proposed rule, obtained internal concurrences, and moved the rule to the Office of Management and Budget (OMB).  Declaration of Michael J. Frueh (Frueh Decl.) at ¶ 4 (Exhibit A attached).  The alternative proposed rule necessitated new costing data, so VA went through the process of data requests and analysis meetings to secure reliable costing data for the new course of action.  *Id.*

During this time, VA kept STP apprised of the status of the rulemaking.  By letter dated February 5, 2020, VA informed petitioners that VBA was "currently [] finalizing a revised and updated costing" and "pledged to prioritize completion of the costing and issuance of this rule."  Pet. Ex. G.  VA met with petitioners in March 2020, expressed its commitment to this rulemaking, entertained petitioners' arguments on COD issues, and committed to providing STP with regular status updates.  Respondent's Exhibit (Resp. Ex.) B.  From April through June 2020, VA provided petitioners with periodic status reports on the rulemaking.  Resp. Ex. B-E. In April, VA indicated that the rule was in the "late stages of the VA Central Office concurrence process" and was expected to go to OMB within a week.  Resp. Ex. B.  In May, VA stated that the proposed rule had been forwarded to OMB. Resp. Ex. C.

On July 10, 2020, VA formally issued its proposed rule (AQ95) in the Federal Register.  Update and Clarify Regulatory Bars to Benefits Based in

Character of Discharge, 85 Fed. Reg. 41471 (July 10, 2020) (to be codified at 38

C.F.R pt. 3).  VA proposed to modify the definitions of "willful and persistent

misconduct," and "moral turpitude," and to change the term "homosexual" to

"sexual" in § 3.12(d)(5).  *Id*. at 41473.  VA also proposed to extend a "compelling

circumstances" exception to certain regulatory bars to benefits to ensure fair COD

determinations in light of all pertinent factors.  *Id.*  VA proposed changes to 38

C.F.R. § 3.12, but not to 38 C.F.R. §§ 17.34 or 17.36 because it was still

considering those provisions in light of the enactment of 38 U.S.C. § 1720I.  *Id*.[1]

In response to the proposed rule, VA received over 70 comments.  Many

commenters argued that the proposed rule was too limited and advocated for a

complete removal of the § 3.12(d) regulatory bars.[2]  *See generally*

---

[1]  Section 1720I requires VA to provide mental and behavioral healthcare to former servicemembers who did not receive dishonorable discharges by the military and were not discharged by court-martial.  A rulemaking amending § 17.34 in light of § 1720I is currently moving through VA's internal concurrence process.  Frueh Decl. ¶ 15.  Moreover, any final rule expanding benefits eligibility under § 3.12 would naturally expand health care enrollment opportunities under § 17.36.

[2]  38 U.S.C. § 5303 sets forth certain bars to benefits based on character of discharge.  For example, § 5303 bars benefits for conscientious objectors who refused to perform military duty, to wear the uniform, or to comply with lawful orders of competent military authority.  *See* 38 U.S.C. § 5303(a).  These § 5303 bars are known as "statutory bars" and are reiterated at 38 C.F.R. § 3.12(c).  Section 3.12(d) provides for additional bars to benefits, such as a discharge or release due to "willful and persistent misconduct."  *See* 38 C.F.R. § 3.12(d).  These § 3.12(d) bars are referred to as "regulatory bars."  *See Garvey v. Wilkie*, 972 F.3d

4

https://www.regulations.gov/document/VA-2020-VBA-0018-0001/comment.  In

contrast, others pushed back on the idea of liberalizing the regulations, arguing that

it would harm military order and degrade Honorable service.[3]  And still others

advocated for different approaches.[4]  In August 2020, VA met with STP to discuss

the proposed rule.  Resp. Ex. F.  During the meeting, STP voiced its concerns

about several aspects of the proposed rule and stated that it would follow up with

written comments.  *Id.*  STP's position was that the limited updates of the proposed

rule still barred benefits for too many former servicemembers.  *Id.*

Due to the "various and differing comments received," in 2021, VBA

decided to issue a Request for Information (RFI) and conduct a two-day listening

session on these issues.  Update and Clarify Regulatory Bars to Benefits Based on

Character of Discharge, 86 Fed. Reg. 50513, 50513 (Sept. 9, 2021) (to be codified

at 38 C.F.R. pt. 3).  The RFI issued on September 9, 2021.  *Id.*  The RFI asked,

among other things, whether removing the regulatory bars would affect military

---

1333 (Fed. Cir. 2020).  Because only Congress can amend the statutory bars, the
petition for rulemaking here concerns only the regulatory bars.

[3] For example, one commenter commented that "[t]he VA should not
denigrate our honorable service by changing the rules to provide care to people
who could not, or would not, serve in the same manner."
https://www.regulations.gov/comment/VA-2020-VBA-0018-0010.

[4] *See, e.g.,* https://www.regulations.gov/document/VA-2020-VBA-0018-
0067.

order and discipline and whether extending benefits eligibility would denigrate others' honorable service.  *Id.* at 50514.  VA received forty-five comments in response to the RFI.[5]  VA conducted the listening session on October 5-6, 2021, during which 29 oral comments were delivered.  Frueh Decl. at ¶ 7.

Following the receipt of comments, VA continued to gather feedback on the experiences of servicemembers with OTH discharges and COD generally.  On November 2-3, 2021, VA held an OTH discharge summit with offices across VA and the United States Department of Defense (DOD).  Frueh Decl. at ¶ 8.  Among other things, there were presentations about DOD discharge history and process, COD history and process, the impact of OTH discharges on former service members, the current state of outreach, and brainstorming improvements and next steps.  *Id.*  On January 12-13, 2022, the Deputy Executive Director for Compensation Service and other VBA staff attended the Air Force Board of Correction for Military Records (AFBCMR) Conference, at which there were presentations on Discharge Appeals Review Board issues, considerations in discharge upgrades, and the COD process, among other things.  Frueh Decl. at ¶ 9.

On February 16, 2022, VBA conducted a listening session with Veterans Service Organizations and other external stakeholders (including STP) concerning

---

[5] *See* https://www.regulations.gov/document/VA-2020-VBA-0018-0076/comment.

OTH discharges generally.  Frueh Decl. at ¶ 10.  The objective of this session was to gain insight on how to provide effective outreach to OTH servicemembers and how to provide caring and professional customer service/care to OTH servicemembers.  *Id.*

On March 16, 2022, VBA presented to VA's Evidence-Based Policy Council (EBPC)[6] three potential courses of action (COAs) for the rulemaking, including a COA that would remove the regulatory bars of § 3.12(d).  Frueh Decl. at ¶ 11.  The EBPC requested data and costing information on the potential COAs. *Id.*  Through the remainder of 2022, VA gathered data and costing information, conducted multiple meetings on costing and rulemaking strategy, and drafted multiple versions of the final rule.  *Id.*  On January 11, 2023, the EBPC convened and requested additional data and costing information.  *Id.*  On April 26, 2023, the EBPC again convened, and members provided their COA recommendations.  *Id.*

Meanwhile, on July 22, 2022, VA provided STP with an update, assuring it that VA was reviewing all comments and working towards a final rule with a

---

[6] "The EBPC is the Department's main body for enterprise-wide coordination, collaborative analysis and policy implementation.  The EBPC identifies major strategic and operational issues facing VA and develops recommendations for consideration by [the VA Operations Board] and [the VA Executive Board].  The EBPC also develops strategies and recommendations for issues specifically identified by VA leadership."  VA Notice 22-15 (Sept. 15, 2022) at 4 (available at https://www.va.gov/vapubs/viewPublication.asp? Pub_ID=1396&FType=2).

"sense of urgency." Resp. Ex. G. And on June 15, 2023, VA again updated STP, noting that cost was still a significant issue, but that VBA would be briefing senior leaders on the VA Operations Board (VAOB) [7] on its recommended approach in the coming weeks. Resp. Ex. H. VA noted that the recent Administrative Pay-As-You-Go Act of 2023 might impact the speed of the process. *Id.* VA also noted that the pace of the rulemaking had been affected by the enactment of the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022, Pub. L. 117-168 (PACT Act) in August 2022, which "created a lot of new law for VA to operationalize." *Id.*

Also on June 15, 2023, VBA presented the COAs to the VAOB. Frueh Decl. at ¶ 12. In response, the VAOB requested additional inter-agency consultation, specifically with DOD. *Id.* On July 21 and July 28, 2023, VBA conducted inter-agency meetings regarding the COAs. *Id.* On August 15, 2023,

---

[7] The VAOB "serves as the most senior operations implementation management body for the Department providing oversight of the implementation and execution of the Secretary's strategic direction. Its purpose is to enable the Deputy Secretary to critically evaluate evidence-based, risk-informed recommendations about the operational implementation and execution of the Department's Strategic Plan and provide Department-level operational direction. . . . VAOB evaluates courses of action and associated recommendations prior to [VA Executive Board] discussion to ensure that they are fully developed prior to a decision by the Secretary. VAOB also reviews, discusses and provides recommendations to [the Secretary] and [the VA Executive Board] on strategy, risk, policy, resource and operational issues." VA Notice 22-15 (Sept. 15, 2022) at 3 (available at https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=1396&FType=2).

VBA received additional inter-agency feedback on the COAs. *Id.* On August 17, 2023, the VAOB re-convened and provided a tentative recommendation pending Secretary of Veterans Affairs (Secretary) approval and further inter-agency engagement. *Id.* On August 23, 2023, VBA received more inter-agency feedback. *Id.*

On August 21, 2023, STP requested a meeting with the Secretary, which was denied on September 28, 2023 "in the interest of ensuring prompt and orderly completion of this public rulemaking process." Resp. Ex. I. VA told STP that it was the "Secretary's full intention to sign a final rule establishing updated and more equitable Character of Discharge regulations in the near future." *Id.*

On October 4, 2023, VBA presented the COAs to VA's Chief of Staff. Frueh Decl. at ¶ 13.

On October 25, 2023, petitioners filed their mandamus petition. Pet. at 1.

On October 26, 2023, VA's Chief of Staff and a senior advisor conducted an inter-agency meeting. Frueh Decl. at ¶ 13. And on October 30, 2023, the Secretary informed VBA that he had decided to adopt the VAOB's recommendation; a written document memorializing that decision is pending.[8] Frueh Decl. at ¶ 14.

---

[8] The preceding background does not describe every step that VA has taken in this rulemaking proceeding, only those that can be shared publicly.

# **ARGUMENT**

No one disputes that VA's rulemaking process has been long or that it is incumbent on VA to complete the rulemaking in the near term.  But that does not mean that the petitioners have demonstrated a clear and indisputable right to an order requiring VA to publish a final rule in 30 days.  As explained below, petitioners have neither established a clear and indisputable right to mandamus nor demonstrated that VA's delay has been unreasonable under the *TRAC* factors.

## I.    Jurisdiction And Standard Of Review

The Supreme Court and all courts established by Congress may issue writs "necessary and appropriate in aid of their respective jurisdictions" under the All Writs Act.  28 U.S.C. § 1651(a).  Because the Secretary's rulemaking proceeding implicates this Court's jurisdiction pursuant to 38 U.S.C. § 502, this Court has authority to address petitioners' petition.  *In re Paralyzed Veterans Of Am.*, 392 F. App'x 858 (Fed. Cir. 2010) (nonprecedential).  But "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr v. United States Dist. Court for Northern Dist. of California*, 426 U.S. 394, 402 (1976).  Three conditions must be met before a court may issue a writ of mandamus: (1) the petitioner must lack adequate alternative means to obtain the desired relief; (2) the petitioner must demonstrate a clear and indisputable right to the writ; and (3) the court must be convinced, given the circumstances, that the issuance of a writ is

10

warranted.  *See Cheney v. United States Dist. Ct. for Dist. of Columbia*, 542 U.S.

367, 380-82 (2004); *In re Stingray IP Sols., LLC*, 56 F.4th 1379, 1382 (Fed. Cir.

2023).

In cases such as this one alleging unreasonable delay, the Court must first

satisfy itself that the agency has a duty to act, and second determine whether the

agency has unreasonably delayed in discharging that duty.  *In re Am. Rivers and

Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (citing 5 U.S.C. §§

555(b) and 706(1)).  One way to evaluate whether a delay is unreasonable is to

apply the six-part test articulated by the United States Court of Appeals for the

District of Columbia Circuit in *Telecommunications Research and Action Center v.

Federal Communications Commission*, 750 F.2d 70, 79-80 (D.C. Cir 1984), known

as the *TRAC* test.  *See Martin v. O'Rourke*, 891 F.3d 1338, 1348 (Fed. Cir. 2017).[9]

---

[9] In *Martin*, this Court adopted the *TRAC* test as the "appropriate standard for the Veterans Court to use in evaluating mandamus petitions based on alleged unreasonable delay."  891 F.3d at 1348.  We are unaware of any cases in which this Court has adopted or applied the *TRAC* test to evaluate a mandamus petition filed in this Court in the first instance, and particularly in the context of a petition urging a change to longstanding regulations rather than in an individual case.  But given this Court's endorsement of the *TRAC* test in *Martin*, we address petitioners' contentions using the *TRAC* factors.

II.     Petitioners Fail To Demonstrate
        A Clear And Indisputable Right To The Writ

There is no dispute that VA agreed to initiate a rulemaking proceeding on its COD regulations in 2016.  And VA has fulfilled that agreement.  Indeed, VA has issued a proposed rule and an RFI, and as reflected in the chronology stated above, fully intends to issue a final rule soon.  But VA never agreed on a certain date for publication of a final rule.  Petitioners therefore have no clear and indisputable right to the publication of a final rule on their timeline.  *See In re Am. Rivers*, 372 F.3d at 418.

To be sure, some courts have held that the Administrative Procedure Act (APA) itself imposes a duty upon agencies to "fully respond to matters that are presented to it under its internal processes," even absent any other legal obligation to act.  *See, e.g., In re A Cmty. Voice*, 878 F.3d 779, 784-85 (9th Cir. 2017); *In re Am. Rivers*, 372 F.3d at 418.  But the Supreme Court has held that "the only agency action that can be compelled under the APA is action legally *required*. This limitation appears in § 706(1)'s authorization for courts to 'compel agency action *unlawfully* withheld.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004)) (emphasis in original).  That is, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Id.* at 64.

12

As the dissent explained in *In re A Community Voice*, this means that courts cannot place a greater duty on an agency than that to which it has agreed. 372 F.3d at 790 (Smith, J., dissenting) (citing *Norton*, 542 U.S. at 64). In that case, the Environmental Protection Agency (EPA) agreed to "begin an appropriate proceeding," but also clarified that it was not "committing to a specific rulemaking outcome [] or to a certain date for promulgation of a final rule." *Id.* at 791. Similarly, in this case, VA agreed to "initiate rulemaking proceedings," Pet. Ex. C, which it did. But it made no commitment as to a timeline for issuance of a final rule. Therefore, under the APA, VA has no legal duty to act within a specific timeline.

It is also worth noting that the regulation petitioners wish to be amended, 38 C.F.R. § 3.12, has been partially upheld by this Court as a valid interpretation of the governing statutes. *Garvey v. Wilkie*, 972 F.3d 1333 (Fed. Cir. 2020). In *Garvey*, the appellant challenged the validity of 38 C.F.R. § 3.12(d)(4) as being contrary to 38 U.S.C. § 5303. 972 F.3d at 1334. Specifically, she asserted that the "willful and persistent misconduct" bar to VA benefits contained in the regulation was contrary to the statute because the statute itself lists six specific conditions rendering a servicemember ineligible for benefits, and that it was improper for the regulation to add another one. *Id.* at 1337. This Court rejected that assertion, holding that "[n]either section 5303 nor any other statute provides that section

13

5303 contains the exclusive list of conditions for benefits eligibility." *Id.* To the contrary, the Court held that regardless of § 5303, VA was authorized under 38 U.S.C. § 101(2) to identify additional discharges that are under "dishonorable conditions." *Id.* And after a lengthy review of the statutory and regulatory provisions relating to COD, the Court upheld VA's interpretation of the governing statutes (sections 5303 and 101(2)), as set forth in § 3.12(d). *Id.* at 1337-1341. Thus, although VA committed to initiate rulemaking and is committed to concluding that rulemaking, VA is under no independent obligation to alter or amend § 3.12.

To be clear, VA is and has been handling this rulemaking with a sense of urgency. But VA's genuine desire to meaningfully update its COD regulations does not provide the petitioners with a clear and indisputable right to an order requiring VA to complete the rulemaking process by a certain date. VA is under no statutory timeline, has made no commitment to a specific publication date, and is voluntarily undertaking an effort to liberalize a regulation that has been upheld by this Court. Thus, updating these regulations is at bottom a policy initiative and, as a legal matter, petitioners do not have a clear and indisputable right to the publication of a final rule by a certain date.

II.    The *TRAC* Factors Analysis Weighs Against
       The Writ Being Appropriate Under The Circumstances

If this Court finds that VA has a legal duty to take final, reviewable action, it

should nonetheless deny the writ because VA's delay has not been unreasonable.

As explained above, the D.C. Circuit's six-factor *TRAC* analysis provides helpful

guidance to courts in determining whether an agency's delay is so egregious as to

warrant issuance of the writ.  Here, the *TRAC* factors weigh against issuance of the

writ.

A. The First *TRAC* Factor Weighs Against Mandamus

The first *TRAC* consideration is that the time that agencies take to make

decisions must be governed by a "rule of reason."  *Martin*, 891 F.3d at 1345

(quoting *TRAC*, 750 F.2d at 80).  This factor does not support issuance of the writ,

as the above-detailed procedural history shows that VA has been continually

moving the rulemaking process forward at a reasonable pace.

Petitioners contend that "this is not a particularly complex rulemaking,"

noting that fewer than 120 comments were submitted and that the "best answer []

is clear."  Pet. at 29.  That is wrong.  Although we concede that in some sense the

regulatory provisions at issue here are easier to understand than other VA

regulations, the questions involved in determining whether certain former service

members should be entitled to VA benefits and services they are not currently

entitled to is tremendously important and exceedingly complex.  Most obviously,

the public comments themselves reveal the complexity here. This is not a case where the comments were nothing more than "support" or "do not support." Many of the comments were dozens of pages long—like STP's 59-page response to the proposed rule, Pet. Ex. H, and 39-page response to the RFI, Pet. Ex. I—written by attorneys and organizations, packed with legal arguments, policy arguments, information, and data. It takes time to synthesize such comments, which— contrary to petitioner's insinuation—were not unanimous. To be frank, not all commenters agreed that the maximally liberalizing result here is necessarily the pro-veteran one. Different commenters had very strong views on different aspects of this rulemaking, and those views have required careful evaluation.

But to focus on the comments masks the deeper reason this rule is complex. Petitioners request not just a tweak of VA's regulations, but sweeping changes to the scope of almost all benefits and services VA provides. *See* Pet. Ex. B. By their own admission, the changes they propose could impact "tens of thousands of former service members who received less-than-honorable discharges." Pet. at 1. And they asserted in their original Rulemaking Petition that roughly 7,000 people are discharged each year under conditions covered by the regulatory bars that they wish to overhaul. Pet. Ex. B at 8. These numbers alone make this a complex rulemaking potentially involving thousands of former servicemembers and costing billions of dollars. In fact, VA could not move forward with the original proposed

rule in 2017 because "its projected cost (in the *tens of billions over 5 years*) necessitate[d] further exploration of alternatives." Pet. Ex. G (emphasis added). It takes time to gather data, compute costing, and identify financing for such a potentially extensive rulemaking—and to persuade all necessary officials that the rulemaking is worth that cost.

Finally, a regulatory change of this scope requires a great deal of inter-agency coordination since military discharge is a matter that affects not just VA, but also DOD. It of course requires more time to complete a rulemaking when multiple agencies must consent.

Petitioners cite several cases in which comparable length delays were found to be unreasonable. Pet. at 28-29. But there is no length of time that is per se unreasonable, *In re Am. Rivers*, 372 F.3d at 52, and there are other cases holding similar length delays to be not unreasonable. For example, in *Public Citizen Health Research Group v. Brock*, the D.C. Circuit considered a five-year delay in an agency's issuance of a final rule. 823 F.2d 626 (D.C. Cir. 1987). Though the court held that such a delay "treads at the very lip of the abyss of unreasonable delay," it nonetheless gave the agency an additional 10 months of time to issue a final rule. *Id.* at 629. It did so because it was "loath to rush in to manage the details of [the agency's] rulemaking procedure" due to the agency's technical expertise and the competing demands on its staff. *Id.* The court was unable to find

17

"any specific aspect of the proposed rulemaking that [was] impermissibly slow, in light of the complexity of the [] questions involved and [the agency's] limited resources." *Id.* The same is true in this case—the regulatory changes petitioners seek require careful evaluation by an agency that is balancing the demands of other critical human health and welfare priorities. Further, as in *Public Citizen*, no aspect of the rulemaking has been "impermissibly slow," as the proceedings have been moving along commensurate with the complexity of the question at issue and VA's limited resources.

In contrast, cases in which similar length delays were found to be unreasonable involved different circumstances. In *Air Line Pilots*, a five-year delay was found unreasonable where the agency completely failed to act for several years. *Air Line Pilots Ass/n, Intern. v. Civil Aeronautics Bd.*, 750 F.2d 81, 85 (D.C. Cir. 1984). The agency first scheduled evidentiary hearings on applications over five years after it received them. *Id.* In *International Chemical Workers*, a six-year delay was found unreasonable when a full year passed before the agency even responded to petitioner's initial request, and where the agency kept pushing back its estimated dates for publication of a proposed rule. 958 F.2d at 1145-47. In *American Rivers*, the agency had failed to respond to the petition at all, after more than six years. 372 F.3d at 417. These cases are a far cry from the situation here, where VA has issued a proposed rule and RFI, conducted internal

and external meetings and listening sessions, and kept petitioners apprised of the status whenever requested.

Petitioners point to *In re National Resources Defense Council*, in which the delay was found to be unreasonable even though some work had been done.  Pet. at 29 (citing *In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1140).  But in that case, the court rejected that agency's assertion that it had made a "reasonable amount of progress," instead finding there to be a "pattern of delayed action—spurred only by outside prompting."  Here, in contrast, VA has been continuously making steady progress in the rulemaking proceeding, from proposed rule, to RFI, to the current status of approaching rule issuance.  We concede that the process has been long— but there has not been unreasonable delay.

B.  The Second *TRAC* Factor Weighs Against Mandamus

The second *TRAC* factor, whether there is a statutory scheme providing a timetable, does not support issuance of the writ because, as petitioners admit, there is no specific statutory deadline for VA to act here.  Pet. at 33.  Presumably, Congress did not want agencies to rush through the rulemaking process to meet a specific deadline, so it enacted no such deadline here.

C.  The Third and Fifth *TRAC* Factors Weigh Against Mandamus

The third *TRAC* consideration is that "delays that might be reasonable in the sphere of economic regulation are less tolerable than when human health and

welfare are at stake." *Martin*, 891 F.3d at 1346 (quoting *TRAC*, 750 F.2d at 80). Relatedly, the fifth factor requires Courts to consider the "nature and extent of the interests prejudiced by the delay." *Id.* In *Martin*, this Court held that [v]eterans' disability claims always involve human health and welfare." *Id.* But in that case, appellants were asserting unreasonable delay in the processing of their own individually filed VA benefits claims under existing law allegedly granting them a right to such benefits. *Id.* at 1340.

In this case, no individual entitlement to benefits is implicated. It is true that liberalizing the current regulations may positively affect thousands of people in their own individual cases, of course with concomitant expense to the public. But the mere fact that someone might benefit from amending a regulation does not create an enforceable legal right or convert the policy question of whether that regulation should be changed into a legal one. Given that the Court upheld the VA's authority to enact the regulatory bars in § 3.12 in *Garvey*, there is no existing legal entitlement to benefits at stake here. Rather, the delay is in VA's voluntary effort to liberalize the existing, valid regulations. Additionally, we note that the regulatory bars do not completely bar OTH-discharged servicemembers from VA benefits—they still have access to a number of services, such as healthcare under 38 C.F.R. § 3.360, mental and behavioral health care under 38 U.S.C. § 1720I, emergent suicide care under 38 U.S.C. § 1720J, certain counseling and treatment

20

under 38 U.S.C. § 1720D, and access to certain homeless veterans programs under chapter 20 of title 38.  Thus, the third and fifth factors do not weigh in favor of granting the writ.

### D. The Fourth *TRAC* Factor Weighs Against Mandamus

The fourth *TRAC* consideration is the "effect of expediting delayed agency action on agency activities of a higher or competing priority."  *Martin*, 891 F.3d at 1347.  This factor also does not support issuance of the writ.  Petitioners' rulemaking petition has been and continues to be a top priority for VA.  As detailed above, VA has continued to move the rulemaking process along and will continue to do so even if no writ is issued.  At the same time, VA has also been handling numerous other important veterans' benefits issues that impact servicemembers' health and welfare, including, most recently, implementing the PACT Act.[10]  While the PACT Act may be the easiest and most undebatable example of a competing priority, it is far from the only matter of utmost importance before VA.  That said, we do not mean to suggest that an order from the Court in this matter would somehow derail continued PACT implementation or have an articulable effect on any other top priority.  Because the final COD rule is

---

[10]  The PACT Act greatly expands benefits for veterans exposed to toxins such as burn pits, Agent Orange, and radiation.  VA has received over 1 million PACT Act claims since August 2022.  *See* https://news.va.gov/press-room/more-than-1-million-benefits-claims-under-the-pact-act/.

in an advanced stage of preparation, it is difficult to articulate exactly how an order may affect other matters important to veterans currently before VA and other parts of the Government. *See* Resp. Ex. H.

Suffice it to say that VA's bandwidth is limited, and it is already treating this matter as a top priority. In fact, because the final rule is nearing completion, the impact from a Court order here would potentially impact important matters handled by DOD and OMB as much or more than VA, since they, too, would need to immediately devote resources to expeditiously approving and publishing a final rule. And finally, as explained below, expediting this rulemaking process on the timeline petitioners request could negatively impact VA's ability to potentially implement the sweeping changes petitioners seek.

E. The Sixth TRAC Factor Is Neutral As To Mandamus

The sixth and final *TRAC* factor is that the Court need not find "any impropriety lurking behind agency lassitude" to hold that the action is unreasonably delayed. *Martin*, 891 F.3d at 1348 (quoting *TRAC*, 750 F.2d at 80). Petitioners acknowledge that this factor has "no effect" here, Pet. at 33, and make no assertions of bad faith on the part of VA. As described in detail above, VA has been working diligently on this rulemaking petition since its filing. The delays are in no way caused by bad faith, but rather by the complex considerations of costs, inter-agency coordination, and competing interests.

* * * *

Because five of the six factors weigh against issuance of the writ, and the
sixth is neutral at best, petitioners have failed to meet their burden of showing that
issuance of the writ is warranted in this case.

III.   Issuance Of The Writ Is Not Warranted Under The Circumstances

Petitioners request that this Court order VA to issue a final, judicially
reviewable rule within 30 days of its order.  We acknowledge and appreciate that
petitioners have been patient with the rulemaking process thus far, and that the
process has been long.  Nonetheless, for the reasons set forth above, issuance of the
writ is not warranted in these circumstances.

But if this Court were to find that the writ is warranted, we respectfully
request a deadline of 150 days, rather than the 30 days requested by petitioners.
Even with all the work that has been put into this rulemaking so far, 30 more days
is simply insufficient time for the Executive branch to finalize a rule.  Per
Executive Order 12866, any proposed rule must be reviewed by the Office of
Information and Regulatory Affairs (OIRA) of OMB, a process which could take
up to 120 days.  Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993)
(Sec. 6(b)(2)).[11]  Thus, even if VA were to move a final rule to OMB the day after

---

[11]   Executive Order 12866 allows for a maximum of 90 days for OIRA
review, with an additional 30-day extension possible upon approval of the Director

23

this Court's order, 30 days would be insufficient to complete the mandatory OIRA review process.  In contrast, a 150-day deadline would give VA a reasonable 30 days to finalize the rule, with an additional 120 days for OIRA review.[12]

Further, if this Court were to impose a 30-day deadline, it could result in an unfavorable outcome for petitioners and the former servicemembers they serve. With such a short amount of time, VA could be forced to adopt its proposed rule as its final rule simply to comply with this Court's order, eschewing any broader scope in the final rule.  Although we make no representations as to whether the final rule will implement all (or any) of the sweeping changes petitioners request, a rule adopting those types of significant changes would certainly require more than 30 days of OIRA review.[13]

Even in cases in which courts have found unreasonable delay, they have often chosen final rule deadlines based on the agency's predicted date of final rule

---

and at the request of the agency head.  Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) (Sec. 6(b)(2)).

[12]   Although the Secretary has adopted the VAOB's recommendation for the final rule, the outcome could change in the inter-agency process.  The very premise of OMB review, of course, contemplates the possibility of OMB disapproval.

[13]   We do not mean to suggest that VA would necessarily alter the intended substance of the final rule in the event of a 30-day order.  In fact, VA would do all it could do to avoid that result.  Nonetheless, such an order could compel VA to grapple with difficult decisions, given that, the more fundamental and expensive the change, the harder it would be to accomplish on an expedited timeline.

issuance. *See, e.g., In re Int'l Chemical Workers Union*, 958 F.2d 144, 292 (D.C.

Cir. 1992) (ordering a final rule to be issued by the agency's "target date" five

months after the court's decision, and six years after the process began); *Public*

*Citizen*, 823 F.2d at 629 (ordering regulation to issue no later than the agency's

proposed deadline, 10 months after the court's decision, and five years after the

process began).

If this Court were to grant VA 150 days, VA would be unopposed to this

Court retaining jurisdiction and to providing periodic status reports so the Court

could ensure that the process continues moving at a reasonable pace.  This

approach would be consistent with what other courts have done in similar

circumstances, *see Air Line Pilots*, 750 F.2d at 87 (retaining jurisdiction and

ordering progress reports every 30 days); *Public Health*, 823 F.2d at 629 (ordering

progress reports every 90 days), and what this Court has done in previous veterans'

benefits cases.  *See, e.g.*, *Kimmel v. Sec'y of Veterans Affairs*, No. 22-1754, 2022

WL 14319044 (Fed. Cir. Oct. 25, 2022) (ordering VA to provide a status report in

60 days).

## CONCLUSION

For these reasons, this Court should deny petitioners' petition for writ of

mandamus.  In the alternative, should the Court grant petitioners' petition, it should

give VA 150 days to issue a final rule.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Eric P. Bruskin
ERIC P. BRUSKIN
Assistant Director

OF COUNSEL:

BRIAN D. GRIFFIN
Deputy Chief Counsel

JONATHAN KRISCH
Attorney
Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC  20420

/s/ Meredyth Cohen Havasy
MEREDYTH COHEN HAVASY
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC  20044
Telephone: (202) 305-2951
meredyth.c.havasy@usdoj.gov

November 8, 2023

*Attorneys for the
Secretary of Veterans Affairs*

# Exhibit A

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

IN RE SWORDS TO PLOWSHARES, )
AND THE NATIONAL VETERANS )
LEGAL SERVICES PROGRAM )          2024-104
Petitioners. )
)

---

### Declaration of Michael J. Frueh

---

I, Mike Frueh, declare as follows:

1. I am the Principal Deputy Under Secretary of the Veterans Benefits Administration (VBA) in the Department of Veterans Affairs (VA). I am responsible for administering benefits programs for Veterans, including education, home loan guaranty, insurance, disability compensation, pension, fiduciary, veteran readiness and employment and transition assistance. I oversee policy, operations and automation initiatives.

2. On December 19, 2015, VA received Swords to Plowshares' petition to amend VA's Character of Discharge (COD) regulations. On May 27, 2016, VA agreed to initiate rulemaking proceedings on that issue.

3. Between 2016 and 2017, VBA drafted a proposed rule and obtained certain internal concurrences, but was ultimately unable to move forward with that proposed rule, as its projected cost (in the tens of billions over 5 years) necessitated further exploration of alternatives and the cost-effectiveness of available approaches.

4. Between 2018 and 2020, VBA drafted an alternative proposed rule, obtained internal concurrences, and moved the rule to the Office of Management and Budget (OMB). More specifically, the alternative proposed rule necessitated new costing, so VA went through the process of data requests and analysis meetings in order to secure reliable costing data for the new course of action. After the data was confirmed with multiple business lines, methodology was

finalized before requests for costing from those VA business lines on the new data was conducted.

5. On July 10, 2020, the proposed rule (AQ95) issued in the Federal Register.

6. On September 9, 2021, due to the varying comments received, VA issued a Request for Information (RFI) in the Federal Register.

7. On October 5-6, 2021, VA conducted a two-day listening session on the questions raised in the RFI, during which 29 oral comments were delivered.

8. On November 2-3, 2021, VBA and the Veterans Health Administration hosted an Other Than Honorable (OTH) discharge summit, which involved offices across VA and the Department of Defense (DoD). Presentations at the summit addressed DoD discharge history and process; VA's COD history and process; barriers related to COD; the impact of OTH discharges on former Service members (SMs); the current state of outreach, business processes, and practices regarding OTH SMs; and brainstorming improvements and next steps.

9. On January 12-13, 2022, the Deputy Executive Director for Compensation Service and other VBA staff attended the Air Force Board of Correction of Military Records conference, which involved offices across VA and DoD. Presentations at the conference addressed current discharge issues, current litigation, Discharge Appeals Review Board issues, correcting National Guard records, discharge upgrades, reprisal, mental health and assault, administrative law issues, medical issues, the Integrated Disability Evaluation System, and the COD process.

10. On February 16, 2022, VBA conducted a listening session with Veterans Service Organizations and other external stakeholders on OTH discharges. The objective of the listening session was to gain insight on how to provide effective outreach to OTH SMs and how to provide caring and professional customer service/care to OTH SMs.

11. On March 16, 2022, VBA presented to VA's Evidence-Based Policy Council (EBPC)[1] potential courses of action (COAs) for AQ95, including a

---

[1] The EBPC is VA's main body for enterprise-wide coordination, collaborative analysis and policy implementation. The EBPC identifies major strategic and

COA that would remove the regulatory bars of 38 C.F.R. § 3.12(d). The EBPC requested data and costing information on the potential COAs. Through the remainder of 2022, VA gathered data and costing information, conducted multiple meetings on costing and rulemaking strategy, and drafted multiple versions of an AQ95 final rule. On January 11, 2023, the EBPC convened and requested additional data and costing. On April 26, 2023, the EBPC convened and members provided their COA recommendations for AQ95.

12. On June 15, 2023, VBA presented the AQ95 COAs to VA's Operations Board (VAOB).[2] The VAOB requested additional inter-agency consultation with DoD. On July 21 and July 28, 2023, VBA conducted inter-agency meetings regarding the COAs for AQ95. On August 15 and August 23, 2023, VBA received additional inter-agency feedback on the COAs. On August 17, 2023, the VAOB re-convened and provided a tentative recommendation pending Secretary of Veterans Affairs (Secretary) approval and further inter-agency engagement.

13. On October 4, 2023, VBA presented the COAs to VA's Chief of Staff. On October 26, 2023, VA's Chief of Staff and a senior advisor conducted an inter-agency meeting on AQ95.

14. On October 30, 2023, the Secretary informed VBA that he had decided to adopt the VAOB's recommendation. A written document memorializing that decision is still pending.

---

operational issues facing VA and develops recommendations for consideration by the VA Operations Board and VA Executive Board. *See* VA Notice 22-15 (Sept. 15, 2022), available at https://www.va.gov/vapubs/viewPublication.asp?Pub_ID=1396&FType=2.

[2] The VAOB is the most senior operations implementation management body for VA, providing oversight of the implementation and execution of the Secretary's strategic direction. Its purpose is to enable the Deputy Secretary to critically evaluate evidence-based, risk-informed recommendations about the operational implementation and execution of the Department's Strategic Plan and provide Department-level operational direction. The VAOB evaluates COAs and associated recommendations to ensure that they are fully developed prior to a decision by the Secretary. *See id.*

15. As of November 7, 2023, it is my understanding that a rulemaking is proceeding through VA's internal concurrence process that would amend 38 C.F.R. § 17.34 in light of the enactment of 38 U.S.C. § 1720I (RIN2900-AR49).

16. It is my considered view as the Principal Deputy Under Secretary of the Veterans Benefits Administration that VA is taking all reasonable steps to ensure that a final rule consistent with the substance of the public comments received is issued in a timely manner.

17. The above facts do not constitute all the steps that have been taken since December 2015 relevant to this rulemaking.

18. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 7, 2023

Digitally signed by
MICHAEL FRUEH
Date: 2023.11.07
18:19:57 -05'00'

Michael J. Frueh
Principal Deputy Under Secretary
Veterans Benefits Administration
Department of Veterans Affairs

# Exhibit B

**Krisch, Jonathan (OGC)**

| | |
|---|---|
| **From:** | Griffin, Brian D. (OGC) |
| **Sent:** | Monday, April 27, 2020 3:49 PM |
| **To:** | Alexander.Stout@lw.com |
| **Cc:** | Krisch, Jonathan (OGC) |
| **Subject:** | Status update: COD rulemaking |

Alex,

I hope this email finds you and yours in good health and hope you're successfully carrying on.

I'm writing to update you on the status of the proposed rulemaking that VA is preparing in response to your client's petition regarding our character of discharge regulations.  As you know, at our meeting in March, VA committed to provide you with regular status updates and specifically with our expectations as of today, April 27, 2020.

Currently, the draft proposed rule is in the late stages of the VA Central Office concurrence process.  Obviously, I cannot guarantee that people whose review comes after mine will act on any given timeline.  That said, given where the rule currently is, we anticipate having it over to OMB roughly within a week.

Unless you'd like to set a different interval, we'll provide you with another update on May 27, 2020.  Please feel free to follow up with myself or Jonathan Krisch of our office, copied.

Thanks,

**Brian D. Griffin**
Deputy Chief Counsel
Benefits Law Group
Office of the General Counsel
U.S. Department of Veterans Affairs
202-461-7699

# Exhibit C

**Krisch, Jonathan (OGC)**

| | |
|---|---|
| **From:** | Griffin, Brian D. (OGC) |
| **Sent:** | Thursday, May 21, 2020 3:59 PM |
| **To:** | 'Alexander.Stout@lw.com' |
| **Cc:** | Krisch, Jonathan (OGC) |
| **Subject:** | RE: Status update: COD rulemaking |

Hi Alex,

Sorry for the delay in responding.  I had some immediate tasks on other matters this morning.

The proposed rule draft has in fact been forwarded to OMB for review.  I'm unsure the exact date we got it over there but its been at least a couple of weeks.  However, you won't see it on their websites (reginfo.gov or regulations.gov) just yet.  OMB's budget office has some steps to take before OMB will put it in their public-facing system.

Thanks,
Brian

# Exhibit D

**Krisch, Jonathan (OGC)**

| | |
|---|---|
| **From:** | Griffin, Brian D. (OGC) |
| **Sent:** | Wednesday, May 27, 2020 11:35 AM |
| **To:** | 'Alexander.Stout@lw.com' |
| **Cc:** | Krisch, Jonathan (OGC) |
| **Subject:** | RE: Status update: COD rulemaking |

Alex,

OMB has accepted our draft of a proposed rule for review.  You can view the public information about it here:

https://www.reginfo.gov/public/do/eoReviewSearch

The RIN is AQ95.

We'll continue to provide you status updates roughly every 30 days, with the next one being June 29, but I don't expect to have anything to report beyond "its still under review" for the next 90 days at least.

Thanks,
Brian

# Exhibit E

**Krisch, Jonathan (OGC)**

| | |
|---|---|
| **From:** | Griffin, Brian D. (OGC) |
| **Sent:** | Monday, June 29, 2020 2:00 PM |
| **To:** | 'Alexander.Stout@lw.com' |
| **Cc:** | Krisch, Jonathan (OGC) |
| **Subject:** | RE: Status update: COD rulemaking |

Alex,

Hope all is well.  The proposed rule is still pending review at OMB.

Thanks,
Brian

# Exhibit F

**Krisch, Jonathan (OGC)**

| | |
|---|---|
| **From:** | Griffin, Brian D. (OGC) |
| **Sent:** | Friday, September 4, 2020 4:17 PM |
| **To:** | 'Alexander.Stout@lw.com' |
| **Cc:** | Krisch, Jonathan (OGC) |
| **Subject:** | RE: COD rulemaking meeting request |
| **Attachments:** | Meeting Summary final.docx |

Alex,

Summary is attached.  If you or your clients think something is inaccurate or unfairly characterized, let me know and we can figure out how to handle it.

Thanks,
Brian

Meeting Summary

<u>Attendees</u>

Dave Barrans – Department of Veterans Affairs (VA) Office of General Counsel (OGC)

Brian Griffin – OGC

Jonathan Krisch – OGC

Evan Grant – OGC

Laurine Carson – Veterans Benefits Administration (VBA) Compensation Service (CS)

Jane Che – CS

Olumayowa Famakinwa – CS

Alex Stout – Latham & Watkins LLP (Latham)

Dana Montalto – Harvard Law School

Brittany Bruns – Latham

Amy Rose – Swords to Plowshares (STP)

Maureen Siedor – STP

<u>Summary</u>

Swords to Plowshares (STP) requested a meeting with the Department of Veterans Affairs (VA) regarding proposed rule RIN 2900-AQ95, Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge.  As the proposed rule notes, STP's petition for rulemaking in part spurred the issuance of the proposed rule.  A meeting was held telephonically on August 20, 2020, at 2:00 PM EDT, during the public comment period.  The names and organizations of those in attendance are listed above.  The meeting lasted approximately one hour.

STP primarily voiced concerns that VA's proposed rule may have the effect of barring VA benefits for more former servicemembers than Congress intended.  Topics raised included VA's use of the term "offense involving moral turpitude" and potential ambiguities therewith, whether VA's definition of "willful and persistent misconduct" is overly broad, and perceived inconsistencies between statutory bars to benefits and regulatory bars, specifically as pertained to periods of absence without leave.

STP specifically requested that VA consider removing 38 C.F.R. § 3.12(d)(5)—which currently bars benefits for former servicemembers discharged for homosexual acts involving aggravating circumstances or other factors affecting the performance of duty—in its entirety rather than simply replacing the word "homosexual" with "sexual," as called for in the proposed rule.  STP believes the provision would nonetheless disparately impact LGBT former servicemembers despite the proposed change.

STP expressed concern about VA's reliance on the Manual for Courts Martial.  The basis for this concern is that the outer limit of what someone could be charged with under the Manual for Courts Martial often is not what would be a realistic or fair handling of that case, so the outcome would be VA potentially treating certain conduct more severely than would be the case in the military justice system.

STP also voiced concerns with not applying the compelling circumstances exception to former servicemembers who have accepted an other than honorable discharge in lieu of trial by general court-martial.  STP believed that could expand eligibility disparities between branches of the Armed Forces, as certain branches may issue certain discharges more frequently than others.

STP inquired as to the level of coordination between VA and the Department of Defense (DoD) in drafting the proposed rule.  VA responded that DoD was involved as indicated in public hearing testimony but that there is no joint rulemaking agreement in place, largely because DoD's process for separating servicemembers serves a notably different purpose than VA's character of discharge determinations.

STP concluded the meeting with a number of other suggestions, which included improving the general structure of the regulation, clarifying the meaning of the phrase "other than honorable *or its equivalent*," and modifying the "benefit to the nation" language used in the "compelling circumstances" exception to certain regulatory bars.  STP also suggested adding sexual harassment, intimate partner violence, and discrimination as compelling circumstances that might mitigate misconduct under proposed new 38 C.F.R. § 3.12(e).

STP stated that it would follow up with detailed written comments documenting the concerns raised in the phone call.

# Exhibit G



**Office of the General Counsel**
Washington  DC  20420

In Reply Refer To:
022-62785

Alexander L. Stout
Latham & Watkins LLP
555 Eleventh St., N.W.
Suite 1000
Washington, D.C. 20004

Dear Mr. Stout,

Thank you for your July 8, 2022, letter regarding rulemaking RIN 2900-AQ95, Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge. As you note, the Department of Veterans Affairs (VA) issued a notice of proposed rulemaking on this matter in July 2020, published a request for information in September 2021 and conducted listening sessions in October 2021. Currently, VA is pursuing a decision regarding next steps, to include potential issuance of a final rule.

VA received a large number of comments and has been actively reviewing and addressing them. We are working to finish up this work as quickly as possible so we can move forward with the rulemaking activities, but we are not quite there. The team is working with a sense of urgency to get this across the finish line soon. I don't have a specific date to share with you, but I do want you to know that this is a priority for VA, and we are working to get it done as quickly as possible.

I appreciate your substantive input throughout this process. Thank you for all you do in support of our Nation's Veterans and their dependents.

Sincerely yours,

Catherine C. Mitrano
Acting General Counsel

# Exhibit H

**Krisch, Jonathan (OGC)**

| | |
|---|---|
| **From:** | Griffin, Brian D. (OGC) |
| **Sent:** | Thursday, June 15, 2023 5:59 PM |
| **To:** | 'Alex Stout' |
| **Cc:** | Matthew.Murchison@lw.com; Mohini.Rarrick@lw.com |
| **Subject:** | RE: AQ95 status request |

Alex,

Thank you for reaching out. VA is continuing to work through the governance process for AQ95. VBA plans to brief its suggested approach internally in the coming weeks. If approved, VBA will move forward with a final rule for AQ95 as promptly as possible. We note that addressing cost issues is a significant component of this rulemaking process and the recent Administrative Pay-As-You-Go Act of 2023 may impact the speed of this process.

As you may know, since the October 2021 listening sessions, we've continued to engage with Character of Discharge issues. In November 2021, VA hosted an Other than Honorable Discharge Summit, which included participation across VA Central Office, VBA, VHA, and DoD. In January 2022, VA attended the Air Force Board of Correction of Military Records conference.

As you may imagine, the enactment of the PACT Act in August of 2022 created a lot of new law for VA to operationalize. The Character of Discharge issue remains a priority for VA and we are working with a sense of urgency to get AQ95 across the finish line. Thank you for continuing to work with us on this matter.

-Brian

# Exhibit I

**Krisch, Jonathan (OGC)**



**From:** Hipolit, Richard (OGC)
**Sent:** Tuesday, September 19, 2023 10:59 AM
**To:** PaulW@nvlsp.org; mblecker@stp-sf.org
**Subject:** FW: AQ95 Meeting Request


Mr. Wright and Mr. Blecker,


This is in response to your inquiry asking for a meeting with Secretary McDonough to discuss VA's rulemaking concerning Character of Discharge.  Thank you for your e-mail and for continuing to reach out to us on this important matter.  Issuing a final rule that updates our Character of Discharge regulations and enables us to serve more former servicemembers remains a high priority for VA.  Please let me assure you we are working with a sense of urgency to issue a final rule as soon as practicable.  We greatly appreciate the information and insights provided in your petition and your inputs throughout this rulemaking process.  In the interest of ensuring prompt and orderly completion of this public rulemaking process, we respectfully decline a meeting at this time.  It is the Secretary's full intention to sign a final rule establishing updated and more equitable Character of Discharge regulations in the near future.


Thank you for your patience and for all that your organizations do in support of our Nation's Veterans and their dependents.


Richard J. Hipolit

Deputy General Counsel, Veterans Programs

Performing the Delegable Duties of the General Counsel